Frank Seddigh (SBN 289846)
fs@sedbetter.com
Alicia M. Veglia (SBN 291070)
av@sedbetter.com
SEDDIGH ARBETTER LLP
626 Wilshire Blvd., Ste. 410
Los Angeles, CA 90017
Tel (213) 816-0008
Fax (213) 816-0009

*Attorneys for Plaintiffs*
*William Frederick Durst; Limp Bizkit;*
*Flawless Records, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM FREDERICK DURST, an individual; LIMP BIZKIT; FLAWLESS RECORDS, LLC, a California limited liability company;<br><br>        Plaintiffs,<br><br>   vs.<br><br>UNIVERSAL MUSIC GROUP, INC., a Delaware corporation; and DOES 1 through 20, inclusive,<br><br>       Defendants. | Case No. 2:24-cv-08630<br><br>**COMPLAINT FOR:**<br>1. **RESCISSION**<br>2. **BREACH OF CONTRACT (RECORDING AGREEMENT)**<br>3. **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (RECORDING AGREEMENT)**<br>4. **BREACH OF CONTRACT (FLIP AGREEMENT)**<br>5. **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (FLIP AGREEMENT)**<br>6. **BREACH OF CONTRACT (FLAWLESS AGREEMENT)**<br>7. **BREACH OF COVENANT OF GOOD FAITH AND FAIR** |

1

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

**DEALING (FLAWLESS AGREEMENT)**
8. **BREACH OF FIDUCIARY DUTY**
9. **FRAUDULENT CONCEALMENT**
10. **INTENTIONAL MISREPRESENTATION**
11. **NEGLIGENT MISREPRESENATION**
12. **PROMISSORY FRAUD**
13. **ACCOUNTING**
14. **COPYRIGHT INFRINGEMENT**
15. **VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***
16. **DECLARATORY RELIEF RE COPYRIGHT RIGHTS**

**DEMAND FOR JURY TRIAL**

Plaintiffs William Frederick Durst ("Durst"), FLAWLESS RECORDS, LLC ("Flawless Records"), and LIMP BIZKIT (collectively, "Plaintiffs"), by and through their attorneys, hereby allege for their Complaint against Defendant UNIVERSAL MUSIC GROUP, INC. ("UMG" or "Defendant") as follows:

**PARTIES**

1.    Durst is an individual with his principal residence located in Los Angeles, California.

2.    Limp Bizkit is a musical artist. Durst is the controlling member of Limp Bizkit and has full authority to act on its behalf, including in the filing of this lawsuit.

_____
**COMPLAINT**

3.      Flawless Records is a California limited liability company with its principal place of business at 11812 San Vicente Blvd., 4th Floor, Los Angeles, CA 90049.

4.      Plaintiffs are informed and believe that UMG is, and at all relevant times was, a Delaware corporation with its principal place of business at 2220 Colorado Avenue in Santa Monica, California. Plaintiffs are informed and believe that UMG is the owner and operator of the record label "Interscope Records" and is its legal successor in interest.

5.      Plaintiffs are ignorant of the true names and capacities of the Defendants named herein as Does 1 through 20, inclusive. Plaintiffs are informed and believes, and thereon alleges, that Does 1 through 20 are liable, in whole or in part, for the claims asserted in this Complaint against the Defendants. When Plaintiffs learn the true identities and capacities of Does 1 through 20, they will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 20.

6.      At all times material to the allegations herein each Defendant was an agent and/or employee of each of the remaining Defendants, and in doing the acts alleged herein, each of the Defendants was acting within the course and scope of such agency or employment and with the permission and consent of the other Defendants. Plaintiffs are further informed and believes that in doing the acts alleged herein, each of the Defendants was acting in concert with each of the other Defendants.

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over UMG. On information and belief, UMG's principal place of business is located in this District.

8.      UMG has transacted business in this District, contracted to supply goods or services in this District directly or through its agents, has offered for sale, sold and/or advertised its products and services in this District.

9.      This action is for copyright infringement, in violation of the law of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 (a) and (b) in that the case arises under the laws of the United States pursuant to the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). The federal and state claims alleged herein are so related that they form part of the same case or controversy.

11.     Venue is properly asserted in this District pursuant to 28 U.S.C. 1391(b)(1) or 28 U.S.C. 1400(a) because UMG resides in this District, and  28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims  herein  arose  in this District.

## **FACTUAL ALLEGATIONS**

12.     Durst is the lead member of the influential rock band Limp Bizkit. The band was nominated for three Grammys and is estimated to have sold in excess of 45 million records and record equivalents. Limp Bizkit saw the height of its popularly in the late 1990s and 2000s, a time during which Limp Bizkit sold millions of copies of each of its records and had many hit singles. However, in recent years, interest has grown in the band and it currently has millions of streaming users per month on Spotify alone. Year-to-date in 2024, Limp Bizkit has over 450 million streams, and is on track to have over 793 million streams by the end of 2024. Indeed, starting around 2017-2018, interest in Limp Bizkit began to increase exponentially, and the band went from having a relatively quiet period during the 2010s to exploding in popularity. Currently, the band is selling out arenas and headlining major festivals—without producing any new music.

_____

13.     The performance of Limp Bizkit's assets has been on a consistent and substantial upward trend, seeing approximately 68% growth the past year alone. Prior to that, the band's assets have been steadily growing approximately 30-40% each year, again despite the fact that the band has not released any new music. Despite this tremendous "come back," the band had still not been paid a single cent by UMG in any royalties until taking action against UMG, leading one to ask how on earth that could possibly be true.

14.     UMG—one of the biggest record companies in the world—holds itself out as a pro-artist company that fights for the rights of artists and "provide[s] the most creative and commercial opportunities possible."[1]  UMG also claims that its "ongoing investment in our royalty reporting systems allows us to provide detailed royalty data to our artists, along with many other significant features including proprietary reporting, search capabilities and trend analysis."[2] As set forth herein, Plaintiffs have discovered that, contrary to these claims, not only did UMG never have any intention of paying Plaintiffs, it designed and implemented royalty software and systems that were deliberately designed to conceal artists' (including Plaintiffs') royalties and keep those profits for itself. On information and belief, Plaintiffs' discovery of UMG's design flaw in its royalty software is systemic and affects not only Plaintiffs but possibly hundreds of other artists who have unfairly had their royalties wrongfully withheld for years. UMG's creation of such a system, while holding itself out as a company that prides itself on investing in and protecting its artists, makes Plaintiffs' discovery of UMG's scheme all the more appalling and unsettling.

15.     On December 1, 2000, Limp Bizkit and Interscope Records entered into a recording agreement related to the creation and recording of musical albums

---

[1] Overview, For UMG Artists, *available at* https://www.universalmusic.com/for-umg-artists/ (last accessed September 12, 2024).

[2] *Id.*

**COMPLAINT**

by Limp Bizkit (the "<u>Recording Agreement</u>"). A true and correct copy of the Recording Agreement is attached hereto as <u>Exhibit A</u> and incorporated by reference. Prior to entering into the Recording Agreement, UMG (via Interscope Records) was the successor in interest to recording agreements between Limp Bizkit and Flip Records, Inc. ("<u>Flip Records</u>"), which dated back to July, 1996 ("<u>Flip Agreement</u>"), a copy of which is attached hereto as <u>Exhibit B</u> and incorporated by reference.

16.     Under the original Flip Agreement, Limp Bizkit agreed to author, create and record musical albums, and Flip Records agreed to pay the cost of such recording, and sell and distribute such albums. Flip Records and Limp Bizkit further agreed that Flip Records would pay Limp Bizkit fifty percent (50%) of the Net Profits from the sale and/or exploitation of the Masters under the Flip Agreement. (Exh. B, par. 7.) The Flip Agreement also provided that Flip Records "shall set up two separate accounts for the calculation of Net Profits: one for the calculation of Net Profits in relation to the EP and the First Album and one for the calculation of Net Profits in relation to the Second Album (i.e. Costs incurred in connection with the EP and the First Album shall only be deducted from Proceeds derived from the exploitation of the EP and the First Album and costs incurred in connection with the Second Album shall only be deducted from Proceeds derived from the exploitation of the Second Album.") (Exh. C, par. 7(c).)

17.     Flip Records agreed to conduct bi-annual accountings of such Net Profits and pay Limp Bizkit its share within ninety (90) days of such accounting. (Exh. B, par. 8(a).) Flip Records agreed that "each such payment shall be accompanied by a statement setting forth in reasonable detail the computation of the amount thereof."  (Exh. B, par. 8(a).) Flip Records further agreed to maintain "true and accurate books of account concerning the sales and exploitation of Records hereunder, the receipt of Proceeds and the deductions therefrom in the calculation of Net Profits." (Exh. B, par. 8(c).)

_____
**COMPLAINT**

18.    In or around approximately September 1996, Limp Bizkit and Flip Records entered into an amendment of the Flip Agreement ("Flip Amendment I"), attached hereto as Exhibit C and incorporated by reference. Among other things, the Flip Amendment I converted the EP to an Album, increased the Advances payable to the band, and provided that Flip Records "shall set up two separate accounts for the calculation of Net Profits: one for the calculation of Net Profits in relation to the Converted Album and the First Album and one for the calculation of Net Profits in relation to the Second Album (i.e. Costs incurred in connection with the Converted Album and the First Album shall only be deducted from Proceeds derived from the exploitation of the Converted Album and the First Album and costs incurred in connection with the Second Album shall only be deducted from Proceeds derived from the exploitation of the Second Album)." (Exh. C, par. 6(c).)

19.    In or around approximately December 1996, Limp Bizkit and Flip Records entered into another amendment of the Flip Agreement ("Flip Amendment II"), a copy of which is attached hereto as Exhibit D and incorporated by reference. The Flip Amendment II, *inter alia*, provided Flip Records with an additional option period, and required Limp Bizkit to produce more records during such option periods. The Flip Amendment II also changed Limp Bizkit's compensation— instead of receiving fifty percent (50%) of Net Profits, the band would now primarily receive royalties as set forth therein (although some exploitations resulted in a split of net receipts), and the band would also receive certain Advances as provided therein. (Exh. D, par. 6, 7.) The Flip Amendment II provided that "all monies paid by Flip to you during the term of this agreement, except royalties or your share of net receipts or credits, as applicable, paid pursuant to sections 7, 9, and 21, will constitute recoupable non-returnable advances." (Exh. D, par, 6(c).) The Flip Amendment II provided that Flip Records would pay Limp Bizkit an Advance for each Commitment Album "in the amount by which the applicable sum

7

1 indicated below ("Recording Fund") exceeds the Recording Costs (including
2 reasonably anticipated Recording Costs not yet paid or billed) for such commitment
3 Album." (Exh. D, par. 6(d).) The Recording Funds were subject to minimum and
4 maximum amounts that ranged from a minimum of $325,000 to a maximum of
5 $800,000. (Exh. D, par. 6(d)(1)(A)(III).)

6     20.   Limp Bizkit and Interscope Records (as successor-in-interest to Flip
7 Records) entered into a third amendment to the Flip Agreement, in or around
8 October 15, 1999 ("<u>Flip Amendment III</u>"), a copy of which is attached hereto as
9 <u>Exhibit E</u> and incorporated by reference.  Among other things, the Flip Amendment
10 III provided Limp Bizkit with additional monetary consideration, including an
11 Execution Advance of $7 million, and gave Interscope further option periods. The
12 Flip Amendment III also increased the Recording Fund for the band's Third Album
13 to two million dollars, subject to increase in the event that record sales of the band's
14 album "Significant Other" exceeded sales of five or six million units.

15     21.   None of Flip Amendment I, Flip Amendment II or Flip Amendment
16 III altered Flip Records' obligations with respect to accounting, payment, and record
17 keeping under paragraph 8 of the Flip Agreement.

18     22.   By the time that Limp Bizkit entered into the Recording Agreement, it
19 had already released its first three albums ("LPs 1-3") pursuant to the Flip
20 Agreement, as amended. Each of those albums sold millions of records and remain
21 Limp Bizkit's highest selling albums. Although UMG was the successor-in-interest
22 to the Flip Agreement, the parties entered into a new agreement, the Recording
23 Agreement, which terminated and replaced the Flip Agreement, except to the extent
24 that UMG was obligated to continue paying the band royalties or other amounts
25 under the Flip Agreement.[3]

26 _____

27 [3] Flip Records sold fifty percent (50%) of its share in royalties under the Flip Agreement to UMG, and UMG became the successor-in-interest under the Flip Agreement, and became responsible for calculating and paying royalties to Limp Bizkit and Durst, as well as to Flip Records, on an

**COMPLAINT**

23.     Under the Recording Agreement, Limp Bizkit was engaged as a musical artist to compose, make and record Master Recordings, which Limp Bizkit caused to be produced and delivered to UMG. (Exh. A, par. 2.01(a).) Limp Bizkit had the right to select and hire producers of its Master Recordings. (Exh. A, par. 2.02(a).) Interscope was not allowed to assign its own producer(s) unless specifically consented to by Limp Bizkit. (Exh. A, par. 2.01(b).)

24.     The Recording Agreement provided that Limp Bizkit and Interscope were required to agree, prior to recording, on the selection of producer, selection of material (including the number of Compositions to be recorded), selection of dates of recording and studios (including the cost), and a proposed budget. (Exh. A, par. 4.01(a).)

25.     The Recording Agreement provides that all "Recording Costs" constitute "Advances" and will be paid by Limp Bizkit (or recouped by UMG). (Exh. A, par. 5.02(a).) All payments other than royalties are deemed Advances. (Exh. A, par. 6.01.) Advances were subject to certain deductions. (Exh. A, par. 6.02.) UMG also agreed to provide Limp Bizkit with annual payments, ranging from nine thousand to twelve thousand dollars per year, split amongst all band members, which was also subject to certain deductions. (Exh. A, par. 6.04(a) – (c).) Article 9 of the Recording Agreement outlines the royalties owed by UMG to Limp Bizkit, which in some cases was a share in net receipts.

26.     The Recording Agreement requires UMG to compute Limp Bizkit's royalties bi-annually for any period in which there "are sales or returns of Records or any other transactions on which royalties are payable to you". (Exh. A, par. 11.01.) Within three months of such computation, UMG is also required to send a royalty statement, and pay such royalties due "after deducting unrecouped

_____

ongoing basis. To this day, Flip Records maintains a fifty percent (50%) share of net profits that it shares with UMG related to Limp Bizkit's Master Recordings under the Flip Agreement.

**COMPLAINT**

1    Advances and chargeable costs under this Agreement paid or incurred during or

2    prior to the accounting period in question" (*Id.*)

3        27.    UMG was required to maintain books and records reporting the sales

4    or other exploitations of the records under the Recording Agreement for calculating

5    royalties and "charges to your royalty account." (Exh. A, par. 11.03.)

6        28.    On June 28, 1999, Flawless Records (as successor-in-interest to Fred

7    Durst, Inc.) [4] and UMG (as successor-in-interest to Interscope Records) entered into

8    a First Look Agreement (the "<u>Flawless Agreement</u>"), whereby Flawless Records

9    agreed to provide A&R, producer, and related services to UMG. The Flawless

10   Agreement was amended on June 28, 2001 (the "<u>2001 Amendment</u>"). A true and

11   correct copy of the Flawless Agreement (including the 2001 Amendment) is

12   attached hereto as <u>Exhibit F</u> and incorporated by reference.

13       29.    Plaintiff Durst is the 100% owner of Flawless Records.

14       30.    Pursuant to the Flawless Agreement, Durst was tasked with finding,

15   signing, and producing new bands to his "Flawless Records" imprint on Interscope

16   Records. The Flawless Agreement provides, *inter alia*, that Durst (via Flawless

17   Records) would share in fifty percent (50%) of the profits generated by the new

18   artists signed to Flawless Records. (Exh. F, 2001 Amendment, par. 11.). However,

19   the profit sharing split for certain existing agreements with artists, including Puddle

20   of Mudd, was twenty-five percent (25%) to Flawless Records, in lieu of any

21   advances under agreements related to those artists, and seventy-five percent (75%)

22   to UMG. (Exh. F, 2001 Amendment, par. 14(2A(a)(i).)

23       31.    The Flawless Agreement also provides that Flawless Records owned

24   twenty-five percent (25%) of all Master Recordings, Website Material, ECD

25   _____

26   [4] Although the Flawless Agreement references "Flawless Records, Inc." as well as Flawless
     Records, LLC, Durst is only the owner of the latter entity, and has no affiliation with "Flawless
27   Records, Inc." Thus, any reference to the corporate entity appears to be in error, and Flawless
     Records, LLC is the only relevant entity at issue in this lawsuit.

_____
**COMPLAINT**

Material, Album Artwork, and any other Materials, in perpetuity, and that UMG owned seventy-five percent (75%), for artists on the Flawless Record label, including Puddle of Mudd. (Exh. F, 2001 Amendment, par. 14(2A(a)(ii).)

32.    Like the Recording Agreement, the Flawless Agreement required UMG to calculate and compute royalties and profit shares owed to Flawless and to send bi-annual written statements showing the profit share and any other royalties earned by Flawless Records, as well as the deductions for "advances and charges under this agreement". (Exh. F, 2001 Amendment, par. 14(5(c)(i).)

33.    UMG was also required to maintain books and records reporting the sales and exploitations of all records subject to profit sharing or for which any other royalties were owed to Flawless Records. (Exh. F, 2001 Amendment, par. 14(5(c)(ii).) The Flawless Agreement also provided Flawless Records with certain accounting and audit rights. (Exh. F, 2001 Amendment, par. 14(5(c)(ii)-(iii).)

34.    UMG is the owner and operator of Interscope Records. Plaintiffs are informed and believe that the entity that executed the Recording Agreement on behalf of Interscope Records (Interscope Records, a California general partnership) is no longer in existence, and that UMG is the legal successor in interest to that entity.

35.    In or around early April 2024, Durst retained new representation and explained that he had not received any money for any Limp Bizkit exploitations—*ever*. Durst's representatives were shocked because they were aware of Limp Bizkit's phenomenal increase in popularity over the past several years. Not only that, Durst was informed by the prior owner of Flip Records that Flip Records was receiving millions of dollars in recent years on Limp Bizkit assets, and that the amounts that Flip Records was getting from UMG had grown exponentially over the past few years, as interest in the band was renewed. Knowing that UMG knew that revenues had exploded since they were paying exponentially more and more to

their label partner Flip Records, Durst and his representatives started to look for Durst's royalty statements from UMG and couldn't find any. Durst explained that he had been informed by UMG that he had not received any royalty statements because UMG told him over the years that it was not required to provide them since his account was still so far from recoupment. Durst's representatives, suspicious that UMG was wrongfully claiming Plaintiffs' accounts were unrecouped, suggested investigating further.

36.     Plaintiffs were also suspicious because UMG had recently reached out to Plaintiffs several times regarding new exploitations of the Limp Bizkit assets— but Plaintiffs had still not been paid any royalties. For example, beginning in or around May 30, 2023, UMG reached out to Durst to get his approval related to reissuing "Chocolate Starfish and the Hot Dog Flavored Water" on vinyl, and for UMG's plans for a "big anniversary" for the following year. UMG also sought approval for an "Americana Remix" of the Limp Bizkit single "Behind Blue Eyes" on September 13, 2023. In February – April, 2024, UMG repeatedly asked Durst to get involved with the 25th anniversary re-release of Limp Bizkit's album "Significant Other", which would include new songs, artwork, and other assets. On April 2, 2024, Durst replied that he did not approve any "new art, new tracks, unreleased tracks, new versions of songs, new mastering, or remixes, etc." because it seemed like a "money grab" that would only benefit UMG, as Plaintiffs had not seen a dime in royalties on any Limp Bizkit assets at that point. The fact that UMG had sought to exploit Limp Bizkit's assets shows that they knew that they would generate significant revenues due to the band's newly reignited popularity. Thus, UMG knew that, although Limp Bizkit's assets were generating millions in income for UMG and Flip Records, and could be further exploited to generate even more, that UMG had still never paid Limp Bizkit a cent in royalties on any of those assets.

**COMPLAINT**

37.    On or about April 9, 2024, Plaintiffs' business managers contacted UMG, stating that they had not received any royalty statements from UMG, and requested access to UMG's portal to view them. Once Plaintiffs' business managers were able to access the UMG portal, they noticed that one of Limp Bizkit's accounts had a balance due of $679,942.00, and another Limp Bizkit account had a balance due of $358,379.87. When Plaintiffs' business managers inquired how to get these amounts immediately paid, UMG responded on May 22, 2024 that they needed to "create a royalty vendor for Limp Bizkit," and requested that they fill out various forms (such as a W9) and provide bank verification. Upon information and belief, UMG had never previously set up Plaintiffs as payees because it had no intention of actually paying them. Indeed, according to UMG's royalty statements, Plaintiffs' accounts had been payable starting in 2019, and then fraudulently reclassified as "unrecouped" to prevent payment. Had Plaintiffs not discovered this fraud, Plaintiffs have every reason to believe that UMG would have found a way to fraudulently turn its positive accounts back into negative "unrecouped" accounts, as it had done in the past, to continue to avoid its payment obligations in perpetuity. Had UMG intended to actually make payment to Plaintiffs from the beginning, it should have obtained standard documents like W9s much sooner or used ones that it already had from when UMG paid Plaintiffs advances in the past. The fact that UMG allegedly needed new information for people it had paid advances before is highly suspicious, and suggests this was either a delay tactic or that something in UMG's system wrongfully shut Plaintiffs down as payees.

38.    UMG did not explain why it failed to alert Limp Bizkit that it had over $1 million sitting with UMG that was payable to Limp Bizkit, why UMG had never even obtained the documents and forms it allegedly needed in order to actually make these payments, or why UMG could not use the documents already in their possession that it had used to pay Plaintiffs advances in the past.

_____
**COMPLAINT**

39.     As a result, Plaintiffs began to suspect whether UMG had failed to make payments with respect to other accounts, and began to question UMG's accounting and payment practices. Thus, Plaintiffs decided to conduct a review of their royalty statements.

40.     In reviewing the documents Plaintiffs had access to, they discovered that UMG had not provided a detailed accounting of its alleged recoupment costs, had claimed recoupment costs for an extraordinarily long time, and had failed to issue any royalty statements at all for certain periods, including those during which Limp Bizkit was selling millions of albums. Even if an account was in recoupment, UMG was still required to account to Plaintiffs during those periods, and UMG's statements to Plaintiffs that UMG was not required to provide Plaintiffs with statements because the account was so unrecouped were material misstatements. Indeed,  this is belied by the fact that UMG did in fact prepare many accounting statements during periods in which the accounts were in recoupment. Apparently, UMG just never provided those statements to Plaintiffs until now.

41.     UMG failed to issue any royalty statements for a number of accounting periods, including those during the height of Limp Bizkit's fame that likely generated significant sales and/or royalties. By way of example only, Plaintiffs have found that UMG failed to issue any royalty statements for the following periods for Limp Bizkit's "LP 1-3": Q4 1997-Q4 2004; Q4 2005-Q2 2006; Q2 2010; Q2 2011-Q4 2011; Q2 2013-Q2 2014; Q2 2015. UMG did generate royalty statements during several other periods which showed that the account was unrecouped until 2018. Plaintiffs did not receive any such statements until April 2024.

42.     Limp Bizkit's "LP 1-3" includes the band's first three and most successful records, which were released between 1997 – 2000. Limp Bizkit's third album, titled "Chocolate Starfish and the Hot Dog Flavored Water," was released

on October 17, 2000, and sold 1,055,000 copies in the first week after its release.[5] Only twenty four albums have achieved this feat and sold over 1 million copies in their first week.[6] The album quickly hit No. 1 on the Billboard chart, and became "the first rock record ever to sell a million copies in a single week."[7] Limp Bizkit's first and second albums also sold several million records each.

43.     Thus, UMG's failure to issue royalty statements in particular from 1997-2004—the height of the band's fame and during periods in which they made record-breaking sales—with respect to its most popular albums suggests that UMG was intentionally concealing the true amount of sales, and therefore royalties, due and owing to Limp Bizkit in order to unfairly keep those profits for itself.

44.     Further, on the royalty statements that UMG did provide, they show an "unrecouped" balance until Q4 2018 on Limp Bizkit's LP 1-3. It is highly suspect that UMG could claim unrecouped balances on all of these three albums until the end of 2018, and then proceed to pay Limp Bizkit paltry sums that are suspected to be only a fraction of what is truly owed, given that these albums had each sold millions of records over the past decades and are the band's best-selling albums with a number of hit singles. Not only that, Defendants' royalty statements failed to comport with Limp Bizkit's massive explosion in popularity over the past five or so years, during which the band's original recordings have generated millions in revenues, and should be generating the same in royalties to the band.

---

[5] *See Only 24 albums in history have sold 1 million copies in a single week — here they all are*, Business Insider, available at https://www.businessinsider.com/best-selling-albums-all-time-one-week-2021-10#7-chocolate-starfish-and-the-hot-dog-flavored-water-by-limp-bizkit-7 (last accessed, September 11, 2024)

[6] *Id.*

[7] *Limp Bizkit's Sales Record*, ABC News, October 25, 2000, available at https://abcnews.go.com/Entertainment/story?id=114143&page=1 (last accessed September 11, 2024).

**COMPLAINT**

45.    Similarly, the UMG statements showed that Limp Bizkit's "Greatest Hitz" album did not generate any positive royalties payable to the band, and was still showing unrecouped losses, until as recently as Q4 2022, and UMG failed to provide any royalty statements in 2006, 2008, and from 2012-2021. The Q4 2022 statement shows the first positive royalty balance of $12,375.06. Again, this is highly suspicious, given that the album was first released in 2005.

46.    UMG also failed to provide any royalty statements for Limp Bizkit's fourth album, released in 2003, from 2003-2006, 2007-2008, 2009, 2011, and 2013. This record was also a Platinum-selling album, and UMG's failure to provide royalty statements particularly in the years surrounding the album's release again suggests that UMG is intentionally concealing its profits and depriving Plaintiffs of their royalties.

47.    Plaintiffs also discovered that UMG failed to provide them with royalty statements relating to music videos utilizing the Master Recordings during significant periods of time, for which they are also entitled royalties. By way of example only, UMG failed to issue royalty statements for music videos for Limp Bizkit's videos from its first 4 albums until 2005 or 2006, at the earliest. Again, the videos would have been released during the height of the band's fame between 1997-2003, meaning that UMG's failure to produce royalty statements covering those years suggests that UMG was intentionally concealing the true royalties in relation to those assets. These royalties were also likely to be significant, as MTV and music videos were also at the zenith of their popularity in this era.

48.    Plaintiffs have also discovered fraudulent accounting practices reflected in Limp Bizkit's royalty statements. For example, the account for Limp Bizkit's "LP 4 Video" shows a balance payable beginning in Q2 2020 that grew to $176,470.05 by Q2 2022. However, in the statement for Q4 2022, the account shows that it is "unrecouped" by $186,549.65. The statement does not explain how this

account was in the positive, and then suddenly in the negative, or what the charged recoupment was for. The statement shows that, of the $176,470.05 positive balance, UMG then overdrafted the account by transferring "-376,146.05" to the account for Limp Bizkit's LP 4 video, recognized $13,126.35 of earnings, and thereby generated the allegedly "unrecouped" balance of $186,549.65. But where did this additional $199,676.00 charged to the account come from? It seems to have come out of thin air to overdraft Limp Bizkit's due and payable account in order to defraud Limp Bizkit and show an unrecouped account, when in reality it had been in the positive since Q2 2020, and there was no reason that additional recoupments should have been charged to that account.

49.    Similarly, the account for Limp Bizkit's "LP 4" record showed a positive payable balance from Q4 2019 to Q4 2021, at which point UMG again overdrafted the account and transferred an amount that exceeded the available funds to another Limp Bizkit account to show the LP 4 account as allegedly "unrecouped," when in fact it had a positive, payable balance for over two years.

50.    UMG never alerted Limp Bizkit or Durst about the positive balances in these accounts, or sought to make payment of the payments in the accounts, despite the fact that the accounts showed a payable balance for two years. Moreover, UMG's accounting practice of overdrafting these accounts, without any idea where the additional charges came from or back up to show their validity, was fraudulent and intentionally designed to show the Limp Bizkit accounts as all unrecouped, when in fact they were not. The addition of unsubstantiated costs in these overdrafts is also fraudulent since they have no legitimate basis in fact.

51.    Likewise, UMG had failed to pay Flawless Records any of the profit share income or royalties owed under the Flawless Agreement, despite the fact that Flawless Records had signed a number of artists, including the commercially successful bands Puddle of Mudd, She Wants Revenge, and several others, and

failed to provide Flawless Records with accounting statements for its profit share. Despite repeated requests, Plaintiffs have still not received any profit share accounting statements for Flawless Records since 2008.

52.     On July 15, 2024, counsel for Plaintiffs sent a letter to UMG alleging that UMG had grossly underpaid Plaintiffs with respect to their royalties, had failed to provide accurate royalty statements for all periods in which there were sales of any albums, and apparently had seemed to design a royalty system that systematically prevented artists from being paid their royalties. Plaintiffs demanded immediate payment, provision of documents, and return of the Limp Bizkit Master Recordings.

53.     In or around the days after Plaintiffs' counsel sent the July 15, 2024 letter, Plaintiffs' manager had a telephone conversation with UMG's SVP of Business Affairs, Jason Kanejsza. During this phone call, Mr. Kanejsza claimed that the non-payment of Plaintiffs' royalties as alleged in the letter was a "one-off mistake" due to an error with UMG's new software. He was apologetic over what he considered an "egregious" and "embarrassing" alleged mistake. However, when questioned about how an allegedly one-off mistake could happen to two completely separate accounts (i.e. Limp Bizkit and Flawless Records), Mr. Kanejsza was not able to offer any logical explanation.

54.     On July 26, 2024, UMG's agent Scott Bauman responded to Plaintiffs' letter, claiming that it paid Limp Bizkit "approximately $43 million" in recoupable "advances" "over the years", which is why the account only recently began paying the band any royalties. UMG did not provide any back-up for this alleged amount, and did not provide Plaintiffs with any of the missing accounting records.

55.     With respect to Flawless Records, UMG claimed that the account remained unrecouped "for many years" but stated that "the account is now recouped and has a positive balance of approximately $2.3 million." UMG then directed

Flawless Records to fill out forms via UMG's portal and/or "help desk" in order to route payment to Flawless Records. Again, UMG did not provide any back-up for this alleged amount, and did not provide Plaintiffs with any of the missing accounting records.

56.     Notably, Flawless Records and Limp Bizkit are completely separate operations (although Durst is involved in both). There is no cross-collateralization or intermingling of these accounts, and they always have been completely separate at UMG and otherwise (i.e. they are legally and factually separate and distinct entities).

57.     UMG also failed to offer any explanation for its failure to notify Plaintiffs of these account balances, or why it had failed to set Plaintiffs up to receive payment in its system. Plaintiffs do not believe that they were not paid due to an allegedly "one-off" mistake or software issue, given the fact that there is no rational explanation for how this alleged mistake affected two completely separate accounts. On information and belief, Plaintiffs allege that Defendants' software and systems were intentionally designed to deprive Plaintiffs and potentially hundreds of other artists of their royalties and profits, and keep them in the dark about positive balances in their accounts.

58.     When UMG still had not sent payment, Plaintiffs inquired further. On August 16, 2024, UMG stated that "payment will be released within the next 1-2 weeks." However, since Plaintiffs sent their notice of breach on July 15, 2024, UMG had only thirty days to cure its material breach, and thus it had to make payment of all outstanding royalties, and provide all missing royalty statements, by no later than August 14, 2024, which it indisputably failed to do.

59.     Importantly, Section 19.07 of the Recording Agreement provides: "Neither party will be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by the other party of its material obligations,

unless the latter party has failed to remedy the breach within sixty (60) days following notice (except thirty (30) days with respect to payment by Interscope of any monies due hereunder)." (Exh. A, par. 19.07.) Thus, by shortening the cure period for breaches by Interscope for non-payment, the Recording Agreement recognizes that such breach is more material and severe than *any other kind of breach* under the Recording Agreement. Indeed, after Limp Bizkit finished creating and recording the albums it was required to under the Recording Agreement, calculation and payment of royalties was really UMG's only obligation under the Recording Agreement, and it utterly and materially breached that primary obligation.

60.     On August 24, 2024, Plaintiffs' attorneys emailed UMG's Mr. Bauman stating, among other things, that UMG had failed to cure the material breaches of the applicable agreements within 30 days, and failed to provide the requested documentation. The notice further provided that, as a result of such material breaches, the agreements are null and void, and any further distributions of the Master Recordings would constitute copyright infringement.

61.     On August 26, 2024 (more than 30 days after July 15, 2024), Limp Bizkit received $1,038,321.87 in back royalties from UMG. Prior to that date, Limp Bizkit *had never received any royalties from UMG*.

62.     On August 27, 2024 (more than 30 days after July 15, 2024), Flawless Records received $2,348,060 in back profit participation from UMG. Prior to that date, Flawless Records *had never received any profit sharing revenue from UMG*.

63.     On August 30, 2024, Mr. Bauman responded that UMG had (finally) paid Limp Bizkit and Flawless Records their outstanding royalties and profits. Mr. Bauman further denied that UMG owed a fiduciary duty to Plaintiffs and denied that Plaintiffs had the right to void or terminate the relevant agreements.

64.   As of the date of the filing of this Complaint, UMG has still failed to provide Plaintiffs with all of the missing royalty statements. It has been more than sixty (60) days since UMG was provided notice of the same, and has also failed to cure this material breach as well.

65.   Although Limp Bizkit and Flawless Records had completely separate royalty accounts with UMG, they appear to both have suffered from a critical, prejudicial, and essentially fraudulent design in UMG's system whereby artists are owed millions of dollars in royalties and yet know nothing about it. In both cases, UMG failed to alert Plaintiffs that they had a positive royalty account, and failed to obtain the allegedly necessary documents and/or forms required to make payment until after Plaintiffs had contacted UMG to inquire about their royalties. Indeed, if UMG had never set up the accounts to pay Limp Bizkit or Flawless Records, it seems obvious that UMG had no intention of ever making such payments, had Plaintiffs not taken action on their own and discovered these issues.

66.   UMG's system appears to be designed to bilk artists out of their rightful royalties by holding royalties due to artists in royalty accounts and failing to notify the artists that they have positive balances. Furthermore, UMG should have obtained all of the information necessary to make payment to Plaintiffs at the outset, not after Plaintiffs inquired about their account. Had Plaintiffs not made such an inquiry, UMG would still have control of over $3 million that rightfully belongs to Plaintiffs, with Plaintiffs having received no notice about it at all.

67.   Not only that, UMG's claim that Plaintiffs had aggregated unrecouped Advances "over the years" that only recently were recouped is misleading since the Flip Agreement required calculation of Advances paid via Recording Funds to be on a per-album basis, and thus UMG was required to provide Plaintiffs with statements showing the recoupment of such advances on a per-Album basis, not on an aggregated basis "over the years", with no back up. Given that Limp Bizkit's

1   first three albums had already sold several million copies by the early 2000s, the

2   Recording Funds and Costs should have been quickly recouped, and UMG should

3   have started paying royalties on those albums right away—not ***over twenty years***

4   later.

5        68.    Further, in reviewing the royalty statements that Plaintiffs do have

6   access to (which are incomplete), Plaintiffs have only been able to determine that

7   Defendants have charged $13,107,196.26 in recoupable costs and advances to Limp

8   Bizkit, which is far below the alleged $43 million that UMG claims constituted the

9   recoupable costs and advances charged to Limp Bizkit "over the years", offering

10   further support for Plaintiffs' allegations that UMG is and has been fraudulently

11   overstating the amount of recoupable costs applicable to Plaintiffs' accounts in

12   order to avoid paying them all of the royalties to which they are entitled. Because

13   Defendants have failed to substantiate the $43 million in recoupable costs, and the

14   documents in Plaintiffs' possession also do not substantiate those costs, Defendants

15   must produce documents through this litigation in order to do so and bear the burden

16   of proving the same. However, on information and belief, Plaintiffs allege that

17   Defendants will not be able to substantiate the $43 million figure because it is

18   grossly overinflated.

19        69.    For the avoidance of doubt, on September 30, 2024, Plaintiffs served

20   Defendants with a formal Notice of Rescission of the Flip Agreement, the

21   Recording Agreement, and the Flawless Agreement ("Rescission Notice") in

22   accordance with Cal. Civ. Code §§ 1688, 1689, 1691, a copy of which is attached

23   hereto as Exhibit G and incorporated by reference.

24        70.    As set forth in the Rescission Notice,  Limp Bizkit and Flawless

25   Records, as applicable, agree to restore to UMG everything of value which they

26   have received from UMG under the Flip Agreement, the Recording Agreement or

27   the Flawless Agreement, upon condition that the other party do likewise. However,

**COMPLAINT**

given the vast amounts of money collected by UMG in relation to sales of Limp Bizkit's and Flawless Records' albums over the years, and UMG's admission that it has now allegedly recouped more than $43 million in advances and other costs as to Limp Bizkit (which Plaintiffs allege is fraudulently overinflated), Plaintiffs estimate that the amount owed to them  following rescission of the Flip Agreement, the Recording Agreement, and the Flawless Agreement will far exceed any amounts received by Plaintiffs from UMG to date, and that UMG is liable to Plaintiffs for tens of millions of dollars in copyright infringement, if not more. Indeed, Plaintiffs allege that the amounts owed to them by UMG following the rescission of these agreements will easily surpass $200 million.

71.     Further, Plaintiffs allege that they are owed even more due to UMG's fraudulent calculation and provision of royalty statements, as alleged herein. Only upon a full accounting of UMG's books and records through discovery in this action can the parties understand their relative profits with relation to the exploitation of the Master Recordings. However, on information and belief, Plaintiffs allege that they have been grossly underpaid as a result of UMG's fraudulent practices.

72.     As a result of the Rescission Notice, the Flip Agreement, the Recording Agreement, and the Flawless Agreement were legally void *ab initio* as of September 30, 2024 at the latest, subject to the authority of the Court to award relief pursuant to Cal. Civ. Code § 1692 or otherwise. Because UMG has failed to accept the rescission, and has instead only continued its fraudulent actions, Plaintiffs have had no choice but to file the instant action to ask the Court to confirm the rescission of the Flip Agreement, the Recording Agreement, and the Flawless Agreement pursuant to Cal. Civ. Code § 1692, and to seek recovery for UMG's ongoing copyright infringement and other causes of action.

//

//

_____
**COMPLAINT**

## **FIRST CAUSE OF ACTION FOR RESCISSION**

### **(Against All Defendants)**

73.     Plaintiffs reallege and incorporate all of the above paragraphs as fully set forth herein.

74.     Plaintiffs bring this cause of action under Civil Code §§ 1688 et seq. and common law, including but not limited to *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 586 (9th Cir.1993) (recognizing that a material breach of licensing agreement justifies rescission, and that subsequent use constitutes copyright infringement.)

75.     Plaintiffs gave UMG proper notice of rescission in accord with Civil Code section 1691. See Exhibit G attached hereto and incorporated by reference.

76.     Plaintiffs seek the rescission of the Flip Agreement, the Recording Agreement, and the Flawless Agreement based on Defendants' material breaches of the Flip Agreement, the Recording Agreement, and the Flawless Agreement, fraud and contract against public policy.

77.     Defendants materially breached the Flip Agreement, the Recording Agreement, and the Flawless Agreement by failing to properly compute Plaintiffs' royalties or profits, failing to provide accurate royalty statements, failing to provide any royalty statements (particularly during Limp Bizkit's and Flawless Records' most successful periods), failing to notify Plaintiffs of positive royalty or profit balances, improperly (and fraudulently) calculating royalties, profits and recoupments, fraudulently showing Plaintiffs' accounts as "unrecouped" when in fact they were not, and failing to timely pay royalties and profits.

78.     These breaches were so material that they affect the very essence of the Flip Agreement, the Recording Agreement, and the Flawless Agreement and defeat the object of the parties under such agreements. Defendants' primary obligations under the Flip Agreement, the Recording Agreement, and the Flawless Agreement were the calculation, payment, and documentation of royalties and

24

profits. For example, Section 19.07 of the Recording Agreement recognizes that non-payment is a material breach of the same (subject to a shorter notice and cure period than any other breach), and authorizes injunctive relief. The preamble of the Recording Agreement also recognizes UMG's continuing obligation to pay royalties under the Flip Agreement.

79.    Nevertheless, Defendants failed to make *any* payments to Plaintiffs until August 26-27, 2024, which was after Plaintiffs discovered Defendants' fraud and demanded immediate payment.

80.    However, Defendants failed to timely cure such breach after Plaintiffs provided notice of the same. Moreover, Plaintiffs allege that the payments received on August 26-27, 2024 are only a fraction of what is actually owed due to Defendants' fraudulent accounting practices described herein.

81.    Given that Defendants claim that Plaintiffs were only entitled to royalties or profits and out of recoupment as recently as 2022, failed to notify Plaintiffs of positive royalties in their accounts totaling over $3 million for multiple years, failed to provide royalty or profit statements and accounting for Plaintiffs' best-selling albums during the height of their success, and failed to properly set up Plaintiffs to even receive payment in its system, it is clear that Defendants did not intend to make any royalty payments unless or until Plaintiffs took action on their own, and have implemented a system designed to prevent artists, including Plaintiffs, from obtaining their rightful royalties by default. This is in material breach of the Flip Agreement, the Recording Agreement, and the Flawless Agreement, and has wrongfully defrauded Plaintiffs out of millions of dollars of royalties and/or profits owed to them. As a result, Plaintiffs are entitled to rescind Flip Agreement, the Recording Agreement, and the Flawless Agreement. See *Rano, supra*, 987 F.2d at 586. Plaintiffs estimate that UMG owes Plaintiffs in excess of $200 million due to the rescission of these agreements.

_____
**COMPLAINT**

1

## **Fraud**

2       82.    Fraud is an affirmative misrepresentation, suppression, concealment or

3  nondisclosure of a fact, with knowledge of falsity; intent to defraud, i.e., to induce

4  reliance; justifiable reliance; and damages. *Engalla v. Permanente Medical Group,*

5  *Inc.* (1997) 15 Cal.4th 951, 973. However, a defrauded party seeking to rescind a

6  contract need not show pecuniary damages. *Id.* at 979. A contract is subject to

7  unilateral rescission by a party whose consent to the contract was obtained through

8  duress, fraud, or undue influence. (See Civil Code § 1689(b)(1).)

9       83.    Cal. Civ. Code § 1572 defines "Actual Fraud" as "any of the following

10 acts, committed by a party to the contract, or with his connivance, with intent to

11 deceive another party thereto, or to induce him to enter into the contract: . . . 3. The

12 suppression of that which is true, by one having knowledge or belief of the fact; . .

13 . 5. Any other act fitted to deceive."

14      84.    "Active concealment or suppression of facts by a nonfiduciary 'is the

15 equivalent of a false representation, i.e., actual fraud.'" *Vega v. Jones, Day, Reavis*

16 *& Pogue*, 121 Cal. App. 4th 282, 291, 17 Cal. Rptr. 3d 26, 32 (2004) (citation

17 omitted).

18      85.    As generally described herein (see, e.g., ¶¶ 35-71; 161-208),

19 Defendants suppressed, concealed and/or failed to disclose material facts to

20 Plaintiffs, including but not limited to, that Plaintiffs were entitled to royalties or

21 profits wrongfully withheld by Defendants, and that Defendants had no intention of

22 actually paying such royalties until Plaintiffs asserted their rights. Further,

23 Defendants provided Plaintiffs with fraudulent royalty or profit statements that

24 wrongfully overstated recoupment costs and understated royalties owed to

25 Plaintiffs. These statements also engaged in fraudulent accounting practices,

26 whereby UMG overdrew accounts with positive balances to show them as once

27 again allegedly "unrecouped", without any basis for doing so.

_____
**COMPLAINT**

1       86.    Further, Defendants fraudulently induced Plaintiffs into the Flip

2   Agreement, the Recording Agreement and the Flawless Agreement by luring them

3   in with promises to pay Plaintiffs significant amounts of royalties and profits,

4   without any intention of actually doing so. If Plaintiffs knew that Defendants never

5   intended to pay them this money, and instead would try to do everything they could

6   to prevent paying it, Plaintiffs obviously never would have signed these agreements

7   with them.

8       87.    Indeed, Defendants designed and implemented a system that

9   intentionally and wrongfully concealed Plaintiffs' positive royalty balances from

10   them by default, and such system was further built so that Plaintiffs were not

11   structured as payees who could receive payment, showing that Defendants never

12   actually intended to pay Plaintiffs. This system automatically works to the detriment

13   of Plaintiffs—and likely extends to many other artists—by withholding their

14   royalties and not even notifying them about positive royalties in their accounts for

15   years. Such systematic flaws show that Defendants intentionally designed this

16   system to attempt to avoid and/or delay paying royalties to artists for as long as

17   possible. Not only that, Defendants failed to provide Plaintiffs with royalty

18   statements for their best-selling albums during key periods of time (including but

19   not limited to 1997-2006), in order to conceal the true number of sales of records

20   and royalties generated during that time. Given that Plaintiffs sold millions of

21   records during this time period, Defendants' failure to provide royalty statements

22   during this period evidences fraudulent concealment intentionally designed to

23   prevent Plaintiffs from being paid their royalties. Not only that, the royalty

24   statements understate the royalties earned by Limp Bizkit in recent years, as the

25   band has seen an unprecedented rise in its popularity, and Flip Records has

26   acknowledged that it received exponentially larger profits from UMG in the past

27

several years. It seems the only people who are not profiting from this return to fame are Plaintiffs.

88.    Plaintiffs actually and justifiably relied on Defendants' concealment and nondisclosure.

89.    By providing Plaintiffs with fraudulent royalty statements, Defendants committed actual fraud. Cal. Civ. Code § 1572.

90.    Defendants also owed Plaintiffs a legal duty of disclosure because (i) Defendants had exclusive knowledge of material facts not known to the Plaintiffs; (ii) Defendants owed a fiduciary duty to Plaintiffs; and/or (iii) Defendants actively concealed a material fact from the Plaintiffs.  This duty to disclose arose from the fiduciary duty that Defendants owed Plaintiffs. Specifically, Defendants and Plaintiffs were joint venturers, and had a long (over 20 years) relationship that spanned numerous albums and bands. Mr. Durst even had his own imprint, Flawless Records, with Defendants, and the parties were clearly joint venturers, as they split the profits and even shared in the ownership of the master recordings under the Flawless Agreement. Not only that, Limp Bizkit had significant artistic and production control over the production of its master recordings under the Recording Agreement, and Mr. Durst and other members of Limp Bizkit also had solo recording agreements with Defendants. Thus, the relationship between the parties was long and vast, and shows that the parties were engaged in multiple joint ventures over the course of their relationship. As a result, Defendants owed Plaintiffs a fiduciary duty. Defendants, at a minimum, had a duty to act in utmost good faith towards Plaintiffs.

91.    Thus, Defendants were under a duty to accurately disclose Plaintiffs' royalties to them, and accurately calculate recoupment costs. Defendants were also under a duty to inform Plaintiffs that they had positive balances in their royalty

accounts and take all necessary actions to promptly pay such balances. Defendants also had a duty to act in Plaintiffs' best interests.

92. Defendants intended to fraudulently deceive Plaintiffs by concealing and/or misrepresenting these facts.

93. Plaintiffs justifiably relied on Defendants' concealment and/or misrepresentations.

94. Plaintiffs have been harmed to the extent that Defendants' fraudulent royalty statements have overinflated their recoupable costs and advances, and underreported Plaintiffs' royalties and profits due and owing to them. Defendants also fraudulently concealed from Plaintiffs that they had over $3 million in their royalty accounts by designing a system that intentionally failed to alert artists that they had payable royalties in their accounts and by failing to obtain the necessary forms and information which would allow Defendants to actually make payment to artists from the beginning. Defendants also concealed Plaintiffs' royalties from them by failing to provide royalty statements during the height of Plaintiffs' fame.

95. As a direct and proximate result of Defendants' fraudulent conduct and concealment, Plaintiffs seek rescission of the Flip Agreement, the Recording Agreement, and the Flawless Agreement and complete relief, and any consequential damages to which Plaintiffs are entitled and/or compensatory damages which justice may require, including disgorgement of profits. (See Civil Code §§ 1689(b)(1),1692.)

## **Violates Public Policy**

96. A contract is also subject to an action for rescission if the contract, or clauses within the contract, violates public policy or where its enforcement would be prejudicial to the public interest. (See Civil Code § 1689(b)(6).)

97. California has a public policy in favor of timely paying workers, including artists, all of their wages, compensation, and royalties. Defendants'

_____
**COMPLAINT**

actions, which have designed a system that automatically fails to alert artists that they have payable royalties and fails to set up payable accounts, unfairly delays paying artists and wrongfully requires them to inquire with Defendants to obtain their royalty payments. Even after Plaintiffs did so in this case, Defendants still failed to timely cure their breaches, and Plaintiffs allege that the payments made are only a small fraction of what is actually owed. It is certainly in the public's interest to ensure that artists are timely paid all royalties when due and require Defendants to build a system that automatically works in favor of paying artists, instead of automatically in favor of hiding and delaying their payments.

98.     Plaintiffs seek all available remedies, including but not limited to consequential damages and disgorgement of profits, in relation to their rescission of these agreements.

99.     The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

### [Recording Agreement]

### (Against All Defendants)

100.   Plaintiffs reallege and incorporate all of the above paragraphs as fully set forth herein.

101.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Recording Agreement, then as an alternative theory of recovery, they allege that Defendants breached the Recording Agreement as set forth herein.

102.   Limp Bizkit and UMG entered into a contract, described herein as the Recording Agreement, attached hereto as Exhibit A and incorporated by reference.

103.   Limp Bizkit has duly performed all of the conditions of the Recording Agreement required to be performed by Limp Bizkit and/or Limp Bizkit was

excused from doing those things based on Defendants' breaches of the Recording Agreement.

104. For all conditions required by the Recording Agreement for Defendants' performance, all such conditions occurred.

105. Defendants breached the Agreement by engaging in the acts described above, including but not limited to, failing to properly compute Limp Bizkit's and Durst's royalties, failing to provide accurate royalty statements, failing to notify Limp Bizkit and Durst of positive royalty balances, improperly (and fraudulently) calculating royalties and recoupments, failing to provide any royalty statements (particularly during Limp Bizkit's most successful periods), and failing to timely pay royalties.

106. Indeed, Defendants' most material obligation under the Recording Agreement at this point in time is paying royalties, which is why it is subject to a shorter cure period than all other breaches under Section 19.07 of the Recording Agreement. Defendants' obligation is to timely and accurately pay royalties, not to design and implement a system that frustrates their only material obligation.

107. Limp Bizkit and Durst have suffered and continues to suffer damages as a result of Defendants' breach of the Recording Agreement, in an exact amount to be proven at trial.

108. Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Limp Bizkit and Durst. Limp Bizkit and Durst have no adequate remedy at law for such wrongs and injuries. As a result, Limp Bizkit and Durst are entitled to an injunction restraining and enjoining Defendants from any further use, distribution or exploitation of the Master Recordings.

//

1

2

3

4

## THIRD CAUSE OF ACTION FOR BREACH OF IMPLIED COVENANT OF GOOD STANDING AND FAIR DEALING

### [Recording Agreement]

**(Against all Defendants)**

5

6

109.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

7

8

9

10

110.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Recording Agreement, then as an alternative theory of recovery, they allege that Defendants breached the duty of good faith and fair dealing in the Recording Agreement as set forth herein.

11

12

13

14

15

16

111.   The Recording Agreement includes an implied covenant of good faith and fair dealing between the respective parties. The implied covenant imposed on Defendants, under the Recording Agreement, a duty not to do anything to deprive Limp Bizkit and Durst of the benefits of the Recording Agreement, and to exercise good faith and honor the terms and obligations of the Recording Agreement, in performance and spirit.

17

18

19

112.   The conduct of Defendants described above unfairly interfered with Limp Bizkit's and Durst's right to receive the benefits of the Recording Agreement, constituting a breach of the implied covenant of good faith and fair dealing.

20

21

113.   Defendants' breach of the implied covenant of good faith and fair dealing harmed Limp Bizkit and Durst in an amount to be proven at trial.

22

23

24

## FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT

### [Flip Agreement]

**(Against All Defendants)**

25

26

114.   Plaintiffs reallege and incorporate all of the above paragraphs as fully set forth herein.

27

115.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Flip Agreement, then as an alternative theory of recovery, they allege that Defendants breached the Flip Agreement as set forth herein.

116.   Limp Bizkit and UMG (as successor-in-interest to Flip Records) entered into a contract, described herein as the Flip Agreement, including multiple amendments, attached hereto as Exhibits B – E, and incorporated by reference.

117.   Limp Bizkit has duly performed all of the conditions of the Flip Agreement required to be performed by Limp Bizkit and/or Limp Bizkit was excused from doing those things based on Defendants' breaches of the Flip Agreement.

118.   For all conditions required by the Flip Agreement for Defendants' performance, all such conditions occurred.

119.   Defendants breached the Agreement by engaging in the acts described above, including but not limited to, failing to properly compute Durst's and Limp Bizkit's royalties, failing to provide accurate royalty statements, failing to notify Durst and Limp Bizkit of positive royalty balances, improperly (and fraudulently) calculating royalties and recoupments, and failing to timely pay royalties.

120.   Limp Bizkit and Durst have suffered and continues to suffer damages as a result of Defendants' breach of the Flip Agreement, in an exact amount to be proven at trial.

121.   Defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Limp Bizkit and Durst. Limp Bizkit and Durst have no adequate remedy at law for such wrongs and injuries. As a result, Limp Bizkit and Durst are entitled to an injunction restraining and enjoining Defendants from any further use, distribution or exploitation of the Master Recordings.

1

**FIFTH CAUSE OF ACTION FOR BREACH OF IMPLIED COVENANT**

2

**OF GOOD STANDING AND FAIR DEALING**

3

**[Flip Agreement]**

4

**(Against all Defendants)**

5
6

122.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

7
8
9
10

123.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Flip Agreement, then as an alternative theory of recovery, they allege that Defendants breached the duty of good faith and fair dealing in the Flip Agreement as set forth herein.

11
12
13
14
15

124.   The Flip Agreement includes an implied covenant of good faith and fair dealing between the respective parties. The implied covenant imposed on Defendants, under the Flip Agreement, a duty not to do anything to deprive Limp Bizkit or Durst of the benefits of the Flip Agreement, and to exercise good faith and honor the terms and obligations of the Flip Agreement, in performance and spirit.

16
17
18

125.   The conduct of Defendants described above unfairly interfered with Limp Bizkit's and Durst's right to receive the benefits of the Flip Agreement, constituting a breach of the implied covenant of good faith and fair dealing.

19
20

126.   Defendants' breach of the implied covenant of good faith and fair dealing harmed Limp Bizkit and Durst in an amount to be proven at trial.

21

**SIXTH CAUSE OF ACTION FOR BREACH OF CONTRACT**

22

**[Flawless Agreement]**

23

**(Against All Defendants)**

24
25

127.   Plaintiffs reallege and incorporate all of the above paragraphs as fully set forth herein.

26

27

_____
**COMPLAINT**

128.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Flawless Agreement, then as an alternative theory of recovery, they allege that Defendants breached the Flawless Agreement as set forth herein.

129.   Flawless Records and Defendants entered into a contract, described herein as the Flawless Agreement, attached hereto as Exhibit F, and incorporated by reference.

130.   Flawless Records has duly performed all of the conditions of the Flawless Agreement required to be performed by Flawless Records and/or Flawless Records was excused from doing those things based on Defendants' breaches of the Flawless Agreement.

131.   For all conditions required by the Flawless Agreement for Defendants' performance, all such conditions occurred.

132.   Defendants breached the Flawless Agreement by engaging in the acts described above, including but not limited to, failing to properly compute Flawless Records' royalties and profit share, failing to provide accurate royalty and profit share statements, failing to provide any profit sharing statements,  failing to notify Flawless Records of positive royalty and profit share balances, improperly (and fraudulently) calculating profit shares, royalties and recoupments, and failing to timely pay royalties and profit shares.

133.   Flawless Records has suffered and continues to suffer damages as a result of Defendants' breach of the Flawless Agreement, in an exact amount to be proven at trial.

**SEVENTH CAUSE OF ACTION FOR BREACH OF IMPLIED COVENANT OF GOOD STANDING AND FAIR DEALING**

**[Flawless Agreement]**

**(Against all Defendants)**

_____

**COMPLAINT**

134.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

135.   In the event that this Court finds that Plaintiffs are not entitled to rescind the Flawless Agreement, then as an alternative theory of recovery, they allege that Defendants breached the duty of good faith and fair dealing in the Flawless Agreement as set forth herein.

136.   The Flawless Agreement includes an implied covenant of good faith and fair dealing between the respective parties. The implied covenant imposed on Defendants, under the Flawless Agreement with Flawless Records, a duty not to do anything to deprive Flawless Records of the benefits of the Flawless Agreement, and to exercise good faith and honor the terms and obligations of the Flawless Agreement, in performance and spirit.

137.   The conduct of Defendants described above unfairly interfered with Flawless Records' right to receive the benefits of the Agreement, constituting a breach of the implied covenant of good faith and fair dealing.

138.   Defendants' breach of the implied covenant of good faith and fair dealing harmed Flawless Records in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

139.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

140.   As set forth above, Plaintiffs and Defendants were joint venturers. Specifically, Defendants and Plaintiffs had a long (over 20 years) special relationship that spanned numerous albums and bands. Mr. Durst even had his own imprint, Flawless Records, with Defendants, and the parties were clearly joint venturers, as they split the profits and even shared in the ownership of the master recordings under the Flawless Agreement. The Flawless Agreement also fails to

_____
**COMPLAINT**

state that the parties are not joint venturers, and the rights afforded under that Agreement clearly show that the parties are in fact joint venturers. Not only that, Limp Bizkit had significant artistic and production control over the production of its master recordings under the Recording Agreement, and Mr. Durst and other members of Limp Bizkit also had solo recording agreements with Defendants. Thus, the relationship between the parties was long and vast, and shows that the parties were engaged in multiple joint ventures over the course of their relationship. As a result, Defendants owed Plaintiffs fiduciary duties.

141.   Defendants breached their fiduciary duties to Plaintiffs by engaging in the conduct described above, including but not limited to Defendants' concealment of material facts to Plaintiffs, including that Plaintiffs were entitled to royalties wrongfully withheld by Defendants, and that Defendants had no intention of actually paying such royalties until Plaintiffs asserted their rights. Further, Defendants breached their fiduciary duties by providing  Plaintiffs with fraudulent royalty and/or profit share statements that wrongfully overstated recoupment costs and understated royalties and/or profit shares owed to Plaintiffs. Defendants even used fraudulent accounting practices that overdrafted positive accounts to make them appear "unrecouped" without any justification to do so. Defendants also designed and implemented a system that intentionally and wrongfully concealed Plaintiffs' positive royalty and/or profit share balances from them by default, and such system was further built so that Plaintiffs were not structured as payees who could receive payment, showing that Defendants never actually intended to pay Plaintiffs. This system automatically works to the detriment of Plaintiffs by withholding their royalties and not even notifying them about positive royalties. Such systematic flaws show that Defendants intentionally designed this system to attempt to avoid and/or delay paying royalties to artists for as long as possible.

**COMPLAINT**

142.   Defendants' breach of their fiduciary duties harmed Plaintiffs in an amount to be proven at trial.

143.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm. The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## NINTH CAUSE OF ACTION FOR FRAUDULENT CONCEALMENT

### (Against All Defendants)

144.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

145.   As described above, Plaintiffs and Defendants were joint venturers, and had a long (over 20 year) relationship that spanned numerous bands and ventures, and was therefore a special relationship. As a result, Defendants owed Plaintiffs fiduciary duties.

146.   As generally described herein, Defendants suppressed, concealed and/or failed to disclose material facts to Plaintiffs, including, but not limited to, that Plaintiffs were entitled to royalties wrongfully withheld by Defendants, and that Defendants had no intention of actually paying such royalties until Plaintiffs asserted their rights.

147.   Despite repeated requests made by Plaintiffs' agents, Defendants have failed to deliver to Plaintiffs numerous accounting statements, with gaps for years that would have significantly enhanced revenue, intentionally concealing material facts regarding the actual gross sales/receipts, recoupable costs, expenses royalty calculation and/or profits owed to Plaintiffs, namely from 1997-2004, when Plaintiffs made the majority of sales and released several best-selling albums.

148.   In the accounting statements that Defendants did deliver to Plaintiffs, Defendants intentionally concealed and/or omitted material facts that were known

only to Defendants and that Plaintiffs could not have reasonably discovered. For example, Plaintiffs learned only in May 2024, following their inquiry to UMG regarding its failure to send a royalty statement, that Plaintiffs had positive balances in their royalty accounts totaling over $3 million, collectively. These positive balances had never otherwise been reported to Plaintiffs, and Defendants did not reveal that these balances existed until Plaintiffs inquired about missing royalties and statements.

149. Defendants also made statements designed to conceal their fraud, including the statements made by UMG's SVP of Business Affairs, Jason Kanejsza, claiming that UMG's failure to pay Plaintiffs' royalties was a one-off mistake due to an error with UMG's new software. On information and belief, these statements were made in an attempt to placate Plaintiffs and prevent them from further discovering the extent of Defendants' fraud.

150. Plaintiffs also allege that Defendants concealed and/or intentionally misrepresented facts related to the calculation of Plaintiffs' royalties, profit share and/or recoupments. Defendants also designed and implemented a system that intentionally and wrongfully concealed Plaintiffs' positive royalty balances from them by default, and such system was further built so that Plaintiffs were not structured as payees who could receive payment, showing that Defendants never actually intended to pay Plaintiffs. This system automatically works to the detriment of Plaintiffs by withholding their royalties and not even notifying them about positive royalties. Such systematic flaws show that Defendants intentionally designed this system to attempt to avoid and/or delay paying royalties to artists for as long as possible. On information and belief, Plaintiffs are not the only artists to suffer from Defendants' implementation of this system, and allege that discovery will show that potentially hundreds of other artists have likewise been wrongfully

**COMPLAINT**

defrauded regarding their royalties, showing that the system was intentionally designed to commit fraud on Plaintiffs and other artists.

151.   Defendants intentionally failed to disclose these facts, which were known only to Defendants and others acting in concert with Defendants, and which Plaintiffs could not have discovered.

152.   Defendants prevented Plaintiffs from discovering these facts by keeping them concealed from Plaintiffs. Indeed, Plaintiffs still do not understand how much money Defendants have fraudulently concealed from Plaintiffs, and will not be able to do so, until Plaintiffs obtain discovery of all relevant information, including all royalty statements and back up for the calculation of Plaintiffs' royalties, profit share, and recoupment costs through discovery in this action.

153.   Defendants also owed Plaintiffs a legal duty of disclosure because (i) Defendants had exclusive knowledge of material facts not known to the Plaintiffs; (ii) Defendants owed Plaintiffs fiduciary duties; and/or (iii) Defendants actively concealed material facts from the Plaintiffs.  This duty to disclose arose from the relationship between the parties, as Plaintiffs and Defendants were joint venturers and have had a long and special relationship for more than 20 years. As a result, Defendants were under a duty of disclosure to Plaintiffs.

154.   Plaintiffs did not know of the concealed facts until they recently discovered that Defendants had failed to send royalty statements in or around April, 2024. Thereafter, Plaintiffs learned that Defendants had not paid Plaintiffs over $3 million in royalties and/or profit shares due and owing to them, and had not even notified them of such positive account balances.

155.   In conducting further subsequent investigations, Plaintiffs learned that Defendants have failed to provide royalty statements for certain periods over the course of their relationship, and, on information and belief, Plaintiffs allege that the royalty statements that Defendants have provided to Plaintiffs over the years

_____
**COMPLAINT**

materially overstate the recoupment costs and understate the royalties and/or profit share owed to Plaintiffs. Plaintiffs will not be able to discover the extent of Defendants' fraud until Plaintiffs obtain all relevant documentary accounting evidence through discovery in this action and analyze the same. However, on information and belief, Plaintiffs allege that Defendants have underpaid them tens of millions of dollars, or more.

156.   Defendants intended to deceive Plaintiffs by concealing these facts.

157.   Had the omitted information been disclosed to Plaintiffs, Plaintiffs reasonably would have behaved differently. Specifically, had Plaintiffs known that they were being systematically underpaid, they could have rescinded the Flip Agreement, Flawless Agreement, and/or Recording Agreement sooner and exploited the Limp Bizkit and/or Flawless Records Master Recordings in a manner that would earn them considerably more than the royalties under the applicable agreements, for example by shifting control over these assets away from Defendants many years earlier. Further, had Plaintiffs been aware of Defendants' concealment sooner, they could have asserted their rights sooner (including by filing this lawsuit sooner, and enforcing their intellectual property rights sooner), and obtained relief sooner, allowing them to have the time benefit of receiving payment and other relief sooner, and interest on such amounts. Plaintiffs would also have avoided the expense of fees paid to consultants and/or attorneys necessary to discover Defendants' fraud. As a direct and proximate result of Defendants' concealment, Plaintiffs have been harmed, the exact amount to be proven at trial.

158.   Defendants' concealment was a substantial factor in causing Plaintiffs' harm.

159.   The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

_____
**COMPLAINT**

1

2

3

## TENTH CAUSE OF ACTION FOR INTENTIONAL MISREPRESENTATION

### (Against all Defendants)

4   160.   Plaintiffs reallege and incorporate all of the above paragraphs as

5   though fully set forth herein.

6   161.   Defendants made false, misleading, and incomplete statements to

7   Plaintiffs in connection with the calculation of their royalties and/or profit shares.

8   Since the beginning of their relationship, Defendants have created periodic royalty

9   and/or profit share statements to Plaintiffs, representing to Plaintiffs that the gross

10  sales/receipts, recoupable costs, expenses, royalty calculation and/or net profits

11  identified therein (including those revenues and royalties reported by Defendants)

12  were truthful and accurate.

13  162.   Further, Defendants also designed and implemented a system that

14  intentionally and wrongfully concealed Plaintiffs' positive royalty balances from

15  them by default, and such system was further built so that Plaintiffs were not

16  structured as payees who could receive payment, showing that Defendants never

17  actually intended to pay Plaintiffs. This system automatically works to the detriment

18  of Plaintiffs by withholding their royalties and not even notifying them about

19  positive royalties. Such systematic flaws show that Defendants intentionally

20  designed this system to attempt to avoid and/or delay paying royalties to artists for

21  as long as possible.

22  163.   Plaintiffs also allege that Defendants intentionally misrepresented facts

23  related to the calculation of Plaintiffs' royalties, profit share and/or recoupments.

24  For example, according to statements provided by Defendants, Limp Bizkit's

25  "Greatest Hitz" album did not generate any positive royalties payable to the band,

26  and was still showing unrecouped losses, until as recently as Q4 2022. The Q4 2022

27  statement shows the first positive royalty balance of $12,375.06. This is highly

42

suspicious, given that the album was first released in 2005. Similarly, Defendants' statements show an "unrecouped" balance until Q4 2018 on Limp Bizkit's LP 1-3, its most successful records that sold tens of millions of albums. Again, it is highly suspect that Defendants could claim unrecouped balances until the end of 2018, and then proceed to pay Limp Bizkit paltry sums that are suspected to be only a fraction of what is truly owed, given that these albums had each sold millions of records over the past decades.

164. Likewise, Defendants had failed to pay Flawless Records any of the profit share income or royalties owed under the Flawless Agreement, despite the fact that Flawless Records had signed a number of artists, including the commercially successful bands Puddle of Mudd, She Wants Revenge, and several others.

165. Further, Defendants provided Plaintiffs with fraudulent royalty statements that wrongfully overstated recoupment costs and understated royalties owed to Plaintiffs. As set forth above, Defendants even used fraudulent accounting practices that overdrafted positive accounts to make them appear "unrecouped" without any justification to do so. Instead, Defendants appear to have simply come up with charges to Plaintiffs' accounts out of thin air.

166. Defendants also designed and implemented a system that intentionally and wrongfully concealed Plaintiffs' positive royalty balances from them by default, and such system was further built so that Plaintiffs were not structured as payees who could receive payment, showing that Defendants never actually intended to pay Plaintiffs. This system automatically works to the detriment of Plaintiffs by withholding their royalties and not even notifying them about positive royalties. Such systematic flaws show that Defendants intentionally designed this system to attempt to avoid and/or delay paying royalties to artists for as long as possible. On information and belief, Plaintiffs are not the only artists to suffer from Defendants'

implementation of this system, and allege that discovery will show that potentially hundreds of other artists have likewise been wrongfully defrauded regarding their royalties, showing that the system was intentionally designed to commit fraud on Plaintiffs and other artists.

167. Defendants have also failed to provide back-up documentation to support the calculation of their recoupment, whereby they deemed Limp Bizkit to be in recoupment for a period of over 20 years, despite the commercial success of their albums when they were released, as well as due to their renewed popularity in recent years.

168. Through discovery of Defendants' accounting and other records, Plaintiffs anticipate that they will be able to prove further misrepresentations and/or concealments related to Plaintiffs' royalties and/or profit shares.

169. Defendants intentionally concealed these and other material facts from Plaintiffs with the intent to deceive and defraud Plaintiffs. Defendants also affirmatively represented that the accounting statements were truthful and accurate, both through affirmative representations made by Defendants, and through Defendants' continued delivery of cumulative accounting/royalty statements without correction or amendment. Defendants through their agents further affirmatively represented that they were using all available means to promote Plaintiffs' assets and enforce their intellectual property to maximize revenue for the creators.

170. By way of example only, on July 26, 2024, Defendants' agent Scott Bauman provided a responsive letter to Plaintiffs' demand which stated that Defendants paid Limp Bizkit "approximately $43 million" in recoupable "advances" "over the years," which is why the account only recently began paying the band any royalties. Plaintiffs allege that this statement is false and/or misleading, in that Defendants has overstated the amount of recoupable advances, and

understated the royalties owed. In reviewing the royalty statements that Plaintiffs do have access to (which are incomplete), Plaintiffs have only been able to determine that Defendants have charged $13,107,196.26 in recoupable costs and advances to Limp Bizkit, which is far below the alleged $43 million that Defendants now claim constitutes the recoupable costs and advances. Thus, Plaintiffs allege that Defendants have improperly inflated the alleged advances and/or recoupments, which Defendants were supposed to calculate on an itemized basis in relationship to each Album and/or Recording Fund. Thus, Defendants' attempt to categorize the sum total of Advances allegedly received by Limp Bizkit over the years is again misleading, as they were required to properly segregate the accounts. This is compounded by the fact that Defendants have provided no back up to support the alleged $43 million, and have not provided Plaintiffs with the missing royalty statements. Because Defendants have failed to substantiate the $43 million in recoupable costs, and the documents in Plaintiffs' possession also do not substantiate those costs, Defendants must produce documents through this litigation in order to do so and bear the burden of proving the same. However, on information and belief, Plaintiffs allege that Defendants will not be able to substantiate the $43 million figure because it is grossly overinflated.

171.    Further, Mr. Kanejsza's statements claiming that Defendants' failure to pay Plaintiffs was a one-off mistake due to an error with UMG's new software was an intentional misrepresentation. Indeed, when questioned about how an allegedly one-off mistake could happen to two completely separate accounts (i.e. Limp Bizkit and Flawless Records), Mr. Kanejsza was not able to offer any logical explanation, showing that he knew his statements were false when they were made.

172.    Not only that, Defendants knew that Limp Bizkit's assets were generating millions of dollars in revenue due to their explosion in popularity over the past several years. Defendants were aware of this because UMG was paying Flip

Records millions of dollars, keeping millions of dollars for itself, and willfully failing to account to Plaintiffs or pay the monies rightfully owed to them.

173.  Further, as mentioned above, UMG had reached out to Limp Bizkit several times in 2023-2024 to obtain approval for new exploitations of the assets, showing that Defendants were aware that there was demand for them and that even more money could be made off of them, while at the same time, UMG knew that it had failed to pay Limp Bizkit *any royalties at all*.

174.  Not only that, Defendants went into Limp Bizkit's royalty accounts and fraudulently changed positive accounts into purportedly "unrecouped" ones by overdrawing them without providing any basis for doing so.

175.  Thus, Defendants cannot claim ignorance or that some unknown benign software issue caused these problems. Rather, these actions could only have been accomplished as a result of Defendants' knowing, intentional acts that were specifically designed to defraud Plaintiffs and deny them millions in revenue, while keeping it all for themselves and seeking to exploit Plaintiffs further while continuing to steal all their revenues.

176.  With respect to Flawless Records, Mr. Bauman stated that the account remained unrecouped "for many years" but stated that "the account is now recouped and has a positive balance of approximately $2.3 million." Mr. Bauman claimed that Defendants needed Plaintiffs to fill out forms in order to route payment to Flawless Records. Plaintiffs allege that this statement is false and/or misleading in that Defendants has misstated the reason why Flawless Records was not paid sooner; Plaintiff alleges that it was not because of Defendants' need for forms and documents, but because Defendants had intentionally misrepresented profits payable to Flawless Records. Further, UMG's statement about recoupments is again misleading to the extent that UMG has not provided any back up, has failed to

_____

provide missing profit share statements, and has failed to explain how the recoupment was calculated.

177. Plaintiffs further allege that Defendants made intentional misrepresentations as to the existence and/or amount of positive royalty balances in Plaintiffs' accounts, which were not discovered for *years*, until Plaintiffs inquired with Defendants.

178. As mentioned above, Plaintiffs had positive, payable balances in their royalty accounts according to UMG's statements since as early as Q4 2019, and Defendants never notified Plaintiffs or otherwise attempted to make payment whatsoever. Instead, Defendants fraudulently overdrafted the accounts with positive balances to wrongfully show them as being back in recoupment, without any basis to do so. Defendants made the choice to fraudulently doctor the royalty accounting by overdrawing the accounts instead of paying Plaintiffs their royalties for the past several years. These were intentional, willful, knowing choices made by Defendants.

179. Defendants also made material misrepresentations over the years to the effect that Plaintiffs were not receiving royalty statements because their accounts were so deeply unrecouped, which was untrue given that, at least in some instances, the accounts were only "unrecouped" because Defendants fraudulently made them so. Further, Defendants in fact prepared statements for periods in which the accounts were unrecouped, and had an obligation to provide them to Plaintiffs, and to substantiate their unrecouped costs.

180. Defendants knew that these statements were false, misleading, and incomplete as evidenced by the system designed to keep artists from claiming their rightful royalties, and Defendants' repeated false and fraudulent accounting practices and statements related to Plaintiffs' royalties, recoupments, and profit shares.

_____
**COMPLAINT**

181. Plaintiffs believe that discovery of Defendants' internal and external communications will reveal further facts showing Defendants' misrepresentations, knowledge of falsity, and intent. Such evidence is presently in the exclusive knowledge of Defendants.

182. Defendants also knew that these statements would mislead Plaintiffs and deprive Plaintiffs of the full amount of royalties and/or profit share owed to them, and to prevent Plaintiffs from discovering these facts or claiming such payments for as long as possible. Plaintiffs were denied such royalties and profit shares, to their severe detriment and to the benefit of Defendants, as a direct and proximate result of Defendants' material misrepresentations.

183. Defendants intended for Plaintiffs to rely on these statements and to continue to be underpaid amounts they are entitled to, and to wrongfully keep those amounts for themselves.

184. As a direct result of Defendants' intentional misrepresentations and active concealment of material facts, Plaintiffs were unaware of the true facts. Plaintiffs did not discover Defendants' fraudulent accounting practices until approximately April – July, 2024, when Plaintiffs learned that, although they had never been paid royalties by Defendants, that Flip Records was reportedly raking in millions of dollars for the exploitation of Limp Bizkit's Master Recordings, that Limp Bizkit's popularity had grown exponentially over the past several years, and that Defendants were seeking to market and reissue various Limp Bizkit assets. Plaintiffs, upon further investigation, learned that they had over $3 million in positive royalty balances that Defendants had never notified them about—for years. This was when Plaintiffs first learned that they ***were not even set up as payees in Defendants' system***, which suggested to Plaintiffs that Defendants never intended to actually pay them. Plaintiffs then understood that Defendants' system automatically disfavors artists and defaults to non-payment, when it should do the

1   opposite—ensure that artists know they have royalties and make every effort to

2   actually pay them.

3   185.   Plaintiffs then began further investigating Defendants' accounting

4   practices, and realized that Defendants had failed to provide Plaintiffs with any

5   accounting statements for certain years that were likely to be some of the highest

6   grossing periods (for example, during the height of Limp Bizkit's fame for its top-

7   selling records from 1997-2006).

8   186.   In reviewing accounting statements that were provided, Plaintiffs also

9   began to suspect that Defendants had been understating royalties and profits, and

10   overstating recoupment costs. This is evidenced, for example, by Defendants

11   claiming that Limp Bizkit's account was still in recoupment at the end of 2022—

12   over 20 years after some of their most successful and highest grossing albums had

13   been released. Not only that, Defendants' royalty statements failed to comport with

14   Limp Bizkit's massive explosion in popularity over the past five or so years, during

15   which the band's original recordings have generated millions in revenues, and

16   should be generating the same in royalties to the band.

17   187.   Plaintiffs reasonably and justifiably relied upon Defendants'

18   statements in continuing to work with Defendants over the course of many years,

19   spanning multiple bands and joint ventures. Had Plaintiffs known of Defendant's

20   fraud, Plaintiffs reasonably would have behaved differently. Specifically, had

21   Plaintiffs known that they were being systematically underpaid, they could have

22   rescinded the Flip Agreement, Recording Agreement, or Flawless Agreement

23   sooner and exploited the Limp Bizkit or Flawless Records Master Recordings in a

24   manner that would earn them considerably more than the royalties under the Flip

25   Agreement, Recording Agreement, or Flawless Agreement, for example by shifting

26   control over these assets away from Defendants many years earlier. Further, had

27   Plaintiffs been aware of Defendants' concealment sooner, they could have asserted

_____
**COMPLAINT**

their rights sooner (including by filing this lawsuit sooner, and enforcing their intellectual property rights sooner), and obtained relief sooner, allowing them to have the time benefit of receiving payment and other relief sooner, and interest on such amounts. Plaintiffs would also have avoided the expense of fees paid to consultants and/or attorneys necessary to discover Defendants' fraud.

188.  As a direct and proximate result of the foregoing fraudulent and deceitful conduct, Plaintiffs have been damaged in an amount to be proven at trial.

189.  Defendants' actions were a substantial factor in causing Plaintiffs' harm.

190.  The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## **ELEVENTH CAUSE OF ACTION FOR**
## **NEGLIGENT MISREPRESENTATION**
### **(Against All Defendants)**

191.  Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

192.  As alleged above (see, e.g., ¶¶ 35-71; 161-208), Defendants made false, misleading, and incomplete statements to Plaintiffs in connection with the calculation of their royalties and/or profit shares. These statements were false and misleading, especially in the context in which they were made.

193.  At the time these representations were made, Defendants had no reasonable grounds for believing they were true, because sufficient evidence to corroborate Defendants' statements did not exist, information was known and available to Defendants concerning the unreliability and/or falsity of Defendants' material misstatements, and Defendants carelessly failed to check into, assess and/or verify Defendants' misstatements, which were otherwise false.

_____
**COMPLAINT**

194.   Plaintiffs were ignorant of the falsity of Defendants' representations and believed them to be true. In justifiable reliance on Defendants' representations of material fact, and in ignorance of the true facts, Plaintiffs continued to work with Defendants over the course of many years and through many projects, while being systematically underpaid, to Plaintiffs' severe detriment.

195.   Defendants intended for Plaintiffs to rely on these statements and to continue to be underpaid by Defendants and remain ignorant of Defendants' fraudulent accounting practices and systems.

196.   Plaintiffs reasonably relied upon Defendants' statements in deciding to continue to do business with them and believe that they were sending accurate royalty statements and providing Plaintiffs with all of the royalties and profits owed to them.   Had Plaintiffs known of Defendant's fraud, Plaintiffs reasonably would have behaved differently. Specifically, had Plaintiffs known that they were being systematically underpaid, they could have rescinded the Flip Agreement, Recording Agreement, or Flawless Agreement sooner and exploited the Limp Bizkit or Flawless Records Master Recordings in a manner that would earn them considerably more than the royalties under the Flip Agreement, Recording Agreement, or Flawless Agreement, for example by shifting control over these assets away from Defendants many years earlier. Further, had Plaintiffs been aware of Defendants' concealment sooner, they could have asserted their rights sooner (including by filing this lawsuit sooner, and enforcing their intellectual property rights sooner), and obtained relief sooner, allowing them to have the time benefit of receiving payment and other relief sooner, and interest on such amounts. Plaintiffs would also have avoided the expense of fees paid to consultants and/or attorneys necessary to discover Defendants' fraud.

197.   As a direct and proximate result of the foregoing fraudulent and deceitful conduct, Plaintiffs have been damaged in an amount to be proven at trial.

_____
**COMPLAINT**

198.   Defendants' actions were a substantial factor in causing Plaintiffs' harm.

199.   The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

## TWELFTH CAUSE OF ACTION FOR

## PROMISSORY FRAUD

### (Against All Defendants)

200.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

201.   As alleged above, Defendants made promises to pay Plaintiffs royalties and/or profit sharing from the exploitation of the Master Recordings of Limp Bizkit and artists signed to Flawless Records. Payment was Defendants' primary, material obligation, and is what induced Plaintiffs to enter into the Flip Agreement, the Recording Agreement and the Flawless Agreement.

202.   However, Defendants had no intention of actually performing these promises and paying Plaintiffs any royalties or profit shares at the time these promises were made. Indeed, Defendants never set up Plaintiffs as payees able to receive payment in their system, and doctored Plaintiffs' accounts to fraudulently show them as "unrecouped" when in fact they had positive balances. Plaintiffs allege that Defendants never would have paid them any money had Plaintiffs not discovered their fraud and took action.

203.   Defendants intended that Plaintiffs rely on these promises.

204.   Plaintiffs in fact reasonably relied on these promises.

205.   Defendants failed to perform these promises. As set forth above, Defendants failed to make any payments of any royalties or profit shares at all to Plaintiffs until August 26-27, 2024, and Plaintiffs further allege that those payments

_____
**COMPLAINT**

are grossly understated and do not represent the full amounts due to Plaintiffs, as a result of Defendants' fraud as described herein.

206.    Plaintiffs have been harmed as a result, and estimate that Defendants have failed to pay them millions of dollars.

207.    Plaintiffs' reliance on Defendants' promise was a substantial factor in causing Plaintiffs' harm.

208.    The actions of Defendants as alleged herein were willful, wanton and malicious, subjecting Defendants to punitive and exemplary damages according to the reprehensibility of their conduct.

<u>**THIRTEENTH CAUSE OF ACTION FOR**</u>

<u>**ACCOUNTING**</u>

**(Against All Defendants)**

209.    Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

210.    Defendants were obligated to provide to Plaintiffs statements accurately reflecting the amount of sales and revenues derived from the distribution and exploitation of Limp Bizkit's Master Recordings and intellectual property, and for the distribution and exploitation of Master Recordings and intellectual property of artists signed to Flawless Records, and to remit to Plaintiffs their royalties and/or share of revenues.

211.    Despite demand therefor, Defendants have failed and refused, and continue to fail and refuse, to provide Plaintiffs with proper and accurate accountings reflecting the amount of revenues derived from the distribution and exploitation of Limp Bizkit's and Flawless Records' Master Recordings and intellectual property. Instead, Defendants have intentionally provided false and fraudulent royalty and/or profit participation statements to Plaintiffs.

_____
**COMPLAINT**

212.   The false and fraudulent profit participation statements submitted by Defendants are cumulative, and entitle Plaintiffs to an accurate and truthful accounting showing how the current cumulative numbers were calculated.

213.   Plaintiffs are entitled to an order requiring Defendants to provide their complete books and records of account in all details.

**FOURTEENTH CAUSE OF ACTION FOR**

**COPYRIGHT INFRINGEMENT**

**(Against All Defendants)**

214.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

215.   On September 30, 2024, Plaintiffs served Defendants with the Rescission Notice, a copy of which is attached hereto as Exhibit G and incorporated by reference. The Rescission Notice rescinded the Flip Agreement, Recording Agreement, or Flawless Agreement. Plaintiffs Limp Bizkit and Durst are the creators of all of the musical compositions embodied in the Master Recordings subject to the Flip Agreement and Recording Agreement. On information and belief, Plaintiff Flawless Records has copyright ownership in the Master Recordings of artists on the Flawless Record labels by virtue of agreements entered into between Flawless Records and those artists.

216.   Despite receiving the Rescission Notice, Defendants have continued to sell, distribute and exploit the Master Recordings, including through streaming platforms. However, because the Flip Agreement, Recording Agreement, and Flawless Agreement have been rescinded, and Plaintiffs have not otherwise granted Defendants with permission to sell, distribute and exploit the Master Recordings, such acts constitute copyright infringement.

_____

217.   Due to Defendants' acts of infringement, Plaintiffs have suffered substantial damages, including general and special damages, in an amount to be proven at trial.

218.   Due to Defendants' acts of infringement alleged herein, Defendants have obtained direct and indirect profits that they would not otherwise have realized but for their infringement of the Master Recordings. As such, Plaintiffs are entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of Plaintiffs' rights in the Master Recordings in an amount to be proven at trial.

219.   Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, have committed acts of copyright infringement, described herein, which were willful, intentional and malicious, subjecting Defendants to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to one hundred and fifty thousand dollars ($150,000) per infringement. Within the time permitted by law, Plaintiffs will make their election between actual damages and statutory damages.

## FIFTEENTH CAUSE OF ACTION FOR VIOLATION OF
## CAL. BUS. & PROF. CODE § 17200 *ET SEQ*
### (Against All Defendants)

220.   Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

221.   On information and belief, and as described more fully above (see, e.g. ¶¶ 35-71; 161-208), Defendants has knowingly performed acts, including but not limited to, failing to properly compute Plaintiffs' royalties, failing to provide accurate royalty or profit statements, failing to notify Plaintiffs of positive royalty or profit balances, improperly (and fraudulently) calculating royalties, profits, and recoupments, failing to timely pay royalties and profits, intentionally

_____
**COMPLAINT**

misrepresenting royalties and profits owed to Plaintiffs, and systematically designing and implementing a system to prevent Plaintiffs from obtaining their royalties and profits.

222.  On information and belief, Defendants knowingly committed these acts in order to unlawfully deprive Plaintiffs of their revenues and profits. These acts constitute unlawful, unfair and/or fraudulent business practices and unfair competition under Sections 17200, et seq., of the California Business and Professions Code.

223.  As a result of such conduct, Plaintiffs have suffered, and will continue to suffer, irreparable harm by Defendants' unfair, unlawful and/or fraudulent practices, including but not limited to, harm to its reputation, goodwill, and stature in the music community, for which there is no adequate remedy at law, thereby justifying injunctive relief. Until and unless injunctive relief is granted, Defendants will be unjustly enriched, which should be disgorged pursuant to allowable remedies under Sections 17200, et seq., of the California Business and Professions Code.

## SIXTEENTH CAUSE OF ACTION FOR
## DECLARATORY RELIEF
### (Against All Defendants)

224.  Plaintiffs reallege and incorporate all of the above paragraphs as though fully set forth herein.

225.  In light of Plaintiffs' recission of the Flip Agreement, the Recording Agreement, and the Flawless Agreement on September 30, 2024, Plaintiffs allege that Defendants have no rights in or to the Master Recordings of Limp Bizkit or artists signed to Flawless Records under the Flip Agreement, the Recording Agreement, the Flawless Agreement, or otherwise, and that Plaintiffs are the legal

owners of all copyright, intellectual property and other rights in and to the Master Recordings, in perpetuity.

226.   Durst and Limp Bizkit, as the authors and creators of the musical compositions in the Master Recordings, owned all copyrights in the works immediately upon their creation including but not limited to copyrights in the musical compositions, sound recordings, and any related and/or derivative assets.

227.   On information and belief, Plaintiff Flawless Records has copyright ownership in the Master Recordings of artists on the Flawless Record labels by virtue of agreements entered into between Flawless Records and those artists.

228.   A substantial controversy exists between the parties with respect to the validity and legal effect of Plaintiffs' Rescission Notice (Exhibit G) and assertion of Dust's and Limp Bizkit's copyrights in and to the Limp Bizkit Master Recordings and Flawless Records' assertion of copyrights in and to the Master Recordings of artists signed to Flawless Records. Defendants have stated to Plaintiffs that they have no termination or other rights in or to the Master Recordings, and have refused to acknowledge the rescission of the Flip Agreement, the Recording Agreement, or the Flawless Agreement.

229.   The controversy has sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A judicial declaration is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights and duties with respect to the copyrights and ensure that they can rely on quiet, unclouded title to their copyright interests.

230.   Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, confirming that (i) Plaintiffs Limp Bizkit and Durst are the sole owners of all copyright and intellectual property rights in and to the Limp Bizkit Master Recordings; (ii) Plaintiff Flawless Records is a copyright owner of Master Recordings of artists signed to Flawless Records; (iii) Defendants

_____
**COMPLAINT**

have no intellectual property or other rights in any of Limp Bizkit's Master Recordings or any Master Recordings of artists signed to Flawless Records; and (iv) Plaintiffs' assertion of their copyrights in the Limp Bizkit Master Recordings and Flawless Records Master Recordings does not infringe upon any rights of Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs William Frederick Durst, Limp Bizkit and Flawless Records, LLC pray as follows:

1.      For general damages in an amount to be proven at trial, but exceeding at least $10,000,000;

2.      For special damages in an amount to be proven at trial, but exceeding at least $10,000,000;

3.      For an award of all profits of Defendants plus all losses of Plaintiffs, plus any other monetary advantage gained by Defendants through their copyright infringement, the exact amount to be proven at trial, or, if elected before final judgment, statutory damages as available under the Copyright Act, 17 U.S.C. § 101 et seq.;

4.      For punitive and exemplary damages against Defendants on those causes of action which support such an award;

5.      For their attorney's fees and costs pursuant to the Copyright Act, 17 U.S.C. § 101 et seq., or any alternative;

6.      For an order confirming the rescission of the Flip Agreement, the Recording Agreement and the Flawless Agreement;

7.      For all lawful remedies and damages allowed by law and equity as a result of the rescission of the Recording Agreement, the Flip Agreement, and the Flawless Agreement, including but not limited to consequential damages (see Civil

**COMPLAINT**

Code §§ 1670.5, 1689, 1692.), as well as disgorgement of all profits received under those agreements, which Plaintiffs estimate could easily exceed $200 million;

8.     For an order declaring that (i) Plaintiffs Limp Bizkit and Durst are the sole owners of all copyright and intellectual property rights in and to the Limp Bizkit Master Recordings; (ii) Plaintiff Flawless Records is a copyright owner of Master Recordings of artists signed to Flawless Records; (iii) Defendants have no intellectual property or other rights in any of Limp Bizkit's Master Recordings or any Master Recordings of artists signed to Flawless Records; and (iv) Plaintiffs' assertion of their copyrights in the Limp Bizkit Master Recordings and Flawless Records Master Recordings does not infringe upon any rights of Defendants.

9.     For an order compelling Defendants to produce the original books and records of account and to satisfactorily and accurately account to Plaintiffs with respect to all expenses and revenues for any Master Recordings and other intellectual property subject to the Flip Agreement, the Recording Agreement or the Flawless Agreement, and to disgorge the monies due to Plaintiffs therefrom;

10.    For an order compelling Defendants to account to Plaintiffs for their profits and any damages sustained by Plaintiffs from the acts of copyright infringement described herein;

11.    For a temporary restraining order and/or preliminary and/or permanent injunction enjoining permanent injunction enjoining Defendants, its directors, officers, agents, and employees, and those acting in privity or in concert with it, and its partners, subsidiaries, divisions, successors, and assigns, from further acts of (i) Copyright Infringement or (ii) engaging in further unfair, unlawful or fraudulent conduct in violation of Sections 17200, et seq., of the California Business and Professions Code;

**COMPLAINT**

12.     For a judgment that Plaintiffs be awarded other relief including but not limited to disgorgement of any amounts by which Defendants have been unjustly enriched as a result of their wrongful conduct;

13.     For costs of suit;

14.     For pre-judgment and post-judgment interest on any award; and

15.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

COMES NOW Plaintiffs William Frederick Durst, Limp Bizkit, and Flawless Records, LLC and hereby demand a jury trial in the above matter.

Dated: October 8, 2024                          **SEDDIGH ARBETTER LLP**

By:___*/s/ Alicia M. Veglia*_____
        Alicia M. Veglia
        *Attorneys for* Plaintiffs William
        Frederick Durst, Limp Bizkit and
        Flawless Records, LLC

**COMPLAINT**