

*1996*

THIS AGREEMENT is made as of the ___ day of July, 996 between Fred Durst, Sam Rivers, and John Otto p/k/a "Limp BizKut" c/o Katz, Smith & Cohen, Ivy Place, 3423 Piedmont Road N.E., Atlanta, Georgia 30305 (hereinafter called "you" or "Artist") and Flip Records, Inc. 433 West Broadway, New York, New York 10012 (hereinafter called "Flip").

WHEREAS Flip is engaged in the business of recording, producing, manufacturing, distributing and otherwise exploiting phonograph records of all types; and

WHEREAS Flip has agreed to engage you to render your exclusive recording services as a musician and/or vocalist to Flip during the Term in connection with the production of Masters to be used by Flip for the manufacture, distribution and sale of records; and

WHEREAS you have agreed to accept such engagement.

NOW, based on the foregoing and for and in consideration of the mutual covenants herein set forth, the parties agree as follows:

1.   **DEFINITIONS**

(a)   "Record" or "phonograph record" means and includes all conventional types of phonograph records now in use, as well as tape recordings of all types, compact discs and any other devices now known or unknown, by which sound may be recorded for later transmission to listeners, whether by reproducing device or via radio, television or any other medium intended primarily for home use or use in means of transportation and whether embodying (i) sound alone or (ii) sound synchronized with visual images by motion picture film, electronic tape or any other device by which both picture and sound can be projected, transmitted or played back simultaneously.

(b)   "Commercial Videogram" shall mean an audiovisual recording, whether on magnetic recording tape or any other substance or material now know or unknown, consisting of a sequence of visual images capable of being shown as a moving picture including any soundtrack associated with such recording embodying your performance as a musical performer and intended for commercial exploitation by way of home use videograms, cinema, theatrical or other public exhibition and/or all forms of television whether know or unknown.

(c)   "Promotional Videogram" shall mean an audiovisual recording as aforesaid made primarily for the purpose of promoting a sound-only record.

(d)   "Videogram" shall mean, a Promotional Videogram and/or Commercial Videogram.

(e)   "Compact Disc" shall mean a disc record (presently of 120mm diameter) reproducing sound alone, the signals on which are read and transmitted by laser.

(f)   "Masters" shall mean the original sound and/or visual recording or combination

From: Migdalia Jimenez To: Jordan Schur Case 2:24-cv-08630-PA-AJR Document 1-2 Filed 10/08/24 Page 2 of 16 Page ID #:142 Date: 8/1/96 Time: 16:20:38 Page 3 of 17

of recordings whether on magnetic recording tape or wire, lacquer disc, or any other substance or material now known or unknown, embodying Artist's performances which have been recorded for Flip for use in the manufacture of Records therefrom for sale to the public and including any duplicates thereof.

(g)  "A Single" shall consist of a number of Masters sufficient to have a playing time equivalent to one (1) 7-inch or 12-inch 33 1/3 rpm or 45 rpm single or extended-play record having a playing time of not more than eighteen (18) minutes.

(h)  "An Album" shall consist of a number of Masters sufficient to have a playing time equivalent to one (1) 12-inch 33 1/3 rpm long-playing record, i.e. a playing time of not less than thirty-five (35) minutes nor more than forty (40) minutes.

(i)  An "EP" shall mean a record consisting of at least six (6) Masters having a total playing time of not less than eighteen (18) minutes and having a dealer price of less than the dealer price of Flip's top price Albums.

(j)  "Soundtrack Recording" shall mean a record reproducing recordings performed by Artist and forming part of or used in connection with a motion picture film, television film or stage production.

(k)  "Controlled Composition" means that portion of a musical composition written and/or composed by you and/or owned or controlled by you or by any person, firm or company in which you have any interest and embodied on a Master.

(m)  "Retail Price" shall mean (at Flip's election): (i) the recommended retail price in the country of sale; or (ii) the price used by the mechanical copyright collection society in the country concerned for the calculation of royalties; or (iii) the price used by Flip's licensee in the country concerned for the calculation of royalties due to Flip.

(n)  "Term" shall mean the Initial Period as defined in Paragraph 4 hereof.

(o)  "Territory" shall mean the Universe.

(p)  "Delivery" of Masters shall mean Flip's receipt of technically and commercially satisfactory Masters, fully mixed, edited, leadered and equalized, along with all reasonably necessary consents, permissions, approvals and information, including label copy, credits and publisher information.

(q)  "Mid Priced Records" shall mean Records sold at not more than eighty (80%) percent of the Retail Price and not less than sixty-six and two-thirds (66 2/3%) percent of the Retail Price.

2

2.  **GRANT OF RIGHTS**

(a) You hereby grant and assign to Flip all rights of every kind and the complete unconditional, exclusive, perpetual, unencumbered title throughout the Territory in and to all result and products of your services and performances hereunder (excluding copyrights in musical compositions), any and all Masters, Records, sound recordings, and videograms, which include the voice, instrumental or other sound and/or visual effects, name, photograph likeness, services or performances of Artist, including without limitation the right to record, reproduce, broadcast, transmit, publish, sell, exhibit, distribute, advertise, exploit, perform and use the same separately or in combination with any other material for any purpose in any manner, under any label, trademark or other identification and by and any means or method, whether or not now known, invented, used or contemplated, and to refrain from all or any part thereof.

(b) Without prejudice to the generality of the foregoing, you hereby grant to Flip the following rights throughout the Territory which Flip may use or refrain from using as it elects:

(i) the exclusive right during the Term to manufacture, distribute and sell in the Territory Records and Videograms reproducing Artist's performances;

(ii) the exclusive right for the full periods of copyright to manufacture, distribute and sell throughout the Territory Records and Videograms produced from Masters made hereunder;

(iii) the exclusive right in all media to advertise, publicize and exploit in the Territory Records and Videograms produced hereunder by any and every means, particularly, but without limiting the generality of the foregoing, to use the name, including the professional name, approved photograph and likeness of Artist, and approved biographical material concerning Artist for advertising, publicizing and otherwise exploiting said Records and Videograms. Notwithstanding anything to the contrary contained herein, during the Term, you shall have the right to approve the likenesses and biographical materials reproduced, printed, published or disseminated by Flip hereunder, provided that such approval shall not be unreasonably withheld and any objections must be specific, in writing and received by Flip within ten (10) business days after you have been informed that the applicable likenesses and/or biographical materials are available for inspection at Flip's office. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the provisions of this Paragraph 2(b)(iii). Once you have approved such likenesses and/or biographical materials, the same need not be approved again in respect of any subsequent use thereof. Any such material submitted or furnished by you shall be deemed approved. You will cooperate with Flip, as it reasonably requests, at Flip's nonrecoupable expense and subject to your reasonable availability, in making photographs and preparing other materials for use in promoting Artist and the Records made hereunder. Flip's inadvertent failure to comply with the provisions of this paragraph shall not be deemed a breach of this agreement. Flip shall cure any such failure on all materials manufactured after Flip's receipt of your written notice of such failure.

3

(iv) the exclusive right to authorize public performances in the Territory of Records and Videograms produced hereunder for the purpose of exploiting the same to the extent that you have acquired or may acquire such right;

(v) the right to permit and authorize others to exercise, directly or through persons designated by them, any or all of Flip's rights hereunder;

(vi) all rights necessary to enable Flip to exercise the rights granted to it under this Paragraph 2.

(c) Each Master produced hereunder or an embodying Artist's performances and recorded, excluding the copyright in the musical composition recorded, during the Term shall, from the inception of its creation, be considered a "work made for hire" for Flip within the meaning of the U.S. Copyright Law. If it is determined that a Master does not so qualify, then such Master, together with all rights in it (including the sound recording copyright but excluding the copyright in the musical composition recorded), shall be deemed transferred to Flip by this Agreement. All such Masters shall, from the inception of their creation, be entirely the property of Flip in perpetuity, throughout the world, free of any claim whatsoever by you or by any persons deriving any rights or interests therefrom. Flip shall have the same rights with respect to Videograms produced hereunder as are set forth in this Paragraph 2.

(d) You agree that, during the Term hereof, you will not directly or indirectly appoint, authorize or permit any person other than Flip to manufacture, sell or exploit Records or Videograms of your performances in the Territory in which Flip has the said rights hereunder or to exercise any of the rights herein granted to Flip for the Territory in which Flip has the said rights. You further agree, warrant and undertake that you will not for a period of two (2) years from and after the expiration of the Term of this Agreement perform any part of the material performed by you on any Master hereunder (nor allow your name, likeness, voice, biographical material or other identification to be associated with any such material) for the purpose of making Records or Videograms therefrom for manufacture, sale or distribution by anyone other than Flip.

(e) Flip shall be in sole and exclusive control of the sale and exploitation of Records and Videograms hereunder and shall have the right to exercise said rights directly or through any subsidiary, associated or otherwise related company, licensee or franchise holder.

(f) Flip has not made and does not hereby make any representation or warranty with respect to the extent of the sale of Records or the exploitation of Videograms hereunder. You recognize and acknowledge that such matters are speculative and agree that the judgment of Flip and its related companies, licensees or franchise holders in regard to any such matters shall be binding and conclusive upon you.

(g) All recordings to be made hereunder shall be made in accordance with any agreements with any applicable labor unions. The terms of any applicable collective bargaining

4

agreement between Flip and any union required by the terms of such agreement to be included in this Agreement shall be deemed incorporated herein as if such provisions were expressly set out. Artist shall become and remain a member in good standing of any labor union, membership of which is required for any of the activities contemplated by this Agreement.

3.  **YOUR REPRESENTATIONS AND WARRANTIES**

    You represent, warrant and undertake to Flip that:

    (a)  You have the full and unfettered right to enter into this Agreement and have not done and will not during the Term hereof do, or permit any person to do, anything which might curtail or impair any of the rights herein granted to Flip.

    (b)  During the Term, you shall render your exclusive services as a recording artist in recording Masters for Flip.

    (c)  (i)  Artist shall appear at the times and places mutually designated by Flip and you, for recording sessions hereunder. You shall record the musical compositions mutually designated by you and Flip under the direction of a producer mutually designated by you and Flip.

    (ii)  If Artist shall fail to appear or be late in appearing at any recording session hereunder (other than for reasons of sickness or injury or otherwise beyond your reasonable control) Flip shall be entitled (without prejudice to its other rights): (A) to require immediate payment by you to Flip of all costs and expenses incurred by Flip as a result thereof; or (B) to treat such costs and expenses as additional advances to you recoupable from any and all monies payable to you under this Agreement;

    (iii)  You shall comply with all reasonable and lawful rules and regulations governing the use of each recording studio utilized hereunder.

    (d)  You own all rights required hereunder in and to the name "Limp BizKut" or such other real and/or professional names as you may, from time to time, use (each of which is hereinafter called the "Name"). You agree that during the Term of this Agreement you will not authorize or knowingly permit any performance by any person or persons who shall in any way be identified with the Name for the purpose of making Records other than for Flip, and during the period referred to in Paragraph 2(d), you will not authorize, license, or permit the performance by any person who shall in any way be identified with the Name of any compositions recorded hereunder for any party other than Flip for the purpose of making Records or Videograms.

    (e)  You are resident in the United States of America.

5

4. TERM AND RECORDING COMMITMENT

(a) The initial Period of this Agreement shall be for the period commencing on the date hereof and expiring nine (9) months after delivery to Flip of the Minimum Recording Commitment to be delivered by your during the Initial Period.

(b) You hereby grant to Flip one (1) separate consecutive and irrevocable option (the "First Option Period") to extend the Term of this Agreement, for a further period commencing immediately upon the expiration preceding Period and expiring nine (9) months after delivery to Flip of the Minimum Recording Commitment Album to be delivered by you during the First Option Period. The option shall be exercisable by Flip giving you written notice at any time prior to the expiration of the initial Period.

(c) Notwithstanding anything to the contrary contained or implied herein.

    (i) You shall not commence the recording of the First Album earlier than three (3) months following delivery to Flip of the EP.

    (ii) You shall not commence the recording of the Second Album hereunder earlier than six (6) months following delivery to Flip of the First Album.

    (iii) Flip shall not be obliged to accept delivery of the Second Album earlier than seven (7) months after delivery to Flip of the First Album.

    (iv) The Second Album shall be delivered to Flip not later than fifteen (15) months after delivery to Flip of the First Album.

(d) During the Term of this Agreement you agree to produce and deliver to Flip Master comprising the following (the "Minimum Recording Commitment"):

    (i) during the Initial Period - one (1) EP and one (1) Album (the "EP" and the" First Album").

    (ii) during the First Option Period - one (1) Album (the "Second Album")

(e) (i) During the Term of this Agreement, subject to your previously scheduled professional commitments, you shall perform for the purposes of making Videograms.

    (ii) Flip agrees to produce one (1) videogram in connection with the release of the EP and agrees to provide a budget therefor in the minimum amount of $10,000.00.

    (iii) All creative elements of any Videograms produced hereunder (eg. concept, director, song) shall be mutually agreed upon by Flip and you.

6

5.  **RECORDING COSTS**

(a) Prior to the commencement of recording, you shall submit to Flip, for its written approval, a written budget (the "Budget") for the recording of the EP or the applicable Album. Such budget shall specify all the costs to be incurred in the course of producing and recording Masters (including, without limitation, the costs of studio time, musicians' fees, union payments, instrument hire, producers' fees and advances, the costs of tape, editing, mixing, remixing and mastering, equipment rental and cartage, hotel, living and travel expenses and other similar costs customarily regarded in the recording industry as recording costs). Flip shall pay the recording costs in accordance with the Budget. In the event that any recording costs exceed the amount of the Budget as it may have been increased with the written consent of both parties (the "Excess Costs"), such Excess Costs shall (if paid by Flip) be recoverable by Flip from any subsequent payments to be made by Flip to you or on your behalf.

(b) Flip hereby approves an amount for the Budget of the EP in the amount ten thousand ($10,000.00) dollars. Flip hereby approves an amount for the Budget of each Album in the amount of seventy five thousand ($75,000.00) dollars.

6.  **ADVANCES**

(a) Flip shall pay to you, in respect of the EP and First Album, an advance ("Initial Artist Advance") in the amount of one hundred and seventy five thousand ($175,000.00) dollars.

(b) The Artist Advance for the Second Album shall be one hundred twenty five thousand ($125,000.00) dollars (the "Second Album Advance").

(c) The Initial Artist Advance shall be payable promptly after execution of this agreement as follows:

    (i) One hundred thousand ($100,000.00) dollars to Mojo Records LLC; and

    (ii) Seventy-five thousand ($75,000.00) dollars to you.

(d) The Second Album Advance shall be payable fifty (50%) on commencement of recording of the Second Album and fifty (50%) percent on delivery to Flip of the Second Album.

(e) One hundred and twenty five thousand ($125,000.00) dollars of the Initial Artist Advance and the Second Album Advance are deemed non-refundable prepayments to you of Net Profits otherwise payable to you pursuant to paragraph 7 of this Agreement. Fifty thousand ($50,000.00) dollars of the Initial Artist Advance shall be deemed a cost deducted from Proceeds in the calculation of Net Profits for the EP and the First Album pursuant to paragraph 7 hereof.

7

7.  DIVISION OF NET PROFITS

(a) Flip shall pay to you fifty (50%) percent of Net Profits derived by Flip from the sale of Records or other exploitation of Masters hereunder.

(b) "Net Profits" are defined as and shall be calculated as follows:

Flip will compute gross receipts and credits of sale attributable to the exploitation of Records hereunder received by it, or credited to it, from distributors, subdistributors or licensees or directly from consumers for mail order sales or otherwise ("Proceeds"), less actual returns, reserves and unpaid billing, and shall further deduct therefrom any and all recording costs, any and all unreimbursed, direct, out of pocket, third party fees and manufacturing charges (including, without limitation, duplication and printing costs); actually incurred costs of insertion and shrinkwrapping, freight, delivery charges or other costs incurred in connection with the shipment of Records; actually incurred, third party costs of refurbishing, restocking, inventory warehousing; sales or other commissions; (excluding any commission payable to Flip's full time employees) insurance costs; unreimbursed, direct, out of pocket, third party costs and expenses of advertising, publicity, promotion and marketing (including, without limitation, promotional or sales materials or advertisements including promotional Records and all manufacturing costs associated therewith); the unreimbursed, direct, out of pocket, third party costs of producing or acquiring rights in and to any Video(s); third party mechanical copyright royalties, synchronization fees, or other fees payable to songwriters, publishers, or unions; all taxes levied on any amounts hereunder or on the sale of Records (sales and use taxes shall be deducted from Proceeds but income taxes shall not), and any other unreimbursed, direct, out of pocket, third party expenses incurred by Flip or required to be paid in connection with the recording, producing, manufacture, distribution, sale, advertising, marketing and exploitation of Masters hereunder and Records embodying the Masters. Flip shall not deduct from Proceeds any costs incurred in connection with Flip's general overhead. Flip shall use its best commercially reasonable judgment in incurring expenses deductible from Proceeds.

(c) Flip shall set up two separate accounts for the calculation of Net Profits: one for the calculation of Net Profits in relation to the EP and the First Album and one for the calculation of Net Profits in relation to the Second Album (ie., Costs incurred in connection with the EP and the First Album shall only be deducted from Proceeds derived from the exploitation of the EP and the First Album and costs incurred in connection with the Second Album shall only be deducted from Proceeds derived from the exploitation of the Second Album).

(d) It is specifically understood that nothing contained herein, including the use of the phrase "Net Profits", shall be deemed to create a partnership relationship between Flip and you (or any other person affiliated with you), it being understood that Flip and you are each independent contractors. The term "Net Profits" is being utilized solely to describe the economic relationship.

8

## 8. ACCOUNTING

(a) Accounts between Flip and you shall be taken as at the last day of June and December in each year and Flip shall (subject to any necessary consents of government authorities) pay such sums as may be due to you within ninety (90) days after the appropriate accounting date, and each such payment shall be accompanied by a statement setting forth in reasonable detail the computation of the amount thereof.

(b) All statements and accounts rendered by Flip to you shall be binding upon you and not subject to any objection whatsoever unless specific objection in writing stating the basis thereof is given to Flip within two (2) years of the date of the statement in question. No action, suit or proceeding of any nature (excluding fraud) in respect of any royalty statement or other accounting may be brought against Flip unless such action, suit or proceeding is commenced against Flip in a court of competent jurisdiction within three (3) years after the date rendered.

(c) Flip shall maintain true and accurate books of account concerning the sales and exploitation of Records hereunder, the receipt of Proceeds and the deductions therefrom in the calculation of Net Profits. You shall not be entitled to inspect any Records relating to the manufacture of Records hereunder. A duly qualified certified public accountant in private practice may, not more than once in any year and at your expense and upon giving Flip not less than thirty (30) days written notice, examine those of Flip's books as are necessary to verify the computation of monies paid to you. Flip's said books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered and Flip shall have no obligation to permit the examination of such books relating to any particular statement more than once. The right conferred by this sub-clause shall constitute your sole right to examine Flip's said books and Records.

## 9. MECHANICAL LICENSES

(a) You warrant and represent that the material recorded by Artist hereunder on Masters will be available to Flip for the full period of copyright therein and any and all renewals and extensions thereof for use in connection with the manufacture of Records and Videograms on the standard terms and conditions for the licensing of copyright material for reproduction in the Territory and shall not be obscene or constitute a libel or slander of any person and shall not infringe upon or violate any other right of any person, subject only to the standard licenses for the use thereof and payment by Flip or its licensees of the fees provided for therein.

(b) All Controlled Compositions are hereby licensed to Flip or its licensees, payment for which is deemed included in your share of Net Profits as set forth in paragraph 7.

(c) You warrant and represent that there are no restrictions with respect to Controlled Compositions which Artist is lawfully entitled to perform on Masters hereunder.

9

## 10. RELEASE COMMITMENT

Provided you have complied with all then current material obligations of this agreement, Flip agrees that the EP and each Album will be commercially released in the United States within one hundred twenty (120) days (not including the months of November and December, if applicable) after delivery of the each to Flip has been completed. In the event Flip has not so released the EP or Album,, as applicable, as aforesaid, and Flip continues to fail to release the EP or Album, as applicable, for sixty (60) days after receipt of written notice from you of such failure, you may terminate this agreement by written notice.

## 11. FORCE MAJEURE

If either party's material performance hereunder is delayed or becomes impossible or impracticable because of any act of God, fire, earthquake, strike, civil commotion, act of government or any order, regulation, ruling or action of any labor union or association of artists affecting Flip or you or the phonograph record industry, Flip, upon notice to you may suspend its obligations under this Agreement for the duration of such delay, impossibility or impracticability and in such event a number of days equal to the number of such days of suspension shall be added to the then-current period of the Term hereof. In the event that any one such period of suspension exceeds twelve (12) months in aggregate, either party shall be entitled by notice in writing to terminate this Agreement.

## 12. INDEMNIFICATION

(a)    You shall indemnify Flip, its assignees and licensees and hold each of them harmless from and against any and all claims, demands, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable legal fees) arising out or by reason of any breach by you of any of the representations, warranties or agreements made by you hereunder which has resulted in a final judgment or has been settled with your consent, which consent shall not be unreasonably withheld (it being understood that your consent shall not be deemed given for any settlement not in excess of three thousand five hundred ($3,500.00) dollars. Notwithstanding the foregoing, if you withhold consent to any settlement which Flip is willing to make, the foregoing indemnity shall apply and Flip may settle such claim in its sole discretion unless you promptly assume all costs of defending against such claim, demand or action including, without limitation, court costs, reasonable attorneys' fees, and direct expenses theretofore incurred by Flip in connection with said claim; provided that in the event you assume said costs, Flip shall nonetheless have the right to settle such claim in its sole discretion without your consent, provided that in such event, the foregoing indemnification shall not apply with respect thereto. You shall reimburse Flip, on demand, for any payments made by Flip at any time with respect to any such claim, loss, damage, liability or expense to which the foregoing indemnity applies.

(b) Upon notice on any such claim against Flip, Flip upon written notice to you shall be entitled to withhold from the amounts payable to you under this Agreement an amount equal

10

to the potential liability and cost in connection with such claim until liability upon any such claim has been finally settled, determined and paid and Flip has been reimbursed its actual out-of-pocket costs and expenses, including the reasonable legal fees incurred in connection therewith as to which Flip is entitled to indemnification. Flip shall not withhold sums in connection with a claim if you post a bond in a form and with a bonding company reasonably approved by Flip and in an amount equal to the amount of the reasonable potential liability. If no lawsuit in commenced and if there then are no active settlement negotiations taking place, as of the date twelve (12) months after the date on which such claim was first formally made, then Flip shall cease withholding sums in connection therewith; provided, however, Flip shall have the right to resume withholding if such claim is thereafter reasserted. Flip shall give you prompt notice of any such claim and you shall have the right to participate in the defense of any such claim at your own cost and expense but you agree that any such claim may be compromised or settled by Flip without you consent (subject only to the restriction on Flip's right to indemnification in the event of a settlement without your consent, as provided in subparagraph 12 (a).

13.     DEFAULT AND TERMINATION

(a)     In the event of any material default or material breach by you in the performance of any of your obligations hereunder, Flip may, without prejudice to its other rights, by specific written notice to you, suspend its obligations hereunder for the duration of such default or breach and until the same has been cured, and may, at its option, extend the term of this Agreement for a period equal to all or any part of the period of such default or breach.

(b)     It is acknowledged that your performances hereunder and the rights and privileges granted to Flip under the terms hereof are of a special, unique and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by you of any provision of this Agreement will cause Flip irreparable injury and damage.

(c)     Save as otherwise provided in this Agreement, no party shall be deemed in default hereunder unless the other party shall give such party notice in writing of such default and such party shall fail to remedy the same within thirty (30) days after the service of such notice.

(d)     Flip shall be entitled, without prejudice to its other rights and notwithstanding the provisions of Paragraph 12(c) above, to terminate the Term of this Agreement in the event that Artist becomes permanently or substantially unable by reason of illness, death or any other cause to perform his obligations hereunder or Artist is convicted of a criminal offense or cease to pursue his career as an entertainer.

14.     PROMOTION AND ARTWORK

(a)     During the Term, you agree, at Flip's request, on reasonable notice to you, subject to your other previously scheduled professional commitments and at Flip's non-

11

recoupable expense, to be available to render promotional services. As used herein the expression "promotional services" means: (i) attending photograph sessions to enable Flip to take such photographs as Flip may require in relation to the manufacture, promotion and exploitation of Records and Videograms hereunder; (ii) appearing in publicity promotions such as, but not limited to, radio and television programs, press interviews and receptions and making personal appearances in stores and elsewhere for the purpose of publicizing and promoting Artist's Records and Videograms and/or Artist generally. Your failure without good cause to comply with Artist's obligations under this Paragraph 13(a) will constitute a material breach of this Agreement.

(b) The copyright and all other rights conferred by law in respect of the literary, artistic and visual elements comprising the artwork and packaging produced and designed hereunder shall vest in Flip throughout the Territory for the full period of copyright therein and all possible renewals and extensions thereof.

(c) Notwithstanding anything to the contrary contained herein, you shall be entitled to use any Album's cover artwork for Limp Bizkut merchandising purposes provided you first reimburse Flip the out of pocket costs it incurred in connection with such artwork.

15. NOTICES

All notices, including statements and payments, required to be given hereunder shall be in writing and may be delivered to the other party personally or by registered or recorded delivery mail or by telegram addressed to that party at its address specified in this Agreement or such other address as the respective parties may designate by notice. The date of deposit of any such notice in the post office or telegraph office, postage or charges prepaid, shall be deemed the date of service thereof. You shall send an additional copy of each notice served upon Flip to Michael Guido, Esq., 40 West 57th Street, Suite 2104, New York, New York 10019. Flip shall send an additional copy of each notice served upon you to David Mantel, Esq., Katz, Smith & Cohen, Ivy Place, 3423 Piedmont Road N.E., Atlanta, Georgia 30305.

16. EXCEPTIONS TO EXCLUSIVITY

(a) Provided you have fulfilled all of your material obligations hereunder, you shall have the right to perform as a so-called "back-up" musician or "back-up" vocalist ("sideman") with featured artists for the purpose of making Records for third parties, provided; (i) such activities do not in any way interfere with the timely performance of your obligations hereunder;
(ii) the compositions so recorded shall not have been recorded by Artist hereunder and Artist shall not be restricted from thereafter recording the same compositions for Flip; (iii) no such performances nor phonograph Records derived therefrom shall in any way be identified with you other than as a sideman; Artist's names, photographs or likenesses shall not be used on record covers, labels or any advertising materials of such Records (except that artist's names may be used on the liner notes for albums derived from such performances in a size type not larger than is customary for the name of sideman); and Flip shall be given courtesy credit in

12

conjunction with any use of Artist's names.

(b) Notwithstanding anything to the contrary contained in this agreement, you are authorized to grant Commercial Videogram rights to third parties in conjunction with any substantially non-musical role you perform as an actor in any motion picture or television show.

17. **INDEPENDENT MARKETING**

In connection with the initial release of the EP in the United States, Flip agrees to expend a minimum of twenty ($20,000.00) dollars in the engaging of third party marketing and promotion consultants. In connection with the initial release of each Album in the United States, Flip agrees to expend a minimum of fifty thousand ($50,000.00) dollars in the engaging of third party marketing and promotion consultants.

18. **TOUR SUPPORT**

In connection with the initial release of the EP in the United States, Flip agrees to expend the minimum amount of $10,000.00 to subsidize the costs of a personal appearance tour which monies are deemed a non-refundable prepayment of Net Profits otherwise payable to you pursuant to this Agreement.

19. **MARKETING RESTRICTIONS**

It is understood and agreed that:

(a) Flip will not grant synchronization licenses which authorize the use of any Masters in motion pictures, television programs and other audiovisual soundtracks (other than television or radio commercials directly or indirectly promoting Artist, Masters, radio stations, Flip Records, or video channels such as MTV) without your prior written consent.

(b) If Flip elects to edit and/or remix any Master hereunder in connection with the initial release of any Committed LP embodying such Masters, then Flip shall offer you the first opportunity to edit and/or remix such Master, which editing and/or remixing must be completed within ten (10) business days following Flip's notice to you, and which offer shall be deemed rejected if you do not respond and/or complete such editing and/or remixing within said ten (10) day period. If you do not so remix such Master within said ten (10) day period, Flip shall have the right to edit and/or remix such Master.

(c) (i) Flip will meaningfully consult with you with respect to the selection of the Master to be embodied on the "A" Side of each Single released hereunder.

(ii) Flip will obtain your approval with respect to the selection of the Master to be embodied on the "B" Side of each Single released hereunder.

13

    (iii) No Master delivered hereunder shall be released on any Record sold embodying Masters recorded hereunder coupled with Masters not recorded hereunder, without your prior written consent, not to be unreasonably withheld, provided, however that the foregoing restriction shall not apply with respect to (i) up to two (2) Masters delivered hereunder with respect to each Album and (ii) so-called "Sampler Records", the coupling of Masters hereunder for jukeboxes or use of Masters in promotional Records, Videograms or Records used in connection with public transportation carriers or facilities.

    (iv) No premium record sales or sales of Records through record clubs shall be made without your prior written consent, not be unreasonably withheld.

  (d) Both during and after the Term, Flip will not, without your prior written consent, license any Master motion pictures, or in radio commercials.

  (e) With respect to any "Greatest Hits" or "Best of ..." Albums embodying Masters delivered hereunder ("Greatest Hits Albums") to be released by Flip, the following shall apply:

    (i) During the Term, Flip and you shall mutually approve all Masters to be included on a Greatest Hits Album, provided that any Master previously released as the "A Side" of a Single shall be deemed approved. If Flip and you are unable to mutually agree on Masters to be included on such Album, then Flip and you shall alternate selecting twelve (12) Masters.

    (ii) Flip shall pay you an additional advance in respect of any such Greatest Hits Album in the amount of One Hundred Thousand ($100,000.00) Dollars, less any costs incurred in respect of the Extra Track and less the amount of any unrecouped balance in your royalty account as of the date of delivery of such Album to Flip. The foregoing advance shall be payable promptly after delivery of the Album to Flip.

    (iii) You agree to record a new Master (the "Extra Track") for inclusion of the Greatest Hits Album and Flip agrees to provide of up to twenty thousand ($20,000.00) dollars to pay recording costs therefor.

  (f) No use of "outtakes" or alternate versions of Masters shall be made by Flip without your prior written consent.

20. <u>MISCELLANEOUS</u>

  (a) The captions in this Agreement are for convenience and are not to be deemed a part of this Agreement or relied upon in the construction or interpretation thereof.

  (b) No waiver of any term or condition of this Agreement or any breach of this Agreement or any part thereof shall be deemed a waiver of any other terms or conditions of this Agreement or of any later breach of this Agreement or any part thereof.

From: Migdalia Jimenez To: Jordan Schur Date: 8/1/96 Time: 10:29:29

(c) You grant to Flip the right to assign this Agreement to: (i) any parent, associated or subsidiary company, or (ii) any other company owning or acquiring all or substantially all of the stock of Flip or its record operations assets, it being understood and agreed that nothing herein contained in this paragraph 19(c) shall be deemed to limit the right of Flip to license its rights in Masters. This Agreement is personal to you and may not be assigned by you in whole or in part.

(d) Illegality and unenforceability of any part of this Agreement shall not affect the legality or enforceability of the balance of this Agreement.

(e) You shall execute such other documentation as may reasonably be necessary for the purpose of vesting, confirming or further assuring any of the rights granted herein.

(f) You shall cooperate fully with Flip in enforcing its rights against unauthorized third parties such as (without limitation) those making or seeking to make recordings of you in derogation of Flip's right of exclusivity hereunder.

(g) Nothing contained or implied herein shall be deemed to give rise to the relationship of a partnership between the parties hereto.

(h) In this Agreement, unless the context otherwise requires, the masculine include the feminine and vice-versa and the singular includes the plural and vice-versa.

(i) Flip shall be entitled, at its own expense, at any time during the Term hereof, to take out life insurance on Artist for the benefit of Flip and you agree to submit to any medical examination as may be required by any reputable insurance company. Your failure of such a medical examination shall not be deemed a breach of this agreement.

(j) The provisions set forth herein constitute the entire agreement of the parties. This Agreement may not be modified, altered or changed except by an instrument signed by you and by a duly authorized officer of Flip. This agreement replaces any and all other prior agreements oral or in writing between the parties relating to your recording services.

(k) This Agreement shall be subject to the laws of the State of New York applicable to contracts made and to be wholly performed therein. All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District courts located in New York City.

(l) This Agreement shall not become effective unless and until fully executed by all

proposed parties hereto.

AS WITNESS the hands of the parties hereto the day and year first before written.

"Limp BizKut"                                    FLIP RECORDS, INC.

_____           By:  _____
Fred Durst

_____
Sam Rivers

_____
John Otto

16