## AMENDMENT

Amendment dated the ___ day of December 1996, to the agreement dated the 1 of July 1996 (the "Agreement") by and between Fred Durst, Sam Rivers, John Otto and Wesley Borland p/k/a "Limp Bizkut, _____, _____, _____ ("you" or "Artist") and Flip Records, Inc., 433 Broadway, New York, New York ("Flip").

WHEREAS, the parties have heretofore entered into the Agreement; and

WHEREAS, the parties desire to amend certain terms of the Agreement:

The parties hereby amend the Agreement as follows:

1. **The following is hereby added to the end of Section 1 of the Agreement.**

"    (r)    "Royalty Base Price": Royalty Base Price for Records shall be the Suggested Retail List Price applicable to the Phonograph Records concerned, less all excise, purchase, value added or similar taxes included in the price and less the applicable Container Charge. The Royalty Base Price for Records sold through any so-called "record club" will be he same as that for the identical Records sold through Normal Retail Channels in the territory concerned.

   (s)    "Container Charge": the applicable percentage, specified below, of the Suggested Retail List Price applicable to the Records concerned:

      (1)    Compact disc Records - twenty-five percent (25%).

      (2)    Other Records - twelve and one-half percent (12.5%) on analog vinyl-disc Records in single-fold packaging; fifteen percent (15 %) on analog vinyl-disc Records in single-fold packaging and twenty percent (20%) on analog Records in non-vinyl disc configurations.

   (t)    "Net Sales" - one hundred percent (100%) of gross sales, less returns, credits and reserves against anticipated returns and credits. Returns will be apportioned between Records sold and "free goods" in the same ratio in which Flip's customer's account is credited."

2. **Section 4(b) of the Agreement, is deleted and replaced with the following:**

"    (b)    (I)    The initial Contract Period of the term will end eight (8) months after the earlier of the dates referred to in sections (1) and (2) below:

      (1)    the date of completion of the lacquer, copper, or

1

Scanned Copy of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen   Date: 3/13/97 Time: 13:18:20   Page 3 of 20
2LIMP BIZK9314

equivalent masters to be used in the manufacturing the disc Phonograph Records unites to be made for distribution in the United States from the last Master Recordings made in fulfillment of your Recording Commitment for that Contract Period; or

          (2)   the date thirty (30) days after you give Flip notice that you have completed delivery of those Master Recordings,

but will not end earlier than one (1) year after the date of its commencement.

        (ii)   You grant Flip two (2) separate, consecutive and irrevocable option periods (the "First Option Period" and the "Second Option Period") to extend that term for additional Contract Periods ("Option Periods") on the same terms and conditions, except as otherwise expressly provided in this agreement. Each of those options shall be exercised by Flip, if at all, by notice to you not later than the expiration date of the Contract Period which is then in effect (the "current Contract Period"). Each Option Period for which Flip exercises its option will begin immediately after the end of the then-current Contract Period and will end eight (8) months after the earlier of the dates referred to in sections 4 (b)(I)(1) and (2) above. Notwithstanding the foregoing, the term will end upon Delivery of the last Master Recordings made in fulfillment of your Recording Commitment. You warrant, represent and agree that neither you nor any other Person furnishing your services will authorize the manufacture, distribution and/or exploitation of Phonograph Records consisting of Master Recordings embodying your Performances during six (6) month period commencing at the end of this agreement. In any agreement entered into before or during such six (6) month period between you or any other Person furnishing your services, on the one side, and any Person other than Flip, on the other side, regarding the manufacture, distribution and/or exploitation of Phonograph Records embodying the Master Recordings of any Performance rendered by you, a recitation of the parties' compliance with the terms of this paragraph 4 (b) (ii) will be included for the benefit of Flip and Flip shall be deemed a third party beneficiary thereof. After the term of this agreement, you will reasonably continue to cooperate with Flip, at Flip's reasonable request, with respect to any obligations that you thereafter may have under this agreement (e.g., any approval rights).

        (iii)   Each of the two (2) separate and consecutive Option Periods shall consist of two (2) Albums Consequently, the First Option Period shall consist of two Albums during that period and the Second Option Period shall consist of two Albums during that option period."

   3.   Section 4 (c) is deleted in its entirety and replaced with the following language:

"   (c)   Notwithstanding anything to the contrary contained or implied herein.

        (I)   You shall not commence the recording of the First Album earlier than three (3) months following delivery to Flip of the Converted Album

2

(ii) You shall not commence the recording of the first or second album of either the First or the Second Option Periods hereunder earlier that five (5) months following delivery to Flip of the First Album or any immediately preceding Album during the Term or any Option Period.

(iii) Flip shall not be obligated to accept delivery of the first or second album of either the First or the Second Option Periods hereunder earlier that seven (7) months after delivery to Flip of the First Album or any immediately preceding Album during the Term or any Option Period.

(iv) The first or second album of either the First or the Second Option Periods shall be delivered to Flip no later than eighteen (18) months after delivery to Flip of the First Album or any immediately previous Album during the Term or any Option Period."

4. Section 4(d)(ii) of the Agreement is deleted and replaced with the following:

"       (ii) during the First Option Period - two (2) albums.

(iii) during the Second Option Period - two (2) albums."

5. The following clause (iv) is added to section 4(e) of the Agreement:

"       (iv) The Artist shall have approval over any Video budget in excess of one hundred thousand ($100,000) dollars."

6. The second sentence of Section 5(b) is deleted, and the following clauses are added to the end of Section 5:

"       (c) All monies paid by Flip to you during the term of this agreement, except royalties or your share of net receipts or credits, as applicable, paid pursuant to sections 7, 9 and 21, will constitute recoupable non-returnable advances. Each payment (except such royalties or receipts) made by Flip during the term to anyone else on your behalf will also constitute an Advance if it is made with your written consent, if it is required by law, or if it is made by Flip to satisfy an obligation incurred by you in connection with the subject matter of this agreement. Flip will advise you before making any such payment to satisfy an obligation incurred by you and will accord you an opportunity to make the payment yourself, or to resolve any dispute with respect to such obligation, unless the delay would subject Flip to any liability."

(d) (1) In connection with each Commitment Album, Flip will pay you an Advance in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs (including reasonably anticipated Recording Costs not yet paid or billed) for such commitment Album:

WM: c\office\wpdoc\flip\agt 1-21                             3

Scanned Copy Of Original 03-18-2002 16:07:32
From: Magdalia Jimenez To: David Cohen Date: 3/19/97 Time: 13:19:21
02 LIMP BIZK9316
Page 5 of 20

(A) The amount of the Recording Funds for the Second Album Delivered of the Initial Period, the first and second Albums Delivered of the First Option Period and the first and second Albums Delivered of the Second Option Period shall be, subject to the minimum and maximum amounts set forth below in paragraph 5(d) (A) (III), the lesser of:

(I) the net amount of royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of the Commitment Album released most recently before the Delivery of the Commitment Album concerned (the "Prior Album"), as determined by Flip from its most recent monthly trial balance accounting statement as of the later of (a) the date twelve (12) months after the initial United States release of the Prior Album; or (b) the date the applicable Subsequent Commitment Album is required to be Delivered, or the date Subsequent Commitment Album actually is Delivered hereunder, if earlier, after deduction of reserves for returns and credits not exceeding fifteen percent (15%) of the aggregate number of units of that Album shipped to Flip's customers in the United States.

(II) the net amount of royalties of such royalties on the two (2) Prior Albums.

(III)

| ALBUM | MINIMUM AMOUNT | MAXIMUM AMOUNT |
|---|---|---|
| Second Album of the Initial Period | $325,000.00  396,074.30 | $650,000.00 |
| First Album of First Option Period | $350,000.00 | $700,000.00 |
| Second Album First Option Period | $350,000.00 | $700,000.00 |
| First Album of Second Option Period | $400,000.00 | $800,000.00 |
| Second Album of Second Option Period | $400,000.00 | $800,000.00 |

(2) Each such Advance will be reduced by the amount of any reasonably anticipated costs of mastering, remastering, remixing and/or "sweetening" (which cumulative amount shall not exceed fifteen percent (15%) of the applicable Recording Fund); any such anticipated costs which are deducted but not incurred will be remitted promptly to you. Notwithstanding the foregoing, Flip will not reduce and Advance by the amount of costs incurred in connection with remixing occurring after the Delivery to Flip of the Commitment Album concerned, but all such costs shall constitute Recording Costs hereunder. If any Commitment

WM. c\office\wmdocs\flip\agt 1-28

4

Scanned Copy Of Original 03-18-2002 16:07:32
From: Magdalena Jimenez To: David Cohen Date: 3/13/97 Time: 13:19:48
08/02 LIMP BIZK9317

Album is not Delivered within one hundred and twenty (120) days after the Actual Due Date of the Album concerned (the "Determination Date"), the Recording Fund for that Album will be reduced by five percent (5%) for each thirty (30) day period (or fraction thereof) occurring subsequent to the Determination Date and prior to the Delivery of such Album; provided, however, that in no event shall the Recording Fund for said Album be reduced to an amount less than the minimum Recording Fund set forth above for said Album; provided, however, in the event that you fail to Deliver any Commitment Album hereunder prior to the Actual Due Date solely by reason of the fact that you are engaged in a bona-fide tour in connection with a Commitment Album released hereunder, then Flip will consider in good faith extending the Actual Due Date with respect to the Commitment Album, but in no event by more than four (4) months.

(c) (1) A "Qualifying Recompilation Album," in this paragraph means a Recompilation Album consisting of: (1) Master Recordings made under this agreement and previously released in different Album combinations; and (2) new Master Recordings made hereunder of at least two (2) new Compositions, made expressly for initial release in that Recompilation Album and not applicable in reduction of your Recording Commitment. If you so determine (which you may do in your unrestricted discretion), you shall Deliver the two (2) new Master Recordings made under this agreement to Flip within seventy-five (75) days after Flip's request therefor.

(2) Promptly after Flip's release of a qualifying Recompilation Album on Topline Records for sale Through Normal Retail Channels in the United States during the term thereof, Flip will pay you an Advance in the amount of One Hundred and Fifty Thousand Dollars ($150,000). (No other advance will be payable in connection with those Recordings.) Each such advance will be reduced as provided in paragraph 5(d)(2). If your royalty account is in an unrecouped position (i.e., if the aggregate of the Advances (excluding the Recording Costs for the new Master Recordings) and other recoupable items charged to that account at the time of payment of that Advance exceeds the aggregate of the royalties credited to that account at the end of the most recent monthly trial balance accounting statement), the Advance payable under the first sentence of this subparagraph will be reduced by the amount of the unrecoupable balance; provided, however, in any event, Flip shall pay Recording Costs in connection with each new Master Recordings in an amount not in excess of an approved recording budget, plus an Advance in the amount of Twelve Thousand Dollars ($12,000) for each new Master Recording.

(3) The selection of Master Recordings to be included in each Recompilation Album shall be mutually determined by you and Flip. You hereby approve the inclusion of any Master Recording that has been released as a Single hereunder and has been listed among the first forty (40) Singles in the weekly chart of best-selling Singles in the Unites States in BILLBOARD (i.e., as of the date of this agreement, the chart entitled "HOT 100 SINGLES")."

7. Section 7 of the Agreement, is hereby deleted and replaced in its entirety as follows:

W.M. c:\office\wpdocs\limp\agt 1-28                           5

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen    Date: 3/13/97 Time: 13:20:22
18/02LIMP BIZK9318

"7. **Royalties**

7.01. Flip will pay you a royalty computed at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect of Net Sales of Phonograph Records consisting entirely of Master Recordings recorded under this agreement during the respective Contract Periods specified below and sold by Flip or its Licensees Through Normal Retail Channels ("NRC Net Sales"). (Such royalty shall include your royalties and all royalties payable to all other artists, Producers and other Persons which become or may become due by reason of the recording and/or exploitation of Master Recordings recorded under this agreement, other than "per-record royalties" and the royalty, if any, payable to Flip Records.) The royalties payable pursuant to the provisions of paragraph 7.01, 7.02, 7.03, 7.04, and 7.05 and the provisions of section 21 shall apply to all Phonograph Records except Audiovisual Records. The royalties payable pursuant to the provisions of paragraph 7.06 shall apply solely to Audiovisual Records.

(a) ON ALBUMS SOLD FOR DISTRIBUTION IN THE UNITED STATES

(1) (i) Master Recordings made during the initial Contract Period: 16%.

(ii) Master Recordings made during the First Option Period: 16.5%.

(iii) Master Recordings made during the Second Option Period: 17%.

(iv) The royalty rates pursuant to subsection 7.01(a)(i),(ii) and (iii) will apply to the initial 500,000 units of NRC Net Sales in the United States ("USNRC Net Sales") of each Album made during each such period. The royalty rates will be increased by:

(A) .5%, on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B) .5%, on USNRC Net Sales of any such Album in excess of 1,000,000 units.

(2) As used herein, the "Base U.S. Album Royalty Rate" for a particular Album Delivered hereunder (and each Master Recording embodied therein) shall mean a royalty rate equal to the royalty rate for the first USNRC Net Sale of such Album on a configuration-by-configuration basis.

(3) The only Net Sales to be considered for the purposes of

escalating the royalty rates pursuant to sections 7.01(a)(1), above shall be USNRC Net Sales. Without limiting the foregoing, Net Sales subject to the remainder of section 21 shall not be considered for the purposes of such escalations. None of the foregoing escalations shall result in an increase in any royalty rates contained herein other than for USNRC Net Sales under sections 7.01(a)(1), even though other royalty rates may be based on the royalty rates set forth in those paragraphs.

(b) ON ALBUMS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

(1) On Albums Delivered hereunder and sold for distribution in Canada: 85% of the Base U.S. Album Royalty Rate;

(2) On Albums Delivered hereunder and sold for distribution in the United Kingdom: 80% of the Base U.S. Album Royalty Rate;

(3) On Albums Delivered hereunder and sold for distribution in Japan, Australia, New Zealand, France, Austria, Switzerland, Spain, Italy, Scandinavia, Greece, Denmark, Belgium, the Netherlands and Luxembourg: 75% of the Base U.S. Album Royalty Rate; and

(4) On Albums Delivered hereunder and sold for distribution in the rest of the world: 60% of the Base U.S. Album Royalty Rate.

(c) (1) ON SINGLES SOLD FOR DISTRIBUTION IN THE UNITED STATES: 10%. As used herein, the "Base U.S. Single Royalty Rate" shall mean 10%.

(2) ON TWELVE-INCH SINGLES SOLD FOR DISTRIBUTION IN THE UNITED STATES: 12%. As used herein, the "Base U.S. Twelve-Inch Single Royalty Rate" Shall mean 12%.

(3) ON EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION IN THE UNITED STATES: 12%. As used herein, the "Base U.S. Extended Play Royalty Rate" shall mean 12%.

(d) ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

(1) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in Canada: 85% of the Base U.S. Single Royalty Rate, Base U.S. Twelve-Inch Single Royalty Rate or Base U.S. Extended Play Royalty Rate, as applicable.

(2) On Singles, Twelve-Inch Singles and Extended Play

7

Scanned Copy Of Original 03-18-2002 16:07:32

08/02LIMP BIZK9320

Records sold for distribution in the United Kingdom: 80% of the U.S. Single Royalty Rate, Base U.S. Twelve-Inch Single Royalty Rate or Base U.S. Extended Play Royalty Rate, as applicable

(3) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in Japan, Australia, New Zealand, France, Austria, Switzerland, Spain, Italy, Scandinavia, Greece, Denmark, Belgium, the Netherlands and Luxembourg: 75% of the Base U.S. Single Royalty Rate, Base U.S. Twelve-Inch Single Royalty Rate or Base U.S. Extended Play Royalty Rate, as applicable.

(4) On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in the rest of the world: 60% of the Base U.S. Single Royalty Rate, Base U.S. Twelve-Inch Single Royalty Rate or Base U.S. Extended Play Royalty Rate, as applicable

(e) ON RECOMPILATION ALBUMS: The royalty rates applicable under subparagraph 7.01(a) and (b) to a Recompilation Album will be determined by proration on the basis of the number of Master Recordings in it, using the following rates:

(1) The rates applicable to any Master Recording previously released by Flip in another Album will be the rates applicable to the latter Album on the date of Flip's initial release of the Recompilation Album concerned.

(2) The rates applicable to any other Mater Recording will be those applicable to the most recent Commitment Album released prior to the initial release of the Recompilation Album concerned.

If any non-affiliated Licensee of Flip, or Interscope Records, for a territory other than the United States accounts to Flip on the basis of less than one hundred percent (100%) of Net Sales, Flip will account to you for the Records concerned on the same basis, but not on less than ninety percent (90%) of Net Sales.

7.01. Notwithstanding anything to the contrary contained in this agreement, with respect to Records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of Records sold in such territory(ies), the royalty payable hereunder shall equal the lesser of: (a) the applicable royalty payable under subparagraph 7.01(b) or (d); or (b) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to three (3%) percent of the retail list price and such monies as Flip or its Licensees shall be required to pay to all applicable union funds in respect of said sales.

7.03 (a) The royalty rate on any Record described in section (1), (2), or (3) of this sentence will be one-half (½) of the royalty rate that would apply if the Record concerned were

WM: c\office\wp-lic\\flip\agt 1-28

8

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen    Date: 3/13/97 Time: 13:21:48    Page 10 of 20
08/02:LIMP BIZK9321

sold Through Normal Retail Channels: (1) any catalog Phonograph record sold by the special products operations of Flip or its Licensees ("SPO's") to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes (but not for sale to the general public Through Normal retail Channels); (2) any phonograph Record sold outside the United States by Flip or its Licenses in the country concerned in conjunction with a substantial radio or television advertising campaign during the calendar semi-annual period in which that campaign begins or the next such period (however, if the aggregate amount of money not accrued to your account because of the royalty reductions permitted pursuant to the terms of this subparagraph 7.03(a) equals Flip's or its Licensee's expenditures with respect to such television campaign, then thereafter the terms of this subparagraph 7.03(a) will be of no force and effect with respect to Net Sales of Records sold by Flip or its Licensees); and (3) any non-catalog Phonograph Record created on a custom basis for SPO clients. The royalty on any Record described in section (3) will be computed on the basis of the SPO's actual sales price less all taxes included in such price an Container Charges.

(b) In respect of any Master Recording: (1) leased by Flip or its Licensees to others for their distribution of Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Flip's licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called "record clubs"); or (3) embodied on Phonograph Records sold by Flip's Licensees in the United States through retail stores in connection with special radio or television advertisements (sometimes referred to as "key-outlet marketing"), Flip will pay you fifty percent (50%) of Flip's net receipts or credits with respect to such exploitation. ("Net receipts or credits", in the preceding sentence, means Flip's gross receipts as computed after deduction of all AFM, union and other applicable third party payments actually made or incurred; provided, however, if Flip's net receipts or credits from such sales are inclusive of manufacturing costs and/or Mechanical Royalties for the applicable Record(s) hereunder, your royalty shall instead be one-half (½) of the otherwise applicable royalty rate hereunder.) If another artist, a Producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates. No royalties shall be payable with respect to Records given away as "bonus" or "free" Records as a result of joining a record club or purchasing a number of records from a record club or in connection with any introductory, incentive or other offer made by a record club; provided, however, for the purposes hereof, the number of such non-royalty Records shall not exceed fifty percent (50%) of the total number of your Records distributed through such means.

(c) (1) If Flip or its Distributor sells Records directly (and not through other Licensees) via television and/or radio advertisements or through mail or phone order in the United States, then such sales for the purposes of subparagraph 7.01(a) hereof shall be deemed USNRC Net Sales and, accordingly, you shall be paid royalties with respect thereto in accordance with subparagraph 7.01(a) hereof, but only with respect to eighty-five percent (85%) of such Net Sales, with no 'Standard Free Goods' (defined in subparagraph 21(d), below), less the applicable Container Charge.

WM. c\office\wpdocs\flip\mgt 1-28

9

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez   To: David Cohen   Date: 3/13/97 Time: 13:22:26   Page 11 of 20

(2)     If Flip sells or licenses third parties to sell Records via telephone, satellite, cable or other direct transmission to the consumer over wire or through the air, the royalty rate will be the otherwise applicable royalty rate prescribed in paragraph 7.01 but, for purposes of calculating royalties payable in connection with such sales, the retail list price of such Records shall be deemed to be the then-current retail list price of analog tape copies of such records and in the case of Records which have no analog tape equivalent, the corresponding price of the vinyl disc (but in the United States, eighty-five percent (85%) of the then-current retail list price of such tape copies or corresponding vinyl disc with no "Standard Free Goods," less the Container Charge which applies to analog tape copies; provided, however, with respect to records sold by Flip's Licensees, in no event shall your royalty exceed one-half (½) of Flip's net receipts after deduction from Flip's gross receipts of union and all other applicable third party payments actually made or incurred by Flip.

7.04    (a)     The royalty rate on any Budget Record, any Premium record (Premium records will not be distributed without written consent) or any "picture disc" (i.e., a disc phonorecord with artwork reproduced on the surface of the Record itself) will be one-half (½) of the applicable royalty rate prescribed in paragraph 7.01. The royalty rate on any Mid-price record or any Record sold for distribution through military exchange channels will be three-fourths (3/4) of the applicable royalty rate prescribed in paragraph 7.01. (The preceding two sentences will not apply to a Budget Record sold within twenty-four (24) months, or to a Mid-price record sold within eighteen (18) months, after the initial release of the Master recordings concerned of Phonograph Records in the United States.) The royalty on any Premium Record or Record sold for distribution through military exchange channels will be computed on the basis of the actual sales price (or Post Exchange list price where applicable) less all taxes and Container Charges. The royalty rate on any Record which is not an Album, a Single, a Twelve-Inch Single, or an Extended Play Record will be two-thirds (2/3) of the applicable Album royalty rate prescribed in paragraph 7.01.

(b)     (i)     The royalty on any compact disc Record will be a royalty computed at eighty-five (85%) of the rate which would otherwise apply under this agreement. Notwithstanding the foregoing, the royalty rate on any compact disc Record will be increased to the following percentages of the otherwise applicable rate as follows:

(ii)    For the First and Second Album delivered during the initial contract period, for USNRC Net Sales in excess of 1,000,000: 90%;

(iii)   For the First and Second Album delivered during the First Option Period, for USNRC Net Sales in excess of 1,000,000. 95%.

(iv)    For the First and Second Album during the Second Option Period, for USNRC Net sales in excess of 1,000,000: 100%.

(c)     (i)     The royalty on any New Medium Record will be seventy-

10

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdelia Jimenez To: David Cohen   Date: 3/18/97 Time: 13:23:08
02:LIMP BIZK9323
Page 12 of 20

five percent (75%) of the rate which would otherwise apply under this agreement with respect to Net Sales in a particular New Medium occurring during the "Introductory Period" (defined below) applicable to that New Medium.

      (ii)  With respect to Net Sales in a particular New Medium occurring after the Introductory Period applicable to that new Medium, you and Flip agree to negotiate in good faith (in light of Flip's then-current policy with respect to royalty rates applicable to Net sales in the applicable New Medium as same applies to artists on Flip's exclusive artist roster who then-currently maintain a stature in the United States record industry which is comparable to Artist's then-current stature in said industry for the purpose and intent of agreeing upon the percentage royalty rate payable to you with respect thereto; provided, however, in no event will the percentage royalty rate applicable to Net Sales hereunder in a particular New Medium occurring after the Introductory Period applicable to any New Medium exceed eighty-five percent (85%) of the rate which would otherwise apply under this agreement; and provided further, the provisions of this subsection (ii) are not intended to restrict Flip's rights hereunder to release, manufacture, sell, advertise and promote Records hereunder in a particular New Medium after the Introductory Period applicable to that New Medium. As used herein, the term "Introductory Period" shall mean, on a New Medium-by-Medium basis, that period commencing on the applicable "Commencement Date" (as such term is hereinafter defined) and ending three (3) years thereafter. As used herein the term "Commencement Date" shall mean, on a New Medium-by-New Medium basis, the applicable of the following: (A) if the first Phonograph Record released by Flip in the United States in the applicable New Medium (irrespective of the identity of the recording artist whose performance is embodied thereon) is released during the first three (3) months of a particular semi-annual accounting period, the commencement Date of the Introductory Period applicable to such New Medium shall be the first day of the semi-annual accounting period in which such release occurs and (B) if Flip's aforesaid first release in such New Medium shall be during the last three (3) months of a particular semi-annual accounting period, the Commencement Date of the Introductory Period applicable to such New Medium shall be the first day of the semi-annual accounting period immediately following the semi-annual accounting period in which such release occurs. Notwithstanding the foregoing, in the event that Net Sales in a New Medium of a particular Album released hereunder exceed thirty percent (30%) of all net sales of that Album, then the royalty rate for the New Medium on Subsequent Albums will be equal to the compact disc royalty hereunder.

      (3)  Notwithstanding anything set forth to the contrary in subsections 7.04(b)(1) or (2) above, if any of Flip's Licensees or Distributors accounts to Flip with respect to any New Medium sold outside the United States on the basis of a royalty rate less than the royalty rate applicable in the territory concerned to a Standard tape unit of the same Record release, Flip will account to you for the Record concerned on the same royalty basis, but not on less than a royalty basis computed at eighty-seven and one-half percent (87 ½%) of the otherwise applicable rate for compact disc Records and seventy-five percent (75%) of the otherwise applicable rate for any New Medium

WM: c:\office\mpdnce\flip\ag 1-28

11

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen      Date: 3/13/97 Time: 13:23:55

(d) The royalty rate on a Multiple Record Set will be the otherwise applicable royalty rate multiplied by a fraction (which shall in no event be larger than one (1), the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the territory where the Multiple Record Set is sold and the denominator of which is Flip's then-prevailing SRLP for Flip's newly-released Top-line Albums in such configuration in the applicable territory multiplied by the number of Records contained in such Multiple Record Set.

7.05. In respect of Phonograph Records derived from Master Recordings furnished by Flip or its Licensees to others for their manufacture and distribution of Records outside the United States, Flip will pay you fifty percent (50%) of the net receipts or credits derived from those transactions by Flip after deduction from Flip's gross receipts of all Mechanical Royalties, AFM, union and all other applicable third party payments actually paid (which payments will be apportioned as provided in paragraph 7.02 if another artist, a Producer, or any other Person is entitled to and paid royalties in respect of such Records), but not in excess of the amount of the royalties which would be payable to you for those Records under subparagraph 7.01(b) or (d) if they were manufactured and distributed by Flip or its Licensees.

7.06. Subject to the terms of this agreement, if Flip authorizes the use of any Master Recording made under this agreement on a flat fee basis, royalty rate or cent rate basis for any type of use not specifically covered elsewhere in this Section 7, (such as, but not limited to, use) in a commercial or motion picture other than a Covered Video), it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts or credits attributable directly to that use. "Net receipts or credits", in the preceding sentence, means Flip's gross receipts as computed after deduction of all payments required to be and actually made by Flip to third parties in connection with those uses (for example, re-use payments under Flip's agreements with the American Federation of Musicians). If another recording artist, a Producer, or any other Person is entitled to royalties on such uses, the amount to be credited under this paragraph will be apportioned in the same ratio as that among your respective basic royalty percentages. If any item of such receipts is attributable to Master Recordings made under this agreement and other Master Recordings, the amount of that item includible in gross receipts under this paragraph will be computed by apportionment on the basis of the number of royalty bearing Master Recordings involved.

7.07. Flip will pay you royalties as follows in connection with the following uses of Audiovisual Records (including for sales of Audiovisual Records which contain Covered Videos):

(a) (1) Flip will pay you a royalty (the "Net receipts or credits Royalty") in the amount equal to fifty percent (50%) of Flip's "Net Video Receipts" (defined below) derived from all uses of a Audiovisual Records which produce revenue directly for Flip other than the sales described in subparagraph 7.07(b) below.

(2) "Gross Receipts", in this subparagraph 7.07(a), means all monies (including advances) actually received by Flip (or credited to Flip's account against advances

previously received) in the United States which are specifically allocated to the exploitation of Audiovisual Records hereunder. "Net Video Receipts" means Gross Receipts, less all direct out-of-pocket expenses paid to third parties, taxes, adjustments, and collection costs incurred by Flip in connection with the exploitation of such Audiovisual Records, all payments required to be made to Persons other than you or any other "Royalty Participant" (as hereinafter defined), including, without limitation, to unions or guilds or to publishers of non-Controlled Compositions and "Independent Interests" (as hereinafter defined) in Controlled Compositions in connection with the production and/or exploitation of such Audiovisual Records and any Covered Videos embodied therein, and a distribution fee equal to fifteen percent (15%) of those Gross Receipts. Any item of expenses which is actually recouped from Gross receipts under this section will not be chargeable against royalties. If any item of revenue or expenses is attributable to an Audiovisual Record or a Covered video and to other audiovisual works, the amount of that item includible in Gross Receipts or deductible in computing Net Video Receipts will be determined be apportionment based on actual playing time of the royalty-bearing videos on the Record concerned.

(3) You shall be solely responsible for and shall pay any and all monies to the Producers, to the producers and directors of the visual portion of the Audiovisual Records of Covered Videos, to the publishers of Controlled Compositions and to any other Persons (except publishers of non-Controlled compositions of Independent Interests which are embodied in the Audiovisual records or Covered Videos and any unions or guilds or their funds) who are entitled to a royalty or any other payment in respect of the exploitation of the Audiovisual Records (each such person being herein referred to as a "Royalty Participant"). Notwithstanding the foregoing, if Flip shall pay or be required to pay any such monies directly to any Royalty Participant, then Flip shall have the right to deduct same from any and all royalties payable to you pursuant to this paragraph 7.07.

(b) In Flip or Flip's Distributor manufactures and distributes Audiovisual Records embodying one or more Covered Videos, then, Flip will pay you royalties at the rates and in the manner set forth in this subparagraph 7.07(b), rather than the Net receipts or credits Royalty payable to you pursuant to subparagraph 7.07(a).

(1) On Net Sales of Audiovisual Records distributed in the United States: twenty percent (20%) of the applicable Royalty Base price for such Audiovisual Records, and on Net Sales of audiovisual Records distributed outside of the United States: fifteen percent (15%) of the applicable Royalty Base Price for such Audiovisual Records.

(2) The royalty rate payable to you on any Audiovisual Record containing a Covered Video and other audiovisual works will be determined by apportionment based on actual so-called royalty-bearing playing time on the Record concerned.

(3) The provisions of paragraphs 21( c ) and 21 (d) shall be applicable to sales of Audiovisual records under this subparagraph 7.07(b); provided, however, that Flip

13

shall not distribute "Standard Free Goods" (as hereinafter defined), but Flip shall have the right to distribute "Special Free Goods" (as hereinafter defined) with respect to Audiovisual Records hereunder.

(4)   The royalties payable in accordance with this subparagraph 7.07(b) shall be inclusive of all royalties that may be payable to all Persons (other than unions or guilds and their funds), including, without limitation, Royalty Participants and the publishers of both Controlled Compositions and non-Controlled Compositions or Independent Interests. If Flip makes any payments to any Person with respect to any such Audiovisual Record, then Flip shall have the right to deduct such payments from royalties otherwise payable to you with respect to Audiovisual Records."

8.   *Section 9 of the Agreement, is hereby deleted and replaced in its entirety as follows:*

"9.   **LICENSES FOR MUSICAL COMPOSITIONS**

9.01.   (a)   (1)   You grant to Flip and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this agreement, other than Audiovisual Records, and to distribute them in the United States and Canada.

(2)   For that license, Flip will pay Mechanical Royalties, on the basis of Net Sales, at the following rates:

(i)   On Records sold for distribution in the United States:   The rate equal to the minimum compulsory license rate applicable to the use of Compositions on Phonorecords under the United States copyright law on whichever of the following dates is the earlier:

(A)   The date of completion of Delivery of the Master Recordings constituting the Album project (or other recording project) concerned; or

(B)   The date of expiration of the time within which the Recording concerned is required to be Delivered

(ii)   On Records sold for distribution in Canada:   The rate prescribed in subsection (1) above or the rate equal to the lowest Mechanical Royalty rate prevailing in Canada on a general basis with respect to the use of Compositions on Standard Records, whichever is lower, but not less than four cents ($.04) (Canadian) in either event. The Mechanical Royalty on any Record sold through a so-called "record club" will be seventy-five percent (75%) of the amount fixed in subsection (1) or (ii) above. The mechanical Royalty on any Record described in subparagraph 7.03(a) will be three-fourths (3/4) of seventy-five percent

14

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen   Date: 3/13/97 Time: 13:25:58   Page 16 of 20
2LIMP BIZK9327

(75%) of the amount fixed in subsection ( I ) or (ii) above. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be one-half (½) of the amount fixed in subsection (I) or (ii) above, unless a different rate applies under section 9.01(a)(4) below. No Mechanical royalties will be payable for any Record described in paragraph 21(c). Notwithstanding the preceding sentence, Flip shall pay Mechanical royalties pursuant to this subparagraph 9.01(a) with respect to Controlled Compositions embodied on Albums hereunder on fifty percent (50%) of those units of such albums distributed in the United States as Standard Free Goods, but Flip shall not be obligated to pay Mechanical Royalties on any such Albums distributed as Special Free Goods.

        (3) if a Person, who is not the Artist, Producer, or anyone in which the Artist or Producer has a direct interest, holds a joint ownership interest ("Independent Interest") in a Controlled composition, Flip will have the right, at its election, to pay or credit directly to that Person a share of the Mechanical Royalty payable with respect to that Composition under subsection 9.01 (a)(2)( I ), proportionate to the amount of the Independent Interest, and increased proportionately on the basis of the full amount of the minimum statutory rate applicable under clause (A) or (B) of section 9.01(a)(2)( I ) (for example, $.033 if the Independent Interest is one-half (½) ownership interest and the applicable minimum statutory rate is $.066). The amount of the proportionate increase of each such payment or credit will constitute an Advance and will be recoupable from all monies becoming payable by Flip to you hereunder.

        (4) If ASCAP or BMI accords regular performance credit for any Controlled Composition which is an arranged version of a public domain work, the Mechanical Royalty rate on that Composition will be apportioned according to the same ration used be ASCAP or BMI in determining the performance credit. Flip will not be required to pay you at that rate unless you furnish it with reasonably satisfactory evidence of that ratio.

    (b) (1) The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be limited to twelve (12) times the amount which would be payable on it under section 9.01(a)(2) if it contained only one (1) Controlled Composition. The total Mechanical Royalty will be limited to two (2) times that amount on any Single, six (6) times that amount on any Extended Play Record, and three (3) times that amount on any Twelve-Inch Single or any other Record which is not an Album, a single, or an Extended Play Record.

        (2) The maximum Mechanical Royalty under this subparagraph (b) on a Multiple Record Set will be the same amount prescribed in section 9.01(b)(1), multiplied by a fraction, the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the United States and the denominator of which is Flip's then-prevailing SRLP for Flip's newly-released Top-line Albums in such configuration in the United States.

    (c) Flip will compute Mechanical Royalties on Controlled

WM. e\office\wpdocs\flip\agt 1-28      15

Compositions as of each February 28th (or 29th, if applicable), May 31st, August 31st and November 30th (or such other quarter-annual periods as Flip may elect in its sole discretion) for the prior three (3) months, in respect of each quarter-annual period in which there are sales, distributions or returns of Records on which Mechanical Royalties are payable to you, or liquidations of Mechanical Royalty reserves established previously. On the 15th day of the second month following the end of each such quarter-annual period, Flip will send a statement covering those Mechanical Royalties, less a reasonable reserve against anticipated returns and credits, and will pay any net Mechanical Royalties which are due. Mechanical Royalty reserves maintained by Flip against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. If Flip makes any overpayment of Mechanical Royalties to you or any person you will reimburse Flip for it; Flip may also recoup it from any payments due or becoming due to you hereunder. If Flip pays any Mechanical Royalties on Records which are returned later, those royalties will be considered overpayment. If the total amount of the Mechanical Royalties which Flip pays on any Record consisting of Master Recordings made under this agreement (including Mechanical Royalties for Compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under subparagraph 9.01(b), that excess amount will be considered an overpayment also.

9.02. You also grant to Flip and its Licensees and their designees an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos and Audiovisual Record, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so. Flip will not be required to make any payment in connection with those uses, and that license will apply whether or not Flip receives any payment in connection with any use of any Covered Video or Audiovisual record. If any exhibition of a Covered Video or an Audiovisual Record is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this agreement. (In all events, Flip and its Licensees will have no liability by reason of any such exhibition.)

9.03. (a)    If any Recordings made under this agreement contain copyrighted Compositions which are not Controlled Compositions, you will use reasonable efforts to obtain licenses covering those Compositions for Flip's benefit on the same terms as those which apply to Controlled Compositions under this Section 9. In all events, you will obtain licenses covering them for the United States providing for royalties at the minimum rate applicable to the use of Compositions on Phonorecords under the compulsory license provisions of the United States copyright law, and licenses for them for Canada providing for royalties at the rates prevailing in Canada on a general basis with respect to the use of Compositions on Standard Records, and otherwise on terms not less favorable to Flip in any respect than those prescribed and subparagraph 9.01(b) will continue to apply.

16

Scanned Copy Of Original 03-18-2002 16:07:32
From: Migdalia Jimenez To: David Cohen    Date: 3/13/97 Time: 13:27:15
LIMP BIZK9329

(b)     You will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to Flip or its Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

9.04    You will notify Flip of the music publishers in which you have a direct or indirect interest. You will notify Flip promptly of each additional music publisher in which you acquire any such Interest and of every other change required to keep the list currently accurate.

9.05    Subject to the provisions of section 9.01(a)(3) above, if the copyright in any Controlled Compositions is owned or controlled by a Person other than you, you shall cause that Person to grant Flip and its Licensees and their designees the same rights as you are required to grant to Flip and its Licensees pursuant to this Section 9. Any assignment, license or other agreement made with respect to any Controlled composition shall be subject to the terms hereof.

9.06.   You also grant to Flip and its Licensees and their designees an irrevocable license under copyright to print and reproduce, at their election, the title and lyrics to any Controlled Composition on Album Artwork and in connection with Covered Videos or Audiovisual Records, including the packaging therefor, throughout the world in perpetuity, without payment to you or any other Person of any monies or other consideration in connection therewith; provided, however, that you have consented to inclusion of such lyrics in the Album Artwork."

9.      Section 15 of Agreement, titled "NOTICES," the address of Michael Guido, Esq. shall be deleted and replaced with:

"660 Madison Avenue, Fourteenth Floor, New York City, New York 10021."

10.     A new Section 21 of the Agreement shall be added after Section 20, in its entirety as follows:

"Notwithstanding anything to the contrary contained in Section 7:

(a)     In respect of Joint Recordings (which you shall express approval over) the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

(b)     The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings ("coupling") will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides embodying Master Recordings made hereunder and the denominator of which is the total number

of royalties Sides contained on such Record. During the term, Flip shall not, in the United States, couple more than two (2) Master Recordings made hereunder with other master recordings in any twelve (12) month period.

(c) Except as otherwise provided in subsection (d) below, no royalties will be due or payable in respect of Phonograph Records: (I) sold (for less than 50% of Flip's posted wholesale price), distributed or furnished on a no-charge basis by Flip or its Licensees for promotional purposes (including, without limitation, Records to disc jockeys, publishers, motion picture companies, television and radio stations, and other customary recipients of promotional Records) or to Flip's or its Licensees' employees and relatives; (II) sold, distributed or furnished on a no-charge basis to members to members, applicants or other participants in any "record club" or other direct mail distribution method (subject to section 7.02 (b) above); (III) sold at close-out prices or as surplus, overstock or scrap; (IV) sold as cutouts after the listing of such Record had been deleted from the catalogue of Flip or its Licensees; (V) given away or shipped as "free," "no charge," or "bonus" Records (whether or not intended for resale); and (VI) sold at a discount from the Record's posted wholesale list price (but for more than 50% of such price), whether or not intended for resale. In determining the number of Records as to which no royalties are payable pursuant to subparagraph (VI) above, Flip shall multiply the percentage amount of such discount by the number of Records sold at such discount. No royalties will be payable to you on Records containing Recordings of not more than two (2) Master Recordings made hereunder sold a "samplers" at a price which is fifty percent (50%) or less of the SRLP of Flip's then current newly-released Top-line Records, on Records intended for free distribution as "samplers" to automobile or audio and/or audio/visual equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

(d) Those Records distributed pursuant to subparagraphs 21(c)(V) and (VI) are herein referred to as "Free Goods." Flip shall have the right to distribute Free Goods not in excess of its then current Distributor's standard policy ("Standard Free Goods"), which, for Albums currently is fifteen percent (15%) of the aggregate units of all Top-line Albums distributed under this agreement. In addition, from time to time, Flip or its Distributor, jointly or separately, shall have the right to conduct special sales programs of limited duration which include the distribution of Free Goods in excess of the limitation set forth in the preceding sentence ("Special Free Goods"), but not in excess of ten percent (10%) of the aggregate units of all Albums distributed under this agreement. If Flip distributes Free Goods in excess of the foregoing limitations, Flip will not be in breach hereof, but Flip will pay you your normal royalty on such excess.

(e) If legislation requiring the payment of copyright royalties for the public performance of Phonograph Records is enacted in the United States and Flip receives such royalties with respect to Master Recordings produced under this agreement, and you do not receive or waive any similar payment from anyone other than Flip, then Flip will credit your royalty account with that portion of such royalties as required (e.g., by law, applicable collective bargaining agreement, etc.), less any portion thereof which is payable by Flip to Producers or any other Person; provided, that if you receive payment in respect thereof from any other Person, then

Flip shall credit your royalty account with such amount as shall provide you with a total (including the share received by you from any other Person) equal to one-half (1/2) of the aggregate amount paid to Flip, you less any portion thereof which is payable by Flip to any Producers or any other Person."

**11.  The following is added to the end of Section 20 of the Agreement:**

"   (m)   Flip presently has a distribution agreement with Interscope/MCA Records ("Interscope") for records embodying the Master Recordings made under this agreement, (the "Interscope Agreement"). In the event that the Interscope Agreement ends and Flip does not doe not secure a distribution agreement for you with any other major distributor within six (6) months thereof, the terms of this December 1996 Amendment shall no longer be in effect, and the terms of the August 1, 1996 Agreement and the September 1996 Amendment to that Agreement shall be in full force and effect."

AS WITNESS the hands of the parties hereto the day and year first before written.

"Limp-BIZKut"

_____
Fred Durst

_____
Sam Rivers

_____
John Otto

_____
Wesley Borland

FLIP RECORDS, INC.

By: _____

WM: c:\office\wpdocs\flip\agt 1-28

19