Dated as of October 15, 1999

Fred Durst, Jon Otto, Sam Rivers
and Wesley Borland, p/k/a "Limp Bizkit"
c/o David Mantel, Esq.
7 West 22nd Street, 4th Floor
New York, NY 10010

RE:   **LIMP BIZKIT / RECORDING AGREEMENT AMENDMENT**

Gentlemen:

This letter, when fully executed, shall constitute an amendment of that certain Recording Agreement, dated as of July __, 1996, by and between Fred Durst, Jon Otto, Sam Rivers and Wesley Borland, p/k/a "Limp Bizkit" (individually and collectively, "Artist"), and Interscope Records ("Interscope") (as successor-in-interest to Flip Records, Inc. ("Flip")), as amended (the "Agreement"). Capitalized terms used herein and not otherwise defined shall have the same meanings as in the Agreement.

In consideration of the mutual promises contained herein the parties hereto agree as follows:

1.   **Execution Advance.** Promptly following the execution of this Amendment, Interscope will pay Artist a general advance in the amount of Seven Million Dollars ($7,000,000). The foregoing general advance will constitute an advance recoupable from royalties (excluding mechanical royalties, except as otherwise specifically provided to the contrary in the Agreement).

2.   **Additional Album.** Artist hereby grants Interscope an irrevocable option to extend the term of the Agreement for one (1) additional Contract Period (the "Third Option Period"), on the terms and subject to the conditions set forth in the Agreement, except as otherwise provided in this Amendment. The Recording Commitment for the Third Option Period will be one (1) Album.

3.   **Third Album.**

    (a)   In lieu of the Recording Fund set forth in the Agreement, the Recording Fund for the Third Album (the "Third Album Fund") shall be Two Million Dollars

18/02LIMP BIZK9333

Fred Durst, Jon Otto, Sam Rivers
and Wesley Borland, p/k/a "Limp Bizkit"
Dated as of October 15, 1999
Page 2

($2,000,000), subject to adjustment as set forth below. Interscope will pay the Recording Costs for the Third Album pursuant to a mutually approved budget, and the balance of the Third Album Fund, less all Recording Costs paid or incurred by Interscope, will be paid to Artist within thirty (30) days after the Delivery to Interscope of the Third Album.

(b)     For each unit of the Album entitled Significant Other sold in the United States from five million (5,000,000) units through six million (6,000,000) units (as measured by Soundscan as of March 31, 2000), the Third Album Fund will be increased by One Dollar ($1.00), and for each unit of such Album sold in the United States in excess of six million (6,000,000) units (as measured by Soundscan as of March 31, 2000), the Third Album Fund will be increased by One Dollar and Fifty Cents ($1.50), subject to a maximum aggregate increase of Four Million Dollars ($4,000,000).

(c)     Artist will complete a tour of Canada and Europe (the "Tour") prior to December 31, 1999. The elements of the Tour will be subject to the mutual approval of Artist and Interscope, such approval not to be unreasonably withheld or delayed, provided that the Tour will include the following elements: (i) November 19, 1999 - promotional day in Toronto, Canada; (ii) November 17 and 18, 1999 - Canadian concerts in Montreal and Toronto; and (iii) a meaningful promotional tour of Europe commencing approximately December 4, 1999 and consisting of at least seven (7) days of promotional work in Europe, provided that Artist will consider in good faith a request by Interscope to extend the duration of such promotional tour up to no later than December 19, 1999. In the event that Artist does not complete the Tour in accordance with this paragraph, the Third Album Fund will be reduced by One Million Dollars ($1,000,000) (provided that such fund shall not be reduced to less than the actual recording costs for the Third Album not in excess of the approved Budget therefor).

(d)     Artist will commence recording of the Third Album no later than March 15, 2000. For purposes of this Amendment, the commencement of recording of the Third Album will be deemed to have occurred no later than March 15, 2000 if, by no later than March 21, 2000, Artist has completed five (5) consecutive days of meaningful recording work in the studio in the context of a recording schedule that will enable Artist to complete the recording of such Album in a reasonably expeditious manner. If Artist has not commenced recording of the Third Album as set forth in this subparagraph by March 15, 2000, then, unless the delay in the commencement of recording has been approved in advance in writing by Interscope, in addition to the option granted pursuant to paragraph 2 above, Artist will be deemed to have granted Interscope an additional irrevocable option to extend the term of the Agreement for one (1) additional Contract Period (the "Fourth Option Period"), on the terms and subject to the conditions set forth in the Agreement, except as otherwise provided in this Amendment. The Recording Commitment for the Fourth Option Period, if any, will be one (1) Album.

LimpBizkitAmendment3.doc SH:sb/10/18/99

Scanned Copy of Original 03-18-2002 17:05:12
18/02LIMP BIZK9334

Fred Durst, Jon Otto, Sam Rivers
and Wesley Borland, p/k/a "Limp Bizkit"
Dated as of October 15, 1999
Page 3

(e)   Artist will Deliver the Third Album to Interscope no later than August 31, 2000. If the Third Album is not Delivered by August 31, 2000, then, unless the delay in Delivery has been approved in advance in writing by Interscope, the Third Album Fund will be reduced by Five Hundred Thousand Dollars ($500,000) for each month (or fraction thereof) occurring subsequent to August 31, 2000 and prior to the Delivery of such Album (e.g., if the Third Album is Delivered at any time between September 1, 2000 and September 30, 2000, the Third Album Fund will be reduced by Five Hundred Thousand Dollars; if the Third Album is Delivered at any time between October 1, 2000 and October 31, 2000, the Third Album Fund will be reduced by One Million Dollars; etc.) (provided that such fund shall not be reduced to less than the actual recording costs for the Third Album not in excess of the approved Budget therefor). Notwithstanding the foregoing, the inadvertent failure to deliver particular non-material items concurrently with the Master Recordings comprising the Third Album shall not in and of itself extend the date of Delivery to the date of actual receipt of such item, provided that such failure does not affect or delay the release of the Third Album and does not materially affect Interscope's rights hereunder, and provided that such item is actually delivered to Interscope.

(f)   If by reason of a Force Majeure event (as hereinafter defined) Artist fails to commence recording of the Third Album within the time period prescribed in subparagraph (d) above or fails to Deliver the Third Album within the time period prescribed in subparagraph (e) above, then the running of the applicable time period will be suspended for the duration of such Force Majeure event. A "Force Majeure" shall mean any act of God, fire, earthquake, strike, civil commotion, act of government or any order, regulation, ruling or action of any labor union or association of artists, the death or disability of Artist or any of its members, the unavailability of a producer or recording facility previously approved by Interscope (provided Artist has submitted an alternate selection and Interscope has disapproved that selection) or any other event beyond Artist's reasonable control.

4.   Royalties.

(a)   Sections 7.01(a)(ii) and 7.01(a)(iii) of the Agreement are hereby deleted in their entirety and the following sections inserted in their place and stead:

"(ii)   On Master Recordings made during the first Option Period: 17%.

(iii)   On Master Recordings made during the second, third and, if applicable, fourth Option Periods: 17%."

Fred Durst, Jon Otto, Sam Rivers
and Wesley Borland, p/k/a "Limp Bizkit"
Dated as of October 15, 1999
Page 4

For the avoidance of doubt, the sales escalations contained in section 7.01(a)(iv) of the Agreement shall apply to the foregoing royalty rates.

(b) The compact disc rate reduction contained in subparagraph 7.01(b) of the Agreement shall not apply to the Third Album or any other Record embodying Master Recordings made under the Agreement that is initially released after the date hereof.

5. Additional Albums.

(a) The Recording Funds for the Commitment Album to be Delivered during the Third Option Period and the Commitment Album to be Delivered during the Fourth Option Period (if any) will be calculated in accordance with subsection 6(d)(1)(A) of the Agreement, provided that the minimum amount of the Recording Fund for each such Album will be One Million Dollars ($1,000,000) and the maximum amount will be Three Million Dollars ($3,000,000).

(b) Each of the Third Option Period and the Fourth Option Period (if any) will end, unless extended as provided in the Agreement, six (6) months after Interscope's United States retail street date for the last Master Recording Delivered by Artist in fulfillment of the Recording Commitment for that Option Period. Notwithstanding the foregoing, but subject to the other provisions of this Amendment and the Agreement, neither such Option Period will end prior to the date ten (10) months after the date of commencement thereof. Artist will fulfill the Recording Commitment for each of the Third Option Period and the Fourth Option Period (if any) within the first six (6) months of such Option Period. Artist will not begin recording of either of the Commitment Album to be Delivered during the Third Option Period or the Commitment Album to be Delivered during the Fourth Option Period (if any) within five (5) months after the Delivery of the prior Commitment Album.

6. Videos. Effective as of the commencement of the term of the Agreement, fifty percent (50%) of the production and acquisition costs incurred in connection with any Covered Video will be recoupable from Artist's royalties (excluding Mechanical Royalties) on sales of Records which do not reproduce visual images ("audio royalties"), and one hundred percent (100%) of such costs will be recoupable from all monies (excluding Mechanical Royalties, if any) otherwise payable to Artist from the exploitation of such Covered Videos pursuant to paragraph 7.07 of the Agreement. If any such costs are recouped from audio royalties and additional royalties accrue under paragraph 7.07 subsequently, the latter royalties will be applied in recoupment of those costs and the amount of those audio royalties which were previously applied against those costs will be credited back to Artist's account. Notwithstanding the foregoing, the production and acquisition costs for the videos entitled "Re-arranged" and "N 2 Gether

LimpBizkitAmendment3.doc SH:sh/10/18/99

Fred Durst, Jon Otto, Sam Rivers
and Wesley Borland, p/k/a "Limp Bizkit"
Dated as of October 15, 1999
Page 5

Now" will be recoupable as set forth in the letter, dated August 9, 1999, from David Cohen to Jeff Kwatinetz, a copy of which is attached hereto.

7.  Full Force and Effect.  Except as otherwise modified herein, the Agreement is hereby ratified and affirmed and remains in full force and effect.

If the foregoing accurately reflects the understanding and agreement of the parties, please sign this amendment where indicated below.

Sincerely,

INTERSCOPE RECORDS,
a California general partnership,
by its general partner

INTERSCOPE RECORDS, INC.
a Delaware corporation

By: _____

AGREED AND ACCEPTED:

_____
Fred Durst

_____
Jon Otto

_____
Sam Rivers

_____
Wesley Borland

FLIP RECORDS, INC.

By: _____

p/k/a "Limp Bizkit"

LimpBizkitAmendment3.doc SH:sb/10/18/99