

June 28, 1999


Fred Durst, Inc.
c/o David Mantel, Esq.
7 West 22nd Street, 4th Floor
New York, NY 10010


RE:    FRED DURST / FIRST LOOK AGREEMENT


Gentlemen:

        You and we agree as follows:

        1.    General Definitions.    The following terms shall have the following
meanings:

        (a)    (i)    The term "Term" shall mean the "Initial Period" and the
"Renewal Period" (if we exercise our option therefor);

            (i)    The term "Initial Period" shall mean the period commencing
on the date hereof and continuing until the date two (2) years thereafter, subject to
extension as provided herein;

            (ii)    The term "Renewal Period" shall mean the period
commencing immediately upon the expiration of the Initial Period and continuing for one
(1) year thereafter, subject to extension as provided herein. We shall have an option to
extend the term of this Agreement for the Renewal Period, upon all of the same terms
and conditions as contained in this Agreement.  The Renewal Period shall only
commence if we exercise our option therefor by written notice to you prior to the
expiration of the Initial Period;

            (iii)    The term "Contract Period" shall mean the Initial Period or
the Renewal Period;

            (iv)    The term "Contract Year" shall mean each one (1) year
period of the Initial Period or the Renewal Period.

        (b)    The term "Available Artist" shall mean (i) any individual, duo or
group whose recording services are available, of whom you are aware as of the date
hereof or become aware at any time during Term, and with whom you desire to record
Master Recordings (except for those Master Recordings in connection with which

Fred Durst, Inc.
June 28, 1999
Page 2

Principal renders services solely as a producer, mixer or remixer) or with whom you desire to enter into a recording agreement, or (ii) any person, duo or group (or entity furnishing his, her or their services) with whom you shall have entered into an Artist Agreement during the Term.  Reference is made to (i) the Recording Agreement, dated as of July __, 1996, by and between the recording artist professionally known as "Limp Bizkit" and us (as successor-in-interest to Flip Records, Inc.), as amended (the "Limp Bizkit Recording Agreement"); and (ii) the Solo Album Agreement, dated as of March 24, 1999, by and between the Principal and us (the "Solo Album Agreement").  For the avoidance of doubt, the parties hereto acknowledge and agree that this Agreement is wholly separate from and shall have no force or effect upon the Limp Bizkit Recording Agreement or the Solo Album Agreement.

(c)     The term "Artist" shall mean any Available Artist who is approved by us in writing and becomes subject to a Production Agreement.

(d)     The term "Rejected Artist" shall mean an Available Artist whom you have presented to us in accordance with the terms of this Agreement and with respect to whom we have notified you in writing that we elect not to enter into a Production Agreement or are deemed to have notified you in accordance with the provisions hereof that we elect not to enter into a Production Agreement.

(e)     The term "Artist Agreement" shall mean a recording agreement between you, on the one part, and an Available Artist or an entity furnishing to you the services of an Available Artist, on the other part.  Each Artist Agreement shall enable you to fulfill the terms hereof and of a Production Agreement if we so elect.

(f)     The term "Production Agreement" shall mean an agreement between you and us pursuant to which you furnish to us the exclusive recording services of a particular Artist in the form and on the terms set forth in Exhibit "A" attached hereto.

(g)     The term "Territory" shall mean the Universe.

(h)     The term "Principal" shall mean Fred Durst.

(i)     The term "Label Royalties" shall mean royalties (excluding Mechanical Royalties) earned by you pursuant to a particular Production Agreement less the royalties earned pursuant to the applicable Artist Agreement by the Artist (or entity furnishing the services of that Artist) subject to the Production Agreement in question.  Only for purposes of recoupment as described in subparagraph 5(a) below, Label Royalties for a particular Production Agreement shall not be less than royalties calculated at a rate of four percent (4%) of the applicable Royalty Base Price for USNRC Net Sales of Albums and otherwise calculated, prorated, proportionally reduced, adjusted and paid in all respects in accordance with the applicable provisions

FredDurst12.doc SH:sh/06/28/99

Fred Durst, Inc.
June 28, 1999
Page 3

of the applicable Production Agreement for all USNRC Net Sales of Albums and for all
other sales in and outside the United States of all Records embodying Master
Recordings.

(j)     The term "Artist Royalties" shall mean the royalties earned by a
particular Artist (or entity furnishing the services of that Artist) pursuant to a particular
Artist Agreement as a result of exploitations of Master Recordings pursuant to a
particular Production Agreement (including royalties paid to the applicable individual
producer or mixer pursuant to paragraph 2.02 of the Production Agreement (including
without limitation the Principal in the event he is engaged to perform such services)).
Artist Royalties shall not include royalties payable to a party for the mechanical
reproduction of Compositions controlled by that party.  Promptly following the execution
of each Production Agreement entered into by you and us, you shall notify us in writing
of the applicable royalty rate or rates for Artist Royalties pursuant to the  applicable
Artist Agreement.

(k)     The term "Artist Costs" shall mean (i) each Recording Fund (as that
Recording Fund may be adjusted pursuant to the applicable Production Agreement),
and (ii) Recording Costs and all other costs of any nature which are recoupable from
royalties pursuant to the particular Production Agreement to which that Artist is subject.

(l)     The term "Gross Royalties" shall mean all royalties (excluding
Mechanical Royalties) earned by you pursuant to a particular Production Agreement
(i.e., all royalties payable pursuant to Articles 9 and 10 (but excluding Article 12) of such
Production Agreement).

(m)     The terms "Album," "Composition," "Distributor," "Licensee,"
"Master Recording," "Person," "Record," "Royalty Base Price," "USNRC Net Sales,"
"Recording Fund," "Recording Costs," "Recording Commitment," "Side" and "Covered
Video" shall have the meanings attributed to those terms in the applicable Production
Agreement.

    2.    General Services.

(a)    (i)    During the Term, neither you nor the Principal, nor any entity
owned or controlled, in whole or in part, directly or indirectly, by you or the Principal,
shall (A) submit to any Person in the Territory other than us any Available Artist, (B)
render any "A&R," marketing or promotion services in the music recording industry for
any Person other than us other than with respect to Recordings embodying the featured
performances of a Rejected Artist and Recordings embodying the featured
performances of the recording artist "Staind," or (C) render or furnish Principal's
services as a producer, executive producer, mixer or remixer in the music recording
industry for any Person other than us other than with respect to the recording artist
"Staind," except as expressly provided in section 2(a)(ii) below.  The foregoing shall not

Fred Durst, Inc.
June 28, 1999
Page 4

be deemed to prohibit any such activity by the members other than the Principal of the
recording artist professionally known as "Limp Bizkit" or any existing entity owned by all
of the members of Limp Bizkit, provided that the Principal shall not render any services
in connection with, or have any financial interest in, any such activity by such an entity.
The foregoing will not be deemed to prohibit your or the Principal's purchase or
ownership, as a passive investment, of not more than one percent (1%) of the
outstanding capital stock of any corporation whose stock is publicly traded. During the
Term, you shall cause the Principal to render such services as we may reasonably
request in connection with Artists and Master Recordings, including rendering "A&R"
services in connection with the recording of Master Recordings pursuant to any
particular Production Agreement, rendering services as a producer of recordings
(subject to subparagraph 2(g) below), rendering services as a video director (subject to
subparagraph 2(h) below), and consulting with us, as and when we may reasonably
request, in the marketing and promotion of Records embodying Master Recordings and
Records embodying the performances of other recording artists signed to Interscope
Records or our affiliated record labels ("Interscope Artists"). Neither you nor the
Principal shall be our employee for any purposes hereof (except for the limited purpose
set forth in the applicable Production Agreement, if at all, in connection with our
ownership of the sound recording copyright in and to Master Recordings), and neither
you nor the Principal shall hold yourself or himself out as our employee. All services
rendered hereunder shall be rendered on an independent contractor basis and, in
connection therewith, you shall maintain your own offices and other materials, and you
shall be solely responsible for the payment of costs related thereto.

(ii)    Subject to the next sentence of this section 2(a)(ii), during
each Contract Year the Principal shall have the right to render his services as a
producer of not more than one (1) Album embodying the featured performances of one
(1) Rejected Artist or one (1) other recording artist who has had an album certified
platinum or better by the RIAA during the preceding five years, and not more than two
(2) additional Sides embodying the featured performances of any recording artist(s),
and the Principal shall have the right to render his services as a mixer or remixer of not
more than two (2) Sides embodying the featured performances of any recording
artist(s). Notwithstanding the foregoing, the Principal shall not render his services as a
producer, mixer or remixer of any recordings other than pursuant to subparagraph 2(g)
below during the first three (3) months of the first Contract Year.

(b)    During each Contract Year, you shall submit exclusively to us for
our consideration all Available Artists. For the avoidance of doubt, any recording artists
that you or the Principal may have informally presented to Interscope Records
executives prior to the date of this Agreement shall not be deemed to have been
submitted to us in accordance with this subparagraph 2(b) and you shall not submit any
such artist to any third party prior to submitting such artist to us hereunder. During each
Contract Year of the Term, you shall submit to us not less than three (3) bona fide
Available Artists. If you fail to submit to us at least three (3) bona fide Available Artists

Fred Durst, Inc.
June 28, 1999
Page 5

in any Contract Year hereunder, then the running of that Contract Year (and the
corresponding Contract Period) automatically, without notice, shall be suspended and
shall be extended until the date sixty (60) days after the date on which you shall have
submitted to us the third of those three (3) Available Artists during the Contract Year in
question. We shall have the right to suspend any of our obligations hereunder during
the period of any suspension, but no such suspension shall in any way impair any of
our rights hereunder. Notwithstanding the foregoing, during any period of suspension
pursuant to the foregoing provisions of this subparagraph (b), we shall not suspend our
obligations to account for and pay Artist Royalties and Mechanical Royalties if
otherwise payable pursuant to any particular Production Agreement then in effect and
in accordance with the provisions hereof. You shall give us written notice of each
Available Artist, together with, if we so request, no less than three (3) demonstration
recordings embodying the featured performances of that Available Artist. If we request
such demonstration recordings, we shall pay the recording costs actually incurred in
connection therewith (pursuant to a budget approved in advance in writing by us). If we
elect to enter into a Production Agreement with respect to that Available Artist, such
recording costs shall constitute recoupable Recording Costs in connection with the First
Album under such Production Agreement; if we do not elect to enter into a Production
Agreement with respect to that Available Artist, such recording costs shall be non-
recoupable. At our request and non-recoupable expense (pursuant to a budget
approved in advance in writing by us), you shall arrange for a live performance audition
by a particular Available Artist for our designated representatives or you shall arrange
for our designated representatives to attend a live performance at our non-recoupable
expense by a particular Available Artist at a venue at which that Available Artist is then
performing.

(c) We shall determine in our sole discretion whether any particular
Available Artist submitted by you shall become an Artist hereunder (except as
specifically provided to the contrary in subparagraph 2(d) below). No Available Artist
shall be deemed to be a Rejected Artist unless and until we notify you in writing that we
do not desire to enter into a Production Agreement with respect to that particular
Available Artist (or such Available Artist is deemed to be a Rejected Artist as provided
in the next sentence). If we fail to notify you that we elect to enter into a Production
Agreement with an Available Artist on or before the date thirty (30) days (or such
greater number of days on which you and we may agree in any specific instance) after
we receive your written notice and demonstration recordings embodying the featured
performances of the Available Artist in question, then that Available Artist shall be
deemed to be a Rejected Artist. If we notify you in writing that we elect to enter into a
Production Agreement with respect to such Available Artist (provided such Available
Artist has not been deemed to be a Rejected Artist as provided in the preceding
sentence), you and we shall be deemed to have entered into the applicable Production
Agreement with respect to the particular Available Artist. In connection with each
Available Artist with respect to whom you and we enter into a Production Agreement
pursuant to this subparagraph 2(c), you shall promptly furnish to us all of the

FredDurst12.doc SH:sh/06/28/99

Fred Durst, Inc.
June 28, 1999
Page 6

information required by us to complete those sections of Exhibit A which are incomplete
as of the date hereof (such as the names of the members of Artist) and the inducement
letters attached thereto signed by each member of the applicable Artist. Upon our
request and after we shall have notified you pursuant to this subparagraph 2(c) that you
and we shall enter into a particular Production Agreement, you shall execute a
document in form and substance identical to Exhibit A containing complete information
with respect to the Artist in question and designation of Applicable Members (as defined
therein), if at all, as directed by us. Your failure to do so, however, shall not limit any of
our rights hereunder or otherwise with respect to the Artist in question or with respect to
the Production Agreement in question and, if you fail to do so within ten (10) business
days after our written request therefor, you shall be deemed to have granted to us an
irrevocable power of attorney to include the relevant information in that documentation
and execute that documentation in your name and on your behalf.

(d)     With respect to each Contract Year, provided you are not then in
material breach of this Agreement (including, without limitation, your obligation to
submit to us written notice of each Available Artist together with demonstration
recordings embodying the featured performances of each Available Artist as provided in
subparagraph 2(b) above), then notwithstanding anything to the contrary contained
herein, but subject to the next sentence of this subparagraph 2(d), we shall enter into a
Production Agreement solely with respect to one (1) Available Artist submitted by you
during such Contract Year that you designate as a Required Artist (a "Required Artist")
and upon receipt of your notice designating such Available Artist as a Required Artist,
you and we shall be deemed to have entered into the applicable Production Agreement
with respect to such Required Artist, subject to the other terms and conditions
contained in subparagraph 2(c) above. Notwithstanding the foregoing, (i) in the event
that a total of five (5) or more Available Artists have become Artists hereunder (whether
pursuant to subparagraph 2(c) above or this subparagraph 2(d)) during the Initial
Period, then you shall not have the right to designate any additional Available Artists as
Required Artists during the Initial Period, and (ii) you shall not have the right to
designate any Available Artists as Required Artists if there would not be sufficient funds
remaining in our A&R budget for the applicable fiscal year to cover the Recording Fund
for the First Album under the applicable Production Agreement if such Available Artist
were to become an Artist hereunder.

(e)     If we elect to enter into a Production Agreement with respect to a
particular Artist (or are deemed to have entered into a Production Agreement with
respect to a Required Artist) and subsequently elect not to exercise an option pursuant
to paragraph 1.02 of such Production Agreement or to terminate the term of such
Production Agreement, such Artist shall then be deemed to be a Rejected Artist. We
will use reasonable efforts to consult with you prior to electing not to exercise an option
pursuant to paragraph 1.02 of any Production Agreement, provided that our inadvertent
failure to so consult with you shall not be deemed a breach of this Agreement. In
addition, if we elect not to exercise a Leaving Member Option pursuant to subparagraph

Fred Durst, Inc.
June 28, 1999
Page 7

20.02(b) of a Production Agreement, the applicable Leaving Member shall then be
deemed a Rejected Artist.

(f)     Notwithstanding anything to the contrary contained herein or in
Exhibit A attached hereto, in the event that you would be required to commit to any
terms more favorable than those set forth in Exhibit A in order to consummate an Artist
Agreement with respect to a particular recording artist, such recording artist shall
nevertheless be deemed an Available Artist; provided, however, that (i) such Available
Artist shall not be applied toward the three (3) bona fide Available Artists required to be
submitted under subparagraph 2(b) above for the applicable Contract Year unless such
Available Artist becomes an Artist hereunder; (ii) such Available Artist may not be a
Required Artist; and (iii) if the Recording Funds or other committed monies (e.g.,
marketing funds) in the applicable Artist Agreement are in excess of those set forth in
Exhibit A, if we accept such Available Artist as an Artist, then in no event shall you
retain any portion of the Recording Funds applicable to such Available Artist, i.e., the
Recording Funds and other committed monies in the applicable Artist Agreement shall
be no less than the Recording Funds and other committed monies in the applicable
Production Agreement, or, if such Available Artist becomes a Rejected Artist, the
applicable agreement you enter into with a third party in accordance with paragraph 10
below.

(g)     All Sides and Albums that the Principal produces hereunder will
be subject to the mutual approval of the Principal, us, and the applicable Artist or
Interscope Artist. No producer advance or fee shall be payable to you or the Principal
with respect to the first ten (10) Sides produced by the Principal hereunder during each
Contract Year, whether for Artists or Interscope Artists.    The provisions of the
immediately preceding sentence shall not preclude the Principal from receiving royalties
from the Artist or Interscope Artist in question for the producing services rendered by
the Principal, in accordance with paragraph 2.02 of the applicable Production
Agreement or the corresponding provision of the applicable recording agreement with
respect to an Interscope Artist.   Subject to the approval of the applicable Artist or
Interscope Artist, the royalty payable to the Principal in connection with such producing
services (the "Producing Royalty") will be three percent (3%) of the applicable royalty
base price in respect of USNRC Net Sales of full-priced Albums, with prospective one-
half percent (1/2%) escalations at USNRC Net Sales of 500,000 and 1,000,000 units
on an Album-by-Album basis.    The Producing Royalty will be otherwise calculated,
proportionally reduced, adjusted and paid in all respects in accordance with the
applicable provisions of the applicable Production Agreement or recording agreement
for the applicable Interscope Artist for all USNRC Net Sales of Albums and for all other
sales in and outside the United States of all Records embodying Master Recordings. As
to Records not consisting entirely of Sides produced by the Principal hereunder, the
royalty rate otherwise payable to the Principal shall be prorated on the basis of the
number of Sides produced by the Principal which are embodied on such Records
compared to the total number of masters (including the Sides produced by the

Fred Durst, Inc.
June 28, 1999
Page 8

Principal) contained on each such Record. The Producing Royalty shall be payable solely by the Artist or Interscope Artist in question (or deductible from monies otherwise payable to the Artist or Interscope Artist in question), subject to the terms of paragraph 2.02 of the applicable Production Agreement or the corresponding provision of the applicable recording agreement with respect to an Interscope Artist. If the Principal produces more than ten (10) Sides embodying the performances of Artists or Interscope Artists during any Contract Year, then in connection with such additional Sides produced by the Principal, subject to the approval of the applicable Artist or Interscope Artist, in addition to royalties payable in accordance with this subparagraph 2(g), the Principal shall be entitled to receive a producer advance in the amount of Fifty Thousand Dollars ($50,000) per Album, or if the Principal produces less than the entire applicable Album, Seven Thousand Five Hundred Dollars ($7,500) per Side. For the avoidance of doubt, the Principal will consider in good faith all potential producing projects submitted by us to him, but subject to the foregoing, the Principal's failure to accept any such producing project will not be deemed a breach of this Agreement.

(h)    All promotional videos that the Principal directs hereunder will be subject to the mutual approval of the Principal, us, and the applicable Artist or Interscope Artist. No additional fee shall be payable to you or the Principal in connection with the Principal's directing services for any promotional video embodying the performances of an Artist. No additional fee shall be payable to you or the Principal with respect to the first two (2) promotional videos directed by the Principal embodying the performances of Interscope Artists during each Contract Year. If the Principal directs more than two (2) promotional videos embodying the performances of Interscope during any Contract Year, then in connection with such additional promotional videos directed by the Principal, subject to the approval of the applicable Interscope Artist, the Principal shall be entitled to receive a directing fee equal to ten percent (10%) of the applicable video budget. For the avoidance of doubt, the Principal will consider in good faith all potential video directing projects submitted by us to him, but subject to the foregoing, the Principal's failure to accept any such video directing project will not be deemed a breach of this Agreement, and, the Principal may, subject to the terms of this Agreement, direct music videos for any Person.

(i)    The parties acknowledge and agree that it is their intention that during each Contract Year, we will release on your label at least one (1) Album embodying the soundtrack of a feature-length theatrical motion picture (a "Soundtrack Album" or the Principal will serve as executive producer for at least one (1) Soundtrack Album to be released by Interscope Records or one of our affiliated record labels, subject to our mutual agreement with respect to the selection of the particular Soundtrack Album and the recording budget and other material terms with respect thereto. During the Term, you will submit to us for our consideration all potential Soundtrack Album projects prior to submitting them to any third party. During the Term, we will submit to you for your consideration potential Soundtrack Album projects that we believe are appropriate for release hereunder. No additional fee or advance shall be

Fred Durst, Inc.
June 28, 1999
Page 9

payable to you or the Principal in connection with a Soundtrack Album released on your label, provided that we will pay royalties to you with respect to such Soundtrack Album at a rate to be negotiated in good faith. The failure to record or release a Soundtrack Album hereunder during any Contract Year shall not be deemed a breach of this Agreement by either party.

3.      Rights. If you and we enter into a particular Production Agreement, your and our respective rights and obligations shall be governed by the terms of that Production Agreement, as expressly modified hereby. Notwithstanding anything to the contrary contained in subparagraph 1(f) or 2(c), in the event you and we specifically agree in writing to terms of a Production Agreement with respect to a particular Artist that differ from those contained in Exhibit A, you and we shall enter into a Production Agreement with respect to such particular Artist on the different terms agreed rather than those set forth in Exhibit A.

4.      Advances. During the Term, in addition to any amounts set forth in the applicable Production Agreement, we shall pay to you the following amounts at the following times, each of which shall constitute an advance recoupable from royalties (excluding Mechanical Royalties) in accordance with the provisions of paragraph 5 below:

(a)      With respect to the first Contract Year, Seven Hundred Fifty Thousand Dollars ($750,000), payable promptly following the full execution of this Agreement, which amount you hereby instruct us to pay to the Principal.

(b)      With respect to the second Contract Year, an advance, payable promptly following the commencement of the second Contract Year, equal to three-quarters (3/4) of the net amount of the Label Royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of all Albums released hereunder as of the date which is twelve (12) months after the date hereof, as determined by us from our most recent monthly trial balance accounting statement and after deduction of reasonable reserves for returns and credits not exceeding twenty percent (20%) of the aggregate number of units of each such Album shipped to our customers solely for purposes of the foregoing calculation, with a minimum advance of Five Hundred Thousand Dollars ($500,000) and a maximum advance of One Million Five Hundred Thousand Dollars ($1,500,000).

(c)      With respect to the third Contract Year, solely in the event we exercise our option for the Renewal Period, an advance, payable promptly following the commencement of the third Contract Year, equal to two-thirds (2/3) of the net amount of the Label Royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of all Albums released hereunder during the twelve (12) month period commencing on the first day of the second Contract Year, as determined by us from our most recent monthly trial balance accounting statement and after

Fred Durst, Inc.
June 28, 1999
Page 10

deduction of reasonable reserves for returns and credits not exceeding twenty percent
(20%) of the aggregate number of units of each such Album shipped to our customers
solely for purposes of the foregoing calculation, with a minimum advance of Seven
Hundred Fifty Thousand Dollars ($750,000) and a maximum advance of Two Million
Five Hundred Thousand Dollars ($2,500,000).

Each advance set forth in subparagraphs 4(a), 4(b) and 4(c) above is hereinafter
referred to as a "General Advance" and all such advances are hereinafter referred to
collectively as "General Advances." Other than as provided in paragraph 9 below, the
General Advances shall be non-returnable provided the foregoing shall not operate to
affect your indemnification obligations hereunder.

    5.    Recoupment.

         (a)    Artist Costs shall be recoupable from Gross Royalties earned by
you pursuant to the Production Agreement in question and, subject to the last sentence
of this subparagraph (a), from Label Royalties earned by you pursuant to all Production
Agreements.  In no event shall any royalties (other than Mechanical Royalties) be
payable to you (whether Label Royalties or Artist Royalties) pursuant to a particular
Production Agreement unless and until all recoupable costs pursuant to the particular
Production Agreement in question have been recouped by us from all Gross Royalties
earned pursuant to the Production Agreement in question. After that recoupment, the
Label Royalties shall be applied to recoup the General Advances (if any), and Artist
Royalties under the applicable Production Agreement shall be payable prospectively.
Producer Royalties under each Production Agreement will be paid pursuant to
paragraph 2.02 thereof, if applicable. After recoupment of all General Advances, fifty
percent (50%) of the Label Royalties with respect to such Production Agreement shall
be paid to you, and the remaining fifty percent (50%) of such Label Royalties shall be
used to recoup any and all unrecouped costs under all other Production Agreements.

         (b)    With respect to each Production Agreement, unless you otherwise
instruct us in writing, we agree to account and pay directly to the applicable Artist any
Artist Royalties due thereunder. We will undertake to send to you a copy of each royalty
statement sent to an Artist, but our failure to send any such copy will not constitute a
breach of this Agreement.  Notwithstanding anything to the contrary contained herein,
our compliance with the preceding sentence will constitute an accommodation to you
alone; the Artist is not a beneficiary of it.  All payments to the applicable Artist
hereunder will constitute payment to you and we will have no liability by reason of any
erroneous payment or failure to comply with the foregoing.  You will indemnify and hold
us harmless against any claims asserted against us and any damages, losses or
expenses we incur by reason of any such payment or otherwise in connection with such
payment.

Fred Durst, Inc.
June 28, 1999
Page 11

      (c)    All accountings to you for royalties shall be rendered in accordance with the provisions of the applicable Production Agreement as modified by the foregoing provisions of this paragraph 5. Subject to the provisions of this paragraph 5, we shall maintain separate royalty accounts pursuant to each Production Agreement.

      (d)    We shall have the right to deduct from any monies payable to you hereunder or under any Production Agreement any amounts which may be required to be deducted from any of those monies under any statute, regulation, treaty or other law, or under any union or guild agreement (provided that we shall be responsible for the payment of union or guild "per record royalties"), and upon our request therefor, you shall promptly execute and deliver to us any forms or other documents as may be reasonably required in connection therewith. If we fail for any reason to deduct and instead pay to you any of those monies required to be deducted from monies payable to you hereunder, or under any Production Agreement and if, as a result, we are required by any statute, regulation, treaty or other law or union or guild agreement to pay to any third party any amounts which were paid to you but which were required to be deducted, then, without limiting any of our other rights or remedies in that event, you shall, upon our demand, pay to us the amount of those monies which were paid to you but which were required to be deducted, or, at our election, we may deduct the amount of those monies paid to you but which were required to be deducted from any monies payable to you hereunder or under any Production Agreement.

      6.    Mechanical Royalties. Compositions written by the Principal and embodied on Master Recordings made under a Production Agreement will be deemed Controlled Compositions; provided, however, that the mechanical royalty rate applicable to such Compositions will be one hundred percent (100%), rather than seventy-five percent (75%), of the applicable minimum statutory rate as set forth in Article 12 of Exhibit A, and provided, further, that with respect to any such Compositions: (a) the Mechanical Royalties payable to the Principal shall not be reduced as a result of the total Mechanical Royalties for all Compositions on the applicable Record exceeding the applicable limitation set forth in clause 12.01(b)(1) of Exhibit A, and (b) with respect to Albums, we shall pay Mechanical Royalties on fifty percent (50%) of Standard Free Goods (but not Special Free Goods).

      7.    Warranties and Representations. You warrant, represent, covenant and agree as follows:

      (a)    You have the right to enter into this Agreement and to grant to us all of the rights granted to us hereunder;

      (b)    You shall execute any further documents and do all other acts necessary to fully effectuate the provisions of this Agreement as reasonably requested by us;

Fred Durst, Inc.
June 28, 1999
Page 12

(c) The rights granted by you to us under this Agreement are free and clear of any claims, demands or other encumbrances;

(d) Neither you nor any entity owned or controlled, in whole or in part, by you shall be a party to any record production or distribution agreement with a third party with respect to an Available Artist or with respect to any other individual, duo or group, except as expressly provided elsewhere in this Agreement (including without limitation in clause 1(b)(i) above);

(e) Except as expressly provided herein, we shall not be obligated under this Agreement or otherwise to pay to you or to any Person deriving rights through or from you any monies or other consideration in respect of the rights granted to us hereunder, the services furnished by you hereunder or the exploitation in any manner or medium of any one (1) or more of the Master Recordings;

(f) No materials furnished or designated by you and used by us in connection with the exploitation of the Master Recordings or the packaging or advertising therefor shall violate or infringe on any rights of any third party;

(g) This Agreement shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted to such third party by the terms hereof;

(h) You and the Principal acknowledge, recognize and agree that your services hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as a breach of such services will cause us irreparable damages, we shall be entitled to seek injunctive and other equitable relief, in addition to whatever legal remedies are available, to prevent or cure any such breach or threatened breach;

(i) As provided in each Production Agreement, and except as otherwise specifically provided in paragraph 5 above, you shall be solely responsible for and shall account for and pay to all Artists, entities furnishing services of Artists and any other third parties (other than third parties engaged by us without your or the applicable Artist's consent), all royalties (excluding Mechanical Royalties) to which those parties are entitled as a result of our exploitation of Master Recordings in accordance with the terms of this Agreement and such Production Agreement.

8. (a) Indemnity. You will at all times indemnify and hold harmless us and any of our Licensees (collectively the "Indemnitee") from and against any and all claims, damages, liabilities, costs and expenses, including legal costs and reasonable attorneys' fees (but not including any fees of our "in house" counsel), arising out of any breach or alleged breach of any warranty or representation made by you in this Agreement or any

Fred Durst, Inc.
June 28, 1999
Page 13

other act or omission by you or the Principal, provided the claim concerned has been settled (subject to the provisions of subparagraph 8(b) below) or has resulted in a judgment against any Indemnitee. We will notify you of any claim, demand or action to which the foregoing indemnity applies. You may participate in the defense of same through counsel of your selection at your own expense, but we will have the right at all times, in our sole discretion, to retain or resume control of the conduct of the defense. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition which is not adverse to any Indemnitee, you will reimburse us for fifty percent (50%) of the above-allowed expenses actually incurred by Indemnitee in connection with that claim. Pending the resolution of any such claim, we will have the right to withhold General Advances and/or Label Royalties which would otherwise be payable to you under this Agreement in an amount not exceeding your potential liability to us under this paragraph; provided, however, we will not withhold monies which otherwise would be payable to you under this Agreement if you make satisfactory bonding arrangements in accordance with subparagraph 8(b) below.

(b)    If we pay more than Ten Thousand Dollars ($10,000) in settlement of any such claim, you will not be obligated to reimburse us for the excess unless you have consented to the settlement, except as provided in the next sentence. If you do not consent to any settlement proposed by us for an amount exceeding Ten Thousand Dollars ($10,000) you will nevertheless be required to reimburse us for the full amount paid unless you make bonding arrangements, satisfactory to us in our reasonable discretion, to assure us of reimbursement for all damages, liabilities, costs and expenses (including legal costs and reasonable counsel fees (but not including any fees of our "in house" counsel)), which Indemnitee may incur as a result of that claim to which the foregoing indemnity applies. If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, we will not continue to withhold monies in connection with it under this paragraph.

9.    Certain Obligations With Respect to the Principal.

(a)    During the Term, the Principal shall be an active participant in the management of your record business and your day to day operations and shall devote a substantial portion of his business time and efforts to the operation of your record business, subject to his existing obligations under the Limp Bizkit Recording Agreement and the Solo Album Agreement and his touring commitments as a member of Limp Bizkit or a solo recording artist. Further, we acknowledge and agree that the Principal is currently a party to a conventional music publishing agreement and a conventional merchandising agreement, and that the Principal's performance of his obligations hereunder will be subject to his existing obligations under those agreements, provided that you supply us with copies of those agreements with the financial terms redacted no later than sixty (60) days after the date hereof. Except as specifically stated to the contrary herein, the Principal's activities outside of the music recording business will not be restricted by this Agreement. During the Term, the Principal shall have the title

Fred Durst, Inc.
June 28, 1999
Page 14

"Senior Vice President of Interscope Records." If, for any reason, at any time during the Term the Principal is not an active participant in the management of your record business and your day to day operations, subject to the next sentence of this subparagraph 9(a), we shall have the right, without limiting our other rights or remedies, to terminate the Term on written notice to you and to require you to repay to us the amount of all General Advances paid to you during the Contract Year then in effect which have not been recouped in accordance with the provisions hereof (provided, however, that such amount shall be reduced by One Hundred Fifty Thousand Dollars ($150,000) for each one (1) of the three (3) bona fide Available Artists required to be submitted under subparagraph 2(b) above for the applicable Contract Year that you have actually submitted as of the date of such termination). We shall not be entitled to terminate the term of this Agreement by reason of any failure of the Principal to perform his obligations hereunder, unless you and the Principal have failed to remedy such breach within thirty (30) days following receipt of our notice setting forth the specific nature of such breach. Notwithstanding the foregoing, if the Principal's failure to perform his obligations hereunder is due to a physical disability (as determined by a qualified physician mutually selected by you and us), then we shall not be entitled to terminate the term of this Agreement by reason of such failure unless the period of the Principal's disability exceeds 45 consecutive days or an aggregate of 75 days during any consecutive 365 day period; provided, however, that the running of the applicable Contract Year (and the corresponding Contract Period) shall be suspended and shall be extended for the period of such disability.

(b)    You shall maintain a valid, binding and enforceable employment agreement with the Principal which grants to you the rights necessary for the Principal to fulfill all of the obligations required of him hereunder. You shall also be solely responsible for and shall pay any and all monies which may be payable to the Principal in respect of that employment agreement or in connection with this Agreement, other than as specifically provided herein. You shall not impair any of those rights granted to you under the employment agreement with the Principal (by your failure to perform fully your obligations thereunder, by your modification or amendment of any of the terms thereof, or otherwise) in derogation of any of our rights under this Agreement. We may, in your name and on your behalf, exercise or enforce any of your rights under the employment agreement between you and the Principal. You shall furnish to us a copy of such employment agreement upon our request therefor. Concurrently with the execution and delivery of this Agreement, you shall cause the Principal to execute and deliver to us the guarantee and inducement attached hereto as Exhibit B.

10.    Rejected Artists.    Notwithstanding anything to the contrary contained herein, but subject to the last sentence of this paragraph 10, you (or an entity owned or controlled, in whole or in part, by you) shall have the right to commence negotiations with any third party with respect to a Rejected Artist, but only after that Available Artist becomes a Rejected Artist in accordance with the provisions hereof. In the event that the agreement offered to you by such third party, or offered by you to such third party,

Fred Durst, Inc.
June 28, 1999
Page 15

is upon terms materially less favorable to you than those set forth in Exhibit A (as the same may be modified pursuant to subparagraph 2(f) above), you shall not enter into an agreement with such third party with respect to the Available Artist concerned unless you first notify us in writing and grant us an exclusive option, exercisable by written notice to you within fifteen (15) days following our receipt of your written notice, to enter into a Production Agreement with you with respect to such Available Artist upon the same terms offered to you by said third party, or offered by you to said third party, as applicable. If we fail to notify you in writing that we elect to enter into a Production Agreement upon such terms with such Available Artist within said fifteen (15) day period, then that Available Artist shall be deemed to be a Rejected Artist. In the event we elect to enter into a Production Agreement with you with respect any such Available Artist, such Production Agreement shall be in the form attached hereto as Exhibit A and containing the terms set forth therein; provided, however, that such Production Agreement shall be modified to reflect the terms agreed upon by you and us in accordance with this paragraph 10 or subparagraph 2(f) above. Notwithstanding anything to the contrary contained herein, during the Term neither you nor the Principal (nor an entity owned or controlled, in whole or in part, by you or the Principal) shall enter into an overall agreement with any third party relating to the submission of or Recordings of Rejected Artists (i.e., a "second look" agreement).

      11.    Notices.  Except as otherwise specifically provided in this Agreement, all notices under this Agreement shall be in writing and shall be given by courier or other personal delivery or by registered or certified mail at the appropriate address below or at a substitute address designated by notice by the party concerned:

Fred Durst, Inc.
June 28, 1999
Page 16

TO YOU:                         Fred Durst, Inc.
                                c/o The Firm
                                9000 Sunset Boulevard, Suite 800
                                Los Angeles, CA 90069
                                Attention: Jeff Kwatinetz

TO US:                          10900 Wilshire Boulevard
                                Suite 1230
                                Los Angeles, CA 90024
                                Attention: Head of Business and Legal Affairs

We will undertake to send a copy of each notice sent to you to David Mantel, Esq., 7 West 22nd Street, 4th Floor, New York, New York 10010, but our failure to send any such copy will not constitute a breach of this Agreement or impair the effectiveness of the notice concerned. Notices shall be deemed given when mailed, except that a notice of change of address shall be effective only from the date of its receipt. All royalties, royalty statements and/or payments to you hereunder may also be sent to you at your address above via regular mail and shall be deemed sent on the date the applicable statement is mailed.

    12.    Miscellaneous.

        (a)    This Agreement contains the entire understanding of the parties relating to its subject matter and supersedes all prior or contemporaneous written or oral agreements, representations, understandings and/or discussions between the parties relating thereto. No change or termination of this Agreement will be binding upon us unless it is made by an instrument signed by an officer of Interscope Records. No change of this Agreement will be binding upon you or the Principal unless it is made by an instrument signed by you or the Principal. A waiver by either party of any provision of this Agreement in any instance shall not be deemed to waive it for the future. All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking or obligation of either party. The captions of the paragraphs in this Agreement are included for convenience only and will not affect the interpretation of any provision.

        (b)    The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof. If any provision of this Agreement or its application is deemed invalid or unenforceable, then the remainder of this Agreement shall not be affected thereby. If any provision of this Agreement or its application is deemed invalid or unenforceable, then a suitable and equitable provision shall be substituted in order to carry out, so far as may be valid and enforceable, the intent and purpose of the invalid and/or unenforceable provision.

FredDurst12.doc SH:sh/06/28/99

Case 2:24-cv-08630-PA-AJR   Document 1-6   Filed 10/08/24   Page 17 of 135   Page ID #:200

Fred Durst, Inc.
June 28, 1999
Page 17

(c)     We may assign our rights under this Agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any Person owning or acquiring a substantial portion of the stock or assets of Interscope Records, or only in connection with an assignment of all or substantially all of our stock or assets, to any partnership or other venture in which we participate. In the event of any such assignment, we shall remain secondarily liable hereunder.     You may assign this Agreement only to a corporation wholly owned and controlled by the Principal, but no such assignment shall relieve you or the Principal from any of your or the Principal's obligations hereunder.

(d )     Except as otherwise provided hereunder, neither party hereto shall be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by the other party of its material obligations hereunder, unless such other party has failed to remedy such breach within a reasonable time following receipt of notice therefor. Any rights which you may have pursuant to the preceding sentence may not be exercised earlier than sixty (60) days (thirty (30) days if the breach is a failure to pay monies due) following receipt of your notice therefor. The foregoing shall not apply where a specific cure period is otherwise provided herein, to your obligation to submit Available Artists within the time periods prescribed herein, to breaches incapable of being cured or to an application for injunctive relief.

(e)     THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA.     THE CALIFORNIA COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN LOS ANGELES COUNTY, AND NOT ELSEWHERE.     ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN PARAGRAPH 11 OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO PARAGRAPH 11. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE PRINICIPAL OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE US TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN PARAGRAPH 11 OR SUCH OTHER ADDRESS AS THE PRINICIPAL OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER PRESCRIBED IN PARAGRAPH 11. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

Case 2:24-cv-08630-PA-AJR    Document 1-6    Filed 10/08/24    Page 18 of 135   Page
ID #:201

P.01/01

JUN-28-1999  20:36

Fred Durst, Inc.
June 28, 1999
Page 18

(f)    Except as may be expressly provided in a particular Production
Agreement, we shall have no obligation under this Agreement or otherwise to use or
reproduce any Master Recording in any manner or medium.

(g)    In entering into this Agreement, and in providing services pursuant
hereto, you and the Principal have and shall have the status of independent contractors
and nothing herein contained shall contemplate or constitute you or the Principal as our
agents or employees.

(h)    This Agreement shall not become effective until executed by all
proposed parties hereto.

(i)    Any and all riders annexed hereto together with this basic document
shall be taken together to constitute the Agreement between you and us.

(j)    Notwithstanding that this Agreement may have been drafted by one
or another of the parties hereto, neither this Agreement nor any uncertainty or
ambiguity herein shall be construed or resolved against such party, whether under any
rule of construction or otherwise.  On the contrary, this Agreement has been reviewed
by all parties hereto and shall be construed and interpreted according to the fair
meaning of the words used so as to accomplish the purposes and intentions of the
parties hereto.

If the foregoing correctly sets forth your and our agreement, please so indicate
by signing below.

Very truly yours,

INTERSCOPE RECORDS,
a California general partnership,
by its general partner

INTERSCOPE RECORDS, INC.
a Delaware corporation

By: _Karl Hoffman_

AGREED AND ACCEPTED:

FRED DURST, INC.

By: _____

FredDurst18 doc SH hab/06/28/99

<u>EXHIBIT A</u>

<u>Production Agreement Form</u>

57/02FLAWLESS 0823

Dated as of June 28, 2001

Flawless Records, LLC, and
Flawless Records, Inc.
c/o Ziffren Brittenham Branca & Fischer
1801 Century Park West
Los Angeles, California 90067
Attn:  Mitch Tenzer, Esq.

RE:    INTERSCOPE RECORDS / FLAWLESS RECORDS /
       AMENDMENT TO FIRST LOOK AGREEMENT

Gentlemen:

This letter, when fully executed, shall constitute an amendment to that certain First
Look Agreement, dated June 28, 1999, by and between Flawless Records, LLC,
Flawless Records, Inc. (as successor-in-interest to Fred Durst, Inc.) (Flawless
Records, LLC and Flawless Records, Inc. are hereinafter collectively referred to as
"you"), and Interscope Records ("we" or "us") (the "Flawless Agreement").  Capitalized
terms used herein and not otherwise defined shall have the same meanings as in the
Flawless Agreement.

In consideration of the mutual promises contained herein the parties hereto agree as
follows:

1.      Subparagraph 1(a) of the Flawless Agreement is hereby deleted in its entirety
and the following subparagraph inserted in its place and stead:

                "(a)    (i)     The term "Term" shall mean the "Initial Period"
        and each of the "Renewal Periods" (if we exercise our applicable option
        therefor);

                        (ii)    The term "Initial Period" shall mean the period
        commencing on June 28, 1999 and continuing until the date two (2)
        years thereafter;

                        (iii)   The term "First Renewal Period" shall mean
        the period commencing on June 28, 2001 and continuing for three (3)
        years thereafter, subject to extension as provided herein, and the term
        "Second Renewal Period" shall mean the period commencing
        immediately upon the expiration of the First Renewal Period and
        continuing for two (2) years thereafter, subject to extension as provided

Scanned Copy Of Original 04-17-2002 11:48:24

3/17/02 FLAWLESS 0824

Flawless Records, Inc.
Dated as of June 28, 2001
Page 2

herein.  The First Renewal Period and the Second Renewal Period are sometimes referred to herein each individually as a "Renewal Period" and collectively as the "Renewal Periods."  We shall have separate, consecutive and irrevocable options to extend the term of this Agreement for each of the Renewal Periods, upon all of the same terms and conditions as contained in this Agreement.  We are hereby deemed to have exercised our option for the First Renewal Period.  The Second Renewal Period shall only commence if we exercise our option therefor by written notice to you prior to the expiration of the First Renewal Period;

(iv)   The term "Contract Period" shall mean the Initial Period or either of the Renewal Periods;

(v)   The term "Contract Year" shall mean each one (1) year period of the Initial Period, the First Renewal Period or the Second Renewal Period."

2.   The last sentence of subparagraph 1(b) of the Flawless Agreement is hereby deleted and the following two sentences inserted in its place and stead:

"(b)   Reference is made to (i) the Recording Agreement, dated as of July __, 1996, by and between the recording artist known professionally as "Limp Bizkit" and us (as successor-in-interest to Flip Records, Inc.), as amended (the "Prior Limp Bizkit Recording Agreement"); (ii) the Recording Agreement, dated as of December 1, 2000, as amended, by and between the recording artist professionally known as "Limp Bizkit" and us (the "Current Limp Bizkit Recording Agreement"); and (iii) the agreement between the Principal and us dated as of March 24, 1999 (the "Solo Album Agreement").  For the avoidance of doubt, the parties hereto acknowledge and agree that this Agreement is wholly separate from and shall have no force or effect upon the Prior Limp Bizkit Recording Agreement or the Current Limp Bizkit Recording Agreement, or except as specifically provided to the contrary herein, the Solo Album Agreement."

3.   Subparagraph 1(e) of the Flawless Agreement is hereby deleted in its entirety and the following subparagraph inserted in its place and stead:

"(e)   The term "Artist Agreement" shall mean a recording agreement between you, on the one part, and an Available Artist or an entity furnishing to you the services of an Available Artist, on the other part.  Each Artist Agreement shall conform to the terms of subparagraph

Scanned Copy Of Original 04-17-2002 11:48:24

Flawless Records, Inc.
Dated as of June 28, 2001
Page 3

2(f) below and shall otherwise enable you to fulfill the terms hereof and of a Production Agreement if we so elect."

4.    As of the date hereof, the Production Agreement form referred to in subparagraph 1(f) of the Flawless Agreement and attached to the Flawless Agreement as Exhibit "A" is hereby deleted in its entirety and the Production Agreement form attached hereto as Exhibit "A" inserted in its place and stead.

5.    The last sentence of subparagraph 1(j) of the Flawless Agreement is hereby deleted.

6.    In subparagraph 1(m) of the Flawless Agreement, the phrase ""Commitment Album," "Deliver,"" is hereby inserted after the word "Album."

7.    The following are hereby inserted as subparagraphs 1(n), 1(o), 1(p) and 1(q) of the Flawless Agreement:

"(n)    (i)    The term "Puddle Of Mudd Production Agreement" shall mean the Production Agreement dated as of June 22, 2000 between you and us with respect to the services of the recording artist professionally known as "Puddle Of Mudd;"

(ii)    The term "Swish Production Agreement" shall mean the Production Agreement dated as of May 23, 2000 between you and us with respect to the recording artist professionally known as "Swish;"

(iii)    The term "Kenna Production Agreement" shall mean the Production Agreement dated as of June 22, 2000 between you and us with respect to the recording artist professionally known as "Kenna;"

The Puddle Of Mudd Production Agreement, the Kenna Production Agreement and the Swish Production Agreement are sometimes referred to herein each individually as an "Existing Agreement" and collectively as the "Existing Agreements."

(o)    The term "Big Dumb Face Production Agreement" shall mean the Production Agreement dated as of December 1, 2000 among you, Flip Records and us with respect to the recording artist professionally known as "Big Dumb Face. "

(p)    The term "FVT Agreement" shall mean the agreement dated as of November 19, 1999 between Family Values Tour LLC ("FVT") and us with respect to, among other things, our right to distribute

7/02FLAWLESS 0826

Flawless Records, Inc.
Dated as of June 28, 2001
Page 4

a phonograph record album embodying performances derived from the
1999 Family Values Tour (the "FVT Album").

(q)    The term "Sinisstar Artist Agreement" shall mean the
recording agreement dated as of January 28, 2000, as amended,
between Geffen Records (an Interscope Records affiliate) and the
recording artist professionally known as "Sinisstar.""

8.    The third, fourth, fifth and sixth sentences of subparagraph 2(b) of the Flawless
Agreement are hereby deleted in their entirety.

9.    Subparagraph 2(d) of the Flawless Agreement is hereby modified and amended
such that the phrase "but subject to the next sentence of this subparagraph 2(d)," is
hereby deleted in its entirety.  The last sentence of subparagraph 2(d) of the Flawless
Agreement is hereby deleted in its entirety.

10.    Subparagraph 2(e) of the Flawless Agreement is hereby modified and amended
such that the following sentence is inserted at the end thereof:

"Notwithstanding the foregoing, if we elect (i) not to exercise an option pursuant to
paragraph 1.02 of any Production Agreement, (ii) to terminate the term of any
Production Agreement, or (iii) not to exercise a Leaving Member Option pursuant to
subparagraph 20.02(b) of any Production Agreement, you may designate one (1) such
Artist or Leaving Member as a Required Artist for the applicable Option Period or
applicable Contract Period in lieu of designating one (1) Available Artist as a Required
Artist pursuant to subparagraph 2(d) herein."

11.    Subparagraph 2(f) of the Flawless Agreement is hereby deleted in its entirety
and the following subparagraph is hereby inserted in its place and stead:

"(f)    (i)    Each Artist Agreement (other than the Existing
Agreements) shall be in the form of our standard form recording
agreement (subject to such changes thereto as we may make from time
to time) which we shall supply to you.  You shall have the authority to
negotiate improvements to the non-financial terms of Artist Agreements
that are no more favorable to the applicable Artist and/or the entity
furnishing such Artist's services than the terms contained in Exhibit "B"
attached hereto.  For all Artist Agreements, the following terms shall
apply:  (A) the Recording Fund for the first album shall be no greater than
Three Hundred and Fifty Thousand Dollars ($350,000) with escalations
on the future minimum album funds of $25,000 per Album and
maximums being equal to double the amount of the minimums; and (B)
the Base U.S. Album Royalty Rate on USNRC Net Sales of each of the

FlawlessAmendment5 TG:tg/06/22/01

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0827

'Flawless Records, Inc.
Dated as of June 28, 2001
Page 5

first four (4) Commitment Albums shall not exceed fourteen percent (14%), and on the fifth, sixth and seventh Commitment Albums shall not exceed fifteen percent (15%), of the suggested retail list price (or wholesale equivalent). Without limiting the generality of the foregoing, the financial terms of each Artist Agreement shall be mutually agreed by you and us, provided however that in no event shall such financial terms be more favorable for the applicable recording artist and/or the entity furnishing such recording artist's services than the financial terms set forth in Exhibit B. Notwithstanding anything to the contrary contained herein, the parties acknowledge and agree that: (A) a recording artist will only be deemed an Available Artist if such recording artist's services are available to you on terms no more favorable for such recording artist and/or the entity furnishing such recording artist's services than the terms set forth in Exhibit B, and (B) you may only designate a recording artist as a Required Artist under subparagraph 2(d) above if such recording artist's services are available to you on terms no more favorable for such recording artist and/or the entity furnishing such recording artist's services than the terms set forth in Exhibit B. The parties acknowledge and agree that the Production Agreement form attached hereto as Exhibit A and the Artist Agreement form attached hereto as Exhibit B contemplate that the applicable Artist's services will be furnished to you via a furnishing entity, and accordingly Exhibit A and Exhibit B will need to be modified appropriately with respect to any Artist that is signed directly to you (i.e., without a furnishing entity). As set forth in Exhibit A, we shall own jointly with you all rights (including, without limitation, the copyright in the sound recording) in and to any Master Recordings delivered to Interscope by any Artist, and any audiovisual records which embody such Master Recordings.

(ii)    On net sales of phonograph records embodying the performances of any Artist, other exploitations of Master Recordings embodying any Artist's performances and any other releases you furnish to us (e.g., soundtrack albums), we will credit your royalty account hereunder in an amount equal to fifty percent (50%) of our profits derived therefrom (the "Flawless Profit Share") as computed pursuant to the provisions of Exhibit "C" attached hereto and incorporated by reference as though fully set forth herein.

12.    Subparagraph 2(g) of the Flawless Agreement is hereby modified and amended such that the fourth sentence is deleted in its entirety and replaced with the following:

"Subject to the approval of the applicable Artist or Interscope Artist, the royalty payable to the Principal in connection with such producing services (the

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0828

Flawless Records, Inc.
Dated as of June 28, 2001
Page 6

"Producing Royalty") will be four percent (4%) of the applicable royalty base price in respect of USNRC Net Sales of full-priced Albums."

13.    The following is hereby inserted as subparagraph 2(j) of the Flawless Agreement:

"2(j)    We will consult with you regarding the scheduling of release dates for Albums delivered to us by you hereunder, provided our inadvertent failure to so consult with you shall not be deemed a breach of this Agreement."

14.    The following is hereby inserted as paragraph 2A of the Flawless Agreement:

"2A.    Existing Agreements; Other Agreements.

(a)    The Existing Agreements (i.e., the Puddle Of Mudd Production Agreement, the Kenna Production Agreement and the Swish Production Agreement) are hereby amended, effective as of the respective commencement dates of the terms thereof, as follows:

(i)    We shall have no obligation to pay any Label Royalties, Advances or any other amounts to you pursuant to the terms of the Existing Agreements, and in lieu thereof, your royalty account will be credited with the Flawless Profit Share with respect to the applicable Artist in accordance with the terms hereof; provided, however, that with respect to the Existing Agreements, the Flawless Profit Share shall be an amount equal to twenty-five percent (25%) (rather than fifty (50%)) of our profits derived therefrom as computed pursuant to the provisions of Exhibit C attached hereto. You hereby irrevocably authorize and direct us to make all payments referenced in the applicable Artist Agreement (copies of which you will supply to us concurrently with your execution hereof) directly to the applicable Artist (or furnishing entity) on your behalf. All costs paid or incurred by us pursuant to the Existing Agreements (or other payments incurred by us which would constitute Record Expenses as defined in Exhibit C herein), whether before or after the date of this Amendment, shall constitute Record Expenses hereunder.

(ii)    Article 7 of each Existing Agreement is hereby modified such that we shall co-own with you in perpetuity from the Inception of Recording all Master Recordings (including, without limitation, Audiovisual Records and Covered Videos), Website Material, ECD Material, Album Artwork and any other Materials (as those terms

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0829

·Flawless Records, Inc.
Dated as of June 28, 2001
Page 7

are defined in the applicable Existing Agreement) specified in the applicable Existing Agreement to which you have any rights of ownership granted to you by the applicable Artist (or furnishing entity) or otherwise, such that you own twenty-five percent (25%) and we own seventy-five percent (75%) of the interest in and to such Master Recordings and other Materials. Accordingly, we shall copyright those Master Recordings, Covered Videos, Artwork, Website Material and ECD Material in our name and your name as the authors and owners of them and we may secure any and all renewals and extensions of such copyright throughout the world. You hereby grant to us a power of attorney, irrevocable and coupled with an interest, for you and in your name, to apply for and obtain, and on obtaining same, to assign to you and us jointly all such copyrights and renewals and extensions thereof. You will execute and deliver to us such instruments of transfer and other documents regarding our joint rights in the Master Recordings, Covered Videos, Artwork, Website Material and ECD Material subject to this Agreement as we may reasonably request to carry out the purposes of this Agreement, and we may sign such documents in your name and make appropriate disposition of them. We will give you ten (10) days notice before signing any document in your name. We may dispense with that waiting period when necessary, in our judgment, to protect or enforce our rights, but we will notify you in each instance when it has done so. We will not be required to notify you before signing applications for copyright and/or short form assignments of rights granted herein for recordation in the Copyright Office.

(b)  The parties acknowledge and agree that as of the date hereof, you are negotiating an Artist Agreement with the recording artist professionally known as "Bless." In the event that you consummate such Artist Agreement (subject to our approval of the terms thereof to the extent such terms vary from the terms you have previously presented to us), then you and we shall enter into a Production Agreement with respect to Bless, which Production Agreement shall be deemed a Existing Agreement pursuant to subparagraph 2A(a) above.

(c)  (i)  With respect to the Sinisstar Artist Agreement, you shall have the option (the "Sinisstar Option") to cause us to identify Sinisstar as a Flawless Records artist (in accordance with the terms of this agreement) and to cause such agreement to be treated for financial purposes as an Existing Agreement in accordance with section 2A(a)(i) above. The Sinisstar Option must be exercised by you, if at all, by written notice to us no later than September 30, 2001.

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0830

Flawless Records, Inc.
Dated as of June 28, 2001
Page 8

           (ii)     If you do not exercise the Sinisstar Option, the following terms shall apply:

           (A)    With respect to all Albums released by Geffen until such time as Sinisstar has fulfilled its Recording Commitment *under the current Sinisstar Artist Agreement* (not including any renegotiations or extensions thereof), if any, we shall pay to you an override royalty (the "Sinisstar Override Royalty") of two percent (2%) of the applicable Royalty Base Price with respect to top-line, full price USNRC Net Sales of Albums, computed, adjusted, prorated and paid (but not escalated based on sales) in the same manner applicable to royalties payable to Sinisstar under the Sinisstar Artist Agreement in respect of such Albums (e.g., without limitation, Singles rates, foreign royalty rates, allowances for free goods, packaging deductions) with proportionate reductions on all sales for which reduced royalties are payable *under the Sinisstar Artist Agreement. With respect to any license* of any Sinisstar Master Recordings on a flat fee or net royalty basis, the Sinisstar Override Royalty will be an amount equal to the net flat fee or net royalty, as the case may be, received by Sinisstar as its royalty in respect of the particular license, multiplied by a fraction, the numerator of which is the Sinisstar Override Royalty rate, and the denominator of which is Sinisstar's so-called "all-in" base royalty rate for the applicable Commitment Album (including any royalties payable to individual producers and/or mixers).

           (B)    The Sinisstar Override Royalty shall be payable to you by us on a prospective basis only after the recoupment of all Recording Costs and other Advances and recoupable costs paid or incurred pursuant to the Sinisstar Artist Agreement. Such recoupment will be computed at Sinisstar's net royalty rate (i.e., the royalty payable to Sinisstar as reduced to reflect the deduction of third party royalties).

           (C)    *We shall account to you on the same* terms and at the same times as provided in the Sinisstar Artist Agreement, and you shall have the right to audit our books and records in accordance with the terms of the Sinisstar Artist Agreement with respect to phonograph records delivered thereunder. Neither you nor the Principal shall be entitled to any other royalties or other payments in connection with the Sinisstar Artist Agreement or any Records or Master Recordings thereunder. When payable, the Sinisstar Override Royalty will be paid through and not applied to recoup other debits to your account.

Scanned Copy Of Original 04-17-2002 11:48:24

17/02/FLAWLESS 0831

Flawless Records, Inc.
Dated as of June 28, 2001
Page 9

(iii)     For the avoidance of doubt, if you do not exercise the Sinisstar Option, section 2A(a)(ii) above shall not apply to the Sinisstar Artist Agreement, and no Albums recorded by Sinisstar shall apply toward your obligation under subparagraph 4(d) below to timely Deliver and approve for release by us at least two (2) Commitment Albums by Artists hereunder in the first nine (9) months of the applicable Contract Year.

(d)     With respect to the Big Dumb Face Production Agreement, we shall pay you Gross Royalties and other Advances in accordance with the terms thereof, and you shall not be entitled to the Flawless Profit Share with respect thereto; provided however that any and all Label Royalties earned by you thereunder shall be applied to your royalty account hereunder.  No costs paid or incurred by us pursuant to the Big Dumb Face Production Agreement, whether before or after the date hereof, shall constitute Record Expenses hereunder; provided however that Artist Costs thereunder shall be recoupable in accordance with the terms of paragraph 5 of the Flawless Agreement.

(e)     With respect to the FVT Agreement, you and we agree as follows:

(i)     In respect of net sales of top line long-playing phonograph record albums embodying the FVT Album released through normal retail channels in the United States (such sales are hereinafter referred to as "Basic LP Retail Sales"), you shall receive a basic royalty (the "FVT Album Royalty") at the rate of two percent (2%) ("Your Basic LP Rate") of the Royalty Base Price (as defined in Exhibit B hereto) (as such Royalty Base Price may vary from time to time) of such records.

(ii)     The FVT Album Royalty for sales of phonograph records of the FVT Album which are not Basic LP Retail Sales shall be reduced in the same manner as such sales would be reduced under the terms of Exhibit B.

(iii)     Except as provided hereinabove, the FVT Album Royalty for sales of phonograph records of the FVT Album or (an) individual master(s) derived therefrom shall otherwise be reduced, computed or otherwise determined (without regard to any escalations with respect thereto, if any) in the same manner and on the same terms as provided under the terms of Exhibit B in respect of such sales.

17/02FLAWLESS 0832

Flawless Records, Inc.
Dated as of June 28, 2001
Page 10

        (iv)    The FVT Album Royalty shall not be payable to you hereunder unless and until we have recouped all costs paid by us in connection with the FVT Album at a deemed rate of eighteen percent (18%). Upon such recoupment by us, we shall credit to your royalty account hereunder with all royalties, if any, prospectively earned by you in connection with the FVT Album.

        (f)    With respect to the Swish Production Agreement, the parties hereby agree that in the event you enter into an agreement for the services of the artist/producer known professionally as "Nate Dogg" in connection with any Commitment Album you Deliver to us under the Swish Production Agreement (each, a "Nate Dogg Album"), the following terms shall apply:

        (i)    Provided we have approved the budget with respect to the first Commitment Album (provided such Album is a Nate Dogg Album), and provided we approve any Recording Costs or other expenditures which exceed the applicable Recording Fund under the Swish Production Agreement with respect to each subsequent Nate Dogg Album, we will accept a letter of direction from you instructing us to pay to Nate Dogg (or the entity furnishing his services) fifty percent (50%) of the Flawless Profit Share with respect to such Nate Dogg Album without regard to recoupment of (A) Record Expenses not related to Nate Dogg Albums or (B) the General Advances paid under section 4(a)(i), 4(a)(ii) and subparagraph 4(b) herein. All Nate Dogg Albums will be treated collectively for the purpose of determining profits.

        (ii)    Each Nate Dogg Album will only apply toward the Flawless Delivery Requirement (as defined in subparagraph 4(d) below) for the Contract Year in which in such Album is Delivered, and then only in the event such Album achieves USNRC Net Sales in excess of 750,000 units.

        (iii)    Each Commitment Album Delivered to us by you under the Swish Production Agreement which do not constitute Nate Dogg Albums as defined herein will apply toward the Flawless Delivery Requirement.

15.    In the second sentence of paragraph 3 of the Flawless Agreement, the first reference to "Production Agreement" shall be replaced with "Artist Agreement," and both references to "Exhibit A" shall be replaced with "Exhibit B."

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0833

Flawless Records, Inc.
Dated as of June 28, 2001
Page 11

16.    Paragraph 4 of the Flawless Agreement is hereby deleted in its entirety and the following subparagraph inserted in its place and stead:

"4.    Profit Advances; Overhead Payments.

(a)    During the Term, we shall pay to you the following amounts at the following times, each of which shall constitute an advance against and shall be recoupable from the Flawless Profit Share and all other royalties (excluding Mechanical Royalties) payable to you hereunder:

(i)    With respect to the First Renewal Period, Three Million Dollars ($3,000,000), payable promptly following the full execution of this Amendment.

(ii)    With respect to the Second Renewal Period, solely in the event we exercise our option with respect thereto, an advance, payable promptly following the commencement of the Second Renewal Period, equal to Two Million Five Hundred Thousand Dollars ($2,500,000) less the unrecouped balance in your royalty account, with a minimum advance of Seven Hundred Fifty Thousand Dollars ($750,000).

Each advance set forth in sections 4(a)(i) and 4(a)(ii) above is hereinafter referred to as a "General Advance" and all such advances are hereinafter referred to collectively as "General Advances." Other than as provided in paragraph 9 below, the General Advances shall be non-returnable provided the foregoing shall not operate to affect your indemnification obligations hereunder.

(b)    During the Term, in addition to the General Advances, we shall pay to you the following overhead payments at the following times:

(i)    With respect to the first Contract Year, Seven Hundred Fifty Thousand Dollars ($750,000), your prior receipt of which amount you hereby acknowledge.

(ii)    With respect to the second Contract Year, Five Hundred Thousand Dollars ($500,000), your prior receipt of which amount you hereby acknowledge.

Each payment made pursuant to this subparagraph 4(b) shall constitute an advance against and shall be recoupable from the Flawless Profit Share and all other royalties (excluding Mechanical Royalties) payable to

Scanned Copy Of Original 04-17-2002 11:48:24
7/02/FLAWLESS 0834

Flawless Records, Inc.
Dated as of June 28, 2001
Page 12

you hereunder. For the avoidance of doubt, such payments shall not also be treated as Record Expenses under Exhibit C herein.

(c)    With respect to each Contract Year of the First Renewal Period and, solely in the event we exercise our option with respect thereto, the Second Renewal Period, One Million Five Hundred Thousand Dollars ($1,500,000) per each such Contract Year, payable in four (4) quarterly installments of Three Seven Hundred Seventy-Five Thousand Dollars ($375,000) each promptly following the commencement of each quarter of the applicable Contract Year. With respect to the foregoing payments, Seven Hundred Fifty Thousand Dollars ($750,000) shall be paid to you promptly upon execution of this Amendment, which payment represents the first and second quarterly payments during the first Contract Year of the First Renewal Period.

Each payment made pursuant to this subparagraph 4(c) is hereinafter referred to as an "Overhead Payment" and all such payments are hereinafter referred to collectively as "Overhead Payments." Each of the Overhead Payments shall constitute "Record Expenses" as defined in Exhibit C hereto.

(d)    Notwithstanding anything to the contrary contained herein, if you fail to timely Deliver and approve for release by us at least two (2) Commitment Albums by Artists hereunder in the first nine (9) months of any Contract Year of the First Renewal Period (the "Flawless Delivery Requirement") or, solely in the event we exercise our option with respect thereto, the Second Renewal Period, then our obligation to pay the fourth (4th) quarterly Overhead Payment for such Contract Year or any subsequent Overhead Payments automatically, without notice, shall be suspended until the date thirty (30) days after the date on which you shall have Delivered and approved for release by us the second (2nd) such Commitment Album during the Contract Year in question. Notwithstanding the foregoing, in the event you have submitted at least five (5) Available Artists between the date hereof and the end of the first nine (9) months of the second Contract Year of the First Renewal Period, and each of those Available Artists submitted by you has been deemed a Rejected Artist in accordance with the terms of subparagraph 2(c) herein, and you have failed to satisfy the Flawless Delivery Requirement pursuant to the terms of this subparagraph 4(d), then the Flawless Delivery Requirement for such second Contract Year shall be reduced to one (1) Commitment Album, and only in the event that you fail to timely Deliver and approve for release one (1) Commitment Album by an Artist hereunder shall we be entitled to exercise our option to suspend

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0835

Flawless Records, Inc.
Dated as of June 28, 2001
Page 13

Overhead Payments as set forth herein. For the avoidance of doubt, no
suspension under this subparagraph 4(d) or otherwise shall in any way
impair any of our rights hereunder.  If you have failed to satisfy the
applicable Flawless Delivery Requirement within thirteen (13) months of
the date on which such suspension began, we will have the right, at our
election, to terminate the Term of this agreement (subject to the cure
period set forth in subparagraph 12(d) herein). All Commitment Albums
under the Existing Agreements (e.g., Commitment Albums under the
Puddle of Mudd Production Agreement, the Kenna Production
Agreement or the Swish Production Agreement [except as provided
under subparagraph 2A(f) herein], but not, for the avoidance of doubt,
the FVT Album or Commitment Albums under the Big Dumb Face
Production Agreement or the Sinisstar Artist Agreement) timely Delivered
and approved by you for release by us during the Term shall apply in
satisfaction of your delivery requirement under this subparagraph (d) for
the applicable Contract Year.

(e)    To the extent we supply office space in our offices for the
Principal or Danny Wimmer (or Danny Wimmer's successor, if applicable),
there will be no imputed or actual charge to you as a Record Expense or
otherwise pursuant to Exhibit C herein for rent, parking or reasonable use
of office phones."

17.    Paragraph 5 of the Flawless Agreement is hereby deleted in its entirety and the
following inserted in its place and stead:

"5.    Recoupment; Accounting.

(a)    With respect to the Big Dumb Face Production Agreement,
Artist Costs shall be recoupable from Gross Royalties earned by you
pursuant to the Big Dumb Face Production Agreement.  In no event shall
any royalties (other than Mechanical Royalties) be payable to you
(whether Label Royalties or Artist Royalties) pursuant to the Big Dumb
Face Production Agreement unless and until all recoupable costs
pursuant to the Big Dumb Face Production Agreement have been
recouped by us from all Gross Royalties earned pursuant thereto.  After
that recoupment, the Label Royalties under the Big Dumb Face
Production Agreement shall be applied to your royalty account, and Artist
Royalties thereunder shall be payable prospectively.  Producer Royalties
under the Big Dumb Face Production Agreement will be paid pursuant to
the terms thereof, if applicable.   The General Advances shall be
recoupable from all Label Royalties earned by you pursuant to the Big
Dumb Face Production Agreement, from the Flawless Profit Share

07/02FLAWLESS 0836

Scanned Copy Of Original 04-17-2002 11:48:24

Flawless Records, Inc.
Dated as of June 28, 2001
Page 14

earned by you pursuant to all other Production Agreements and from the FVT Album Royalty earned by you pursuant to subparagraph 2A(d) above.

(b)    With respect to the Big Dumb Face Production Agreement, unless you otherwise instruct us in writing, we agree to account and pay directly to the Artist any Artist Royalties due thereunder. We will undertake to send to you a copy of each royalty statement sent to such Artist, but our failure to send any such copy will not constitute a breach of this Agreement.  Notwithstanding anything to the contrary contained herein, our compliance with the preceding sentence will constitute an accommodation to you alone; such Artist is not a beneficiary of it.  All payments to such Artist hereunder will constitute payment to you and we will have no liability by reason of any erroneous payment or failure to comply with the foregoing.  You will indemnify and hold us harmless against any claims asserted against us and any damages, losses or expenses we incur by reason of any such payment or otherwise in connection with such payment.

(c)    (i)    We shall send to you statements for the Flawless Profit Share and any other royalties payable to you hereunder on or before September 30th for the semiannual period ending the preceding June 30th and on or before March 31st for the semiannual period ending the preceding December 31st, together with payment of the Flawless Profit Share and other royalties, if any, earned by you hereunder during the semiannual period for which the statement is rendered (based on our receipts in the United States during the accounting period for which the statement is rendered), less all advances and charges under this Agreement.  We shall have the right to retain, as a reserve against charges, credits, or returns, such portion of payable royalties as shall be reasonable in our best business judgment. You shall reimburse us on demand for any overpayments, and we may also deduct the amount thereof from any monies payable to you hereunder. Royalties paid by us on phonograph records subsequently returned shall be deemed overpayments.

(ii)    We will maintain books and records which report the sales or other exploitations of Phonograph Records and Master Recordings hereunder on which the Flawless Profit Share and any other royalties are payable to you. You may, at your own expense, designate a certified public accountant ("CPA") to examine those books and records, as provided in this paragraph only. Such examination: (a) may be made only for the purpose of verifying the accuracy of the statements

Scanned Copy Of Original 04-17-2002 11:48:24

37/02FLAWLESS 0837

Flawless Records, Inc.
Dated as of June 28, 2001
Page 15

sent to you under section 5(c)(i); (b) may be made for a particular statement only once and only within two-and-one-half (2 ½) years after the date when we send you that statement; and (c) may be made only during our usual business hours, and at the place where we keep the books and records to be examined, and upon reasonable notice to us. (We will be deemed conclusively to have sent you each statement on the date prescribed in section 5(c)(i) unless you notify us otherwise, with respect to any statement, within ninety (90) days after that date.)  No examination may be made of any manufacturing records or any other records that do not specifically report sales or other distributions of Phonograph Records or other transactions on which the Flawless Profit Share and any other royalties are payable to you.  Further, such examination shall be conditioned upon the CPA's written agreement to us that the CPA will not voluntarily disclose any findings to any Person other than you, your attorney or other advisers.

        (iii)    If you have any objections to a so-called "royalty statement," you will give us specific notice of that objection and your reasons for it within two-and-one-half (2 ½) years after the date that we are deemed to have sent you that statement under section 5(c)(ii).  Each royalty statement will become conclusively binding on you at the end of that two-and-one-half-year period, and you will no longer have any right to make any other objections to it.  You will not have the right to sue us in connection with any royalty or Flawless Profit Share accounting, or to sue us for the Flawless Profit Share or any other royalties on Records sold or receipts derived by us during the period an accounting covers, unless you commence the suit within six (6) months after the end of that two-and-one-half-year period.  If you commence suit on any controversy or claim concerning accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the Flawless Profit Share and any other royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any monies found owing.  Your recovery of any such monies will be the sole remedy available to you by reason of any claim related to our accountings.  Without limiting the generality of the preceding sentence, you will not have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim.  The preceding three sentences will not apply to any item in an accounting if you establish that the item was fraudulently misstated.

        (d)    We shall have the right to deduct from any monies payable to you hereunder any amounts which may be required to be deducted

Scanned Copy Of Original 04-17-2002 11:48:24

4/17/02FLAWLESS 0838

Flawless Records, Inc.
Dated as of June 28, 2001
Page 16

from any of those monies under any statute, regulation, treaty or other law, and upon our request therefor, you shall promptly execute and deliver to us any forms or other documents as may be reasonably required in connection therewith. If we fail for any reason to deduct and instead pay to you any of those monies required to be deducted from monies payable to you hereunder, and if, as a result, we are required by any statute, regulation, treaty or other law to pay to any third party any amounts which were paid to you but which were required to be deducted, then, without limiting any of our other rights or remedies in that event, you shall, upon our demand, pay to us the amount of those monies which were paid to you but which were required to be deducted, or, at our election, we may deduct the amount of those monies paid to you but which were required to be deducted from any monies payable to you hereunder. For the avoidance of doubt, such monies shall not be duplicative of those deductions made for taxes as set forth in subparagraph (b)(vii) of Exhibit C."

18.    The following is hereby inserted as paragraph 4A of the Flawless Agreement:

"4A.    Solo Album Agreement. Notwithstanding anything to the contrary contained herein or in the Solo Album Agreement: (i) at such time as your royalty account under the Solo Album Agreement is in an otherwise payable position, royalties earned by you under the Solo Album Agreement shall be applied to recoup the unrecouped balance, if any, in your royalty account hereunder; and (ii) at such time as your royalty account hereunder is in an otherwise payable position, the Flawless Profit Share and all other royalties earned by you hereunder shall be applied to recoup the unrecouped balance, if any, in your royalty account under the Solo Album Agreement."

19.    All references in paragraph 6 of the Flawless Agreement to "Exhibit A" shall be deemed to refer to Exhibit B attached hereto.

20.    Subparagraph 7(i) of the Flawless Agreement is hereby modified and amended such that the words "Except as provided in paragraph 2A herein," before the words "as provided in each Production Agreement" at the beginning of the paragraph.

21.    In the last sentence of subparagraph 8(a), the phrase "Overhead Payments (except such third party payments you have previously committed to continue business operations [e.g., employee salaries], which payments shall be made directly by us to such third parties on your behalf), the Flawless Label Share," is hereby added before the phrase "General Advances."

Scanned Copy Of Original 04-17-2002 11:48:24

Flawless Records, Inc.
Dated as of June 28, 2001
Page 17

22.    The parties acknowledge and agree that to the extent the "conventional music publishing" and "conventional merchandising" agreements referenced in the second sentence of subparagraph 9(a) of the Flawless Agreement have not been delivered to us by you prior to the date of this amendment, we hereby waive any claim we may have that you have breached the Flawless Agreement by virtue of your failure to deliver such agreements, provided you comply with such requirement promptly after the date hereof.

23.    In paragraph 11 of the Flawless Agreement, the address for notices to you shall be deemed to be "Flawless Records, Inc., c/o The Firm, 9100 Wilshire Boulevard, Suite 400 West, Beverly Hills, CA 90212, Attention: Jeff Kwatinetz," the address for notices to us shall be deemed to be "2220 Colorado Avenue, Santa Monica, CA 90404, Attention: Head of Business and Legal Affairs" and the address for courtesy copies of notices to you shall be deemed to be "c/o Ziffren Brittenham Branca & Fischer, 1801 Century Park West, Los Angeles, CA 90067, Attn: John Branca, Esq."

24.    Sub-paragraph 12(a) of the Flawless Agreement is hereby modified and amended such that the words "or termination" are deleted from the second sentence therein.

25.    The second sentence of sub-paragraph 12(d) of the Flawless Agreement is hereby deleted in its entirety, and is replaced by the following in its place and stead:

> "Any rights which either party may have pursuant to the preceding sentence may not be exercised earlier than sixty (60) days (thirty (30) days if the breach is a failure to pay monies due) following receipt by the other party of such party's notice therefor."

Scanned Copy Of Original 04-17-2002 11:48:24

817/02FLAWLESS 0840

Flawless Records, Inc.
Dated as of June 28, 2001
Page 18

26.     Except as otherwise modified herein, the Flawless Agreement is hereby ratified and affirmed and remains in full force and effect.

Very truly yours,

INTERSCOPE RECORDS,
a California general partnership,
by its general partner

INTERSCOPE RECORDS, INC.,
a Delaware corporation

By: _____
       An Authorized Signatory

AGREED AND ACCEPTED:

FLAWLESS RECORDS, LLC

By: _____
       An Authorized Signatory

FLAWLESS RECORDS, INC.,
a Delaware corporation
(as successor-in-interest to Fred Durst, Inc.)

By: _____
       An Authorized Signatory

I hereby reaffirm the Guarantee and Inducement attached to the Flawless Agreement and I guarantee to Interscope Records all of the obligations of Flawless Records, LLC and Flawless Records, Inc. set forth in the above Amendment to the same extent as set forth in the Guarantee and Inducement.

_____
FRED DURST

Scanned Copy Of Original 04-17-2002 11:48:24

357/02FLAWLESS 0841

EXHIBIT A

Production Agreement Form

**INTERSCOPE RECORDS**
2220 Colorado Avenue
Santa Monica, CA 90404

_____, 200_

Flawless Records, LLC
c/o Ziffren Brittenham Branca & Fischer
1801 Century Park West
Los Angeles, California 90067
Attn: Mitch Tenzer, Esq.

Gentlepersons:

Reference is made to the agreement between you and _____ ("Furnisher") furnishing the exclusive recording services of _____ [professionally known as "_____"] ([individually and collectively,] the "Artist") dated of even date herewith (the "Artist Agreement"). *Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Artist Agreement.* Reference is also made to the agreement between you and us dated as of June __, 2001 (the "Flawless Agreement").

1.      You hereby enter into an agreement with us (the "Production Agreement") to furnish to us (via Furnisher) the Artist's services, on the terms of the Artist Agreement which is attached as Exhibit A-1 hereto and incorporated by reference herein. Accordingly, solely for the purposes of this Production Agreement, Exhibit A-1 shall be modified such that the term "you" is defined as "Flawless Records, Inc." and "Flawless Records, Inc." or "Flawless" shall be substituted and replaced with "Interscope Records, a division of UMG Recordings, Inc." or "Interscope."

2.      You hereby irrevocably authorize and direct us to make all payments referenced in Exhibit A-1 directly to Furnisher on your behalf.

3.      Pursuant to the terms of the Flawless Agreement, Article 7 of Exhibit A-1 is hereby modified such that we shall co-own with you in perpetuity from the Inception of Recording all Master Recordings (including, without limitation, Audiovisual Records and Covered Videos), Website Material, ECD Material, Album Artwork and any other Materials specified in Exhibit A-1 to which you have any rights of ownership granted to you by Furnisher and/or the Artist or otherwise.   Accordingly, we shall copyright those

A-1

FlawlessAmendment2 SH:sh/06/14/01

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0842

you by Furnisher and/or the Artist or otherwise.   Accordingly, we shall copyright those Master Recordings, Covered Videos, Artwork, Website Material and ECD Material in our name and your name as the authors and owners of them and we may secure any and all renewals and extensions of such copyright throughout the world.  You hereby grant to us a power of attorney, irrevocable and coupled with an interest, for you and in your name, to apply for and obtain, and on obtaining same, to assign to us all such copyrights and renewals and extensions thereof.  You will execute and deliver to us such instruments of transfer and other documents regarding our joint rights in the Master Recordings, Covered Videos, Artwork, Website Material and ECD Material subject to this Agreement as we may reasonably request to carry out the purposes of this Agreement, and we may sign such documents in your name and make appropriate disposition of them.  We will give you ten (10) days notice before signing any document in your name.  We may dispense with that waiting period when necessary, in our judgment, to protect or enforce our rights, but we will notify you in each instance when it has done so.  We will not be required to notify you before signing applications for copyright and/or short form assignments of rights granted in this Production Agreement for recordation in the Copyright Office.

4..    In accordance with the terms of the Flawless Agreement, your royalty account will be credited with the Flawless Profit Share with respect to the Artist.  The Artist is hereby deemed an "Artist" as defined in the Flawless Agreement, and accordingly the terms of the Flawless Agreement that apply to Artists thereunder shall apply to the Artist.

5.    You shall cause the Artist to execute the inducement letter attached hereto as Exhibit B-1 and incorporated by reference herein.

6.    (a)    We will print your logo or other trade symbol, designated by you (your "Mark"), on the Record labels and Album covers used for Phonograph Records consisting entirely of Master Recordings hereunder, or other Phonograph Records deemed Flawless product by us in consultation with you, manufactured during the term of this Agreement for distribution in the United States.  We will also place your Mark in advertisements prepared and placed by us in the United States for Records derived solely from Master Recordings made under this Production Agreement (other than institutional or similar advertisements) in which our logo is used.  Your Mark, as printed by us on such Record labels and covers and advertisements, shall be the same size and prominence as our logo which appears on the same material.  We will also include your name on the spine of Records derived solely from Master Recordings made under this Production Agreement and in the chyron of promotional videos embodying Master Recordings made under this Production Agreement where our name appears. Your name, as printed by us on such Record spines and video chyrons, shall be of the same size and typeface as our name which appears on the same material.  If we fail to comply with the preceding sentence(s) in any instance(s), our sole obligation to you by reason of

A-2

Scanned Copy Of Original 04-17-2002 11:48:24

8617/02FLAWLESS 0843

such failure shall be to rectify the error in materials prepared after our receipt of notice of that failure from you.

      (b)    Your name and Mark, wherever used by us or our Licensees, will each be deemed an item of "Materials" covered by your warranties, representations, and indemnification obligations under Article 13 of Exhibit A-1. Without limiting our rights under Article 13 or otherwise, we may refrain from printing your name or the Mark at any time when its use might violate any law or the rights of any other Person, in our sole judgment.

                                                          Very truly yours,

                                                        INTERSCOPE RECORDS,
a California general partnership,
by its general partner

INTERSCOPE RECORDS, INC.
a Delaware corporation

By_____
               An Authorized Signatory

ACCEPTED AND AGREED:

FLAWLESS RECORDS, LLC,

By: _____
      An Authorized Signatory

A-3

Scanned Copy Of Original 04-17-2002 11:48:24

04/17/02 FLAWLESS 0844

## EXHIBIT A-1

[attach applicable Artist Agreement]

A-4

FlawlessAmendment2 SH:sh/06/14/01

Scanned Copy Of Original 04-17-2002 11:48:24

SC817/02FLAWLESS 0845

## EXHIBIT B-1

[inducement letter]

FlawlessAmendment2 SH:sh/06/14/01

Scanned Copy Of Original 04-17-2002 11:48:24

## EXHIBIT B

### Artist Agreement Form

B-1

FlawlessAmendment2 SH:sh/06/14/01

17/02FLAWLESS 0847

AGREEMENT made this _____ day of _____, 200_, between
_____, a _____ corporation (referred to herein as "you"),
furnishing the services of _____ [professionally known as]
"_____"], ([individually and collectively] referred to herein as "Artist") and
Flawless Records, LLC (hereinafter "Flawless").

## I.    TERM

1.01. (a)    The term of this Agreement and the initial Contract Period will begin
on the date first written above.

(b)    Each Contract Period of the term will end, unless extended as
provided herein, six (6) months after Flawless's United States retail street date for the last
Master Recording Delivered by you in fulfillment of your Recording Commitment for that
Contract Period under paragraph 3.01 below. Notwithstanding the foregoing, but subject to
the other provisions of this Agreement, no Contract Period will end prior to the date ten
(10) months after the date of commencement of such Period.

1.02.    You grant Flawless six (6) separate, consecutive and irrevocable options to
extend the term for additional Contract Periods ("Option Periods") on the same terms and
conditions, except as otherwise expressly provided in this Agreement.  Each of those
options shall be exercised by Flawless, if at all, by notice to you not later than the expiration
date of the Contract Period which is then in effect (the "current Contract Period").  Each
Option Period for which Flawless exercises its option will begin immediately after the end of
the then-current Contract Period (or, if Flawless so advises you in its exercise notice, such
Option Period will begin on the date of such exercise notice).  Notwithstanding anything to
the contrary contained herein, in the event that Flawless does not, prior to the expiration
date of the current Contract Period, exercise its option for an Option Period, the term of the
current Contract Period shall, subject to the following provisions hereof, continue, unless
Flawless notifies you to the contrary.  However, you shall at any time after the expiration
date of the current Contract Period, have the right to send Flawless written notice
(hereinafter "Termination Request") of your desire that the current Contract Period and the
term of this Agreement shall terminate unless Flawless shall, within ten (10) days after its
receipt of such Termination Request (hereinafter "10-day Period"), exercise its option for
the applicable Option Period. If Flawless does not, prior to the end of such 10-day Period,
exercise its option for the applicable Option Period, the current Contract Period and the
term of this Agreement shall expire as of the eleventh (11th) day after Flawless's receipt of
your Termination Request.  If Flawless shall, prior to the expiration of the current Contract
Period (or such 10-day Period, as applicable) exercise its option for the applicable Option
Period, then the Option Period shall commence and the current Contract Period shall expire,
both upon the later of (i) the expiration date of the current Contract Period, or (ii) the date
of Flawless's such notice to you exercising its option for the Option Period.

- 1 -

Scanned Copy Of Original 04-17-2002 11:48:24

0847/02FLAWLESS 0848

## 2.    SERVICES

2.01.   During the term of this Agreement you will furnish the services of Artist to render services as a performing artist for the purpose of making Master Recordings for Flawless, you will cause those Recordings to be produced and you will Deliver the Recordings to Flawless, as provided in this Agreement.

2.02.   (a)     Your obligations will include furnishing the services of the producers of those Master Recordings and you will be solely responsible for engaging and paying them. (Producers of Master Recordings hereunder are referred to herein as "Producers.")

(b)     If Flawless, instead, engages Producers for any of those Master Recordings, or if the Producers of any such Recordings are regularly employed on Flawless's staff or render their services under contract with Flawless, your royalty account and the production budget for the recording project concerned will be charged with a Recording Cost item in the amount of the fee concerned and/or advance payable to such Producer(s) pursuant to their agreement with Flawless and your royalty on Phonograph Records made from those Recordings under Articles 9 and 10 will be reduced by the amount of the royalty payable to such Producer(s) pursuant to their agreement with Flawless. This subparagraph (b) will not apply unless you have consented in writing to the engagement of the Producer concerned, or the assignment of the staff or contract Producer concerned, to the recording project.

(c)     Flawless will accept letters of direction irrevocably authorizing Flawless to pay and account to the Producers and/or mixers of Master Recordings Delivered in satisfaction of your Recording Commitment on your behalf, in the form of Exhibit B attached to this Agreement, subject to the following:

(1)     The total Producing Royalty (as defined in Exhibit B) pursuant to such letters of direction shall not, without Flawless's prior written consent, exceed three percent (3%) per Album, subject to prospective escalations not to exceed one-half percent (1/2%) each at USNRC Net Sales of 500,000 and 1,000,000 Albums. The total mixing royalty pursuant to such letters of direction shall not, without Flawless's prior written consent, exceed one percent (1%) per Album.

(2)     The total Producing Royalty pursuant to such letters of direction will be deducted from all monies (excluding Mechanical Royalties) payable or becoming payable to you under this Agreement; and

(3)     The total advances to such Producers will in no way increase Flawless's obligations to you under Article 6.

- 2 -

Scanned Copy Of Original 04-17-2002 11:48:24

SH/02FLAWLESS 0849

## 3.    RECORDING COMMITMENT

3.01.    During each Contract Period, you will cause the Artist to perform for the recording of Master Recordings sufficient to constitute one (1) Album, cause those Master Recordings to be produced and Deliver them to Flawless (the "Recording Commitment"). Each Album required to be recorded and Delivered by you hereunder is herein sometimes referred to as a "Commitment Album".

3.02.    You will fulfill the Recording Commitment for each Contract Period within the first five (5) months of the Contract Period.

3.03.    Each Commitment Album (or other group of Master Recordings) Delivered to Flawless will consist entirely of Master Recordings made in the course of the same Album (or other) recording project, unless Flawless consents otherwise. Flawless may withhold that consent in its unrestricted discretion.

## 4.    RECORDING PROCEDURE

4.01.    You will follow the procedure set forth below in connection with Master Recordings made hereunder:

(a)    Except as expressly noted otherwise in this Agreement, prior to the commencement of recording in each instance, you and Flawless shall mutually approve each of the following:

(1)    Selection of Producer.

(2)    Selection of material, including the number of Compositions to be recorded. You will advise Flawless of the content of each medley before it is recorded. Unless Artist is solely an instrumentalist, no Master Recording made hereunder shall embody solely an instrumental Performance. Flawless will have the right to disapprove and reject any material which in Flawless's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Flawless to liability or unfavorable regulatory action. You shall not record a Multiple Record Set without Flawless's consent, which may be withheld for any reason.

(3)    Selection of dates of recording and studios where recording is to take place, including the cost of recording at such studios. You shall not begin recording any Commitment Album within five (5) months after the Delivery of the prior Commitment Album. Flawless may disapprove a studio if it is not a first-class recording studio, if its use

- 3 -

Scanned Copy Of Original 04-17-2002 11:48:24

would be inconsistent with any of Flawless's union agreements, if Flawless anticipates that its use would cause labor or other difficulties, or if Flawless anticipates that its use would require expenditures inconsistent with the approved recording budget, and not any other reason. The scheduling and booking of all studio time will be done by Flawless, in accordance with your requests and the approved recording budget.

(4)    A proposed budget (which you will submit to Flawless sufficiently in advance of the planned commencement of recording to give Flawless a reasonable time to review and approve or disapprove it at least fourteen (14) days before the planned commencement of recording). A recording budget (inclusive of Producer advances and/or fees) for any Commitment Album which does not exceed ninety percent (90%) of the amount of the applicable minimum Recording Fund prescribed in paragraph 6.02 will not be disapproved by reason of its overall amount.

(b)    You shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)    In connection with the requirements of the U.S. Immigration Law, you shall not engage or permit the engagement of any Person to perform services with respect to any Master Recording unless and until you have caused such Person to properly complete an INS Form I-9, you have executed, completed and signed the employer verification section thereof, you have attached copies of documents verifying employment eligibility, and you have delivered same to Flawless with respect to each such Person within seventy-two (72) hours after the applicable Person first renders services with respect to Master Recordings hereunder. You will comply with any revised or alternative employment verification procedure of which Flawless advises you in the future.

(d)    As and when required by Flawless, you shall allow Flawless's representatives to attend any or all recording sessions hereunder at Flawless's expense. (Those expenses will not be recoupable as Recording Costs.)

(e)    You shall timely supply Flawless with all of the information it needs in order: (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations Flawless may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings. Without limiting the generality of section (2) of the preceding sentence:

(1)    You shall furnish Flawless with all information it requires to comply with its obligations under its union agreements, including, without limitation, the following:

- 4 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

8/17/02FLAWLESS 0851

(i)     If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were made, and the AFM Phonograph Recording Contract (Form "B") number(s) covering such sessions;

(ii)     Each change of title of any Composition listed in an AFM Phonograph Recording Contract (Form "B"); and

(iii)     A listing of all the musical selections contained in Recordings Delivered to Flawless hereunder; and

(2)     You will deliver to Flawless all AFM or AFTRA session reports, tax withholding forms, and other documentation required by Flawless within seventy-two (72) hours after each recording session hereunder so that Flawless may timely make all required union payments to the session musicians and other employees concerned, if any.

(f)     You shall deliver to Flawless fully mixed, edited, and unequalized and equalized Master Recordings (including but not limited to a final two-track equalized tape copy), which are technically and commercially satisfactory to Flawless for the production, manufacture and sale of Phonograph Records, all original and duplicate Master Recordings of the material recorded, together with all necessary licenses and permissions, including, without limitation, those relating to all samples, if any, interpolated in the Master Recordings, and all materials reasonably required to be furnished by you to Flawless for use in the packaging and marketing of the Records, including, without limitation, complete and accurate label copy and liner note information. Notwithstanding the foregoing, for purposes of Delivery hereunder and subject to prior notification by you as early as possible, but in no event later than the date of the Delivery of the Master Recording concerned, Flawless will use reasonable efforts to obtain all required mechanical licenses for the United States provided you submit to Flawless all necessary information in connection therewith. If Flawless eventually obtains such fully executed licenses, Delivery will be deemed to be the later of the date described in paragraph 14.10 or the date you have fully complied with the other terms contained in this paragraph, subject to the next sentence. In the event Flawless is given notice or reasonably determines that no such mechanical license can be reasonably obtained, you shall be solely responsible for obtaining such licenses, in which event Delivery shall not occur until Flawless receives such licenses and the other items contained herein. Notwithstanding anything to the contrary contained herein, if you properly notify Flawless as provided herein and Flawless has no reason to believe it will not reasonably obtain mechanical licenses with respect to Master Recordings delivered hereunder, Flawless will make the applicable payments upon your full compliance with the other terms contained in this paragraph and paragraph 14.10. Each Master Recording will be clearly marked to

Scanned Copy Of Original 04-17-2002 11:48:24

SC-187/02FLAWLESS 0852

identify the Artist as the recording artist, and to show the title(s) of the Composition(s) and recording date(s).

(g)      You shall comply with Flawless's policies with respect to samples, and you and Artist hereby warrant and represent that all information supplied by you or the Artist to Flawless in that regard is and shall be complete and correct.  As of the date hereof, Flawless's policies with respect to all samples embodied in any Master Recording (including remixes of Master Recordings, regardless of whether such remixes will be commercially released) are as follows:

(1)      Prior to Flawless's authorization of pre-mastering (e.g., equalization and the making of reference dubs or the equivalent thereof in the applicable configurations) for a particular set of Master Recordings hereunder, you shall deliver the following to Flawless for the applicable set of Master Recordings:

(i)      A detailed list of any and all samples embodied in each Master Recording;

(ii)      A written clearance or license for the perpetual use (as each Master Recording may be exploited in accordance with the terms hereof, subject to customary sample license restrictions) of each such sample interpolated in each Master Recording in any and all media from the copyright holder(s) of the Master Recording and the Composition sampled.

(iii)      Any and all necessary information pertaining to credit copy required by the copyright holder(s) of each sample interpolated in each Master Recording.

(2)      No Master Recording will be scheduled for release and no Master Recording shall be deemed to be Delivered to Flawless hereunder (and no Advances due on Delivery, if any, will be paid) until such written sample clearances (including credit copy, if any) have been obtained and reasonably approved by Flawless.

(3)      If any such sample clearance provides for an advance, a flat-fee "roll-over" payment and/or a royalty payment for Net Sales of the applicable Master Recording and your record royalty account hereunder is in an unrecouped position at the time such royalties are due, then, notwithstanding anything to the contrary contained herein, you shall be solely responsible for making, and shall make, such payment(s) to the applicable Person promptly upon receipt from Flawless of such Person's accounting statement thereof. If Flawless makes any such payment(s), such payment(s) will constitute an Advance and will be recoupable from all monies becoming payable by Flawless to you or the Artist under this Agreement.

- 6 -

07/02FLAWLESS 0853

4.02.   No Composition previously recorded by the Artist will be recorded under this Agreement unless Flawless otherwise agrees to the contrary in writing.   No "live" Recording, solely instrumental Recording (unless Artist is solely an instrumentalist), Joint Recording, or Recording not made in full compliance with this Agreement will apply in fulfillment of your Recording Commitment, nor will Flawless be required to make any payments in connection with any such Recording except any royalties which may become due under this Agreement if the Recording is released by Flawless.  No Recordings shall be made by unauthorized dubbing or sampling.

4.03.   Nothing in this Agreement shall obligate Flawless to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if Flawless reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be technically and commercially satisfactory to Flawless for the production, manufacture and sale of Phonograph Records, subject to the cure provisions in paragraph 19.07 below.

4.04.   The Artist will not be required to perform together with any other royalty artist without the Artist's consent, which may be withheld for any reason.

5.     **RECOUPABLE AND REIMBURSABLE COSTS**

5.01.   Flawless will pay all union scale payments required to be made to the Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by Flawless for the recording of such Master Recordings, and all other amounts required to be paid by Flawless pursuant to any applicable law or any collective bargaining agreement between Flawless and any union representing Persons who render services in connection with such Master Recordings.  If Flawless incurs any penalties for late payments caused by your delay in submitting union contract forms, invoices or other similar forms, you will promptly reimburse Flawless for same upon demand, and without limiting Flawless's other rights and remedies, Flawless may deduct an amount equal to all such penalties from all monies otherwise becoming payable by Flawless to you or the Artist under this Agreement.   Notwithstanding the foregoing, you agree that the Advances hereunder include the prepayment of session union scale to the Artist as provided in the applicable union codes, and you agree to complete any documentation required by the applicable union to implement this sentence.  (Union contracts will be filed and supplied to Flawless and pension benefits will be paid on the Artist's behalf by Flawless which payments shall be an Advance.)

5.02.   (a)     All Recording Costs will constitute Advances.  Any Recording Costs in excess of the applicable Recording Fund fixed in paragraph 6.02 or other amount approved in writing by Flawless, and all Special Packaging Costs, will be your sole

FlawlessExhibitB1 SH:sh/06/15/01

07/02FLAWLESS 0854

responsibility and will be paid by you promptly (or reimbursed by you if paid by Flawless).
Those amounts will also be recoupable from all monies becoming payable by Flawless to
you or the Artist under this Agreement or "any other agreement" (as such phrase is defined
in subparagraph 14.01(a)) to the extent to which they have not actually been paid or
reimbursed as provided in the preceding sentence. All costs incurred by Flawless in
connection with any television or radio advertising campaign(s) in conjunction with Records
featuring Artist's Performances will constitute Advances. Subject to subparagraph 14.01(b)
below, all costs incurred by Flawless in connection with the production or acquisition of
rights in Covered Videos, and fifty percent (50%) of all direct out-of-pocket expenses paid
or incurred by Flawless in connection with independent promotion and/or independent
marketing of Recordings of the Artist's Performances (i.e., promotion and/or marketing by
Persons other than regular employees of Flawless), will constitute Advances; provided,
however, that in no event shall any amounts in connection with independent promotion in
excess of One Hundred Fifty Thousand Dollars ($150,000.00) per Single be recoupable
without your consent (i.e., Flawless shall not recoup independent promotion costs in excess
of Seventy-Five Thousand Dollars ($75,000) per Single without your consent).

(b)    The amounts applicable to any Joint Recording which are payable by
you or chargeable against your royalties under this paragraph 5.02 will be computed by
apportionment as provided in paragraph 10.01.

(c)    Payments to the AFM Special Payments Fund and the Music
Performance Trust Fund based upon Record sales (so-called "per-record royalties"), will not
be recoupable from your royalties or reimbursable by you. With respect to the preparation
of a lacquer, copper, or equivalent master from a fully mixed, edited, and equalized master
tape, an amount equal to the normal engineering charges which would reasonably be
incurred in connection with the production of such a master on a real time basis at Flawless's
studios (or other studios designated by Flawless) will be excluded in the calculation of
Recording Costs, but all costs in excess of those normal engineering charges will be included
in that calculation.

## 6.    ADDITIONAL ADVANCES

6.01.    All monies paid by Flawless to you or the Artist during the term of this
Agreement, except royalties paid pursuant to Articles 9, 10 and 12, will constitute
Advances. Each payment (except such royalties) made by Flawless during the term to
anyone else on behalf of you or the Artist will also constitute an Advance if it is made with
the written consent of you or the Artist, if it is required by law, or if it is made by Flawless
to satisfy an obligation incurred by you or the Artist in connection with the subject matter of
this Agreement.

FlawlessExhibitB1 SH:sh/06/15/01

17/02FLAWLESS 0855

6.02.    (a)    In connection with each Commitment Album, Flawless will pay you an Advance in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs (including anticipated costs not yet paid or billed) for such Commitment Album:

(1)    The amount of the Recording Fund for the Commitment Album Delivered during the initial Contract Period ("First Album") will be Three Hundred Fifty Thousand Dollars ($350,000). The amount of the Recording Fund for each Commitment Album (other than the First Album) Delivered hereunder will be two-thirds (2/3) of whichever of the following amounts is less (subject to section 6.02(a)(2) below):

(i)    the net amount of the royalties credited to your account on Net Sales Through Normal Retail Channels in the United States of the Commitment Album released most recently before the Delivery of the Commitment Album concerned (the "Prior Album"), as determined by Flawless from its most recent monthly trial balance accounting statement as of the date twelve (12) months after the initial United States release of the Prior Album, after deduction of reserves for returns and credits not exceeding fifteen percent (15%) of the aggregate number of units of that Album shipped to Flawless's customers; or

(ii)    the average of the amounts of such royalties on the two (2) Prior Albums.

(2)    No such Recording Fund will be more than the applicable maximum or less than the applicable minimum amount prescribed below:

|  |  | Minimum | Maximum |
|---|---|---|---|
| (i) | Commitment Album Delivered in the first Option Period: | $375,000 | $750,000 |
| (ii) | Commitment Album Delivered in the second Option Period: | $400,000 | $800,000 |
| (iii) | Commitment Album Delivered in the third Option Period: | $425,000 | $850,000 |
| (iv) | Commitment Album Delivered in the fourth Option Period: | $450,000 | $900,000 |
| (v) | Commitment Album Delivered in the fifth Option Period: | $475,000 | $950,000 |

- 9 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:46:24
17/02FLAWLESS 0856

(vi)    Commitment Album Delivered
        In the sixth Option Period:        $500,000              $1,000,000

- 10 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0857

(b)    Each such Advance will be reduced by the amount of any reasonably anticipated costs of mastering, remastering, remixing and/or "sweetening;" any such anticipated costs which are deducted but not incurred will be remitted promptly to you, it being understood that Flawless shall not unreasonably withhold monies hereunder in connection with such anticipated costs for a period in excess of thirty (30) days after the date of Delivery of the applicable Album.    Flawless shall not deduct from the applicable Recording Fund any costs incurred in connection with the remixing of any Master Recordings embodied on a Commitment Album after such Album has been Delivered hereunder. If any Commitment Album is not Delivered within ninety (90) days after the end of the time prescribed in Article 3 (the "Determination Date"), the Recording Fund for that Album will be reduced by five percent (5%) for each thirty (30) day period (or fraction thereof, on a pro rata basis) occurring subsequent to the Determination Date and prior to the Delivery of such Album; provided, however, that in no event shall the Recording Fund for said Album be reduced to an amount less than the actual and approved Recording Costs for said Album.

(c)    (1)    Following the execution of this Agreement and the commencement of its term, Flawless will pay you an Advance in the amount of Twenty Five Thousand Dollars ($25,000).  This paragraph will not apply to any Option Period.  The Recording Fund referred to in section 6.02(a)(1) above for the First Album will be reduced by the amount of that payment.

(2)    The Advance for the First Album will be made within thirty (30) days after the Delivery to Flawless of the Commitment Album concerned.

(3)    The Advance for each Commitment Album other than the First Album will be made by payment to you of:

(i)    ten percent (10%) of the applicable minimum Recording Fund, as reduced pursuant to the subparagraph 6.02(b), following the commencement of recording of the Commitment Album concerned; and

(ii)    the balance, if any, of the Advance, within thirty (30) days after the Delivery to Flawless of the Commitment Album concerned.

6.03.    (a)    A "qualifying Recompilation Album", in this paragraph 6.03, means a Recompilation Album consisting of: (1) Master Recordings made under this Agreement and previously released in different Album combinations; and (2) new Master Recordings made hereunder of at least two (2) new Compositions, made expressly for initial release in that Recompilation Album and not applicable in reduction of your Recording Commitment.  You shall Deliver the two (2) new Master Recordings made under this Agreement to Flawless

- 11 -

Scanned Copy Of Original 04-17-2002 11:48:24

97/02FLAWLESS 0858

within sixty (60) days after Flawless's request therefor (subject to Artist's prior professional commitments provided Flawless has knowledge of same).

(b)    Promptly after Flawless's release of a qualifying Recompilation Album on Top-Line Records for Sales Through Normal Retail Channels in the United States during the term hereof, Flawless will pay you an Advance in the amount by which One Hundred Fifty Thousand Dollars ($150,000) exceeds the Recording Costs for the new Recordings referred to in section (2) of subparagraph 6.03(a). (No other Advance will be payable in connection with those Recordings.) Each such Advance will be reduced as provided in subparagraph 6.02(b). If your royalty account is in an unrecouped position (i.e., if the aggregate of the Advances and other recoupable items charged to that account at the time of payment of that Advance exceeds the aggregate of the royalties credited to that account at the end of the last semi-annual royalty accounting period), the Advance payable under the first sentence of this subparagraph will be reduced by the amount of the unrecouped balance; provided, however, in any event, said Advance shall not be less than Seventy-Five Thousand Dollars ($75,000) inclusive of Recording Costs for the two (2) new Master Recordings.

(c)    The royalty payable with respect to a Master Recording contained in a qualifying Recompilation Album or any other Recompilation Album will be the highest royalty achieved by the Master Recording concerned in its previous Album release hereunder. There shall be no further escalation with respect to royalties on Recompilation Albums.

7.    **RIGHTS IN RECORDINGS**

7.01.    All Master Recordings made or furnished to Flawless by you or the Artist under this Agreement or during its term from the Inception of Recording, and all matrices and Phonograph Records manufactured from them, together with the Performances embodied on them (but excluding the copyrights of the musical compositions contained therein), all Covered Videos, and all artwork created for use in connection with the Phonograph Records hereunder ("Artwork") as well as all Website Material and ECD Material shall be the sole property of Flawless, free from any claims by you, the Artist or any other Person; and Flawless shall have the exclusive right to copyright those Master Recordings, Covered Videos, Artwork, Website Material and ECD Material in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world. In connection therewith you and the Artist hereby acknowledge that each Master Recording made or furnished to Flawless by you or the Artist under this Agreement or during its term (but excluding the copyrights of the musical compositions contained therein), from the Inception of Recording, each Covered Video made hereunder, and all Artwork, Website Material and ECD Material is a work made for hire for Flawless in that (a) it is prepared within the scope of Flawless's employment of

- 12 -

Scanned Copy Of Original 04-17-2002 11:48:24
07/02FLAWLESS 0859

you and the Artist hereunder and/or (b) it constitutes a work specifically ordered by Flawless for use as a contribution to a collective work. To the extent, if any, that you and/or the Artist may be deemed an "author" of any such Master Recordings, Covered Videos, Artwork, Website Material and ECD Material, you and/or the Artist hereby grant to Flawless a power of attorney, irrevocable and coupled with an interest, for you and/or the Artist and in your and/or the Artist's names, to apply for and obtain, and on obtaining same, to assign to Flawless all such copyrights and renewals and extensions thereof. Notwithstanding the foregoing, as between you and Flawless, you shall own your logo, if any, and you shall own all other Artwork (and the worldwide copyrights therein) for which you pay (without reimbursement from Flawless) the costs of acquisition and/or creation of such Artwork, subject to Flawless's exclusive right to use same in connection with the rights granted to Flawless in this Agreement. You and/or the Artist will execute and deliver to Flawless such instruments of transfer and other documents regarding the rights of Flawless in the Master Recordings, Covered Videos, Artwork, Website Material and ECD Material subject to this Agreement as Flawless may reasonably request to carry out the purposes of this Agreement, and Flawless may sign such documents in your name or the name of the Artist and make appropriate disposition of them. Flawless will give you ten (10) days notice before signing any document in your name or the name of the Artist. Flawless may dispense with that waiting period when necessary, in Flawless's judgment, to protect or enforce its rights, but Flawless will notify you in each instance when it has done so. Flawless will not be required to notify you before signing applications for copyright and/or short form assignments of rights granted in this Agreement for recordation in the Copyright Office. All Artwork, Website Material and ECD Material shall contain all such trademarks, trade names, information, logos and other items, as Flawless customarily includes on such Artwork or Website Material and ECD Material, including, without limitation, so-called "watermarks," "meta-data," and "hyperlinks" to Artist Domain Names and other URLs.

7.02.    Without limiting the generality of the foregoing and subject to the terms of this Agreement, Flawless and any Person authorized by Flawless shall have the unlimited, exclusive rights, throughout the world: (a) to manufacture and/or distribute Phonograph Records in any form and by any method now or hereafter known, derived from the Master Recordings and Covered Videos made under this Agreement or during its term; (b) to sell, lease, rent, transmit, import, export, transfer or otherwise deal in or dispose of the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing; (c) to reproduce, adapt, and otherwise use those Master Recordings, Covered Videos, Website Material and ECD Material in any medium and in any manner, including but not limited to use in audiovisual works; and (d)  to publicly perform such Master Recordings, Website Material and ECD Material and Covered Videos and to permit the public performance thereof.

- 13 -

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0860

7.03.  You and the Artist hereby irrevocably authorize, empower, and appoint Flawless your and the Artist's true and lawful attorney (a) at Flawless's sole non-recoupable cost, to initiate and compromise any valid claim or action against infringers of Flawless's rights with respect to Covered Videos, Master Recordings and Artwork made under this Agreement or otherwise furnished to Flawless by the Artist or you; and (b) to execute in the Artist's name and your name any and all documents and/or instruments necessary or desirable to accomplish the foregoing.  Flawless will give you ten (10) days notice before signing any such document in your name or in the name of Artist.  The power of attorney granted under this paragraph 7.03 is coupled with an interest and is irrevocable.

[7.04.  Flawless will have the right to conduct a trademark search with respect to the name "_____" (and any subsequent group name) and to register such trademark in your name or the name of the Artist with each applicable trademark authority.  You and the Artist will execute and deliver to Flawless those documents regarding such name as Flawless may reasonably request to carry out any trademark search and registration. Notwithstanding the foregoing, Flawless may sign those documents in your and the Artist's name and make appropriate disposition of them.  Flawless will give you ten (10) days notice before signing any such document in your name or in the name of the Artist.  All costs paid or incurred by Flawless in connection with any trademark search or registration under this Agreement in an amount not to exceed One Thousand Five Hundred Dollars ($1,500) without your prior written consent will constitute Advances.]

8.  **MARKETING**

8.01.  (a)    Flawless and its Licensees shall have the perpetual and exclusive rights during the term of this Agreement (and the non-exclusive rights thereafter) throughout the world and may grant to others the rights:

(1)    to use your name and the names, approved portraits, approved pictures and approved likenesses of the Artist and Producer(s) and all other Persons performing services in connection with Master Recordings and Covered Videos made under this Agreement (including, without limitation, all past, present or future legal, professional, group, and other assumed or fictitious names used by them), and biographical material concerning you or them, as news or information, for the purposes of trade, or for advertising purposes, in any manner and in any medium in connection with the marketing and exploitation of Phonograph Records and Covered Videos hereunder, including on Websites (including Artist Websites) and Flawless's institutional advertising (i.e., advertising designed to create goodwill and prestige and not for the purpose of selling any specific product or service) and the Artist's career;

(2)    to reproduce your name and the Artist's names, approved portraits, approved pictures and approved likenesses (including, without limitation, all past,

- 14 -

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0861

present or future legal, professional, group, and other assumed or fictitious names used by the Artist) (collectively "Artist's Name and Likeness") on promotional merchandise (i.e., merchandise not intended for resale to consumers) of any kind, without payment of additional compensation to you, the Artist or any other Person, in connection with the marketing and exploitation of Phonograph Records and Covered Videos hereunder, Flawless's institutional advertising and the Artist's career; and

        (3)    to create, host and/or maintain any Websites which incorporate Artist's Name and Likeness or any Master Recordings and Covered Videos or Artwork.

        (4)    It is expressly acknowledged that no so-called "retail" or "tour" or other commercial merchandising rights are granted to Flawless by reason of this subparagraph 8.01(a) or any other provision of this Agreement.

        (b)    During the term of this Agreement neither you nor the Artist shall authorize any Person other than Flawless to use the Artist's Name and Likeness in connection with the advertising or sale of:

        (1)    Phonograph Records; or

        (2)    Blank recording tape or tape recording equipment, other than professional tape or equipment not intended for resale to consumers.

        (c)    Except as otherwise set forth herein, during the term of this Agreement neither you, the Artist nor any Person deriving rights from you or the Artist will use, authorize or permit any Person other than Flawless and its Licensees to create, host and/or maintain any Websites which incorporate Artist's Name and Likeness, or any Master Recordings, Covered Videos or Artwork.

        (d)    Notwithstanding anything to the contrary contained herein, Flawless's rights under this Agreement shall not include Artist's dramatic performance in any medium now known or hereafter devised (e.g., an exclusively dramatic role in a stage play or on television or in a feature film).

- 15 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0862

8.02.   (a)   You and the Artist will cooperate with Flawless, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing the Artist, the Recordings and Covered Videos made under this Agreement, at Flawless's expense and subject to the Artist's prior professional commitments.

(b)   Flawless will make available to you for your approval, at its offices, any pictures of the Artist or biographical material about the Artist which it proposes to use for packaging, advertising or publicity in the United States during the term of this Agreement. Flawless will not use any such material which you disapprove in writing, provided you furnish substitute material, satisfactory to Flawless in its sole discretion, in time for Flawless's use within its production and release schedules. If you object to any previously approved likeness (other than any likeness embodied in Covered Videos or on the packaging for any Record hereunder) or biographical material and provide Flawless with replacements therefor which are approved by Flawless, Flawless shall not make any new use of those likenesses and biographical material to which you have objected. No inadvertent failure to comply with this paragraph will constitute a breach of this Agreement, and neither you nor the Artist will be entitled to injunctive relief to restrain the continuing use of any material used in contravention of this paragraph. Notwithstanding the foregoing, upon receipt by Flawless of notice from you specifying its failure to comply with the provisions of this subparagraph 8.02(b), Flawless will use its reasonable efforts to prospectively cure such failure, it being understood that Flawless shall have no obligation to recall any material used in contravention of this subparagraph 8.02(b).

8.03.   During the term of this Agreement (except as otherwise provided below), in respect of Records, other than Audiovisual Records (except as otherwise provided below), manufactured for sale in the United States, Flawless will not, without your consent and notwithstanding anything in Article 9:

(a)   Initially release any Commitment Album under any Record label other than a label then used by Flawless for Recordings of Performances by Flawless's best selling artists in the Artist's genre then under exclusive term contract to Flawless.

(b)   During or after the term of this Agreement, couple during any one year period more than two (2) Master Recordings (including Covered Videos) made or furnished under this Agreement more than one (1) time each with Recordings not embodying the Artist's Performances, except on promotional Records, Records described in the last sentence of paragraph 10.03 and Records created by Flawless's special products operations for sale to educational institutions.

(c)   During or after the term of this Agreement, sell Records derived from any Master Recording made or furnished under this Agreement as "cut-outs" within

- 16 -

Scanned Copy Of Original 04-17-2002 11:48:24

3-17/02FLAWLESS 0863

eighteen (18) months after the initial release of the Master Recording concerned on Phonograph Records in the United States.

(d)    Release more than one (1) Recompilation Album for every three (3) Commitment Albums released hereunder (it being understood that in the event that fewer than (3) Commitment Albums are released hereunder, due to your failure to deliver such Albums, Flawless shall still have the right to release one (1) such Recompilation Album).

(e)    License any Master Recordings made hereunder (1) for use in a commercial in the United States, other than a commercial for Phonograph Records or for any station or service (e.g., radio stations and MTV) which uses Records, Audiovisual Records or videos, provided that the foregoing restriction with respect to commercials shall apply during and after the term hereof, (2) for use in a feature-length theatrically released motion picture, or (3) as an end-title or main-title of a television series or television motion picture.

(f)    Edit or remix any Master Recording Delivered and accepted hereunder without first according you a period of ten (10) days in which to do that work or to have a third party complete such work, unless that delay would interfere with a scheduled release. The preceding sentence will not apply to editing for the purpose of equalizing the running time of tracks on Phonograph Records in non-disc configurations for the purposes of meeting the requirements of new technologies.

(g)    Release Records hereunder in the form of "picture discs."

(h)    Release Records hereunder in the form of an enhanced CD, CD +, CD Rom, DVD or other similar configuration with an "enhanced" or multimedia portion.

8.04.    Flawless will not use Master Recordings made under this Agreement on "Premium Records" without your written consent and notwithstanding anything in Article 9. (A "Premium Record" is a Record produced for use in promoting the sale of merchandise other than Phonograph Records.)

8.05.    Flawless will not release "outtakes" on Phonograph Records without your consent. ("Outtakes" are preliminary, unfinished, or alternate versions of Master Recordings made under this Agreement.)

8.06.    (a)    Provided you and the Artist have fulfilled all of your and the Artist's material obligations under this Agreement, Flawless will release each Commitment Album Delivered hereunder in the United States within one hundred twenty (120) days after your Delivery to Flawless of such Album. If Flawless fails to do so your sole remedy shall be the right to notify Flawless, within sixty (60) days after the end of the one hundred twenty (120)

- 17 -

57/02FLAWLESS 0864

day period concerned, that you intend to terminate the term of this Agreement unless Flawless releases such Album within sixty (60) days after Flawless's receipt of your notice (the "Cure Period"). If Flawless fails to release such Album before the end of the Cure Period you may terminate the term of this Agreement by giving Flawless notice within sixty (60) days after the end of the Cure Period. On receipt by Flawless of your termination notice the term of this Agreement will end and all parties will be deemed to have fulfilled all of their obligations under it except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions, audit rights and obligation to account and pay royalties). If you fail to give Flawless either of those notices within the period specified, your and the Artist's right to terminate with respect to such unreleased Album will lapse.

(b)    (1)    If any Album in fulfillment of your Recording Commitment hereunder is listed among the first thirty (30) albums in the principal weekly chart of best-selling albums in the United States published in BILLBOARD (i.e., the chart titled "BILLBOARD 200" as of the date hereof, or the chart corresponding most closely to that chart if it is re-titled or discontinued), and if you notify Flawless of that listing within thirty (30) days after the date of the issue of BILLBOARD in which it first appears, then provided you and the Artist have fulfilled all your and the Artist's material obligations under this Agreement, Flawless will release such Album recorded in fulfillment of your Recording Commitment in the following territories ("Release Territories") within one hundred twenty (120) days after the date Flawless receives your notice (the "Foreign Release Date"):

(i)     Canada
(ii)    UK
(iii)   Germany
(iv)    Australia

This section (1) will not apply in any Release Territory for which you or the Artist have not fully complied with your and the Artist's obligations to grant or obtain licenses for the use of the Compositions concerned (Controlled or otherwise) in accordance with Article 12, or if you or the Artist have failed to furnish Flawless with any other authorization or documentation required for release there without additional expense or liability.

(2)    If Flawless fails to comply with section 8.06(b)(1) in any Release Territory, your sole remedy shall be to notify Flawless, within sixty (60) days after the Foreign Release Date concerned, that you intend to invoke this section 8.06(b)(2) if Flawless does not release such Album in that Release Territory within the Cure Period. If Flawless fails to do so you will have the right ("Outside License Option") to require Flawless to enter into an agreement with a licensee designated by you and approved by Flawless, who is actually engaged in the business of manufacturing and distributing Phonograph Records in that Release Territory, authorizing the licensee to manufacture and distribute Records derived from the Recordings comprised in that Album in that Release

- 18 -

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0865

Territory.  You may exercise your Outside License Option by giving Flawless notice within sixty (60) days after the end of the Cure Period.  If you fail to give Flawless either of those notices within the period specified, your and the Artist's rights under this subparagraph will lapse.  Fifty percent (50%) of all revenues actually received by or credited to Flawless under such licenses will be credited to your royalty account under this Agreement, in lieu of any royalties under Articles 9 or 10 on Records sold under those licenses.  Each such license agreement will provide for such compensation for the license as you negotiate with the licensee, and will contain such other provisions as Flawless shall require, including, but not limited to, the following:

          (i)      The licensee will be required to obtain and deliver to Flawless, in advance: (A) all consents by other Persons which Flawless may require (including but not limited to consents by recording artists); and (B) all agreements by other Persons which Flawless may require to look to the licensee, and not to Flawless, for the fulfillment of any obligations arising in connection with the manufacture or distribution of Records under the license (including such agreements by unions and funds established under union agreements).  The licensee will also become a first party to the AFM Phonograph Record Manufacturers' Special Payments Fund Agreement, or any successor agreement then in effect.  The license will not become effective until the licensee has complied with all of the provisions of this subsection (i).

          (ii)      The licensee will make all payments required in connection with the manufacture, sale or distribution in that Release Territory of Phonograph Records made from those Master Recordings after the effective date of the license, including, without limitation, any royalties and other payments to other performing artists, Producers, owners of copyrights in Compositions, the Music Performance Trust Fund and Special Payments Fund, and any other unions and union funds.  The licensee will comply with the applicable rules and regulations of the American Federation of Musicians and any other union having jurisdiction and any other applicable laws, rules and regulations covering any use of the Recordings by the licensee or any Person deriving rights from the licensee, in the manufacture and sale of Phonograph Records or otherwise.

          (iii)      No warranty of merchantability or fitness for a particular purpose or any other warranty or representation, express or implied, will be made by Flawless in connection with the Recordings, the license, or otherwise.  You and the licensee will indemnify and hold harmless Flawless and its Licensees against all claims, damages, liabilities, costs, and expenses, including reasonable counsel fees, arising out of any use of the Recordings or exercise of such rights by the licensee or any Person deriving rights from the licensee.

          (iv)      Flawless will instruct its Licensees in that Release Territory not to manufacture Records derived from those Master Recordings for sale there,

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0866

except as permitted under subsection 8.06(b)(2)(viii) below.  If the licensee notifies Flawless of such manufacture, Flawless will instruct the Flawless Licensee concerned to discontinue it, but neither Flawless nor the Flawless Licensee shall have any liability by reason of such manufacture occurring before Flawless's receipt of such notice, and Flawless shall have no liability by reason of such manufacture at any time.

(v)    Each Record made under the license will bear a sound recording copyright notice identical to the notice used by Flawless for its initial United States release of the Recording concerned, or such other notice as Flawless shall require.  Otherwise, those Records will not be identified directly or indirectly with Flawless.

(vi)    Flawless shall have the right to examine the books and records of the licensee and all others authorized by the licensee to manufacture or distribute Records under the license, for the purpose of verifying the accuracy of the accountings rendered to Flawless by the licensee.

(vii)    The licensee will not have the right to authorize any other Person to exercise any rights without Flawless's prior written consent.

(viii)    Flawless and its Licensees will have the continuing right at all times to manufacture and sell Recompilation Albums which may contain those Master Recordings in that Release Territory.

(c)    The running of the one hundred twenty (120) day and sixty (60) day periods referred to in subparagraphs 8.06(a) and 8.06(b) will be suspended (and the expiration date of each of those periods will be postponed) for the period of any suspension of the running of the term of this Agreement under paragraph 15.03.  If any such one hundred twenty (120) day or sixty (60) day period would otherwise expire on a date between November 20 and the next January 16, its running will be suspended for the duration of the period between November 20 and January 16 and its expiration date will be postponed by the same amount of time.  A Commitment Album will be deemed released, for the purposes of this paragraph 8.06, when Flawless has announced its availability for sale and is prepared to fill orders for such Album in the territory concerned.  At your written request following the release date of a Commitment Album in a particular territory, Flawless will provide you with confirmation of such date.

8.07.  In preparation for the initial release in the United States during the term hereof of each Commitment Album and any Recompilation Album, you shall have the right to produce and deliver to Flawless the "Album Artwork" (as herein defined) to be used in connection with such Album in accordance with the provisions of this paragraph.  As used herein, the term "Album Artwork" means all artwork, photography or other graphics and related materials for the packaging of the applicable Album.   Subject to actual time

- 20 -

Scanned Copy Of Original 04-17-2002 11:48:24

constraints, you will have the right to approve Flawless's concept for the artwork for any Single commercially released hereunder prior to the preparation thereof and the final version of such Single artwork.

   (a) You shall not commence production of such Album Artwork until Flawless has approved in writing the concept for the proposed Album Artwork and the individuals (e.g. photographers, designers and illustrators) whom you intend to engage to produce such Album Artwork and Flawless has assigned a budget for the artwork costs. Flawless agrees that a budget for the Album Artwork for each Commitment Album that does not exceed Twenty Thousand Dollars ($20,000) shall not be disapproved by reason of its overall amount.

   (b) You will produce the Album Artwork in accordance with the concept and budget approved by Flawless and will deliver "camera ready" artwork to Flawless, together with all licenses and consents required in connection with it, not later than seventy-five (75) days before the scheduled release date of the Album. If any of that material has not been delivered to Flawless within that time, Flawless will have the right to prepare such Album Artwork, and Flawless shall not be obligated to make any payments to you or the Artist or any other Person to whom you or the Artist have incurred any obligation in connection with any artwork produced for the Album concerned. Flawless shall use reasonable efforts to obtain your approval (which shall not be unreasonably withheld) regarding Flawless's concept for such Album Artwork prior to preparing same and the final Album Artwork (subject to actual time constraints).

   (c) You will deliver to Flawless, together with the Album Artwork, an itemized statement of your actual costs in connection with it. After Flawless's acceptance of the Album Artwork, Flawless will pay, or reimburse you for, those costs not in excess of the approved budget on a non-recoupable basis. If Flawless, in its sole discretion, shall elect to pay or reimburse you for costs in excess of the approved budget, such excess shall constitute Special Packaging Costs and also shall be recoupable from all monies becoming due to you or the Artist under this Agreement.

   (d) All Album Artwork shall be subject to Flawless's reasonable approval. Flawless shall also have the right to reject any Album Artwork which in Flawless's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Flawless to liability or unfavorable regulatory action. Flawless will consult with you prior to rejecting any Album Artwork by reason of this subparagraph 8.07(d) and will use reasonable efforts to obtain your approval (which shall not be unreasonably withheld) regarding Flawless's concept for any new Album Artwork prior to preparing same and the final Album Artwork (subject to actual time constraints).

- 21 -

Scanned Copy Of Original 04-17-2002 11:48:24

267/02FLAWLESS 0868

(e)      Upon your delivery of Album Artwork, Flawless shall determine the costs for the manufacturing of the packaging therefrom.  If the costs for the manufacturing of the packaging would require Flawless to incur Special Packaging Costs, Flawless will advise you prior to manufacturing packaging from such Album Artwork and give you the opportunity to redesign such Album Artwork within five (5) business days thereafter.  If you do not redesign the applicable Album Artwork to come within Flawless standard packaging costs (i.e., so that Flawless would not be required to incur Special Packaging Costs) within such five (5) business day period, Flawless shall have the right, at its election, to: (1) create different Album Artwork if it is not reasonably possible for Flawless to redesign such Album Artwork to come within Flawless's standard packaging costs (in which event you shall, upon Flawless's request, promptly repay to Flawless all amounts paid or incurred by Flawless in connection with the Album Artwork prepared by you, and all such amounts not repaid by you will constitute Advances and may be recouped from all monies otherwise becoming due to you or the Artist hereunder); (2) redesign the Album Artwork as provided by you to come within such standard packaging costs; or (3) use the Album Artwork provided by you. If Flawless uses the Album Artwork as provided by you, all Special Packaging Costs will be reimbursed by you on Flawless's request, and all such Special Packaging Costs not reimbursed will constitute Advances and may be recouped by Flawless from all monies becoming due to you or the Artist hereunder.

(f)      All matters relating to Flawless's trademarks, legal obligations, notices or disclosures deemed advisable by Flawless's attorneys or other requirements will be determined in Flawless's sole discretion.

(g)      You will act as an independent contractor in all arrangements you make with others in connection with the production of the Album Artwork; you will not purport to make any such arrangements as Flawless's agent or otherwise on behalf of Flawless.

(h)      Any premium charges that are incurred by Flawless to meet the release schedule of the Album concerned because of late delivery of the Album Artwork or costs incurred by Flawless to correct or otherwise modify the Album Artwork to meet the requirements hereof will be reimbursed by you on Flawless's request, and all such costs not reimbursed will constitute Advances and may be recouped by Flawless from any and all monies becoming due to you or the Artist hereunder.

8.07.1 (a)      In the event that you do not deliver to Flawless Album Artwork in accordance with paragraph 8.07 above (or you notify Flawless that you elect not to produce and deliver to Flawless Album Artwork pursuant to paragraph 8.07 above), then in preparation for the initial release in the United States during the term hereof of each Commitment Album and any Recompilation Album, Flawless will consult with you regarding the Album Artwork.  You shall have the right, exercisable, if at all, within five (5)

- 22 -

Scanned Copy Of Original 04-17-2002 11:48:24

5877/02FLAWLESS 0869

days after such Album Artwork has been submitted to you for review and comment, to
disapprove such Album Artwork. Unless otherwise provided in this paragraph 8.07.1,
Flawless will make such changes in the Album Artwork as you or the Artist reasonably
request.

(b)      *Flawless will not be required to make any changes which would delay
the release of the applicable Album beyond the scheduled date or which would require
Flawless to incur any Special Packaging Costs. Any premium charges incurred to meet the
release schedule because of delays in approvals by you will constitute Advances and may be
recouped by Flawless from any and all monies becoming due to you hereunder.* Upon
completion of the Album Artwork, Flawless will determine and advise you if the costs for
the manufacturing of the packaging would require Flawless to incur Special Packaging
Costs. If, within five (5) days thereafter, you notify Flawless of your objection to such
Special Packaging Costs in connection with such Album Artwork, and Flawless nevertheless
uses such Album Artwork, Flawless shall not recoup Special Packaging Costs hereunder.
No failure to so advise you will be deemed a breach hereof, provided that if Flawless fails to
so advise you, Flawless will not recoup any such Special Packaging Costs.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

27/02FLAWLESS 0870

      (c)     *Flawless will not be required to make any change which in Flawless's* reasonable, good faith opinion is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Flawless to liability or unfavorable regulatory action. All matters relating to Flawless's trademarks, legal obligations, notices or disclosures deemed advisable by Flawless's attorneys or other requirements will be determined in Flawless's sole discretion.

      8.07.2. Upon your reimbursement to Flawless of  (i) one-half (1/2) of the actual costs of production of the Album Artwork (including costs of fabrications, stripping and four color separation but not including overhead); and (ii) the cost of preparing duplicates of such Album Artwork, Flawless shall grant to you on a quit claim basis the perpetual  right to *utilize such Album Artwork solely for merchandise purposes (other than in connection with* advertising, distribution and promotion of Records hereunder) provided such grant shall be subject to any restrictions upon such uses which may have been imposed by the creators of such artwork or any other third party's rights; and provided further that you shall indemnify Flawless  with respect to any third party claims which may be brought in connection with such uses. Further, Flawless shall remain the worldwide owner of all rights, title and interest in and to such Album Artwork and accordingly, you shall direct your licensees to place the appropriate copyright notice on all copies of any product manufactured embodying all or any part of such Album Artwork.

      8.08.    If Flawless decides to produce one (1) or more Covered Videos during the *term hereof (which Flawless is under no obligation whatsoever to do), the following shall be* applicable:

      (a)     With respect to Covered Videos made in connection with the initial release of a Commitment Album, the selection(s) to be embodied in each Covered Video shall be mutually designated by you and Flawless, provided that you shall be deemed to have approved any selection that has been or will be embodied on a Single.

      (b)     Each Covered Video shall be shot on a date or dates and at a location or locations to be mutually designated by you and Flawless, subject to the Artist's reasonable prior professional commitments.

      (c)     The producer and director of each Covered Video, and the concept or script for each Covered Video, shall be approved by both you and Flawless.  Flawless shall engage the producer, director and other production personnel for each Covered Video, and shall be responsible for and shall pay the production costs of each Covered Video in an amount not in excess of a budget to be established in advance by Flawless (the "Production Budget").  You shall be responsible for and shall pay the production costs for each Covered Video which are in excess of the Production Budget where such excess is caused by the acts or omissions of you or the Artist, provided that if such excess is not caused by the acts or

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

867/02FLAWLESS 0871

omissions of you or the Artist, such excess shall be a recoupable expense in connection with such Covered Video, which shall be recouped in the same manner as costs incurred in connection with the Production Budget. In the event that Flawless shall pay any production costs for which you are responsible pursuant to the foregoing sentence (which Flawless is in no way obligated to do), you shall promptly reimburse Flawless upon Flawless's request, and all such costs not reimbursed will constitute Advances and may be recouped by Flawless from any monies otherwise payable by Flawless to you or the Artist hereunder. The Artist's compensation for performing in such Covered Videos (as opposed to your compensation with respect to the exploitation of such Videos which is provided elsewhere in this Agreement) shall be limited to any minimum amounts required to be paid for such Performances pursuant to any collective bargaining agreements pertaining thereto; provided, however, that the Artist hereby waives any right to receive such compensation to the extent such right may be waived.

(d)    As set forth in paragraph 12.02 below, you shall issue (or shall cause the music publishing company[ies] having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) perpetual licenses for public performance in the United States (to the extent that ASCAP and BMI are unable to issue same), to Flawless at no cost for the use of all Controlled Compositions in any such Covered Videos effective as of the commencement of production of the applicable Covered Video (and your execution of this Agreement shall constitute the issuance of such licenses by any music publishing company[ies] which is owned or controlled by you, the Artist or by any Person owned or controlled by you or the Artist). In the event that you shall fail to cause any such music publishing company[ies] to issue any such license to Flawless, or if Flawless shall be required to pay any fee to such music publishing company[ies] in order to obtain such license, then Flawless shall have the right to deduct the amount of such license fee from all monies becoming due to you or the Artist under this Agreement. Notwithstanding the foregoing, although the synchronization license is perpetual and remains in effect, if the costs incurred with respect to any such Covered Video is entirely recouped, then after such recoupment, and only with respect to prospective commercial uses of such Covered Video, at your written request prior to such prospective commercial uses of such Covered Video, Flawless and you shall negotiate in good faith with respect to compensation consistent with the then-current Flawless standards, to be paid by Flawless for such a synchronization license for the Controlled Compositions used in such Covered Video.

(e)    Each Covered Video shall be deemed an item of "Materials" covered by your warranties, representations and indemnification obligations under Article 13. Flawless will have the right to reject any Covered Video or any element contained in a Covered Video which in Flawless's reasonable, good faith opinion is patently offensive, constitutes an obscenity, violates any law, infringes or violates the rights of any Person, or which might subject Flawless to liability or unfavorable regulatory action.

FlawlessExhibitB1 SH:sh/06/15/01

0887/02FLAWLESS 0872

8.09. (a)    *Flawless and any Licensee of Flawless each has the perpetual and exclusive right, and may grant to others the right, without any liability to any Person, to create, maintain and host Websites relating to the Artist* (each an "Artist Website") *and to register and use the name* "[name of Artist].XXX" *and all variations thereof which embody the Artist's name or use a name similar to the Artist's name as Uniform Resource Locators* ("URLs"), *addresses and/or domain names (each an* "Artist Domain Name") *in connection with such Artist Websites.    As used in the preceding sentence* ".XXX" *shall mean each and every so-called* "second level" *domain name now in existence or hereafter implemented including without limitation,* ".com," ".net," ".org" *together with  territorial identifiers, e.g.,* ".UK." *All such Artist Domain Names, and all rights thereto or derived therefrom, shall be Flawless's property throughout the Territory and in perpetuity.*

(b)    Flawless will have the right to designate any Artist Website as the "official" Artist Website, and neither you, the Artist nor any Person deriving any rights from you or the Artist shall designate any other Artist Website as the "official" Artist Website.

(c)    Notwithstanding the foregoing, but without limiting Flawless's right during and after the term to create, maintain and host Artist Websites in connection with the Artist's services hereunder, at any time after the later of the end of the term of this Agreement or nine (9) months after the date of the initial United States release of the last Album of the Recording Commitment for the last Contract Period, Flawless shall assign to you (on a quit-claim basis) all of its right, title and interest in and to the Artist Domain Names within thirty (30) days of Flawless's receipt of written notice from you requesting such assignment.

(d)    Notwithstanding the foregoing, you shall have the right to register one (1) mutually approved Artist Domain Name in your or your designee's name and to create, host and maintain one Artist Website located at such Artist Domain Name, provided, however, that neither you, the Artist nor any Person deriving any rights from you or the Artist shall, use, authorize, or endorse such Artist Website as the "official" Artist Website, and provided further that Flawless shall have the right to require you to include on such Artist Website so-called "hyperlinks" to Artist Domain Names and other URLs in Flawless's sole discretion.

8.10. (a)    With respect to Artist Websites, Website Material and ECD Material, all artwork and other creative elements produced in connection therewith, including, without limitation, third party production personnel, shall be mutually approved by you and Flawless; provided, however, that any Artwork or other materials furnished or approved by you for any other purpose hereunder shall be deemed approved by you for use in connection with such Artist Websites, Website Material and ECD Material and

- 26 -

SH7/02FLAWLESS 0873

provided further that Flawless shall have the right to include on Artist Websites and within ECD Material so-called "hyperlinks" to Artist Domain Names and other URLs in Flawless's sole discretion.

(b)     Flawless is and will be the sole owner of all worldwide rights in and to all ECD Material and Website Material created hereunder and to each Artist Website, all individual elements thereof (excluding underlying software architecture), and the selection and arrangement of such elements, including the worldwide copyrights therein and thereto, throughout the Territory and in perpetuity.

(c)     You and the Artist will issue (or cause the music publishing companies having the right to do so to issue) (1) worldwide, perpetual synchronization licenses, and (2) worldwide, perpetual licenses for public performance to Flawless at no cost for the use of all Compositions in Website Material and ECD Material effective as of the commencement of production of the applicable Website Material or ECD Material (and your execution of this Agreement constitutes the issuance of such licenses by you and any music publishing company that is owned or controlled by you, or any Person owned or controlled by you).   In the event that you fail to cause any such music publishing company to issue any such license to Flawless, or if Flawless is required to pay any fee to such music publishing company in order to obtain any such license, Flawless will have the right to deduct the amount of such license fee from any and all royalties otherwise payable to you hereunder.

(d)     Flawless will have the right to use and allow others to use Website Material and ECD Material for advertising and promotional purposes (a use for which Flawless receives no monetary consideration from licensees other than an incidental fee being a reasonable amount for reimbursement of its administrative, duplication  and shipping costs) and for commercial purposes (being a use which is not an advertising or promotional use as defined in this subparagraph).

(e)     Each Artist Website,  Website Material and ECD Material will be deemed a Material as provided herein. Flawless will have the rights in and to each Artist Website, Website Material and ECD Material as are otherwise applicable hereto with respect to Masters made hereunder, including, without limitation, the right to use and publish, and to permit others to use and publish, your name and the Artist's Name and Likeness in each Artist Website, Website Material and ECD Material and for advertising and purposes of trade in connection therewith.

## 9.    ROYALTIES

9.01.  Flawless will pay you a royalty computed at the applicable percentage, indicated below, of the applicable Royalty Base Price in respect of Net Sales Through

- 27 -

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0874

Normal Retail Channels of Phonograph Records consisting entirely of Master Recordings recorded under this Agreement during the respective Contract Periods specified below and sold by Flawless or its Licensees ("NRC Net Sales"). (Such royalty shall include your and the Artist's royalties and all royalties payable to all other artists, Producers and other Persons (other than Persons engaged directly by Flawless without your or Artist's consent) which become or may become due by reason of the recording and/or exploitation of Master Recordings recorded under this Agreement, other than "per-record royalties" pursuant to subparagraph 5.02(c) above.)   The royalties payable pursuant to the provisions of paragraphs 9.01, 9.02, 9.03, 9.04, and 9.05 and the provisions of Article 10 shall apply to all Phonograph Records except Audiovisual Records. The royalties payable pursuant to the provisions of paragraph 9.07 shall apply solely to Audiovisual Records.

(a)    ON ALBUMS SOLD FOR DISTRIBUTION IN THE UNITED STATES:

(1)    (i)    Master Recordings made during the initial Contract Period or the first, second or third Option Periods: 14%.

(ii)    The royalty rate pursuant to subsection 9.01(a)(1)(i) will apply to the first 500,000 units of NRC Net Sales in the United States ("USNRC Net Sales") of each Album consisting of Master Recordings made during the initial Contract Period or the first, second or third Option Periods. The royalty rate will be:

(A)    14½% on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B)    15% on USNRC Net Sales of any such Album in excess of 1,000,000 units.

(2)    (i)    Master Recordings made during the fourth, fifth or sixth Option Periods:   15%.

(ii)    The royalty rate pursuant to subsection 9.01(a)(2)(i) will apply to the first 500,000 units of USNRC Net Sales of each Album consisting of Master Recordings made during the fourth, fifth or sixth Option Periods. The royalty rate will be:

(A)    15½% on USNRC Net Sales of any such Album in excess of 500,000 units and not in excess of 1,000,000 units, and

(B)    16% on USNRC Net Sales of any such Album in excess of 1,000,000 units.

- 28 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0875

(3)    As used herein, the "Base U.S. Album Royalty Rate" for a particular Album Delivered hereunder (and each Master Recording embodied therein) shall mean a royalty rate equal to the royalty rate for the first USNRC Net Sale of such Album on a configuration-by-configuration basis.

(4)    The only Net Sales to be considered for the purposes of escalating the royalty rates pursuant to sections 9.01(a)(1) and 9.01(a)(2) above shall be USNRC Net Sales. Without limiting the foregoing, Net Sales subject to the remainder of Articles 9 and 10 hereof (other than those USNRC Net Sales referred to in subparagraph 9.03(b) below and Net Sales made directly by Flawless pursuant to section 9.02(c)(2) below) shall not be considered for the purposes of such escalations. None of the foregoing escalations shall result in an increase in any royalty rates contained herein other than for USNRC Net Sales under sections 9.01(a)(1) and 9.01(a)(2) above and subparagraph 9.03(b) below, even though other royalty rates may be based on the royalty rates set forth in those paragraphs.

(b)    ON ALBUMS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

(1)    On Albums Delivered hereunder and sold for distribution in Canada, the United Kingdom, France, Germany, Australia and Japan: 80% of the Base U.S. Album Royalty Rate;

(2)    On Albums Delivered hereunder and sold for distribution in Benelux, Scandinavia, Spain and Italy: 75% of the Base U.S. Album Royalty Rate;

(3)    On Albums Delivered hereunder and sold for distribution in the rest of the world: 66-2/3% of the Base U.S. Album Royalty Rate.

(c)    ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION IN THE UNITED STATES: 12%. As used herein, the "Base U.S. Single Royalty Rate" shall mean 12%.

(d)    ON SINGLES, TWELVE-INCH SINGLES AND EXTENDED PLAY RECORDS SOLD FOR DISTRIBUTION OUTSIDE THE UNITED STATES:

(1)    On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in Canada, the United Kingdom, France, Germany, Australia and Japan: 80% of the Base U.S. Single Royalty Rate;

- 29 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

ST 7/02FLAWLESS 0876

(2)    On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in Benelux, Scandinavia, Spain and Italy:  75% of the Base U.S. Single Royalty Rate;

(3)    On Singles, Twelve-Inch Singles and Extended Play Records sold for distribution in the rest of the world:  66-2/3% of the Base U.S. Single Royalty Rate.

If any Flawless Licensee accounts to Flawless on the basis of less than one hundred percent (100%) of Net Sales, Flawless will account to you for the Records concerned on the same basis, but not on less than ninety percent (90%) of Net Sales.

9.01.1. Notwithstanding anything to the contrary contained in this Agreement, with respect to Records sold in Brazil, Greece, Portugal, India, Kenya, Zambia, Zimbabwe, Nigeria and any other territory in which governmental or other authorities place limits on the royalty rates permissible for remittances to the United States in respect of Records sold in such territory(ies), the royalty payable hereunder shall equal the lesser of: (a) the applicable royalty payable under subparagraph 9.01(b) or (d); or (b) the effective royalty rate permitted by such governmental or other authority for remittances to the United States less a royalty equivalent to three (3%) percent of the retail list price and such monies as Flawless or its Licensees shall be required to pay to all applicable union funds in respect of said sales.

9.02.    (a)    The royalty rate on any Record described in section (1), (2) or (3) of this sentence will be one-half (1/2) of the royalty rate that would apply if the Record concerned were sold Through Normal Retail Channels: (1) any catalog Phonograph Record sold by the special products operations of Flawless or its Licensees ("SPO's") to educational institutions or libraries, or to other SPO clients for their promotion or sales incentive purposes (but not for sale to the general public Through Normal Retail Channels); (2) any non-catalog Phonograph Record created on a custom basis for SPO clients (the royalty on any Record described in section (2) will be computed on the basis of the SPO's actual sales price less all taxes and Container Charges); and (3) or its Licensees through direct response, any Phonograph Records sold by Flawless direct mail or phone order or other mail order distribution method (two-thirds (2/3) solely with respect to any such sales made via Flawless's internet site).

(b)    In respect of any Master Recording:  (1) leased by Flawless or its Licensees to others for their distribution of Phonograph Records in the United States; (2) embodied on Phonograph Records sold by Flawless's Licensees in the United States through a direct mail or mail order distribution method (including, without limitation, through so-called "record clubs"); or (3) embodied on Phonograph Records sold by Flawless's Licensees in the United States through retail stores in connection with special

- 30 -

7/02FLAWLESS 0877

radio or television advertisements (sometimes referred to as "key-outlet marketing"), Flawless will pay you fifty percent (50%) of Flawless's Net Receipts with respect to such exploitation. ("Net Receipts," in the preceding sentence, means Flawless's gross receipts and credits as computed after deduction of all AFM, union and other applicable third party payments actually made or incurred; provided, however, if Flawless's net receipts from such sales are inclusive of manufacturing costs and/or Mechanical Royalties for the applicable Record[s] hereunder, your royalty shall instead be one-half (1/2) of the otherwise applicable royalty rate hereunder.) If another artist, a Producer, or any other Person is entitled to royalties on sales of such Records, that payment will be divided among you in the same ratio as that among your respective basic royalty percentage rates.

        (c)    If Flawless sells or licenses third parties to sell Records via telephone, satellite, cable or other direct transmission including by way of Electronic Transmission to the consumer over wire or through the air, the royalty rate will be the otherwise applicable royalty rate prescribed in paragraph 9.01 but, for purposes of calculating royalties payable in connection with such sales, the retail list price of such Records shall be deemed to be the actual sales price received by Flawless of such records (but in the United States, eighty five percent (85%) of the actual sales price) less any referral fees, commissions or similar fees payable to any Person who, through their Website, electronic mail or other means, refers or directs to Flawless a purchaser of an Electronic Transmission or otherwise facilitates Flawless's sale to such consumer, less the applicable Container Charge; provided, however, with respect to Records sold by Flawless's Licensees, in no event shall your royalty exceed one-half (1/2) of Flawless's net receipts and credits after deduction from Flawless's gross receipts of union and all other applicable third party payments actually made or incurred by Flawless; provided, further, that section 9.03(b)(2) shall not apply to Records described in this section 9.02(c)(2).

    9.03.   (a)    The royalty rate on any Budget Record, any Premium Record or any "picture disc" (i.e., a disc phonorecord with artwork reproduced on the surface of the Record itself) will be one-half (1/2) of the applicable royalty rate prescribed in paragraph 9.01. The royalty rate on any Mid-price Record will be two-thirds (2/3) of the applicable royalty rate prescribed in paragraph 9.01. (The preceding two sentences will not apply to a Budget Record sold within twenty-four (24) months, or to a Mid-price Record sold within eighteen (18) months, after the initial release of the Master Recordings concerned on Phonograph Records in the United States.) The royalty rate on any Record sold for distribution through military exchange channels will be three-quarters (3/4) of the applicable royalty rate prescribed in paragraph 9.01. The royalty on any Premium Record or Record sold for distribution through military exchange channels will be computed on the basis of the actual sales price (or Post Exchange list price where applicable) less all taxes and Container Charges. The royalty rate on any Record which is not an Album, a Single, a Twelve-Inch Single, or an Extended Play Record will be one-half (1/2) of the applicable Album royalty rate prescribed in paragraph 9.01 (provided that if such Record

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

27/02FLAWLESS 0878

is released without your consent, the royalty rate will be the applicable Album royalty rate prescribed in paragraph 9.01).

       (b)    (1)    The royalty on any compact disc Record will be a royalty computed at eighty-five percent (85%) of the rate which would otherwise apply under this Agreement.

       (2)    The royalty on any New Medium Record will be eighty-five percent (85%) of the rate which would otherwise apply under this Agreement.

       (3)    Notwithstanding anything set forth to the contrary in sections 9.03(b)(1) or (2) above, if any of Flawless's Licensees or Distributors accounts to Flawless with respect to any compact disc Record or any New Medium Record sold outside the United States on the basis of a royalty rate less than the royalty rate applicable in the territory concerned to a Standard tape unit of the same Record release, Flawless will account to you for the Records concerned on the same royalty basis, but not on less than a royalty basis computed at seventy-five percent (75%) of the otherwise applicable rate for any compact disc Record, or seventy percent (70%) of the otherwise applicable rate for any New Medium Record.

       (c)    The royalty rate on a Multiple Record Set will be the otherwise applicable royalty rate multiplied by a fraction (which shall in no event be larger than one (1)), the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the territory where the Multiple Record Set is sold and the denominator of which is Flawless's then-prevailing SRLP for Flawless's newly-released Top-line Albums in such configuration in the applicable territory multiplied by the number of Records contained in such Multiple Record Set.

      9.04.  In respect of Phonograph Records derived from Master Recordings furnished by Flawless or its Licensees to others for their manufacture and distribution of Records outside the United States, Flawless will pay you fifty percent (50%) of the net receipts or credits derived from those transactions by Flawless after deduction from Flawless's gross receipts of all Mechanical Royalties, AFM, union and all other applicable third party payments (which payments will be apportioned as provided in paragraph 9.02 if another artist, a Producer, or any other Person is entitled to royalties in respect of such Records), but not in excess of the amount of the royalties which would be payable to you for those Records under subparagraph 9.01(b) or (d) if they were manufactured and distributed by Flawless or its Licensees.

      9.05.  If Flawless authorizes the use of any Master Recording made under this Agreement on a flat fee basis, royalty rate or cent rate basis for any type of use not specifically covered elsewhere in this Article 9, (such as, but not limited to, use in a

- 32 -

77/02FLAWLESS 0879

commercial or motion picture other than a Covered Video), it will credit your royalty account with an amount equal to fifty percent (50%) of its net receipts attributable directly to that use. "Net receipts", in the preceding sentence, means Flawless's gross receipts and credits as computed after deduction of all payments required to be made by Flawless to others in connection with those uses (for example, re-use payments under Flawless's agreements with the American Federation of Musicians). If another recording artist, a Producer, or any other Person is entitled to royalties on such uses, the amount to be credited under this paragraph will be apportioned in the same ratio as that among your respective basic royalty percentages. If any item of such receipts is attributable to Master Recordings made under this Agreement and other Master Recordings, the amount of that item includible in gross receipts under this paragraph will be computed by apportionment on the basis of the number of Master Recordings involved.

9.06.  In respect of any Ancillary Exploitation for which Flawless receives a royalty or other payment which is directly attributable to such Ancillary Exploitation, your royalty shall be an amount equal to a percentage of Flawless's Net Receipts from such royalty or other payment which is the same as the percentage of the Base US Album Royalty Rate, adjusted by the appropriate territorial reduction detailed in subparagraph 9.01(b) where the license for the Ancillary Exploitation is made in a country outside the United States. "Net Receipts" in the foregoing sentence shall mean royalties or flat payments received by Flawless in connection with the Ancillary Exploitation less any costs or expenses that Flawless incurs (such as, without limitation, technical and/or production costs, mechanical royalties and other copyright payments, AF of M and other union or guild payments).

9.07.  Flawless will pay you royalties as follows in connection with the following uses of Audiovisual Records (including for sales of Audiovisual Records which contain Covered Videos):

(a)    (1)    Flawless will pay you a royalty (the "Net Receipts Royalty") in the amount equal to fifty percent (50%) of Flawless's "Net Video Receipts" (defined below) derived from all uses of Audiovisual Records which produce revenues directly for Flawless other than the sales described in subparagraph 9.07(b) below.

(2)    "Gross Receipts", in this subparagraph 9.07(a), means all monies actually received by Flawless (or credited to Flawless's account against advances previously received) in the United States which are specifically allocated to the exploitation of Audiovisual Records. "Net Video Receipts" means Gross Receipts, less all direct out-of pocket expenses, taxes (except income taxes), adjustments, and collection costs incurred by Flawless in connection with the exploitation of such Audiovisual Records, all payments required to be made to Persons other than you, the Artist or any other "Royalty Participant" (as hereinafter defined), including, without limitation, to

- 33 -

287/02FLAWLESS 0880

unions or guilds or to publishers of non-Controlled Compositions and "Independent
Interests" (as hereinafter defined) in Controlled Compositions in connection with the
production and/or exploitation of such Audiovisual Records and any Covered Videos
embodied therein, and a distribution fee equal to twenty percent (20%) of those Gross
Receipts. Any item of expenses which is actually recouped from Gross Receipts under
this section will not be chargeable against royalties under paragraph 5.02. If any item of
revenue or expenses is attributable to an Audiovisual Record or a Covered Video and to
other audiovisual works, the amount of that item includible in Gross Receipts or
deductible in computing Net Video Receipts will be determined by apportionment based
on actual playing time of the Record concerned.

(3)    You shall be solely responsible for and shall pay any and all
monies payable to the Producers, to the producers and directors of the visual portion of
the Audiovisual Records or Covered Videos (provided that Flawless shall not pay any
such video producer or director a royalty without your consent), to the publishers of
Controlled Compositions and to any other Persons (except publishers of non-Controlled
Compositions or of Independent Interests in Controlled Compositions which are embodied
in the Audiovisual Records or Covered Videos and any unions or guilds or their funds and
Persons engaged directly by Flawless without your or Artist's consent) who are entitled to
a royalty or any other payment in respect of the exploitation of the Audiovisual Records
(each such Person being herein referred to as a "Royalty Participant"). Notwithstanding
the foregoing, if Flawless shall pay or be required to pay any such monies directly to any
Royalty Participant, then Flawless shall have the right to deduct same from any and all
royalties payable to you hereunder.

FlawlessExhibitB1 SH:sh/06/15/01

SH/02FLAWLESS 0881

(b)    If Flawless or Flawless's Distributor or Licensees manufacture and distribute Audiovisual Records embodying one or more Covered Videos, then, Flawless will pay you royalties at the rates and in the manner set forth in this subparagraph 9.07(b), *rather than the Net Receipts Royalty payable to you pursuant to subparagraph 9.07(a).*

(1)    On Net Sales of Audiovisual Records distributed in the United States: fifteen percent (15%) of the applicable Royalty Base Price for such Audiovisual Records, and on Net Sales of Audiovisual Records distributed outside of the United States:  ten percent (10%) of the applicable Royalty Base Price for such Audiovisual Records.

(2)    The royalty rate payable to you on any Audiovisual Record containing a Covered Video and other audiovisual works will be determined by apportionment based on actual playing time on the Record concerned.

(3)    The provisions of paragraphs 10.03 and 10.04 shall be applicable to sales of Audiovisual Records under this subparagraph 9.07(b); provided, however, that Flawless shall not distribute "Standard Free Goods" (as hereinafter defined), but Flawless shall have the right to distribute "Special Free Goods" (as hereinafter defined) with respect to Audiovisual Records hereunder.

(4)    The royalties payable in accordance with this subparagraph 9.07(b) shall be inclusive of all royalties that may be payable to all Persons (other than unions or guilds and their funds), including, without limitation Royalty Participants and the publishers of both Controlled Compositions and non-Controlled Compositions or Independent Interests.  If Flawless makes any payments to any Person with respect to any such Audiovisual Record, then Flawless shall have the right to deduct such payments from royalties otherwise payable to you or the Artist with respect to Audiovisual Records.

10.    <u>MISCELLANEOUS ROYALTY PROVISIONS</u>

Notwithstanding anything to the contrary contained in Article 9:

10.01. In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of royalty artists whose Performances are embodied on a Joint Recording.

10.02. The royalty rate on a Phonograph Record embodying Master Recordings made hereunder together with other Master Recordings will be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of

- 35 -

Scanned Copy Of Original 04-17-2002 11:48:24

Sides embodying Master Recordings made hereunder and the denominator of which is the total number of royalty-bearing Sides contained on such Record.

10.03. Except as otherwise provided in paragraph 10.04, no royalties will be due or payable in respect of Phonograph Records: (a) sold (for less than 50% of Flawless's posted wholesale price), distributed or furnished on a no-charge basis by Flawless or its Licensees for promotional purposes (including, without limitation, Records to disc jockeys, publishers, motion picture companies, television and radio stations, and other customary recipients of promotional Records) or to Flawless's or its Licensees' employees and relatives; (b) sold, distributed or furnished on a no-charge basis to members, applicants or other participants in any "record club" or other direct mail distribution method (subject to subparagraph 9.02(b) above); (c) sold at close-out prices or as surplus, overstock or scrap; (d) sold as cutouts after the listing of such Records has been deleted from the catalog of Flawless or its Licensees; (e) given away or shipped as "free," "no charge" or "bonus" Records (whether or not intended for resale); and (f) sold at a discount from the Record's posted wholesale list price (but for more than 50% of such price), whether or not intended for resale.   In determining the number of Records as to which no royalties are payable pursuant to subparagraph (f) above, Flawless shall multiply the percentage amount of such discount by the number of Records sold at such discount.  No royalties will be payable to you on Records containing Recordings of not more than two (2) Master Recordings made hereunder sold as "samplers" at a price which is fifty percent (50%) or less of the SRLP of Flawless's then current newly-released Top-line Records, on Records intended for free distribution as "samplers" to automobile or audio and/or audiovisual equipment purchasers (whether or not postage, handling, or similar charges are made), or distributed for use on transportation carriers.

10.04. Those Records distributed pursuant to subparagraphs 10.03(e) and (f) are herein referred to as "Free Goods." Flawless shall have the right to distribute Free Goods not in excess of its then current Distributor's standard policy ("Standard Free Goods"), which, for Albums currently is fifteen percent (15%) of the aggregate units of all Top-line Albums distributed under this Agreement.  In addition, from time to time, Flawless or its Distributor, jointly or separately, shall have the right to conduct special sales programs of limited duration which include the distribution of Free Goods in excess of the limitation set forth in the preceding sentence ("Special Free Goods") but not in excess of ten percent (10%) of the aggregate units of all Albums distributed under this Agreement. If Flawless distributes Free Goods in excess of the foregoing limitations, Flawless will not be in breach hereof, but Flawless will pay you your normal Record royalty and Mechanical Royalty on such excess.

10.05. Flawless will credit your account as follows with respect to copyright royalties received by Flawless, if any, for the public performance of Phonograph Records embodying Master Recordings produced under this agreement:  (i) in jurisdictions where

- 36 -

5H07/02FLAWLESS 0883

there is no statutory or regulatory or collective bargaining or similar rule governing distribution of such royalties ("Rule"), and none of it is payable directly to recording artists, 50% of the amount received by Flawless; (ii) in jurisdictions where there is a Rule governing distribution of such royalties, that portion of such royalties required by such Rule, less any portion thereof which is payable by Flawless to Producers or any other Person; provided that Flawless shall have no obligation to credit your account with any share of royalties it collects if you or Artist could have collected a share of such royalties directly.

11.    **ROYALTY ACCOUNTINGS**

11.01. Flawless will compute your royalties as of each June 30th and December 31st (or such other semi-annual periods as Flawless may elect in its sole discretion; Flawless will use reasonable efforts to give you prior written notice of any such change, but an inadvertent failure by Flawless to give you such notice shall not be deemed a breach of this Agreement) for the prior six (6) months, in respect of each such six-month period in which there are sales or returns of Records or any other transactions on which royalties are payable to you, or liquidations of reserves established previously. Within three (3) months following the end of each such semi-annual period, Flawless will send you a statement covering those royalties and will pay you any royalties which are due after deducting unrecouped Advances and chargeable costs incurred under this Agreement paid or incurred during or prior to the accounting period in question and such amount, if any, which Flawless may be required to withhold pursuant to the California Revenue and Taxation Code, the U.S. Tax Regulations or any other applicable statute, regulations, treaty or law. After the term, no royalty statements shall be required for periods during which no additional royalties accrue unless you give Flawless a written request therefor before the expiration of the semi-annual accounting period to which the desired royalty statement relates. In computing the number of Records sold, only Records for which Flawless has been paid or credited shall be deemed sold, and Flawless shall have the right to deduct returns and credits of any nature and to withhold reasonable reserves therefor from payments otherwise due you. For purposes herein, the "reasonableness" of such reserves shall be determined by Soundscan sales figures. Each royalty reserve against anticipated returns and credits will be liquidated not later than the end of the fourth semi-annual accounting period following the accounting period during which it is established. If Flawless makes any overpayment to you, you will reimburse Flawless for it; Flawless also may deduct it from any payments due or becoming due to you. If Flawless pays you any royalties on Records which are returned later, those royalties will be considered overpayments. Flawless may at any time elect to utilize a different method of computing royalties so long as such method does not decrease the net monies received by or credited to you hereunder.

11.02. Sales of Records for distribution outside the United States are called "foreign sales." Flawless will compute your royalties for any foreign sale in the same national

- 37 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0884

currency in which Flawless's Licensee pays Flawless for that sale, and Flawless will credit
those royalties to your account at the same rate of exchange at which the Licensee pays
Flawless. For purposes of accounting to you, Flawless will treat any foreign sale as a sale
made during the same six-month period in which Flawless receives its Licensee's accounting
and payment for that sale. (For the purposes of this paragraph, any royalties credited by a
Licensee to Flawless's account but charged in recoupment of a prior advance made to
Flawless and retained by the Licensee by reason of that charge will be deemed paid to
Flawless and received by it when it receives the Licensee's accounting reflecting the credit
and charge concerned.) If any Flawless Licensee deducts any taxes from its payments to
Flawless, Flawless may deduct a proportionate amount of those taxes from your royalties.
If any law, any government ruling, or any other restriction affects the amount of the
payments which a Flawless Licensee can remit to Flawless, Flawless may deduct from your
royalties an amount proportionate to the reduction in the Licensee's remittances to Flawless.
If Flawless cannot collect payment for a foreign sale in the United States in U.S. Dollars it
will not be required to account to you for that sale, except as provided in the next sentence.
Flawless will, at your request and at your expense, deduct from the monies so blocked and
deposit in a foreign depository the equivalent in local currency of the royalties which would
be payable to you on the foreign sales concerned, to the extent such monies are available for
that purpose, and only to the extent to which your royalty account is then in a fully recouped
position. All such deposits will constitute royalty payments to you for accounting purposes.

11.03. Flawless will maintain books and records which report the sales or other
exploitations of Phonograph Records and Master Recordings hereunder on which royalties
are payable to you. You may, at your own expense, designate a certified public accountant
("CPA") to examine those books and records, as provided in this paragraph only. Such
examination: (a) may be made only for the purpose of verifying the accuracy of the
statements sent to you under paragraph 11.01; (b) may be made for a particular statement
only once and only within two and one-half (2-1/2) years after the date when Flawless sends
you that statement; and (c) may be made only during Flawless's usual business hours, and at
the place where it keeps the books and records to be examined, and upon reasonable notice
to Flawless. (Flawless will be deemed conclusively to have sent you each statement on the
date prescribed in paragraph 11.01 unless you notify Flawless otherwise, with respect to any
statement, within one hundred twenty (120) days after that date.) No examination may be
made of any manufacturing records or any other records that do not specifically report sales
or other distributions of Phonograph Records or other transactions on which royalties are
payable to you. Further, such examination shall be conditioned upon the CPA's written
agreement to Flawless that the CPA will not voluntarily disclose any findings to any Person
other than you, the Artist, your attorney or other advisers.

11.04. If you have any objections to a royalty statement, you will give Flawless
specific notice of that objection and your reasons for it within two and one-half (2-1/2) years
after the date that Flawless is deemed to have sent you that statement under paragraph

- 38 -

87/02FLAWLESS 0885

11.03. Each royalty statement will become conclusively binding on you at the end of that two and one-half-year period, and you will no longer have any right to make any other objections to it. You will not have the right to sue Flawless in connection with any royalty accounting, or to sue Flawless for royalties on Records sold or receipts derived by Flawless during the period a royalty accounting covers, unless you commence the suit within six (6) months after the end of that two-year period. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to Flawless's royalty accountings. Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim. The preceding three sentences will not apply to any item in a royalty accounting if you establish that the item was fraudulently misstated.

## 12.    LICENSES FOR MUSICAL COMPOSITIONS

12.01. (a)    (1)    You and the Artist grant to Flawless and its Licensees and their designees an irrevocable license, under copyright, to reproduce each Controlled Composition on Phonograph Records of Master Recordings made under this Agreement, other than Audiovisual Records, and to distribute them in the United States and Canada.

(2)    For that license, Flawless will pay Mechanical Royalties, on the basis of Net Sales, at the following rates:

(i)    On Records sold for distribution in the United States:

(A)    If the copyright law of the United States provides for a minimum compulsory rate: The rate equal to seventy-five percent (75%) of the minimum compulsory license rate applicable to the use of Compositions on phonorecords under the United States copyright law on whichever of the following dates is the earlier, the date of completion of Delivery of the Master Recordings constituting the Album project (or other recording project) concerned; or the date of expiration of the time within which the Recording concerned is required to be Delivered under Article 3.

(The minimum statutory rate is currently seven and fifty-five one-hundreds cents  ($.0755) per Composition.)

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

02FLAWLESS 0886

(B)     If the copyright law of the United States does not provide for a minimum compulsory rate: The rate equal to seventy-five percent (75%) of the minimum license rate agreed to by the major record companies and major music publishers in the United States on whichever of the following dates is the earlier: the date of completion of Delivery of the Master Recordings constituting the Album project (or other project concerned); or the date of expiration of the time within which the Recording concerned is required to be Delivered under Article 3.

(ii)     On Records sold for distribution in Canada: The rate prescribed in subsection (i) above or the rate equal to seventy-five percent (75%) of the lowest Mechanical Royalty rate prevailing in Canada on a general basis with respect the use of Compositions on Standard Records, whichever is lower, but not less than four cents ($.04) (Canadian) in either event.

The Mechanical Royalty on any Record sold through a so-called "record club" will be one hundred percent (100%) of the amount fixed in subsection (i) or (ii) above. The Mechanical Royalty on any Record described in subparagraph 9.03(a) will be three-fourths (3/4) of the amount fixed in subsection (i) or (ii) above. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be one-half (1/2) of the amount fixed in subsection (i) or (ii) above, unless a different rate applies under section 12.01(a)(4) below. No Mechanical Royalties will be payable for any Records described in paragraph 10.03.

(3)     If a Person not in any of the categories referred to in paragraph 14.08 holds a joint ownership interest ("Independent Interest") in a Controlled Composition, Flawless will have the right, at its election, to pay or credit directly to that Person a share of the Mechanical Royalty payable with respect to that Composition under subsection 12.01(a)(2)(i), proportionate to the amount of the Independent Interest (or such other amount as you and that Person instruct us in writing), and increased proportionately on the basis of the full amount of the minimum statutory rate applicable under clause (A) or (B) of section 12.01(a)(2)(i) (for example, $.033 if the Independent Interest is a one-half (1/2) ownership interest and the applicable minimum statutory rate is $.066). The amount of the proportionate increase of each such payment or credit will constitute an Advance and will be recoupable from all monies becoming payable by Flawless to you or the Artist hereunder.

(4)     If ASCAP or BMI accords regular performance credit for any Controlled Composition which is an arranged version of a public domain work, the

- 40 -

287/02FLAWLESS 0887

Mechanical Royalty rate on that Composition will be apportioned according to the same ratio used by ASCAP or BMI in determining the performance credit. Flawless will not be required to pay you at that rate unless you furnish it with satisfactory evidence of that ratio.

(b)    (1)    The total Mechanical Royalty for all Compositions on any Album, including Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under section 12.01(a)(2) if it contained only one (1) Controlled Composition. The total Mechanical Royalty will be limited to two (2) times that amount on any Single, five (5) times that amount on any Extended Play Record, and three (3) times that amount on any Twelve-Inch Single or any other Record which is not an Album, a Single, or an Extended Play Record (provided that if such Record is released without your consent, Mechanical Royalties will be paid on the actual number of Compositions embodied thereon, not to exceed the otherwise applicable Mechanical Royalty cap for the type of Record such Record most closely resembles, and subject to the other terms and provisions of this paragraph 12.01).

(2)    The maximum Mechanical Royalty under this subparagraph (b) on a Multiple Record Set will be the same amount prescribed in section 12.01(b)(l), multiplied by a fraction, the numerator of which is the SRLP of such Multiple Record Set in the applicable configuration in the United States and the denominator of which is Flawless's then-prevailing SRLP for Flawless's newly-released Top-line Albums in such configuration in the United States.

(c)    Flawless will compute Mechanical Royalties on Controlled Compositions as of each February 28th (or 29th, if applicable), May 31st, August 31st and November 30th (or such other quarter-annual periods as Flawless may elect in its sole discretion; Flawless will use reasonable efforts to give you prior written notice of any such change, but an inadvertent failure by Flawless to give you such notice shall not be deemed a breach of this Agreement) for the prior three (3) months, in respect of each quarter-annual period in which there are sales or returns of Records on which Mechanical Royalties are payable to you, or liquidations of Mechanical Royalty reserves established previously. On the 15th day of the second month following the end of each such quarter-annual period, Flawless will send a statement covering those Mechanical Royalties, less a reasonable reserve against anticipated returns and credits, and will pay any net Mechanical Royalties which are due. Mechanical Royalty reserves maintained by Flawless against anticipated returns and credits will not be held for an unreasonable period of time; retention of a reserve for two (2) years after it is established will not be considered unreasonable in any case. If Flawless makes any overpayment of Mechanical Royalties to you, the Artist or any Person you will reimburse Flawless for it; Flawless may also recoup it from any payments due or becoming due to you or the Artist hereunder. If Flawless pays any Mechanical Royalties on Records which are returned later, those Mechanical Royalties will be considered overpayments. If the total amount of the Mechanical Royalties which Flawless pays on any

- 41 -

Scanned Copy Of Original 04-17-2002 11:48:24

2002FLAWLESS 0888

Record consisting of Master Recordings made under this Agreement (including Mechan. Royalties for Compositions which are not Controlled Compositions) is higher than the lin. fixed for that Record under subparagraph 12.01(b), that excess amount will be considered an overpayment also. Paragraphs 11.03 and 11.04 will apply to Mechanical Royalty accountings.

12.02. You and the Artist also grant to Flawless and its Licensees and their designees an irrevocable license under copyright to reproduce each Controlled Composition in Covered Videos and Audiovisual Records, to reproduce those Covered Videos and Audiovisual Records, distribute them, and perform them in any manner (including, without limitation, publicly and for profit), to manufacture and distribute Audiovisual Records and other copies of them, and to exploit them otherwise, by any method and in any form known now or in the future, throughout the world, and to authorize others to do so. Subject to subparagraph 8.08(d) above, Flawless will not be required to make any payment in connection with those uses, and that license will apply whether or not Flawless receives any payment in connection with any use of any Covered Video or Audiovisual Record. If any exhibition of a Covered Video or Audiovisual Record is also authorized under another license (such as a public performance license granted by ASCAP or BMI), that exhibition will be deemed authorized by that license instead of this Agreement. (In all events, Flawless and its Licensees will have no liability by reason of any such exhibition.)

12.03. (a)    If any Recordings made under this Agreement contain copyrighted Compositions which are not Controlled Compositions, subject to subparagraph 4.01(f) above, you and the Artist will use reasonable efforts to obtain licenses covering those Compositions for Flawless's benefit on the same terms as those which apply to Controlled Compositions under this Article 12. In all events, subject to subparagraph 4.01(f) above, you and the Artist will obtain licenses covering them for the United States providing for royalties at the minimum rate applicable to the use of Compositions on phonorecords under the compulsory license provisions of the United States copyright law, and licenses for them for Canada providing for royalties at the lowest rates prevailing in Canada on a general basis with respect to the use of Compositions on Standard Records, and otherwise on terms not less favorable to Flawless in any respect than those prescribed in the attached Exhibit "A;" and subparagraph 12.01(b) will continue to apply.

(b)    You and the Artist will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to Flawless or its Licensees than the terms prevailing on a general basis in the country concerned with respect to the use of Compositions on comparable Records.

- 42 -

04/17/02FLAWLESS 0889

12.04. You and the Artist warrant and represent that the "Schedule of Publishers" appended to this Agreement is a complete list of the music publishers in which you or the Artist has a direct or indirect interest. You and the Artist will notify Flawless promptly of each additional music publisher in which you or the Artist acquire any such interest and of every other change required to keep the list currently accurate.

12.05. Neither you nor the Artist, nor any Person deriving rights from you or the Artist, will authorize the use of any Controlled Composition in a radio or television commercial or any other advertising or promotional matter, unless you first require the Person authorized to make the use concerned to agree in writing, for Flawless's benefit, that the use will not involve a "sound-alike" Recording resembling a Performance of that Composition by the Artist. (A "sound-alike" Recording is a different Recording which imitates or simulates the Recording concerned by using a substantially similar musical arrangement or otherwise.)

12.06. Subject to the provisions of section 12.01(a)(3) above, if the copyright in any Controlled Compositions is owned or controlled by a Person other than you and/or the Artist, you shall cause that Person to grant Flawless and its Licensees and their designees the same rights as you are required to grant to Flawless and its Licensees pursuant to this Article 12. Any assignment, license or other agreement made with respect to any Controlled Composition shall be subject to the terms hereof.

12.07. You and the Artist also grant to Flawless and its Licensees and their designees an irrevocable license under copyright to print and reproduce, at their election, the title and lyrics to any Controlled Composition on Album Artwork and in connection with Covered Videos or Audiovisual Records, and the packaging therefor, throughout the world in perpetuity, without payment to you or the Artist or any other Person of any monies or other consideration in connection therewith.

## 13.   WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES; MINIMUM ANNUAL COMPENSATION

13.01. You warrant and represent:

(a)    You have the right and power to enter into and fully perform this Agreement.

(b)    Flawless shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Flawless pursuant to this Agreement except as specifically provided in this Agreement.

- 43 -

(c)    The Artist is or will become and will remain, to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required for the performance of the Artist's services hereunder.

(d)    No Materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights of any Person. "Materials," as used in this Article, means: (1) the Master Recordings made or furnished under this Agreement, (2) all Controlled Compositions, (3) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (4) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist or any Producer and contained in or used in connection with any Recordings made hereunder or their packaging, sale, distribution, advertising, publicizing or other exploitation, including, without limitation, all label copy and liner note information provided by you or the Artist, and any Artist Website, Website Material and ECD Material. Notwithstanding the foregoing, the warranties pursuant to this subparagraph 13.01(d) shall not apply to those non-musical Materials which are wholly prepared by Flawless and not under your specific direction (e.g., the warranties would not extend to an Album cover design which Flawless creates without your specific direction).

(e)    During the term of this Agreement, no Person other than Flawless has any right to use any existing Master Recordings of the Artist's Performances for making, promoting, or marketing Phonograph Records.

(f)    Each and every vocalist, musician, Producer and other individual whose services you furnish in connection with the preparation of a Master Recording or Covered Video under this Agreement either will have done so as an employee within the scope of his or her employment or will have expressly agreed in a written instrument signed by him or her and by the party commissioning the services that the Recording or Covered Video, as applicable, will be considered a "work made for hire." A copy of any and all such instruments will be furnished to Flawless upon the request of Flawless.

13.02. (a)    You warrant and represent that during the term of this Agreement:

(1)    Neither you nor the Artist will enter into any agreement which would interfere with the full and prompt performance of your material obligations hereunder, and you will fully and promptly perform your material obligations to the Artist under the Artist Agreement (provided, however, that the Artist shall not be deemed a third party beneficiary of this Agreement);

87/02FLAWLESS 0890

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0891

(2)    No Person other than Flawless will be authorized to use any existing Master Recordings of the Artist's Performances for making, promoting, or marketing Phonograph Records; and

(3)    Subject to paragraphs 13.02.1 and 13.02.2 below and 8.01(c) above, during the term hereof, the Artist will not perform or render any services as a recording, performing and video artist, or a producer for the purpose of making, promoting, or marketing Master Recordings or Phonograph Records for any Person except Flawless.

(b)    (1)    A "restricted Composition," for the purposes of this subparagraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to Flawless under this Agreement or any other agreement with Flawless.

(2)    Neither you nor the Artist will authorize or knowingly permit the Artist's Performance, and the Artist shall not render any Performance, of any restricted Composition or any adaptation of a restricted Composition to be recorded for any Person except Flawless for the purpose of making Master Recordings or Phonograph Records, or for any other purpose (including, without limitation, radio or television commercials), at any time before the later of the following dates: (i) the date five (5) years after the date of Delivery to Flawless of all the Master Recordings made in the course of the same Album (or other) recording project as the Recording of the restricted Composition concerned, or (ii) the date two (2) years after the expiration or termination of the term of this Agreement or any subsequent exclusive recording agreement between Flawless and you or the Artist (or any Person furnishing the Artist's recording services or the results and proceeds thereof) with respect to the Artist's recording services entered into within four (4) months after the expiration or termination of the term of this Agreement. Notwithstanding the foregoing, if Flawless has not exploited a restricted Composition within one (1) year after the expiration of the term of this Agreement (or, if applicable, a subsequent agreement as described above), this subparagraph (b) will no longer apply to that restricted Composition.

(c)    Neither you nor the Artist shall authorize or knowingly permit the Artist's Performances to be recorded for any purpose without an express written agreement with the Person for whom the Recording is to be made, for Flawless's benefit, prohibiting the use of such Recording for making, promoting, or marketing Master Recordings or Phonograph Records in violation of the restrictions prescribed in subparagraphs 13.02(a) and 13.02(b). You will furnish Flawless with a fully executed counterpart of each such agreement promptly after its execution.

- 45 -

Scanned Copy Of Original 04-17-2002 11:48:24

13.02.1.    [Any member of] the Artist may perform as a background instrumentalist or vocalist ("sideman") accompanying a featured artist for the purpose of making Phonograph Records for others, provided:

(a)    [(1)    Only one member of the Artist may perform in any such engagement, and]

(2)]    The [member] [Artist] may not do so unless you and the Artist have fulfilled all of your and the Artist's then-current material obligations under this Agreement, and the engagement does not interfere with the continuing prompt performance of your and the Artist's obligations to Flawless, including any professional engagement to which the Artist is committed which is intended to aid in the promotion of Phonograph Records hereunder;

(b)    (1)    The [member's] [Artist's] Performance shall be only in a background capacity.  The [member] Artist may not render a solo, duet or "step-out" performance, and

(2)    The musical style of the Recording may not be substantially similar to the characteristic musical style of Recordings made by the Artist for Flawless (i.e., likely to cause confusion as to the identity of the featured performer);

(c)    The [member] [Artist] may not record any material which the Artist has then recorded for Flawless;

(d)    The [member] [Artist] may not accept the sideman engagement unless the Person for whom the Recordings are being made agrees in writing, for Flawless's benefit, that:

(1)    The [Artist's] name [of the member performing (but not the group name of the Artist)] may be used in a courtesy credit to Flawless Records on the Album liners used for such Records, in the same position as the credits accorded to other sidemen and in type identical in size, prominence, and all other respects;

(2)    Except as expressly provided in section 13.02.1(d)(1) above, neither the Artist's name (or any similar name), [nor the name of the member, nor the group name of the Artist], nor any picture, portrait or likeness of the Artist [or member of Artist] may be used in connection with such Recordings, including, without limitation, on the front covers of Album containers, on sleeves or labels used for Singles, or in videos, advertising, publicity or any other form of promotion or exploitation, without Flawless's express written consent, which Flawless may withhold in its unrestricted discretion; and

- 46 -

FlawlessExhibitB1 SH:sh/06/15/01

SH7/02FLAWLESS 0893

(3)    The [member] [Artist] may not appear visually in Audiovisual Records, promotional videos or any other reproductions of any kind.  You will furnish Flawless with a copy of each such agreement promptly after its execution.

(e)    Before the [member] [Artist] accepts the sideman engagement you will notify Flawless of the name of the Person for whom the Recordings are being made and the record company which will have the right to distribute the Records.

13.02.2.    [Any member] [The Artist] may serve as a record producer or mixer or as a composer for the purpose of making Phonograph Records for others, provided:

(a)    You and the Artist have then fulfilled all of your and the Artist's then-current material obligations under this Agreement, and the engagement does not interfere with the continuing prompt performance of your and the Artist's obligations to Flawless;

(b)    (1)    The [member] [Artist] will not produce or mix Recordings of any material which the Artist has then recorded for Flawless;

(2)    The musical style of the Recording may not be substantially similar to the characteristic musical style of Recordings made by the [member] [Artist] for Flawless (i.e., likely to cause confusion as to the identity of the featured performer);

(c)    The [member] [Artist] will not accept such engagement unless the Person for whom the Recordings are being produced or mixed, or the compositions are being made, agrees in writing, for Flawless's benefit, that:

(1)    The [Artist's] name [of the member producing, mixing or composing (but not the group name of the Artist)] may be used in credits on Record labels and the reverse sides of Record packages, comparable in size and prominence to the credits generally accorded to individuals performing such services, and in advertising and publicity in a manner accurately descriptive of the [Artist's] [member's] producing, mixing or composing function, and

(2)    Except as expressly provided in section 13.02.2(c)(1) above, neither the Artist's name (or any similar name), [nor the name of the member, nor the group name of the Artist,] nor any picture, portrait or likeness of the Artist [or member], will be used in connection with such Recordings, including, without limitation, on the front of any Record package or in advertising, publicity or any other form of promotion or exploitation, without Flawless's express written consent, which Flawless may withhold in its unrestricted discretion.

- 47 -

Scanned Copy Of Original 04-17-2002 11:48:24

817/02FLAWLESS 0894

13.03. You warrant and represent that if you or the Artist become aware of any unauthorized recording, manufacture, distribution, sale, or other activity by any third party contrary to the restrictions in this Agreement, you and the Artist will notify Flawless of it and will cooperate with Flawless in any action or proceeding Flawless commences against such third party.

[13.04. (a)    You warrant and represent that, under your agreement with the Artist, you guarantee to pay the Artist during each of the first seven (7) "Fiscal Years" (as hereinafter defined), and you will pay, aggregate annual compensation ("Annual Payments") as set forth in sections (1), (2) and (3) below. You further warrant and represent that, under your agreement with the Artist, the Artist has agreed to accept all such Annual Payments. As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which this Agreement is in effect, commencing with the date of commencement of the term of this Agreement.

(1)    Nine Thousand Dollars ($9,000) for the first Fiscal Year of this Agreement;

(2)    Twelve Thousand Dollars ($12,000) for the second Fiscal Year of this Agreement; and

(3)    Fifteen Thousand Dollars ($15,000) for each of the third through seventh Fiscal Years of this Agreement.

(b)    If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to the Artist exceeds the Annual Payment, you shall so notify Flawless and such excess compensation shall apply to reduce the Annual Payment for any subsequent Fiscal Years. [You warrant and represent the with respect to the Advance payable to you pursuant to section 6.02(c)(1), you will pay the Artist no less than the Annual Payment required pursuant to sections 13.04(a) _____ above in respect of the first _____ Fiscal Year(s), and, upon Flawless's request, you shall furnish Flawless with satisfactory evidence of such payments.)

(c)    Without limiting your obligation under the foregoing subparagraphs (a) and (b), if you have not paid the Artist compensation (other than Mechanical Royalties) equal to the Annual Payment required herein for a Fiscal Year, Flawless will pay, on your behalf and its own behalf, the amount of such deficiency directly to the Artist before the end of that Fiscal Year. At least forty-five (45) days before the end of each Fiscal Year you and the Artist will notify Flawless if you have not paid the Artist compensation equal to the Annual Payment required herein for a Fiscal Year, and of the amount of each deficiency. Flawless will have the right to pay such deficiency ("Deficiency Payment") at its election if it determines, in its sole discretion, that it lacks sufficient information to deem itself assured

- 48 -

FlawlessExhibitB1 SH:sh/06/15/01

7/02FLAWLESS 0895

that you have complied with subparagraph 13.04.(a). Any failure by Flawless to make a Deficiency Payment will not constitute a material breach of this Agreement.

(d)     Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided, that if this Agreement expires or terminates prior to the end of a particular Fiscal Year, the applicable Annual Payment shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423.

(e)     Flawless shall have the right to pay to the Artist at any time any additional amounts which may be required to be paid as a condition to Flawless's petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments"). You warrant and represent that, under your agreement with the Artist, the Artist has agreed to accept any and all such Additional Payments. All compensation (other than Mechanical Royalties) paid to you or the Artist hereunder which is not applied to the Annual Payments theretofore due the Artist will be credited toward satisfying the obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder. If Flawless actually makes any Additional Payments and thereafter elects not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

(f)     Each Deficiency Payment and Additional Payment made by Flawless will constitute an Advance and will be applied in reduction of any and all monies due or becoming due to you, and any and all monies (other than Mechanical Royalties) due or becoming due you or the Artist, under this Agreement. Notwithstanding anything to the contrary contained herein, whenever in this Agreement Flawless has the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due under this Agreement, Flawless's such right shall not extend to deducting such excess expenditures from any Deficiency Payments or Additional Payments made by Flawless.]

[13.04. (a)     You warrant and represent that, under your agreement with the Artist, you guarantee to pay each of the "Applicable Members" (as hereinafter defined) during each of the first seven (7) "Fiscal Years," and you will pay, aggregate annual compensation ("Annual Payments") as set forth in sections (1), (2) and (3) below. You further warrant and represent that, under your agreement with the Artist, each member of the Artist has agreed to accept all such Annual Payments. As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which this Agreement is in effect, commencing with the date of commencement of the term of this Agreement.

(1)     Nine Thousand Dollars ($9,000) for the first Fiscal Year of this Agreement;

FlawlessExhibitB1 SH:sh/06/15/01

04-17/02FLAWLESS 0896

          (2)     Twelve Thousand Dollars ($12,000) for the second Fiscal Year of this Agreement; and

          (3)     Fifteen Thousand Dollars ($15,000) for each of the third through seventh Fiscal Years of this Agreement.

You hereby warrant and represent that all payments made by you to Artist under this Agreement during each Fiscal Year will be distributed equally among all Applicable Members of Artist.

          (b)     If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to each Applicable Member exceeds the Annual Payment, you shall so notify Flawless and such excess compensation shall apply to reduce the Annual Payment due each Applicable Member for any subsequent Fiscal Years. [You warrant and represent that with respect to the Advance payable to you pursuant to section 6.02(c)(1), you will pay each Applicable Member of Artist no less than the Annual Payment required pursuant to sections 13.04(a) _____ above in respect of the first _____ Fiscal Year(s), and, upon Flawless's request, you shall furnish Flawless with satisfactory evidence of such payments.]

          (c)     Without limiting your obligation under the foregoing subparagraphs (a) and (b), if you have not paid each Applicable Member compensation (other than Mechanical Royalties) equal to the Annual Payment required herein to be paid to the Applicable Member for a Fiscal Year, Flawless will pay, on your behalf and its own behalf, the amount of such deficiency directly to the Applicable Members before the end of that Fiscal Year. At least forty-five (45) days before the end of each Fiscal Year you and the Applicable Members will notify Flawless if you have not paid each Applicable Member compensation equal to the Annual Payment required herein for a Fiscal Year, and of the amount of each deficiency. Flawless will have the right to pay each such deficiency ("Deficiency Payment") at its election if it determines, in its sole discretion, that it lacks sufficient information to deem itself assured that you have complied with subparagraph 13.04.(a). Any failure by Flawless to make a Deficiency Payment will not constitute material breach of this Agreement.

          (d)     Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided, that if this Agreement expires or terminates prior to the end of a particular Fiscal Year, the applicable Annual Payment shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0897

(e)     Flawless shall have the right to pay any Applicable Member or any other member of Artist at any time any additional amounts which may be required to be paid as a condition to Flawless's petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments"). You warrant and represent that, under your agreement with the Artist, each member of the Artist has agreed to accept any and all such Additional Payments. All compensation (other than Mechanical Royalties) paid to you or any Applicable Member hereunder which is not applied to the Annual Payments theretofore due the Applicable Member will be credited toward satisfying the obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder. If Flawless actually makes any Additional Payments and thereafter elects not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

(f)     Each Deficiency Payment and Additional Payment made by Flawless will constitute an Advance and will be applied in reduction of any and all monies due or becoming due to you, and any and all monies (other than Mechanical Royalties) due or becoming due you or the Artist, under this Agreement. Notwithstanding anything to the contrary contained herein, whenever in this Agreement Flawless has the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due under this Agreement, Flawless's such right shall not extend to deducting such excess expenditures from any Deficiency Payments or Additional Payments made by Flawless.

(g)     As used in this Agreement, "Applicable Members" shall mean _____.]

13.05. The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Flawless shall be entitled to seek injunctive relief to enforce the provisions of this Agreement. (The preceding sentence will not be construed to preclude you or the Artist from opposing any application for such relief based upon contest of the other facts alleged by Flawless in support of the application.)

13.06. (a)     You will at all times indemnify and hold harmless Flawless and any of its Licensees (collectively the "Indemnitee") from and against any and all claims, damages, liabilities, costs and expenses, including legal costs and reasonable attorneys' fees (but not including any fees of Flawless's "in house" counsel), arising out of any breach or alleged breach of any warranty or representation made by you in this Agreement or any other act or omission by you or the Artist, provided the claim concerned has been settled (subject to the provisions of subparagraph 13.06(b) below) or has resulted in a judgment against any Indemnitee. Flawless will notify you of any action commenced on such a claim. You may participate in the defense of any such claim through counsel of your selection at your own expense, but Flawless will have the right at all times, in its sole discretion, to retain or

- 51 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

resume control of the conduct of the defense. If any claim involving such subject matter has not been resolved, or has been resolved by a judgment or other disposition which is not adverse to any Indemnitee, you will reimburse Flawless for fifty percent (50%) of the above-allowed expenses actually incurred by Indemnitee in connection with that claim. Pending the resolution of any such claim, Flawless will have the right to withhold monies which would otherwise be payable to you under this Agreement in an amount not exceeding your potential liability to Flawless under this paragraph; provided, however, Flawless will not withhold monies which otherwise would be payable to you under this Agreement if you make satisfactory bonding arrangements in accordance with subparagraph 13.06(b) below.

(b)    If Flawless pays more than $6,000 in settlement of any such claim, you will not be obligated to reimburse Flawless for the excess unless you have consented to the settlement, except as provided in the next sentence. If you do not consent to any settlement proposed by Flawless for an amount exceeding $6,000 you will nevertheless be required to reimburse Flawless for the full amount paid unless you make bonding arrangements, satisfactory to Flawless in its reasonable discretion, to assure Flawless of reimbursement for all damages, liabilities, costs and expenses (including legal costs and reasonable attorneys' fees (but not including any fees of Flawless's "in house" counsel),) which Indemnitee may incur as a result of that claim. If no action or other proceeding for recovery on such a claim has been commenced within one (1) year after its assertion, Flawless will not continue to withhold monies in connection with it under this paragraph.

13.07.  You warrant and represent:

(a)    During the term of this Agreement, you shall have the sole and exclusive right to the Artist's recording services under a valid and binding contract with the Artist, which contract shall grant to you all rights necessary or desirable for your full performance hereunder. You shall supply a true copy of such contract to Flawless upon demand. Such contract does not and will not require the payment to the Artist (or to any Person on the Artist's behalf) of a royalty, advance or other monies in excess of monies payable to you hereunder. During or after the term hereof you shall not in a manner which may in any way adversely affect Flawless's rights hereunder: (1) release the Artist from any term or provision of such contract; (2) agree to any termination or modification thereof; (3) fail to exercise any renewal, suspension or extension option with respect thereto (unless Flawless has previously informed you in writing that it does not wish you to exercise such renewal, suspension or extension option); or (4) breach said contract in any manner. Concurrently with your execution hereof, you shall procure and deliver to Flawless an inducement letter as attached hereto (the "Inducement Letter") signed by the Artist and you. You shall cause the Artist to comply with such Inducement Letter, and you shall be bound by the terms and conditions thereof.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

567/02FLAWLESS 0899

(b)    Flawless shall have, and you hereby grant to Flawless, all rights acquired and to be acquired by you under your contract with the Artist which are necessary or desirable to enable Flawless to enjoy its rights under this Agreement. You shall, for the express benefit of Flawless, require the performance by the Artist of said contractual obligations so as to enable Flawless to enjoy the rights granted to Flawless by you. Flawless may participate in your efforts to enforce such contract, and you hereby grant to Flawless the power and authority to enforce the performance of all such contractual obligations directly against the Artist in your name and/or Flawless's, as Flawless may elect in the event you have failed to exercise any such rights, including the seeking of injunctive or other equitable relief, as well as seeking the recovery of damages at law.

14.    **DEFINITIONS**

14.01. (a)    "Advance" - a prepayment of royalties. Flawless may recoup *Advances from royalties to be paid to or on behalf of you or the Artist pursuant to this Agreement or any other agreement*, except as provided in the last sentence of this subparagraph (a). "Any other agreement," in this paragraph, means any other agreement *relating to the Artist as a recording artist or as a Producer of Recordings of the Artist's own Performances*. Advances paid under Article 6 will not be returnable to Flawless except as provided in Article 15 or elsewhere in this Agreement or in other circumstances in which *Flawless is entitled to their return by reason of your and/or the Artist's failure to fulfill your and/or the Artist's obligations*. Mechanical Royalties will not be chargeable in recoupment of any Advances except those which are expressly recoupable from all monies payable under this Agreement.

(b)    (1)    Fifty percent (50%) of the production and acquisition costs incurred in connection with any Covered Video will be recoupable from your royalties (excluding Mechanical Royalties) on sales of Records which do not reproduce visual images ("audio royalties") under subparagraph 5.02(a), and one hundred percent (100%) of such costs will be recoupable from all monies (excluding Mechanical Royalties, if any) otherwise payable to you from the exploitation of such Covered Videos pursuant to paragraph 9.07 above; provided, however, that any such costs incurred in respect of any Covered Video hereunder in excess of One Hundred Fifty Thousand Dollars ($150,000) shall be one hundred percent (100%) recoupable from audio royalties; provided, further, that there shall be no double recoupment of any such costs. If any such costs are recouped from audio royalties and additional royalties accrue under paragraph 9.07 subsequently, the latter royalties will be applied in recoupment of those costs and the amount of those audio royalties which were previously applied against those costs will be credited back to your account.

(2)    All costs incurred in connection with creating the so-called "enhanced" or multimedia portion (including without limitation, videos, photography,

- 53 -

Scanned Copy Of Original 04-17-2002 11:48:24

graphics, technology, etc.) of an enhanced CD, CD +, CD Rom, DVD or any other similar configuration (whether now known or hereafter created) embodying Master Recordings hereunder (the "Enhanced Costs") including, without limitation, ECD Material, will be recoupable from all monies otherwise payable to you hereunder.

(3)    One hundred percent (100%) of all costs incurred by Flawless in connection with securing, registering and/or protecting Artist Domain Names, and creating, hosting and maintaining Artist Websites, including, without limitation, costs incurred in creating and/or acquiring the Website Material, will constitute Advances recoupable from royalties (excluding Mechanical Royalties) payable to you hereunder.

14.02. (a)    "Album" -a sufficient number of Master Recordings embodying the Artist's Performances to comprise one (1) or more compact disc Records, or the equivalent, of not less than forty-five minutes of playing time and containing at least ten (10) different Compositions.

(b)    "Single" - a vinyl-disc Record not more than seven (7") inches in diameter, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than two (2) Compositions.

(c)    "Twelve-Inch Single" - a twelve-inch (12") vinyl-disc Record, or the equivalent in a non-vinyl-disc configuration, which contains Recordings of not more than three (3) Compositions and does not constitute an Album.

(d)    "Extended Play Record" - a Record which contains Recordings of four (4) or more Compositions but does not constitute an Album.

14.03. "Ancillary Exploitations" - (a) the leasing of commercial advertising space to Persons other than Flawless or its Licensees on an Artist Website; (b) the placement on an Artist Website of links to so-called "e-commerce" Websites owned or controlled by Persons other than Flawless or its Licensees; and (c) the inclusion of computer software, or Website links in ECD Material.

14.04. (a)    "Budget Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price which is sixty-seven percent (67%) or less of the Suggested Retail List Price in the country concerned applicable to the Top-line Records in the same configuration (e.g., long-playing Album, two-disc long-playing Album, Twelve-Inch Single, analog tape cassette, compact disc, etc.) released by Flawless or its Licensees in the territory concerned.

- 54 -

07/02FLAWLESS 0901

(b)    "Mid-price Record" - a Record, whether or not previously released, bearing a Suggested Retail List Price in the country concerned in excess of sixty-seven percent (67%) and less than eighty-five percent (85%) of the Suggested Retail List Price applicable to the Top-line Record in the same configuration.

14.05.  "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.  Recordings of more than one (1) arrangement or version of the same Composition, reproduced on the same Record, will be considered, collectively, a recording of one (1) Composition for all purposes under this Agreement.

14.06.  "Container Charges" - the applicable percentage, specified below, of the Suggested Retail List Price applicable to the Records concerned:

(a)    Audiovisual Records - twenty percent (20%).

b)    Compact disc Records/New Medium Records - twenty-five percent (25%).

(c)    Other Records - twelve and one-half percent (12.5%) on analog vinyl-disc Records in single-fold packaging; fifteen percent (15%) on analog vinyl-disc Records in double-fold packaging and twenty percent (20%) on analog Records in non-vinyl disc configurations.

Container Charges will not be deducted for Singles packaged only in stock paper sleeves.

14.07.  "Contract Period" and "Period" - the initial period, or any Option Period, of the term hereof (as such Periods may be suspended or extended as provided herein).

14.08.  "Controlled Composition" - a Composition wholly or partly written, owned or controlled by you, the Artist, a Producer (except any Producer engaged by Flawless pursuant to subparagraph 2.02(b)), or any Person in which you, the Artist, or a Producer (except any Producer engaged by Flawless pursuant to subparagraph 2.02(b)) has a direct or indirect interest.

14.09.  "Covered Video" - an audiovisual work owned or controlled by Flawless, the soundtrack of which consists primarily of one (1) or more Master Recordings subject to this Agreement.

14.10.  "Delivery," when used with respect to Master Recordings - means the actual receipt and acceptance by Flawless of the Master Recordings concerned and all documents and other materials required hereunder to be furnished to Flawless in connection

- 55 -

97/02FLAWLESS 0902

with them. Without limiting the generality of the preceding sentence, no Master Recordings will be deemed Delivered and accepted until Flawless has received all of the related documentation required under subparagraphs 4.01(c), 4.01(e) and 4.01(g) and all other materials referred to in subparagraph 4.01(f). Flawless will have the right to disapprove and reject any Master Recording which in Flawless's reasonable, good faith opinion, is patently offensive, constitutes an obscenity, violates any law, or infringes or violates the rights of any Person, or which might subject Flawless to liability or unfavorable regulatory action.

14.11. "ECD Material" - all material acquired or created for inclusion in the "enhanced" or multimedia portion of an enhanced CD, CD Plus, CD ROM, DVD, or any other similar configuration, whether now known or hereafter created (including, without limitation, Covered Videos, photography, graphics, technology, software, so-called "hyperlinks" to URLs, etc.).

14.12. "Electronic Transmission" - any transmission to the consumer, whether sound alone, sound coupled with an image, or sound coupled with data, in any form, analog or digital, now known or later developed (including, but not limited to, "cybercasts," "webcasts," "streaming audio," "streaming audio/video," "digital downloads," direct broadcast satellite, point-to-multipoint satellite, multipoint distribution service, point-to-point distribution service, cable system, telephone system, broadcast station, and any other forms of transmission now known or hereafter devised) whether or not such transmission is made on-demand or near on-demand, whether or not a direct or indirect charge is made to receive the transmission and whether or not such transmission results in a specifically identifiable reproduction by or for any transmission recipient. All references in this Agreement to the "distribution" of Records, unless expressly provided otherwise, shall be understood to include the distribution of Records by way of Electronic Transmission thereof.

14.13. "Inception of Recording" - the first recording of Performances or other sounds with a view to the eventual fixation of a Master Recording. "Master Recordings from the Inception of Recording" include, without limitation, all rehearsal recordings, "outtakes," and other preliminary or alternate versions of sound recordings which are created during the production of Master Recordings made under this Agreement.

14.14. "Joint Recording" - any Master Recording embodying the Artist's Performance and any Performance by another artist with respect to which Flawless is obligated to pay royalties.

14.15. (a)    "Licensees" - all Persons (whether or not affiliated with Flawless or Flawless's Distributor) to which Flawless has licensed the right of sale, distribution or exploitation of Master Recordings and/or Records made hereunder, including, without

FlawlessExhibitB1 SH:sh/06/15/01

Scanned copy of original 04-17-2002 11:48:24

7/02FLAWLESS 0903

limitation, wholly or partly owned subsidiaries, affiliates, and other divisions of Flawless or its Distributor.

(b)    "Distributor" - the record company having the exclusive right at any time to distribute Flawless's newly released Records through USNRC.

14.16. (a)    "Master Recording" and "Recording" - every recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

(b)    "Digital Master" - a fully mixed, edited, equalized and leadered digital stereo (or superior format) tape master ready for the production of parts from which satisfactory Records can be manufactured.

14.17. "Mechanical Royalties" - royalties payable to any Person for the right to reproduce and distribute copyrighted Compositions on Phonograph Records other than Audiovisual Records.

14.18. "Multiple Record Set" - an Album which contains a sufficient number of Master Recordings embodying Artist's Performances to comprise two (2) or more compact disc Records, or the equivalent, each of not less than forty-five minutes of playing time and each containing at least ten (10) different Compositions packaged as a single unit, or which, because of the number of Master Recordings embodied thereon or the playing time thereof, bears a Suggested Retail List Price which is greater than that of the majority of Flawless's then-current releases in that particular configuration.    For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record Set accepted by Flawless shall be deemed only one (1) Album.

14.19. "Net Sales" - gross sales, less returns, credits and reserves against anticipated returns and credits.  Returns will be apportioned between Records sold and "free goods" in the same ratio in which Flawless's customer's account is credited.

14.20. (a)    "New Medium" Records - Records (other than Audiovisual Records) in any software medium (including, without limitation, "digital audio tape," "digital compact cassette" and "Mini-Disc" and transmission directly into the home) in which recorded music is not in general commercial distribution in the United States as of January 1, 1999.

(b)    "Standard" Records, units, etc. - Records other than New Medium Records and Audiovisual Records.

- 57 -

37/02FLAWLESS 0904

14.21. "Performance" (whether audio only or audiovisual) - means singing, speaking, conducting or playing an instrument, alone or with others.

14.22. "Person" - any natural person, legal entity, or other organized group of persons or entities, or legal successors or representatives of the foregoing. (All pronouns, whether personal or impersonal, which refer to Persons include natural persons and other Persons.)

14.23. "Recompilation Album" - an Album containing Master Recordings hereunder previously released in different Album combinations, such as a "Greatest Hits" or "Best of" Album.

14.24. "Recording Costs" - all amounts representing direct expenses paid or incurred by Flawless in connection with the production of finished Master Recordings under this Agreement. Recording Costs include, without limitation, the amounts referred to in paragraph 5.01, travel, rehearsal, and equipment rental and cartage expenses, advances to Producers, transportation costs, hotel and living expenses approved by Flawless (but not including travel expenses, transportation costs, and/or hotel and living expenses of Flawless personnel unless specifically requested by you in writing), studio and engineering charges in connection with Flawless's facilities and personnel or otherwise, all costs and expenses of obtaining rights to all samples of Master Recordings, selections and other materials embodied in Master Recordings hereunder (including, without limitation, all advances, license fees, attorneys' fees and clearing house fees), all costs of mastering, remastering, remixing and/or "sweetening" and all costs necessary to prepare Master Recordings for release on digital media. Recording Costs do not include the costs of producing metal parts, but include all studio and engineering charges or other costs incurred in preparing Master Recordings for the production of metal parts. (Metal parts include lacquer, copper, and other equivalent masters.)

14.25. (a)    "Records" and "Phonograph Records" - all forms of reproductions (including, sound alone and audiovisual reproductions), now or hereafter known, manufactured or distributed primarily for home use, institutional use (e.g., library or school), juke box use, or use in means of transportation (including, without limitation, video games and any software media or transmission of such reproductions via telephone, cable, satellite or other transmissions to consumers directly into the home [e.g., CD-ROM, CD-I and similar disc systems, interactive cable and/or telephony]).

(b)    "Audiovisual Record" - a Phonograph Record including sound accompanied by visual images intended primarily for home consumer or institutional (e.g., library or school) use, jukebox use or use in means of transportation, including, without limitation, videocassettes, laser discs, videodiscs or other media or devices now or hereafter known that, among other things, allow consumers to control the viewing of, or to interact

- 58 -

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0905

with, the Audiovisual Record, including, without limitation, transmissions to consumers directly into the home that enable consumers to view such Records at any time. Audiovisual Records are not Albums, Singles, Twelve-Inch Singles, or Extended Play Records. Phonograph Records that are intended primarily as carriers of sound recordings shall not be deemed Audiovisual Records solely because they also contain an "enhanced" or multimedia portion (e.g., an enhanced CD or CD +).

14.26. "Royalty Base Price" - The Royalty Base Price for Records (other than Audiovisual Records) shall be the Suggested Retail List Price applicable to the Phonograph Records concerned, less all excise, purchase, value added or similar taxes included in the price and less the applicable Container Charge. The Royalty Base Price for Records (other than Audiovisual Records) sold through any so-called "record club" will be the same as that for the identical Records sold Through Normal Retail Channels in the territory concerned. The Royalty Base Price for Audiovisual Records manufactured and distributed by Flawless or its Licensees shall be Flawless's or its Licensee's published wholesale price as of the commencement of the accounting period concerned, less all excise, purchase value added or similar taxes included in the price and less the applicable Container Charge.

14.27. "Sales Through Normal Retail Channels" - Net Sales other than as described in paragraphs 9.02 (provided, however, that Net Sales made directly by Flawless pursuant to section 9.02(c)(2) shall be deemed Sales Through Normal Retail Channels), 9.03(a), 9.04, 9.05, 9.06, 9.07, 10.03 and 10.04.

14.28. "Side" - a Master Recording of a continuous Performance of a particular arrangement or version of a Composition, not less than two and one-quarter (2-1/4) minutes in playing time. If any Album (or other group of Master Recordings) Delivered to Flawless in fulfillment of a Recording Commitment expressed as a number of Sides includes Master Recordings of more than one (1) arrangement or version of any Composition, all of those Recordings will be deemed to constitute one (1) Side.

14.29. "Special Packaging Costs" - costs incurred by Flawless in creating and producing Album covers, sleeves, and other packaging elements, in excess of Flawless's then-standard costs for design of artwork (including expenses for reproduction rights), engraving, separations and then-standard packaging manufacturing costs.

14.30. "Suggested Retail List Price" or "SRLP":

(a)    With respect to Records sold for distribution in the United States:

(1)    Other than with respect to Audio Visual Records, compact disc Records or New Medium Records: the suggested retail list price in the United States established by Flawless or its Licensees during the applicable accounting period for the

- 59 -

Certified Copy Of Original 04-17-2002 11:48:24

computation of royalties to be made hereunder, it being understood that a separate calculation of the suggested retail list price shall be made for each price-series and configuration of Records manufactured and sold by Flawless or its Licensees.

        (2)    With respect to compact disc Records and New Medium Records and sales by way of Electronic Transmission but not direct to the consumer (sales by way of Electronic Transmission direct to the consumer shall be computed as set forth in subparagraph 9.02(c)): one hundred thirty percent (130%) of Flawless's or its Licensee's lowest published wholesale price in the category of sale concerned. In the case of Electronic Transmission (other than direct to the consumer) where there is no published wholesale price, the price to which the aforementioned uplift of one hundred thirty percent (130%) shall be applied shall be Flawless's directly attributable net receipt or credit in respect of the Electronic Transmission in question.

        (b)    With respect to Records sold for distribution outside the United States (other than Audiovisual Records, or Records sold through direct transmission which shall be computed as set forth in subparagraph 9.02(c)), Flawless's or its Licensees' suggested or applicable retail price in the country of manufacture or sale, as Flawless or its Licensee is paid; provided, however, that in any country where there is an absence of such suggested or applicable retail price, the price as may be established by Flawless or its Licensees in conformity with the general practice of the recording industry in such country, provided that Flawless or its Licensees may, but shall not be obligated to, utilize the price adopted by the local mechanical copyright collection agency for the collection of Mechanical Royalties. Notwithstanding anything to the contrary expressed or implied in the preceding sentence, it is understood and agreed that if the suggested or applicable retail price cannot be established in a particular country, the price shall be that amount equal to the published dealer price payable by the largest category of Flawless's or its Licensee's customers in the normal course of business with respect to such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty six percent (126%).

        (c)    Flawless or its Licensees may at some time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Suggested Retail List Price and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the Record concerned would be the same as that which was payable immediately prior to such New Basis. If a Record was not theretofore sold in a particular configuration or in a particular price-series (e.g., a Budget Record), the adjusted royalty rate for any such configuration shall be the adjusted royalty rate on Top-line Records multiplied by a fraction, the numerator of which is the royalty rate for sales in the configuration (or price-series) concerned prior to the New Basis and the denominator of

- 60 -

7/02FLAWLESS 0906

7/02FLAWLESS 0907

which is the royalty rate for sales of Top-line Records in the applicable configuration prior
to the New Basis. If there are other adjustments made by Flawless or its Licensees that
would otherwise make the New Basis more favorable (a particular example of which might
be the distribution of smaller quantities of free goods than theretofore distributed) then the
benefits of such other adjustments will be taken into consideration in adjusting the royalty
rate.

(d)    Royalties will be calculated separately with respect to each price
series in which units of a particular Record release are sold or returned during the semi-
annual accounting period concerned.

14.31. "Top-line Record" - a Record released bearing the same Suggested Retail
List Price as the majority (or plurality) of the Record releases in the same configuration then
in initial release in Flawless's active catalog. (For the purposes of the preceding sentence, a
Record release will not be deemed in its initial release if it bears a Suggested Retail List
Price lower than that which applied to it when it was first released by Flawless.)

14.32. "Website" - a series of one (1) or more interconnected documents or files
that are formatted using the Hypertext Markup Language, or any similar language, and
that are intended to be accessible by Internet users.

14.33. "Website Material" - all material acquired or created for inclusion on an
Artist Website (including, without limitation, Covered Videos, photography, graphics,
technology, so-called "hyperlinks" to URLs, on-line chats, and electronic press kits or
so-called "EPK's").

## 15.    REMEDIES

15.01. If you do not fulfill any portion of your Recording Commitment within ninety
(90) days after the end of the time prescribed in Article 3, and Flawless notified you of your
failure and you have not cured that failure within thirty (30) days after that notice, Flawless
will have the following options:

(a)    to suspend Flawless's obligations to make payments to you under this
Agreement until you have cured the default. This subparagraph (a) will not apply to
remittances of royalties under Articles 9, 10 and 12 actually becoming due to you under
Articles 11 and 12 or to Deficiency Payments or any Additional Payments payable pursuant
to paragraph 13.04. Advances will not be deemed "royalties" for the purpose of the
preceding sentence;

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

(b)    to terminate the term of this Agreement at any time, whether or not you have commenced curing the default before such termination occurs (but not if you have completely cured the default); and

(c)    to require you to repay to Flawless the amount, not then recouped, of any Advance previously paid to you by Flawless and not specifically attributable under Article 6 to any Commitment Album which has actually been fully Delivered, except as expressly provided in the next sentence. You will not be required to repay any such Advance to the extent to which you furnish Flawless with documentation satisfactory to Flawless establishing that you have actually used the Advance to make payments, to parties not affiliated with you and in which neither you nor the Artist has any interest, for recording costs incurred in connection with the Album concerned before Flawless's demand for repayment. ("Recording costs," in the preceding sentence, means items which would constitute Recording Costs if paid or incurred by Flawless.)

Flawless may exercise each of those options by sending you the appropriate notice. Flawless will not exercise its rights under subparagraph 15.01(a) if the default concerned is attributable entirely to the death or disability of the Artist. If Flawless terminates the term under subparagraph 15.01(b), all parties will be deemed to have fulfilled all of their obligations under this Agreement except those obligations which survive the end of the term (e.g., indemnification obligations, royalty accounting and payment obligations, re-recording restrictions and your obligations under subparagraph 15.01(c)). No exercise of an option under this paragraph will limit Flawless's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02. If Flawless refuses without cause to allow you to fulfill your Recording Commitment for any Contract Period and if, not later than sixty (60) days after that refusal takes place, you notify Flawless of your desire to fulfill such Recording Commitment, then Flawless shall permit you to fulfill said Recording Commitment by notice to you to such effect within sixty (60) days after Flawless's receipt of your notice. Should Flawless fail to give such notice, you shall have the option to terminate the term of this Agreement by notice given to Flawless within thirty (30) days after the expiration of the latter sixty-day period; on receipt by Flawless of such notice, the term of this Agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the end of the term (e.g., warranties, re-recording restrictions and obligation to pay royalties), at which time Flawless shall pay to you, in full settlement of its obligations to you (other than those royalty obligations) an Advance in the amount equal to the greater of Fifty Thousand Dollars ($50,000) or:

- 62 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0909

       (a)    The aggregate of the minimum Recording Funds fixed in paragraph 6.02 for each Commitment Album, then remaining unrecorded, for the Contract Period during which such termination occurs,

less:

       (b)    The average amount of the Recording Costs for the last two (2) Commitment Albums recorded hereunder (or, if only one Commitment Album has been recorded, the amount of the Recording Costs for that Album), multiplied by the number of such unrecorded Albums referred to in subparagraph (a). If Flawless agrees in its sole discretion that you will administer the Recording Fund for any such Commitment Album, the amount equal to ninety percent (90%) of the Recording Fund prescribed in paragraph 6.02 in connection with that Album will be treated as "Recording Costs" for it, for the purposes of this subparagraph (b);

less:

       (c)    any portion of the Recording Funds previously paid for the Commitment Albums then remaining unrecorded.

If Master Recordings sufficient to constitute at least the first Commitment Album to be recorded under this Agreement have not been completed then, the amount of the Advance payable to you under the preceding sentence will be the amount equal to the Artist's minimum union scale compensation for the unfulfilled portion of the Recording Commitment for that Contract Period. If you fail to give Flawless either notice within the period specified therefor, Flawless shall be under no obligation to you for failing to permit you to fulfill such Recording Commitment.

    15.03. If because of: act of God; inevitable accident; fire; lockout, strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or Producer; or other cause of a similar or different nature not reasonably within Flawless's control; Flawless is materially hampered in the recording, manufacture, distribution or sale of Records, then, without limiting Flawless's rights, Flawless shall have the option by giving you notice to suspend the running of the then-current Contract Period for the duration of any such contingency plus such additional time as is necessary so that Flawless shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, to extend the term of this Agreement for the next following Option Period. If any suspension imposed under this paragraph by reason of an event affecting no Record manufacturer or distributor except Flawless and/or its Distributor continues for more than six (6) months, you may request Flawless, by notice, to terminate

Certified Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0910

the suspension by notice given to you within sixty (60) days after its receipt of your notice. If Flawless does not do so, the term of this Agreement will terminate at the end of that sixty-day period (or at such earlier time which Flawless may designate by notice to you), and all parties will be deemed to have fulfilled all of their obligations under this Agreement except those obligations which survive the end of the term (such as warranties, re-recording restrictions, and obligation to pay royalties).

FlawlessExhibitB1 SH:sh/06/15/01

## 16.   AGREEMENTS, APPROVAL & CONSENT

16.01. As to all matters treated herein to be determined by mutual agreement, or as to which any approval or consent is required, such agreement, approval or consent will not be unreasonably withheld (except as otherwise expressly provided in this Agreement).

16.02. Except as otherwise expressly provided in this Agreement, your agreement, approval or consent, or that of the Artist, whenever required, shall be deemed to have been given unless you notify Flawless otherwise within ten (10) business days (or such lesser time period as needed and stated in Flawless's written request) following the date of Flawless's written request to you therefor.

## 17.   NOTICES

17.01. Except as otherwise specifically provided in this Agreement, all notices under this Agreement shall be in writing and shall be given by courier or other personal delivery or by registered or certified mail at the appropriate address below or at a substitute address designated by notice by the party concerned:

TO YOU:                         _____

                                _____

                                _____

                                _____


TO FLAWLESS:                    c/o The Firm
                                9000 Sunset Boulevard, Suite 800
                                Los Angeles, CA  90069
                                Attention:  Jeff Kwatinetz

Notices shall be deemed given when mailed, except that a notice of change of address shall be effective only from the date of its receipt.  All royalties, royalty statements and/or payments to you hereunder may also be sent to you at your address above via regular mail and shall be deemed sent on the date the applicable statement is mailed.

## 18.   EVENTS OF DEFAULT

18.01. In the event of your dissolution or the liquidation of your assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for a substantial portion of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in,

- 65 -

FlawlessExhibitB1 SH:sh/06/15/01

247/02FLAWLESS 0912

bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this Agreement for any other reason, then at any time after the occurrence of any such event, subject to paragraph 19.07 below, in addition to any other remedies which may be available, Flawless shall have the option by notice to require that the Artist render the Artist's personal services directly to it for the remaining balance of the term of this Agreement, including any extensions, for the purpose of making Master Recordings, upon the same terms and conditions, including, without limitation, Articles 3 and 9. You will notify Flawless promptly of the occurrence of any event described in the preceding sentence. Flawless will not exercise that option by reason of the filing of a petition against you by a third party under Title 11 of the United States Code or any similar statute, unless: (a) Thirty (30) days elapse after the filing of the petition and it is not dismissed by order of the court within that time; or (b) Flawless determines in its sole judgment that deferment of exercise of the option during that thirty-day period might jeopardize its interests. If Flawless exercises its option under this paragraph, the Artist shall be deemed substituted for you as a party to this Agreement as of the date of Flawless's option exercise, and, in respect of Master Recordings of the Artist's Performances recorded subsequently, the royalties and any Advances payable under this Agreement, except those referred to in paragraph 13.04, shall be reduced to two-thirds (2/3) of the amounts prescribed in this Agreement and, as so adjusted, will be payable to the Artist, subject to recoupment of all Advances. If Flawless exercises its option under this paragraph, the term of this Agreement will be deemed to have been terminated with respect to you as of the date of Flawless's option exercise and you shall have no further rights or obligations hereunder other than those rights and obligations which survive the end of the term.

## 19.    **MISCELLANEOUS**

19.01. The Artist will, during the term of this Agreement, actively pursue a career as an entertainer in the live engagement field to the extent economically feasible.

19.02. Flawless will have the right, throughout the term of this Agreement, to obtain or increase insurance on the life of the Artist, at Flawless's sole cost and expense, in such amounts as Flawless determines, in Flawless's name and for its sole benefit or otherwise, in its discretion. The Artist will cooperate in such physical examinations without expense to you or the Artist, supply such information, sign such documents, and otherwise cooperate fully with Flawless, as Flawless may request in connection with any such insurance. Flawless will treat the results of any such physical examination confidentially. You and the Artist warrant and represent that, to your best knowledge, the Artist is in good health and does not suffer from any medical condition which might interfere with the timely performance of the Artist's obligations under this Agreement. You will not be deemed in breach of this Agreement by reason of Flawless's inability to obtain any such insurance, unless it results from failure by you or the Artist to comply with your obligations under this paragraph.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0913

19.03. (a)    This Agreement contains the entire understanding of the parties relating to its subject matter and supersedes all prior or contemporaneous written or oral agreements, representations, understandings and/or discussions between the parties relating thereto.  No change or termination of this Agreement will be binding upon Flawless unless it is made by an instrument signed by an officer of Flawless.  No change of this Agreement will be binding upon you unless it is made by an instrument signed by you.  No change of this Agreement will be binding upon the Artist unless it is made by an instrument signed by you or the Artist.  A waiver by either party of any provision of this Agreement in any instance shall not be deemed to waive it for the future.  All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking or obligation of either party.  The captions of the Articles in this Agreement are included for convenience only and will not affect the interpretation of any provision.

(b)    No change of a budget prescribed in this Agreement or established under it will be effective unless the change is approved in writing by Flawless.

19.04.  Those provisions of any applicable collective bargaining agreement between Flawless and any labor organization which are required, by the terms of such agreement, to be included in this Agreement shall be deemed incorporated herein.

19.05.  Flawless may assign its rights under this Agreement in whole or in part to any subsidiary, affiliated or controlling corporation, to any Person owning or acquiring a substantial portion of the stock or assets of Flawless, or to any partnership or other venture in which Flawless participates, and such rights may be similarly assigned by any assignee. Flawless may also assign its rights to any of its Licensees if advisable in Flawless's sole discretion to implement the license granted.  Without limiting the foregoing, you acknowledge and agree that this Agreement may be subject to assignment to Flawless's Distributor (including, without limitation, Interscope Records, Geffen Records, Universal Music and Video Distribution, Inc. in the United States and Universal Music Group's licensees outside the United States) or to any joint venture, partnership or corporation between Flawless (or any affiliate) and its Distributor, or to Flawless's co-venturer, partner or co-shareholder.  In the event of any such assignment, Flawless shall remain secondarily liable hereunder.  You may assign this Agreement only to a corporation wholly owned and controlled by you or the Artist, but no such assignment shall relieve you or the Artist from any of your or the Artist's obligations hereunder.

19.06.  Each option and election granted to Flawless in this Agreement including, without limitation, to suspend the running of one or more periods of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or

- 67 -

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0914

election shall not operate as a waiver of any other option or election unless specifically so stated by Flawless in its notice of exercise of such option or election.

19.07. Neither party will be entitled to recover damages or to terminate the term of this Agreement (including without limitation pursuant to paragraph 18.01) by reason of any breach by the other party of its material obligations, unless the latter party has failed to remedy the breach within sixty (60) days following notice (except thirty [30] days with respect to payment by Flawless of any monies due hereunder). (The preceding sentence will not apply to your warranties hereunder, where a specific cure period is provided herein, breaches incapable of being cured, an application for injunctive relief, any termination by Flawless under subparagraph 15.01(b) or to any recovery to which Flawless may be entitled by reason of your failure to fulfill your Recording Commitment.)

19.08. THIS AGREEMENT HAS BEEN ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF CALIFORNIA. THE CALIFORNIA COURTS (STATE AND FEDERAL), ONLY, WILL HAVE JURISDICTION OF ANY CONTROVERSIES REGARDING THIS AGREEMENT; ANY ACTION OR OTHER PROCEEDING WHICH INVOLVES SUCH A CONTROVERSY WILL BE BROUGHT IN THOSE COURTS, IN LOS ANGELES COUNTY, AND NOT ELSEWHERE. ANY PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY, AMONG OTHER METHODS, BE SERVED UPON YOU BY DELIVERING IT OR MAILING IT, BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN ARTICLE 17 OR SUCH OTHER ADDRESS AS YOU MAY DESIGNATE PURSUANT TO ARTICLE 17. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON THE ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE FLAWLESS TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT BY REGISTERED OR CERTIFIED MAIL, DIRECTED TO THE ADDRESS DESIGNATED IN ARTICLE 17 OR SUCH OTHER ADDRESS AS THE ARTIST OR THE OTHER PERSON CONCERNED MAY DESIGNATE IN THE MANNER PRESCRIBED IN ARTICLE 17. ANY SUCH DELIVERY OR MAIL SERVICE SHALL BE DEEMED TO HAVE THE SAME FORCE AND EFFECT AS PERSONAL SERVICE WITHIN THE STATE OF CALIFORNIA.

19.09. In entering into this Agreement, and in providing services pursuant hereto, you and the Artist have and shall have the status of independent contractors and nothing herein contained shall contemplate or constitute you or the Artist as Flawless's agents or employees.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

47/02FLAWLESS 0915

19.10. Monies to be paid to you under this Agreement will not be assignable by you without Flawless's written consent, which Flawless may withhold in its unrestricted discretion, subject to the next sentence. You may assign royalties to be paid to you under this Agreement, provided: (a) no more than one such assignment will be binding on Flawless at any time, and if Flawless is notified of more than one it will have the right to rely conclusively on priority of notice to it in according priority among them; (b) each such assignment will be subordinate to Flawless's continuing right to apply all such royalties due or becoming due in recoupment of all Advances, loans and other offsets which may be recoupable from your royalties, including, but not limited to, those made under agreements entered into by Flawless and you after the date of the assignment concerned; and (c) no such assignment will be effective until it has been accepted in writing by Flawless. Flawless will not unreasonably withhold acceptance of any assignment which is consistent with this paragraph.

19.11. You recognize that the sale of Records is speculative and agree that the judgment of Flawless with respect to matters affecting the sale, distribution and exploitation of Records hereunder shall be binding upon you. Subject to the terms of this Agreement, nothing contained in this Agreement shall obligate Flawless to make, sell, license or distribute Records manufactured from the Master Recordings recorded hereunder except as specified in this Agreement.

19.12. This Agreement shall not become effective until executed by all proposed parties hereto.

19.13. Any and all riders annexed hereto together with this basic document shall be taken together to constitute the Agreement between you and Flawless.

19.14. Agreements made between Flawless and any affiliated or related entity with respect to the subject matter hereof shall be made on an "arm's-length" basis. Your sole remedy with respect to a breach by Flawless of this provision shall be an action for damages limited to the out-of-pocket monetary loss actually and directly suffered by you in connection with such breach.

## [20.   GROUP PROVISIONS

20.01. (a)   As used herein, the term "Artist" includes all members of the group presently professionally known as _____, whether presently or hereafter bound by the terms and provisions of this Agreement. The obligations, liabilities, prohibitions and restrictions imposed upon the Artist hereunder shall be deemed to apply individually and collectively to each of the members of the Artist, whether performing alone, with others, or as a member of the Artist, regardless of the name by which the Artist or any of its members

- 69 -

Scanned copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0916

may then be identified.  A failure by any member of the Artist to satisfy the material obligations of the Artist shall, at Flawless's election, be deemed a breach of this Agreement. In the event of any such breach, Flawless may, by notice to you, and without limiting Flawless's other rights or remedies hereunder, terminate the term of this Agreement, or alternatively, may terminate the term of this Agreement only as to the member or members of the Artist who have failed to satisfy the obligations of the Artist hereunder.

(b)       Notwithstanding any change in the membership of the group, Flawless will continue to have the right to remit all payments under this Agreement in the name of "_____".

20.02. (a)      (1)       As used herein, a "Leaving Member" means (i) any member of Artist who, during the term hereof, ceases to be an actively performing member of Artist for any reason whatsoever including, without limitation, as a result of the death or physical or mental disability of such member, and (ii) if the Artist disbands or Flawless decides to terminate this Agreement because of there being a Leaving Member, each member of Artist. If there shall be a Leaving Member, you will notify Flawless promptly and, in such event, or if Flawless terminates the term of this Agreement with respect to fewer than all members of the Artist as set forth herein, then, if you and Flawless so agree, the Leaving Member will be replaced by a new member, which replacement member shall be mutually approved by you and Flawless.  Each such replacement member, as well as any additional new member of the Artist, will be deemed a party to this Agreement, and you will cause each new member (whether additional or replacement member) to execute and deliver to Flawless any and all documents as Flawless, in its reasonable judgment, may require to accomplish that addition or substitution.  Thereafter, you will have no further obligation to furnish the services of the Leaving Member for Performances under this Agreement, but you (and the Leaving Member individually) will continue to be bound by the other provisions of this Agreement, including, without limitation, subparagraph 20.02(b) below.  You will not permit any Person to perform in place of the Leaving Member, or any additional new member to perform, in making Recordings under this Agreement, unless that Person has executed and delivered to Flawless the documents referred to in this section.  Flawless will continue to have the right to use the name "_____" and any other professional, group, and other assumed or fictitious names used by the Artist at any time, in connection with Recordings of the Artist's Performances made at any time; no Leaving Member will make any use of the name "_____" or any such other name in any circumstances (except as an historic reference in biographical materials).

(2)       Flawless will have the right to terminate the term of this Agreement with respect to the remaining members of the Artist by notice given to you at any time before the expiration of ninety (90) days after Flawless's receipt of your notice.  In the event of such termination, all of the members of the Artist will be deemed Leaving

- 70 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0917

Members as of the date of such termination notice, and subparagraph 20.02(b) will apply to all or any of them, collectively or individually as Flawless elects.

(b)    You and the Artist grant to Flawless an option to engage the exclusive services of each Leaving Member as a recording artist ("Leaving Member Option"). Each Leaving Member Option may be exercised by Flawless by notice to the Leaving Member at any time before the expiration of sixty (60) days after the date of: (1) Flawless's receipt of your notice under section 20.02(a)(1), or (2) Flawless's termination notice pursuant to section 20.02(a)(2), as the case may be. If Flawless exercises a Leaving Member Option, you and the Leaving Member concerned will be deemed to have entered into a new agreement ("LM Agreement") with Flawless containing the same provisions as this Agreement, except as follows:

(1)    The LM Agreement will apply only to that Leaving Member, and all references to "you" shall refer to you and all references to "the Artist" will be deemed to refer to the Leaving Member;

(2)    The term of the LM Agreement will commence on the date of Flawless's exercise of such Leaving Member Option and may be extended by Flawless, at its *election exercisable in the manner provided in paragraph 1.02 of this Agreement, for the same number of additional Periods* as the number of Commitment Albums yet to be Delivered by you hereunder as of the date of (1) Flawless's receipt of your notice under section 20.02(a)(1), or (2) Flawless's termination notice pursuant to section 20.02(a)(2), as the case may be (but at least four (4) such additional Periods in any event);

(3)    The Recording Commitment for the first Contract Period of the term of the LM Agreement will be two (2) Sides, with an option for additional Master Recordings sufficient to constitute the balance of an Album. The Recording Commitment for each Option Period of the LM Agreement will be Master Recordings sufficient to constitute one (1) Album;

(4)    Paragraph 6.02 and the second sentence of section 4.01(a)(4) will not apply; instead, Recordings will be made on an approved budget basis;

(5)    The royalty percentage rates in respect of Master Recordings made during that term will be sixty-six and two-thirds percent (66-2/3%) of the royalty percentage rates prescribed in paragraph 9.01; and

(6)    If your royalty account under this Agreement is in an unrecouped position at the date of Flawless's exercise of the Leaving Member Option, the unrecouped balance in your royalty account under this Agreement ("Unrecouped Group Advance"), will constitute an Advance recoupable from the royalties payable under the LM

- 71 -

SH7/02FLAWLESS 0918

Agreement; provided, that Flawless shall nevertheless have the right to recoup the entire Unrecouped Group Advance from royalties payable under this Agreement; provided, further, that the Unrecouped Group Advance shall at all times be deemed to be the last monies recouped from royalties payable under the LM Agreement. If Flawless recoups any of the Unrecouped Group Advance from royalties payable with respect to the applicable Leaving Member's Recordings and thereafter recoups all or any portion thereof from royalties payable with respect to Recordings embodying the Performances of the Artist, then Flawless shall thereupon re-credit the royalty account under the LM Agreement with respect to such portion of royalties. Moreover, solely with respect to Master Recordings recorded by the Artist hereunder prior to the commencement of the term of the LM Agreement, Flawless shall have the right to apply the "Prorated Royalty" (as defined below) earned by you hereunder to the recoupment of any unrecouped balances in your account under the LM Agreement. As used herein, the term "Prorated Royalty" means the royalty payable to you hereunder with respect to the Master Recordings in question multiplied by a fraction, the numerator of which is the number of Leaving Members subject to the LM Agreement and the denominator of which is the total number of members of Artist (including all Leaving Members) who participate in such royalty.

(7)    If there shall be more than one (1) Leaving Member for whom Flawless has exercised its option as provided in this subparagraph and two (2) or more of such Leaving Members shall, with Flawless's consent, elect to perform together as a duo or group, then Flawless shall have the right to treat such Leaving Members collectively as if they were only one (1) Leaving Member for the purpose of the royalty rates, advances and other monies payable in respect of their joint recordings pursuant to this subparagraph.]

_____,

a _____ corporation


By: _____
        An Authorized Signatory

FLAWLESS RECORDS, LLC


By: _____
        An Authorized Signatory

- 72 -

4/17/02 FLAWLESS 0919

## SCHEDULE OF PUBLISHERS
### (Reference - Article 12)

FlawlessExhibitB1 SH:sh/06/15/01

04-17/02FLAWLESS 0920

# EXHIBIT A
(Appended in accordance with subparagraph 12.03(a))

TO:     FLAWLESS RECORDS, LLC
        2220 Colorado Avenue
        Santa Monica, CA 90404

A.    TITLE:                          WRITERS:

B.    PUBLISHER(S) AND PAYMENT PERCENTAGE:

C.    RECORD(S) NO.:

      ARTIST:

      ROYALTY RATE:              STATUTORY

THE AUTHORITY HEREUNDER IS LIMITED TO THE MANUFACTURE AND DISTRIBUTION OF PHONORECORDS SOLELY IN THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS AND NOT ELSEWHERE.

DATE OF RELEASE:

You have advised us [, in our capacity as Agent for the Publisher(s) referred to in (B) above,] that you wish to obtain a compulsory license to make and to distribute phonorecords of the copyrighted work referred to in (A) above, under the compulsory license provision of Section 115 of the Copyright Act.

Upon your doing so, you shall have all the rights which are granted to, and all the obligations which are imposed upon, users of said copyrighted work under the compulsory license provision of the Copyright Act, after phonorecords of the copyrighted work have been distributed to the public in the United States under the authority of the copyright owner by another person, except that with respect to phonorecords thereof made and distributed hereunder:

1.     You shall pay royalties and account to us [as Agent for and on behalf of said Publisher(s)] quarterly, within forty-five days after the end of each calendar quarter, on the basis of phonorecords made and distributed;

2.     For such phonorecords made and distributed, the royalty shall be the statutory rate in effect at the time the phonorecord is made, except as otherwise stated in (C) above;

- 74 -

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

07/02FLAWLESS 0921

3.    This compulsory license covers and is limited to one particular recording of said copyrighted work as performed by the artist and on the phonorecord number identified in (C) above; and this compulsory license does not supersede nor in any way affect any prior agreements now in effect respecting phonorecords of said copyrighted work;

4.    In the event you fail to account to us and pay royalties as herein provided for, said Publisher(s) or his Agent may give written notice to you that, unless the default is remedied within 30 days from the date of the notice, this compulsory license will be automatically terminated.  Such termination shall render either the making or the distribution, or both, of all phonorecords for which royalties have not been paid, actionable as acts of infringement under, and fully subject to the remedies provided by the Copyright Act; and

5.    You need not serve or file the notice of intention to obtain a compulsory license required by the Copyright Act.

- 75 -

Scanned Copy Of Original 04-17-2002 11:48:24

EXHIBIT B

ARTIST
c/o ATTY
ATTY Address

Date _____

FLAWLESS RECORDS, LLC
2220 Colorado Avenue
Santa Monica, CA 90404

Gentlemen:

1.      [I] [We] have engaged [_____("Employer") to furnish the services of] _____ (the "Producer") to produce recordings constituting one (1) album (the "Recordings") to be made pursuant to the agreement between you and [me] [us] dated _____, 199 , as amended (the "Agreement").

2.      Although the Agreement requires [me] [us] to pay for the services of the Producer, [I] [we] hereby request and irrevocably authorizes you to make payments to[_____ for the Producer's services] [the Producer]on [my] [our] behalf, as follows:

            (a)  An advance of $_____ Dollars ($          ) following your receipt of this letter, and a further advance of _____ Dollars ($_____) promptly after delivery to you of all of the Recordings in accordance with the Agreement together with all necessary licenses and applicable approvals and consents. Those advances will be recoupable by you from all monies becoming payable to [Employer or] the Producer under paragraph 2(b) below or otherwise.  To the extent not so recouped, such advances may be recouped by you from any monies becoming payable to [me] [us], but all amounts so recouped from monies payable to [me] [us] shall be credited to [my] [our] royalty account if subsequently recouped from monies payable to [Employer or] the Producer.  Each such advance shall be included as a recording cost item in the recording budget applicable to the Recordings under the Agreement [and shall reduce the applicable recording fund].  You may reduce the amount of the advance payable to [Employer] [the Producer] upon the delivery of the Recordings by the amount of any costs incurred in connection with the Recordings in excess of the budget initially approved by you, to the extent permitted in [my] [our] agreement with [Employer] [the Producer].

- 76 -

FlawlessExhibitB1 SH:sh/06/15/01

(b)    (1)    A royalty (the "Producing Royalty") on net sales of phonograph records derived from the Recordings, computed, adjusted and paid in the same manner as the royalty payable to [me] [us] under the Agreement, at the same times, and subject to the same conditions, but at a basic rate of three percent (3%) instead of the rate fixed in paragraph 9.01 of the Agreement, with prospective escalations of one-half percent (1/2%) each at USNRC Net Sales of 500,000 and 1,000,000 Albums, and with proportionate reductions on all sales for which reduced royalties are payable under the Agreement.    If a phonograph record embodying the Recordings contains recordings produced by someone other than the Producer, the Producing Royalty rate shall be reduced by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which is the number of Recordings contained on such phonograph record and the denominator of which is the total number of recordings (inclusive of the Recordings) contained on such phonograph record.    The amount of the Producing Royalty shall be deducted from all monies payable or becoming payable to [me] [us] under the Agreement.

(2)    The Producing Royalty will not be payable until you have recouped all recording costs attributable to the Recordings under the Agreement.    After such recoupment, the Producing Royalty will be computed retroactively and paid on all such records from the first record sold.    Such recoupment will be computed at [my] [our] net royalty rate on the Recordings as reduced to reflect the deduction of the Producing Royalty on the Recordings.

(3)    The foregoing shall apply beginning with the first accounting period that ends at least three (3) months after your receipt of this letter.

3.    Your compliance with this authorization will constitute an accommodation to [me] [us] alone, and nothing herein shall constitute [Employer or] the Producer a beneficiary of or party to this instrument or any other agreement between you and [me] [us].    All payments hereunder will constitute payment to [me] [us] and you will have no liability by reason of any erroneous payment you may make or failure to comply with this authorization.    [I] [We] will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses incurred by you by reason of any such payment or otherwise in connection herewith.

4.    All monies becoming payable under this authorization will be remitted to [Employer] [the Producer] at the following address or otherwise as [it] [he] directs you in writing and shall be accompanied by statements with respect to such payments.

_____
_____
_____

*FlawlessExhibitB1 SH:sh/06/15/01*

7/02FLAWLESS 0924

Scanned Copy Of Original 04-17-2002 11:48:24

5.     Each Recording produced by Producer shall be considered a "work-made-for-hire" for you.  All such *Recordings and the performances contained thereon and recordings derived therefrom* shall from inception of their creation be entirely your property in perpetuity throughout the world, under copyright and otherwise, free of any claims whatsoever by [me] [us], [Employer,] Producer and any third party and you shall have the right to register the copyrights in such Recordings in your name or in the name of your designee(s) and to secure any and all renewals and extensions thereof.  Without limiting the generality of the foregoing, [I] [we] and [Employer and] Producer hereby assign to you all of the right and title to the copyrights in perpetuity throughout the world in and to such Recordings, all recordings derived therefrom and any and all renewals and extensions of such copyrights.

Very truly yours,

[                                        ]

By:
        An Authorized Signatory

ACKNOWLEDGMENT & CONSENT

The undersigned acknowledge[s] that [each] [he] [she] has read the foregoing and assents to the execution thereof and agrees to be bound thereby to the same extent as if [each of] the undersigned were a party thereto.

_____

[name of artist]

FlawlessExhibitB1 SH:sh/06/15/01

5477/02FLAWLESS 0925

# ARTIST INDUCEMENT AGREEMENT

Dated as of: _____, 200____

FLAWLESS RECORDS, LLC
2220 Colorado Avenue
Santa Monica, CA 90404

Gentlemen:

Pursuant to an exclusive recording agreement (the "Artist Agreement") between Flawless
Records, LLC ("Grantor") and me (for purposes of this agreement, "me" or "my" shall refer
to each of us, individually and collectively), Grantor is entitled to my exclusive services as a
recording, performing and video artist. I have been advised that Grantor is entering into a
written agreement with you of even date herewith ("Agreement"), pursuant to which
Grantor is agreeing to furnish my exclusive services to perform for the purpose of making
Phonograph Records to be distributed by you. Unless otherwise defined herein, all terms
shall have the same meaning as given them in the Agreement.

I am familiar with each provision of the Agreement relating to my obligations, and approve
of all such provisions of the Agreement, which provides for an initial Recording
Commitment of one (1) Album, and which may be extended for six (6) further successive
additional Option Periods, which shall be for one (1) Album each.  In addition, the
Agreement also grants you certain rights (including merchandising rights) with respect to my
name and likeness.  If the Agreement is inconsistent with the Artist Agreement, the
obligations of the Agreement shall supersede those of the Artist Agreement.

In consideration of your executing the Agreement and as a further inducement for you to do
so (it being to my benefit as a recording artist that you execute the same), I hereby agree as
follows:

1.     I confirm, warrant, guarantee and agree that I will duly and to the best of my
ability, perform and discharge all of the obligations undertaken by me pursuant to the terms
and conditions of the Artist Agreement so as to fulfill all of the commitments contained in
the Agreement and in all of the provisions thereof as the same apply to me.  I shall be bound
by the Agreement to the extent it relates to me; I hereby join in the warranties,
representations, agreements and grant of rights made by Grantor therein, and I agree not to
take any action which is or in any way may be inconsistent with your rights and privileges

- 79 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0926

thereunder. Without limiting the generality of the foregoing, I agree to perform for the recording of Master Recordings embodying my Performances as provided for in the Agreement.

2.      (a)      I hereby agree that the term of the Artist Agreement shall expire no earlier than the expiration or termination of the Agreement and, in any event, no earlier than seven (7) years following the date of the commencement of the term of the Agreement and, if necessary, the term of the Artist Agreement shall be extended to comply with the foregoing. Grantor's execution of this inducement agreement shall constitute its agreement that the term of the Artist Agreement shall be so extended, if necessary.

(b)      If, during the term of the Agreement or any extensions or renewals thereof, Grantor shall, for any reason, including, without limitation, expiration or termination of the term of the Artist Agreement, cease to be entitled to my recording services in accordance with the terms of the Artist Agreement, or, if Grantor shall fail or refuse to furnish Master Recordings embodying my performances to you, then, subject to the terms and provisions of the Agreement, I shall thereafter, at your request, do all such acts and things as shall give to you the same rights, privileges, and benefits as you would have had under the Agreement if Grantor had continued to be entitled to my recording services and if Grantor had continued to furnish Master Recordings to you. All of your rights, privileges, and benefits pursuant to the Agreement shall be enforceable on your behalf against me and all the terms and conditions contained in the Agreement shall continue to be effective, except that, subsequent to each such request by you as hereinabove set forth, in lieu of the Advances, Recording Funds and royalties payable pursuant to the provisions of the Agreement, the Advances, if any, and the Recording Funds and royalties payable to me in respect of Master Recordings recorded under the Agreement shall nevertheless continue to be calculated, accounted for and paid as provided for in the Artist Agreement. Notwithstanding the foregoing or anything to the contrary contained in the Artist Agreement or the Agreement, I hereby specifically acknowledge and agree that with regard to that portion of the Recording Funds in excess of the Recording Costs for the Master Recordings concerned and Advances and royalties payable in connection with such Master Recordings, you may withhold all such payments to me in escrow pending settlement of any disputes between Grantor and me with respect to the subject matter hereof in an amount reasonably related to such dispute and/or, with respect to any such royalty payments, you shall have the right, in your sole discretion, to make payments to me at a royalty rate not in excess of one percent (1%) less than the royalty rate provided for in the Artist Agreement, the balance to be held in escrow by you pending final settlement of such disputes between Grantor and me. Said Advances and royalties, together with any and all other recording fees and other monies which may become payable to me under the Artist Agreement subsequent to the date of your request as specified in this paragraph 2 shall be paid by you directly to me, except that I shall continue to look to Grantor for payment of royalties in respect of

- 80 -

Master Recordings recorded prior to such request and such other monies as Grantor was obligated to pay to me prior to such request.

3. During and after the term of the Agreement, and subject to the terms and provisions of the Agreement, including, without limitation, paragraph 8.01 thereof, you shall have the exclusive right, without payment of any additional compensation to Grantor, me or any other Person, to use and publish and permit others to use and publish my name (including, without limitation, all legal and professional, group, or other assumed or fictitious names used by me, individually and/or collectively with others), autograph (including facsimile signature), biographical material concerning me, and portraits, pictures and likenesses for advertising, promotion and purposes of trade and in connection with other promotional merchandise of any kind (i.e., merchandise not intended for re-sale), including the manufacture, marketing, sale and exploitation of Phonograph Records, including Audiovisual Records, embodying my Performances and recorded under the Agreement, and in your general institutional advertising. It is further agreed that you shall have the right to refer to me as your exclusive recording artist during the term of the Agreement, and you shall be entitled at any time hereafter to injunctive relief, as well as other equitable relief, to enforce any breach of this grant of exclusivity by me, my heirs or legal assigns. Nothing in this paragraph shall prevent me from opposing such injunctive or equitable relief on any grounds that do not negate my acknowledgments herein.

4. I shall not, during the term of the Agreement, or any extensions or renewals thereof, perform individually or as a part of a group or otherwise for anyone other than you or Grantor (pursuant to the Agreement) for the purpose of making Master Recordings. In addition, after the expiration of the term of the Agreement, I will not perform any Composition which shall have been recorded pursuant to the Agreement for the purpose of making Master Recordings for such other Person(s) prior to the later of (i) the date five (5) years from the date of Delivery to you of the Master Recording embodying such Composition, or (ii) the date two (2) years subsequent to the expiration or other termination of the term of the Agreement or any subsequent agreement between you and Grantor or you and me with respect to my recording services.

5. During the term of the Agreement and thereafter as provided for herein, I will not record or authorize or, with knowing intent, permit to be recorded, for any purpose, any Performance by me for a Person other than you or Grantor, without, in each case, an express written agreement with the Person for whom the recording is to be made, for your benefit, prohibiting the use of such recording in the manufacture, distribution and sale at any time by any Person other than you of Master Recordings or Phonograph Records embodying such Performance or for any other purpose (including, without limitation, radio or television commercials) in violation of the restrictions prescribed in subparagraphs 13.02(a) and 13.02(b) of the Agreement. Specifically, without limiting the generality of the foregoing, I agree that:

- 81 -

FlawlessExhibitB1 SH:sh/06/15/01

87/02FLAWLESS 0928

(a)     If, subject to the provisions of paragraph 13.04 of the Agreement, during the term of the Agreement, I perform any Composition for the purpose of making transcriptions for radio or television or soundtracks for motion picture films, or

(b)     If, during the period of the re-recording restriction referred to in paragraph 4 above, I perform for any such purpose any Composition which was embodied on a Master Recording recorded pursuant to the Agreement,

I will do so only pursuant to a written contract containing an express provision that neither such Performance nor any Recording thereof will be used, directly or indirectly, for the purpose of making Master Recordings or Phonograph Records or for any other purpose (including, without limitation, radio or television commercials). I agree to furnish to you and Grantor a fully executed counterpart of each such contract promptly following execution thereof and I will cooperate with you in any controversy which may arise or litigation which may be brought relating to your rights under this paragraph.

6.     (a)     I acknowledge that, for my exclusive recording services, I am guaranteed, without condition or qualification, annual compensation ("Annual Payments") under the Artist Agreement, and under the Agreement, during each of the first seven (7) "Fiscal Years" (as hereinafter defined) of such amounts as are set forth in sections (1), (2) and (3) below. As used in this paragraph, "Fiscal Year" shall mean each consecutive twelve (12) month period during which the Artist Agreement or the Agreement, as applicable, are in effect, commencing with the date of commencement of the term of the Artist Agreement or the Agreement, as applicable. In the event that, during the term of the Agreement, for any reason whatsoever, Grantor fails to pay me the applicable Annual Payment for any Fiscal Year, then you shall pay me before the end of that Fiscal Year, on your behalf and on behalf of Grantor, and without condition or qualification, an amount which, when added to the amount, if any, paid to me by Grantor under the Artist Agreement shall equal the applicable Annual Payment ("Deficiency Payment"). I hereby agree to accept all such Annual Payments and Deficiency Payments.

(1)     Nine Thousand Dollars ($9,000) for the first Fiscal Year;

(2)     Twelve Thousand Dollars ($12,000) for the second Fiscal Year; and

(3)     Fifteen Thousand Dollars ($15,000) for each of the third through seventh Fiscal Years.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24

S17/02FLAWLESS 0929

(b)    If in any Fiscal Year the aggregate amount of the compensation (other than Mechanical Royalties) paid to me exceeds the Annual Payment, such excess compensation shall apply to reduce the Annual Payment for any subsequent Fiscal Years.

(c)    At least forty-five (45) days before the end of each Fiscal Year, I will notify you if Grantor has not paid me compensation equal to the Annual Payment required for a Fiscal Year, and of the amount of each deficiency.  You will have the right to pay the Deficiency Payment at your election if you determine, in your sole discretion, that you lack sufficient information to deem yourself assured that Grantor has complied with paragraph 13.04 of the Agreement or the applicable provision of the Artist Agreement.  I hereby agree to accept any and all such Deficiency Payments.  Any failure by you to make an Annual Payment or Deficiency Payment will not constitute a material breach of this agreement.

(d)    Each Annual Payment shall be due on or before the last business day of the Fiscal Year to which it applies; provided, that if the Agreement or Artist Agreement, as applicable, expires or terminates prior to the end of a particular Fiscal Year, the applicable Annual Payment shall be reduced proportionately, or shall be such greater amount, if any, as is required pursuant to California Civil Code Section 3423.

(e)    You shall have the right to pay me at any time any additional amounts which may be required to be paid as a condition to petitioning for an injunction pursuant to Section 526 of the California Code of Civil Procedure and Section 3423 (5th) of the California Civil Code ("Additional Payments").  I hereby agree to accept any and all such Additional Payments.  All compensation (other than Mechanical Royalties) paid to me under the Artist Agreement and the Agreement, as applicable, which is not applied to the Annual Payments theretofore due me will be credited toward satisfying your obligation to make Additional Payments as a prerequisite to seeking injunctive relief hereunder.  If you actually make any Additional Payments and thereafter elect not to seek such injunction, such Additional Payments shall constitute Advances hereunder.

(f)    Each Annual Payment, Deficiency Payment and Additional Payment made by you will constitute an Advance and will be applied in reduction of any and all monies (other than Mechanical Royalties) due or becoming due me under the Agreement and the Artist Agreement, as applicable.   Notwithstanding anything to the contrary contained herein, whenever in the Agreement you have the right to deduct excess expenditures (including, without limitation, excess Recording Costs, Mechanical Royalties and Special Packaging Costs) from any and all monies otherwise due or becoming due me under the Agreement, your such right shall not extend to deducting such excess expenditures from any Annual Payments, Deficiency Payments or Additional Payments made by you.

FlawlessExhibitB1 SH:sh/06/15/01

Scanned Copy Of Original 04-17-2002 11:48:24
7/02FLAWLESS 0930

7.      No termination of the Artist Agreement shall operate to diminish my liability or obligations hereunder without your written consent.

8.      Except as provided for in paragraphs 2 and 6 above, I agree that I will look solely to Grantor for the payment of all monies payable to me by reason of my rendering services in accordance with the Artist Agreement and/or Agreement.  Accordingly, I agree that you shall have no responsibility to me therefor whatsoever, and I will not assert any claim in this regard against you or attempt to prevent the manufacture, sale, distribution or exploitation of Phonograph Records subject to the Agreement.  No breach by Grantor of any agreement which I may now or from time to time have with Grantor, including, without limitation, the Artist Agreement, shall be sufficient cause for my failure or refusal to fully perform for you in accordance with the Agreement and this agreement.  Without limiting the generality of the foregoing, in the event of any breach or default by Grantor under the Artist Agreement (including, without limitation, Grantor's failure to exercise options properly), a copy of my notice to Grantor of such breach or default shall be sent simultaneously to you at the address set forth on the first page hereof or such other address as you shall hereafter designate by notice to me, it being understood and agreed that I shall give you such notice within thirty (30) days following any event giving rise to any alleged breach and/or default under the Artist Agreement.  You shall have the right to cure, on Grantor's behalf, each such breach and/or default of the Artist Agreement by Grantor, but in no event shall you have less than sixty (60) days in which to cure any such breach or default following receipt of notice thereof as provided in the preceding sentence.

9.      During the term of the Agreement, I will exert my best efforts to be billed, advertised and described as your exclusive recording artist.

10.     Any permitted assignment by you of the Agreement shall constitute an assignment of this agreement to such assignee and I hereby consent to any such assignment.  Upon any such assignment you shall have no further obligation to me, other than payment of royalties otherwise due to me with respect to Records sold prior to such assignment.

11.     I agree to indemnify, save and hold you harmless from and against any liability, loss, damage, cost or expense (including reasonable attorneys' fees), paid or incurred by you by reason of any breach by me of the covenants, representations, warranties or grant of rights contained herein or in the Agreement or in the Artist Agreement, and, subject to the provisions of paragraph 13.06 of the Agreement, I agree to reimburse you on demand for any payment made by you at any time after the date hereof with respect to any of the foregoing.  Pending the determination of any claim involving such breach or failure, you may, subject to the provisions of paragraph 13.06 of the Agreement, withhold sums due me in an amount reasonably related to the claim.

- 84 -

Scanned Copy Of Original 04-17-2002 11:48:24

7/02FLAWLESS 0931

12.     You will have the right, throughout the term of the Agreement, to obtain or increase insurance on my life at your sole cost and expense, in such amounts as you determine, in your name and for your sole benefit or otherwise, in your discretion. I will cooperate in such physical examinations without expense to me, supply such information, sign such documents, and otherwise cooperate fully with you, as you may request in connection with any such insurance. I warrant and represent that, to the best of my knowledge, I am in good health and do not suffer from any medical condition which might interfere with the timely performance of my obligations under the Agreement. I will not be deemed in breach of the Agreement by reason of your inability to obtain any such insurance, unless it results from my failure to comply with my obligations under this paragraph.

13.     (a)     I acknowledge that the rights, privileges, benefits and remedies granted to Grantor in the Artist Agreement may be enforced against me directly by you in the name of Grantor or in your own name and on your own behalf in any court of competent jurisdiction, whether or not Grantor is a party to the litigation.

(b)     THIS AGREEMENT IS ENTERED INTO IN THE STATE OF CALIFORNIA AND THE VALIDITY, INTERPRETATION AND LEGAL EFFECT OF THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF CALIFORNIA APPLICABLE TO CONTRACTS TO BE WHOLLY PERFORMED THEREIN. THE PARTIES AGREE THAT ANY ACTION, SUIT OR PROCEEDING BASED UPON ANY MATTER, CLAIM OR CONTROVERSY ARISING HEREUNDER OR RELATING HERETO SHALL BE BROUGHT SOLELY IN THE STATE COURTS OF OR THE FEDERAL COURT IN THE STATE OF CALIFORNIA AND COUNTY OF LOS ANGELES. ANY PROCESS IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY, AMONG OTHER METHODS PERMITTED BY LAW, BE SERVED ON ME BY DELIVERING OR MAILING THE SAME, BY REGISTERED OR CERTIFIED MAIL, ADDRESSED TO ME, AT THE FOLLOWING ADDRESS:

To:     _____          _____
                                 _____
                                 _____
                                 _____
                                 _____

To:     _____          _____
                                 _____
                                 _____
                                 _____
                                 _____

- 85 -

Scanned Copy Of Original 04-17-2002 11:48:24

17/02FLAWLESS 0932

To: _____                    _____
                                        _____
                                        _____
                                        _____
                                        _____

To: _____                    _____
                                        _____
                                        _____
                                        _____
                                        _____

Any such delivery or mail service shall be deemed to have the same force and effect as personal service upon me within the State of California. Nothing contained in this paragraph 13 shall constitute a waiver of any other remedies available to you or preclude you from joining Grantor or me in an action brought by a third party against you in any jurisdiction, although your failure to join Grantor or me in any such action in one instance shall not constitute a waiver of any of your rights with respect thereto, or with respect to any subsequent action brought by a third party against you.

        (c)    You shall not be deemed in default or breach of this inducement agreement or the Agreement unless you are given written notice thereof and same is not cured within sixty (60) days after such notice. I shall not be deemed to be in default or breach of this inducement agreement or the Agreement unless I am given written notice thereof and same is not cured within thirty (30) days after such notice; provided that the foregoing shall not be applicable to any breach which cannot be cured (e.g., breach of a re-recording restriction or a provision of Article 13 of the Agreement), and further provided that nothing contained herein shall prevent you from seeking immediate injunctive relief.

        14.    I acknowledge that my services are of a special, unique and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and that a breach of my obligations under the Agreement or hereunder will cause you irreparable injury and damage, entitling you to seek injunctive and other equitable relief in addition to your other rights and remedies.

        15.    I hereby represent and warrant that (a) I shall be the sole owner of any professional name which I may now or hereafter utilize (with your prior written consent, which shall not be unreasonably withheld) in connection with Phonograph Records; (b)

- 86 -

subject to any rights granted to third parties prior to the date hereof with respect to Recordings recorded by me prior to the date hereof, no other Person shall have the right to use any such name or to permit it to be used in connection with Phonograph Records (other than as specifically provided to the contrary in the Agreement), and (c) I have the authority, and have granted same to Grantor, to use any such name as provided in the Agreement. During the term of the Agreement, I shall not adopt or abandon my professional name without your prior written consent.

16.    (a)    I hereby acknowledge and agree that each Master Recording or other Recording (including Audiovisual Records) which is recorded during the term of the Agreement (or which is otherwise subject thereto) embodying the results and proceeds of my services (each such Recording [whether audio or audiovisual] being herein referred to as a "Master") and each Covered Video (but excluding the musical compositions contained therein) is a work made for hire in that (i) it is prepared within the scope of your and Grantor's employment of me under the Agreement and the Artist Agreement, and/or (ii) it constitutes a work specifically ordered by you and Grantor for use as a contribution to a collective work. I further acknowledge and agree that you are the exclusive owner of all rights (including, without limitation, the exclusive copyrights) throughout the world in and to each such Covered Video and each such Master (but excluding the copyrights of the musical compositions contained therein), including the "sound recording" (as defined in 17 U.S.C. Section 101) fixed therein and the "phonorecord" (as defined in 17 U.S.C. Section 101) itself, as well as all phonorecords manufactured therefrom, and that you have the right to exercise all rights of the copyright proprietor with respect thereto, including, without limitation, to all exclusive rights specified in 17 U.S.C. Section 114(a).

(b)    Notwithstanding the provisions of paragraph 16(a) above, I agree that, to the extent, if any, that I may be deemed an "author" of any Master of Covered Video, I hereby grant and assign to you all rights of any nature whatsoever (including, without limitation, to the exclusive copyrights therein and thereto), throughout the world, in and to such Master or Covered Video, including, without limitation, to the exclusive rights specified in 17 U.S.C. Section 114.

17.    This agreement may not be modified except by an instrument in writing executed by each party hereto (including the Grantor to the extent such modification materially affects the rights or obligations of the Grantor). The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof. If any provision of this inducement agreement or its application is deemed invalid or unenforceable, then the remainder of this inducement agreement shall not be affected thereby. If any provision of this inducement agreement or its application is deemed invalid or unenforceable, then a suitable and equitable provision shall be substituted in order to carry out, so far as may be valid and enforceable, the intent and purpose of the invalid and/or unenforceable provision.

- 87 -

FlawlessExhibitB1 SH:sh/06/15/01

18.    I UNDERSTAND THAT THIS INDUCEMENT AGREEMENT IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH I GRANT TO YOU MY EXCLUSIVE RECORDING SERVICES FOR ALL OF THE WORLD UNTIL SUCH TIME AS GRANTOR AND I HAVE FULFILLED ALL OF THE RESPECTIVE OBLIGATIONS HEREUNDER AND UNDER THE AGREEMENT.    I HEREBY REPRESENT AND WARRANT THAT I HAVE BEEN ADVISED OF MY RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THE ARTIST AGREEMENT AND OF THIS INDUCEMENT AGREEMENT AND THAT I EITHER HAVE RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED MY RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS INDUCEMENT AGREEMENT WITHOUT THE BENEFIT OF INDEPENDENT LEGAL REPRESENTATION.

19.    The foregoing shall bind the undersigned individuals jointly and individually and wherever the first person singular is used it shall be deemed to be the first person plural, as well, to effectuate this intention.

If the foregoing comports with your understanding, please sign below.

Very truly yours,

_____

Social Security Number: _____

ACCEPTED AND AGREED TO:
FLAWLESS RECORDS, LLC

By: _____

CONSENTED AND AGREED TO:

_____,
a _____ corporation

By:
    An Authorized Signatory

- 88 -

Scanned Copy Of Original 04-17-2002 11:48:24

## EXHIBIT C

### Profit Definition

Profits shall be defined as "Record Revenues" less "Record Expenses" and the "Distribution/Services Fee" and shall be determined by us in accordance with generally accepted accounting principles as applied by us with respect to our wholly-owned repertoire.

(a)    "Record Revenues" shall mean the aggregate sum of the following:

(i)    With respect to sales through normal retail channels of phonograph records embodying an Artist's performances and any other releases you furnish to us in the United States, the gross revenues received by us, less all cash discounts, rebates, returns, credits and reserves against anticipated returns and credits;

(ii)    With respect to all other exploitations in the United States of master recordings embodying an Artist's performances and any other releases you furnish to us (i.e., master use licenses, so-called "record club" sales, compilation records distributed by third-party record companies), the gross revenues received by us from that third party licensee from the exploitation by that third party licensee of rights in master recordings embodying such Artist's performances, less all taxes;

(iii)    With respect to net sales through normal retail channels of phonograph records embodying an Artist's performances and any other releases you furnish to us outside of the United States, a royalty equal to twenty-three percent (23%) of the applicable published dealer price without a container charge deduction with proportionate reductions and deductions on all sales and other exploitations for which reduced royalties are payable pursuant to the agreement which governs how we are paid by our foreign affiliates;

(b)    "Record Expenses" shall mean all expenses (excluding our general overhead and payments made pursuant to subparagraph 4(e) of the Flawless Agreement, but including all amounts paid by us for your overhead, including without limitation the Overhead Payments) paid, incurred or accrued by us, whether before or after the date hereof, in connection with the exploitation of phonograph records embodying an Artist's performances and which expenses are not already deducted in determining Record Revenues, including, without limitation:

(i)    All recording costs, including, without limitation, all re-recording, remixing or remastering costs;

C-1

Scanned Copy Of Original 04-17-2002 11:48:24

SH17/02FLAWLESS 0936

    (ii) All production costs and other costs incurred in the production of audiovisual records;

    (iii) All costs of manufacturing phonograph records, which costs shall not exceed the amount we are charged by our distributor in connection therewith;

    (iv) All copyright license fees, mechanical royalties and other fees payable to the copyright proprietors (or their designees) of all Compositions embodied in the Master Recordings embodying any Artist's performances;

    (v) All royalties, advances, monies or liabilities payable to a an Artist or third parties pursuant to the applicable Artist Agreement, the individual producers and all other persons entitled to receive royalties, advances, monies or other liabilities with respect to master recordings embodying the applicable Artist's performances;

    (vi) All royalties, monies or other liabilities made to collective bargaining organizations or trust funds thereof (including, but not limited to, the AFM Special Payments Fund and Music Performance Trust Fund and the AFTRA Pension and Welfare Fund);

    (vii) All sales, use or similar taxes which may be imposed by any taxing jurisdiction in connection with the exploitation of phonograph records; and

    (viii) All amounts paid, incurred or accrued by us with respect to third party costs and the costs of goods in connection with the advertising, marketing, publicity and promotion of phonograph records embodying master recordings of an Artist's performances, including, without limitation, all amounts in respect of so-called artist "tour support," merchandising, artwork, promotional phonograph records and audiovisual records, showcase costs and demonstration recording costs.

    (c) "Distribution/Services Fee" shall mean an amount equal to eighteen percent (18%) of Record Revenues and shall be inclusive of the basic distribution fee which we are subject to under our agreements or policies with our distributors. In addition (i.e., not included in the 18%), are those fees and costs that are charged to us and our Interscope-owned labels, including, without limitation, the costs of refurbishing, blister-packaging, collating, corner-cutting, DJ shipping, supplying point-of-purchase materials to customers, SKU charges and returns charges (a current schedule of such charges is attached as Schedule 1 hereto for reference, and the parties acknowledge such Schedule is subject to change without notice).

FlawlessAmendment2 SH:sh/06/14/01

Scanned Copy of Original 04-17-2002 11:48:24

7/02FLAWLESS 0937

## SCHEDULE 1

(See attached)

FlawlessAmendment2 SH:sh/06/14/01